UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
S&R DEVELOPMENT ESTATES, LLC and "JOHN
DOE" NOS. 1 THROUGH 75,



                                        Plaintiffs,

        - *against* -

STEVEN BASS, EDDIE MAE BARNES, PAUL FEINER,
DIANA JUETTNER and FRANCIS SHEEHAN,
Constituting the Town Board of the Town of Greenburgh,
Westchester County, New York, STEVEN BELASCO,
MALCOLM BAUMGARTNER, EVE BUNTING-SMITH,
NICHOLAS DECICCO, LAWRENCE DOYLE, ROHAN
HARRISON and DANIEL ROSENBLUM, Constituting
the Zoning Board of Appeals of the Town of Greenburgh,
Westchester County, New York, MARK STELLATO,
Commissioner of the Department of Community
Development and Conservation of the Town of Greenburgh,
TOWN OF GREENBURGH and JOHN and JANE DOE,

                                        Defendants.
-------------------------------------------------------------------X

07 Civ. 11112 (WCC)

**AMENDED COMPLAINT**

**ECF CASE**

**JURY TRIAL
DEMANDED**

        Plaintiffs by their attorneys, Bleakley Platt & Schmidt, LLP for their complaint against

the defendants, hereby allege as follows:

A.      **Introduction**

        1.      S&R Development Estates, LLC ("S&R") brings this action to obtain relief for

the concerted actions by defendants that have wrongfully deprived S&R of its constitutionally

protected rights as the owner of a parcel of land in the unincorporated Edgemont section of the

Town of Greenburgh (the "Town"), within the County of Westchester, State of New York.

        2.      As described below in more detail, defendants have conspired to unlawfully

prevent S&R from developing its property (the "Property") as allowed by the Town's zoning

ordinance, and to coerce S&R to either develop the Property to a much lower density than

allowed, or convey the entire property or interests in the property to the Town, to an *alter ego* of

the Town or to favored constituents for substantially less than the just compensation to which

S&R would be entitled were the Town to exercise its power of eminent domain.  In furtherance

of their wrongful efforts to deprive S&R of its rights, defendants have, among other things,

engaged in the following unlawful conduct:

     (a)     Defendants first threatened S&R with the imposition of an unlawful

moratorium against development.  Because S&R refused to accede to defendants'

wrongful demands, defendants proceeded at a break-neck pace toward the precipitous

enactment of this moratorium prohibiting any development, which primarily affected

S&R's Property, and was not accompanied by any meaningful review or consideration of

the Town's comprehensive land use plans or policies that would be necessary to justify

the imposition of a development moratorium.

     (b)     After S&R rejected defendants' final demand, defendants suddenly and

without prior warning abandoned their race to enact a moratorium and, instead, purported

simply to change the Town's official zoning map, without the necessary legislative action

required by law.  Defendants justified this unlawful action on the theory that they

suddenly had realized that, if the town were to locate old documents that the Town had

lost and could not find, those documents would reveal that there was an error that had

been perpetuated on the Town's successive official zoning maps over a period of

approximately 10 years.

Defendants have not engaged in the foregoing conduct on the basis of a good-faith belief that

S&R's proposed development of its property was prohibited by the Town's zoning ordinance,

but rather in a corrupt effort to favor particular constituencies within the Town in an election

year.

3.      By engaging in this wrongful conduct, defendants have violated S&R's rights under the Due Process Clauses of the United States Constitution's Fifth and Fourteenth Amendments, the Equal Protection Clause of the Constitution's Fourteenth Amendment, the Just Compensation Clause of the Constitution's Fifth Amendment and the Fair Housing Act.

4.      S&R seeks monetary damages and declaratory and injunctive relief for these violations of its federal constitutional rights. S&R also seeks relief under several theories of State law, including a judgment that annuls a determination by the Town's Zoning Board of Appeals (the "ZBA") that upheld a determination by the Town's Commissioner of Community Development and Conservation that S&R's Property is located within a low-density R-20 zone rather than in the Town's Central Avenue Mixed Use Impact District (the "CA Zone").

**B.      Jurisdiction and Venue**

5.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4) and 1367(a), 42 U.S.C. §§ 1983 and 3601, *et seq.*, and the Fifth and Fourteenth Amendments to the United States Constitution.

6.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b), because defendants and the real property that is the subject of this action all are located within this judicial district.

**C.      The Parties**

7.      Plaintiff, S&R, is a New York limited liability company with its principal office at 600 Mamaroneck Avenue in the Town of Harrison, County of Westchester, State of New York. S&R's managing members are two brothers, Stephen and Richard Troy, both of whom were raised in Westchester County and Richard Troy resides in Westchester.

8.      Plaintiffs "John Doe" Nos. 1 through 75 are unidentified persons, the names being fictitious but are intended to represent the future residents of the multiple dwellings proposed to be constructed on the Property.

9.      The Town is a New York municipal corporation and a political subdivision of the State of New York, with its principal office at the Greenburgh Town Hall, 177 Hillside Avenue, Greenburgh, New York.  The legislative powers of the Town are vested in the Town Board, which also is known as the Town Council.

10.     Defendant Paul Feiner is the Supervisor of the Town and a Member of the Town Board, and is named as a defendant in his official capacity.  Defendant Feiner's principal office is at the Greenburgh Town Hall

11.     Defendants Steven Bass, Eddie Mae Barnes, Diana Juettner and Francis Sheehan are Members of the Town's Town Board, and are named as defendants in their official capacities.  These defendants' principal offices are at the Greenburgh Town Hall.

12.     Defendant Zoning Board of Appeals of the Town of Greenburgh (the "ZBA") is an agency of the Town that is vested with, among other things, the final power (subject to judicial review) to interpret and apply the Town's zoning ordinance.  The ZBA's principal office is at the Greenburgh Town Hall.

13.     Defendant Mark Stellato is the Commissioner of the Town's Department of Community Development and Conservation, and is named as a defendant in his official capacity.  Defendant Stellato's principal office is at the Greenburgh Town Hall.

14.     John and Jane Doe are unidentified persons, the names being fictitious but are intended to represent those persons and/or entities that have engaged in unlawful conduct solely to deprive S&R of its rights *vis-à-vis* the Property.

D.    **The Property**

15.    The property is a vacant 2.34-acre parcel, situated at 1 Dromore Road (also known as 62 Dromore Road) in Edgemont, an unincorporated area within the Town.  It is identified on the relevant tax map, Tax Map Volume 8, Section 31, Sheet 37B, as Block 1692, Parcels 14A, 70A, 70B and 70C.

16.    The Property is situated in close proximity to Central Avenue, a heavily trafficked primarily commercial thoroughfare.  The Property is adjoined on its west by the Scarsdale Woods Condominiums, a 179-unit multifamily residential complex, and lies on the South side of Dromore Road across from the Nature Center property on the North side of Dromore Road.

17.    S&R acquired the Property on May 24, 2006, and owns it in fee.  The Property was improved with one 3,200-square-foot single-family home and a swimming pool at the time of the acquisition, but it now is vacant and undeveloped.

18.    At the time of the Property's acquisition by S&R, the Official Town of Greenburgh Zoning Map showed that the Property is situated in the CA Zone, which would allow development of the Property with a multifamily residential complex containing at least 82 bedrooms (subject only to deduction for steep slopes).  According to the Greenburgh Town Code, this Official Zoning Map is "the final authority as to the current zoning classification of any land" in the Town.  In particular, section 285-7(A) of the Greenburgh Town Code provides as follows:

> The boundaries of such districts and special building lines are hereby established as shown on the map entitled "Zoning Map, Town of Greenburgh," which map is annexed to and is hereby adopted and declared to be a part of this chapter and is hereinafter referred to as the "Zoning Map." Said Zoning Map may be amended in the same manner as any other part of this chapter. An official copy of said map, indicating the latest amendments, shall be kept up to date in the office of the Building Inspector and in the office of the Commissioner of Community Development and Conservation for the use and benefit of the

> public. Said Official Zoning Map <u>shall be the final authority as
> to the current zoning classification of any land within the
> boundaries</u> of the unincorporated Town of Greenburgh.

(Emphasis added.)

**E.**    **S&R's Pre-Acquisition Due Diligence**

19.     In September 2004, Richard Troy and Stephen Troy (the managing members of

S&R) commenced S&R's due diligence regarding the potential acquisition and development of

the Property.

20.     Initially, S&R examined a copy of the year 2000 version of the Town's official

Greenburgh Zoning Map, which clearly showed the Property to be in the CA Zone.

21.     Subsequently, Richard Troy visited the Greenburgh Public Library and examined

the earlier November 1997 version of the Official Greenburgh Zoning Map, which was publicly

displayed. This map also showed that the Property was situated in the CA Zone. Earlier

versions of the official Greenburgh Zoning Map were not available for examination, but the

Property was designated as zoned CA in the following versions of the Official Town Map: two

separate 1997 maps; the 2000 map; the 2003 map; and the 2006 map. These official maps all

conclusively established that the Property was situated in the CA Zone.

22.     Continuing its due diligence, S&R met with Peter Gaito, a licensed architect

experienced with the Town's zoning ordinance. He reviewed his copy of the Official

Greenburgh Zoning Map, and confirmed to S&R that the Property was in the CA Zone. Mr.

Gaito also informed S&R that, since the Property is in excess of two acres, a permitted use of

the Property would include a multifamily development, four stories in height, with a maximum

density of 35 bedrooms per acre, in accordance with Town Code § 285-29.1(B)(3)(a).

23.    Thereafter, Richard and Stephen Troy and the architect, Mr. Gaito, met with Thomas Madden, the Town's Deputy Commissioner of Community Development and Conservation, at the Greenburgh Town Hall.

24.    At this meeting, Deputy Commissioner Madden confirmed that the Property was zoned CA, and he reviewed with S&R's representatives the substantive zoning restrictions that are applicable in the CA Zone, including open space rules, coverage issues, maximum height, side yards, the requirement for a minimum lot size of 2 acres (after deduction for "steep slopes") and the number of allowable bedrooms (35 per acre).

25.    Deputy Commissioner Madden expressed no concerns with regard to the development's potential impact on the environment, open space, the neighboring Nature Center, or water and sewer capacity.  He stated that there should be no obstacles to S&R's development of a multifamily complex, particularly inasmuch as the Property adjoined the existing 179-unit Scarsdale Woods multifamily complex.

26.    Deputy Commissioner Madden raised no objection, and instead was receptive, to the suggestion by S&R that it would build a new multifamily development of 35 bedrooms per acre (subject only to reduction for steep slopes) on the Property.  He expressed the hope that, to the extent possible, S&R's development would be consistent with the architectural style of the adjacent Scarsdale Woods complex, and suggested that S&R explore the possibility of sharing a driveway with Scarsdale Woods.

27.    In September 2005, S&R hired an appraiser, Howard Gelbtuch, MAI, CRE, FRICS, to render an opinion as to the Property's value.

28.    As a basis for Mr. Gelbtuch's opinion, Gary Spilatro, a licensed architect with extensive zoning experience throughout Westchester County, was engaged to provide independent confirmation, as formally set forth in a letter dated September 6, 2005, that the

Property was in the CA Zone. Before issuing that letter, Mr. Spilatro conducted his own independent investigation, personally visiting the Greenburgh Town Hall and examining the Official Zoning Map on the wall of the office of the Town's Department of Community Development and Conservation, which showed that the Property was in the CA Zone. In addition, on the occasion of that visit, Mr. Spilatro was told emphatically by an employee in the office of the Department of Community Development and Conservation that the "map controls" a particular parcel's zoning designation.

29.     Based upon his own study and Mr. Spilatro's zoning letter, and in the belief that the size of the Property and its location in the CA Zone allowed the Property to be lawfully developed with a multifamily complex containing up to 82 one-bedroom units, Mr. Gelbtuch valued the Property at $10,200,000 as of September 22, 2005.

30.     On May 24, 2006, after the completion of the foregoing due diligence, S&R closed on the acquisition of the Property in good faith and in the reasonable belief that the Property was located in the CA Zone.

**F.     Based on the Property's CA Zoning Designation, S&R Demolished the Existing Single-Family Home and Swimming Pool, and Prepared Development Plans**

31.     After acquiring the Property, S&R assembled a development team for the Property that consisted of – in addition to the previously engaged land use counsel and appraiser – John Meyer Consulting as engineers, John Sullivan of Sullivan Architecture as lead architect, the Munson Company as surveyors, and Galdun Frankel Environmental as environmental consultants.

32.     Sullivan Architecture conducted its own independent review of the applicable zoning. As part of that review, Mr. Sullivan spoke by telephone with John Lucido, the Town's

Building Inspector, who confirmed to Mr. Sullivan by telephone that the Property is in the CA Zone.

33.     On or about October 18, 2006, Sullivan Architecture advised S&R that, in view of the Property's size and CA zoning designation, after a deduction for "steep slopes" that was based on a survey by the Munson Company (which had located the steep slopes, measured them and measured the portion of the Property that is free from steep slopes), a maximum of 75 one-bedroom apartments could be built on the Property.

34.     S&R then proceeded with the demolition of the single-family home and swimming pool that were situated on the Property.  To obtain the necessary demolition permit from the Town, S&R took the following steps:

    a.  First, Munson Company surveyed the Property and provided a new survey and topographical map.

    b.  Second, Galdun Frankel Environmental performed a Phase I environmental review of the Property, which confirmed that the Property contained no wetlands or water courses.

    c.  Third, because the Phase I review indicated that there was asbestos-containing material in the existing home, S&R retained Even Air, Inc., which performed the necessary asbestos remediation, and Testor Environmental Technologies, Inc., which undertook air-monitoring during the asbestos remediation.

    d.  Fourth, Consolidated Edison removed the electrical facilities from the Property.

    e.  Fifth, S&R worked with the Town's Water and Sewer Department to obtain a street-opening permit and then performed a water main disconnect in the street and shut off water service to the Property.

    f.  Sixth, phone and cable services to the Property were disconnected.

    g.  Seventh, Robison Oil pumped out the oil remaining in the above ground oil tanks.

35.    S&R also submitted to the Town a Steep Slopes Survey and Slope Clearance Form, a Wetland/Watercourse Clearance Form and a Phase I Environmental Assessment. The Town approved the Slope Clearance Form and the Wetland/Watercourse Clearance Form.

36.    The Town reviewed and approved S&R's Application for Plan Examination and Demolition Permit, and thereafter, on or about December 1, 2006, issued the necessary demolition permit.

37.    The demolition work was conducted from December 6 through 12, 2006, and resulted in the complete demolition of the previously existing home, the excavation and removal of its foundations, the excavation and removal of the swimming pool, and the filling and re-grading of the Property to provide a completely vacant, clean and level well-located parcel of 2.34 acres ready for the construction of an as-of-right apartment complex with 75 one-bedroom apartments or 37 two-bedroom apartments. On December 15, 2006, the Town issued a certificate of completion of the demolition work.

**G.    The Demolition Triggers Opposition by the Nature Center and the Town Supervisor to Multifamily Development of the Property**

38.    Immediately after the commencement of physical demolition of the existing home on the Property, the Executive Director of the Nature Center, William Lawyer, telephoned one of S&R's attorneys, asked about S&R's proposed development plan, and told him that the Nature Center would oppose any development of the Property containing more than one or two homes.

39.    Mr. Lawyer then contacted Town Supervisor Feiner, who promptly announced his opposition to any development at the Property, stating in a December 10, 2006 web log entry his intention to "[i]nitiate effort to protect Greenburgh Nature Center from possible development [at] 1 Dromore Road," to "[o]btain appraisal of [the] property," and to "[r]each out to state/county/private individuals for assistance in obtaining [the] property."

**H.    S&R's December 19, 2006 Pre-Submission Meeting With
the Town's Department of Planning and Conservation**

40.    On December 19, 2006, Richard and Stephen Troy, S&R's architect (John

Sullivan of Sullivan Architecture), one of its engineers (Bob Roth of John Meyer Consulting)

and one of S&R's attorneys (Janet Giris of DelBello Donnellan Weingarten Tartaglia Wise &

Widerkehr, LLP) participated in a pre-submission meeting at the Greenburgh Town Hall with

Commissioner Stellato and Deputy Commissioner Madden of the Town's Department of

Planning and Conservation.

41.    At that meeting, S&R presented the Commissioner and Deputy Commissioner

with an "as of right" development plan for the Property that would require no variances

inasmuch as the plan satisfied the Town's requirements for development in the CA Zone.

42.    The plan called for a four-story building containing 37 two-bedroom apartments.

The building's footprint would cover only 30% of the site, and thus would include generous

green corridors. The building complied in full with CA Zone's requirements that mandate a

setback of 80 feet in front of the building, 50 feet at the rear and at least 40 feet on either side.

43.    S&R's plan was designed to create the most attractive and environmentally

sensitive structure and landscaping possible for the site. The plan called for S&R to voluntarily

forgo economically advantageous open-air parking despite the fact that the adjoining Scarsdale

Woods Condominium includes open-air parking. Rather than an open-air parking lot for 82 cars

as allowed by the CA zoning requirements, S&R's plan used the entire first floor of the building

for indoor parking for 82 cars. Although this design would increase construction costs and

decrease the rentable or saleable square footage in the building, S&R proposed it so as to

minimize any potential impact on neighboring properties.

44.    At this meeting, neither Commissioner Stellato nor Deputy Commissioner

Madden raised any objections or questions as to the Property's location in the CA Zone, or as to

the development plan's compliance with the Town's zoning ordinance as an "as-of-right" project encompassing 37 two-bedroom units. To the contrary, each of them raised only one minor issue: Commissioner Stellato concluded that the plan required amendment to provide for 5,000 square feet of open space within the building envelope; and Deputy Commissioner Madden expressed concern that "Type I" disturbances of steep slopes of over 20% (which presumably referred to the State Environmental Quality Review Act ("SEQRA"), Environmental Conservation Law § 8-0101, *et seq.*) should be avoided. In addition, Deputy Commissioner Madden observed approvingly that the sewer and water service necessary to service the project already existed in the road bed of Dromore Road.

45.     At the meeting, S&R specifically asked Commissioner Stellato and Deputy Commissioner Madden whether they saw any stumbling blocks to the plan. They mentioned only the possibility of a SEQRA "Type I" disturbance, and the fact that they would prefer more of a "green" building.

46.     At the conclusion of the pre-submission meeting, Commissioner Stellato privately warned the Troys that S&R should be aware of recent public comments by other Town officials in opposition to development of the Property.

47.     Immediately after the meeting, the Troys and S&R's development team by chance met Supervisor Feiner in the hallway of the Town Hall. Supervisor Feiner recognized S&R's attorney, Ms. Giris, and initiated an impromptu hallway conversation with the Troys, Ms. Giris, Mr. Roth and Mr. Sullivan. He suggested that S&R speak to the Nature Center about its planned development. S&R responded to the Supervisor's suggestion by asking him to arrange the meeting and to attend it.

48.     After this impromptu conversation with Supervisor Feiner, the Troys, again by chance, met and were introduced to John Lucido, the Town's Building Inspector, who

12

recognized Ms. Giris and S&R's architect, Mr. Sullivan. Mr. Lucido asked them how S&R's project was going and advised them that the Town would delay S&R's progress toward approval of its development plan for a while, but he also assured them that S&R eventually would obtain the necessary approvals and complete its development.

I.    **The Town's Pursuit of a Moratorium on Development**

49.    Unbeknownst to S&R, by the time of S&R's December 19, 2006 pre-submission meeting, Town officials, the Nature Center and Edgemont community activists already had joined together to devise steps to prevent development of the Property. For example, the Greenburgh Conservation Advisory Council had voted on December 18, 2006 (the day before the pre-submission meeting), to assist the Nature Center in acquiring the Property.

50.    These efforts came to light immediately after the New Year, when the Town and the other defendants suddenly rushed to promulgate a moratorium on development that was intentionally crafted to apply to the Property and virtually no other parcels, that was not accompanied by and was not calculated to lead to the sorts of land use studies that would be necessary to justify a legitimate moratorium, and that only was intended to prevent lawful development of the Property and coerce S&R to convey the Property to the Town, the Nature Center or another *alter ego* of the Town.

51.    On or about January 1, 2007, on the Town's web site, Supervisor Feiner reiterated his prior opposition to development of the Property, stating that his "goals" for 2007 included "[p]resent[ing the] Town Board with options (including acquisition of property/conservation overlay zones/compromise) to protect Greenburgh Nature Center from development that can have a negative impact on wildlife/habitats/eco system," and "[r]each[ing] out to state/county/private individuals to determine if a partnership can be established regarding possible acquisition" of the Property.

52.     On January 4, 2007, Supervisor Feiner stated on his web log that he would ask that a resolution for a public hearing on a development moratorium be placed on the agenda for the Town Board's upcoming January 12, 2007 meeting.

53.     On the next day, *The Scarsdale Inquirer* reported that defendant Steve Bass, a Member of the Town Board, had spoken to Commissioner Stellato in late December, had told him to put the moratorium on the Town Board's agenda in January, and had urged the Nature Center's board to support the moratorium, which the Nature Center's board had agreed to do. On the following day, the Greenburgh Conservation Advisory Council's December 18, 2006 vote was reported in the press.

54.     On January 7, 2007, *The Journal News* published an article that reported on the proposed moratorium, including a statement by Supervisor Feiner that, if S&R wanted too much money for the Property, the Town could try to acquire it through eminent domain.

55.     On January 8, 2007, in a surprising announcement that directly contradicted his statements at S&R's December 19, 2006 pre-submission meeting, Commissioner Stellato submitted to the Town Board a recommendation for a moratorium that was based on a draft prepared by Michelle McNally, the President of the Edgemont Community Council ("ECC"), an influential neighborhood association. Commissioner Stellato and Ms. McNally clearly worked together in concert to devise this recommendation.

56.     A tentative agenda then was set for Greenburgh's Town Board meeting of January 10, 2007, including a proposal that the Town Board consider scheduling a public hearing within the next 30 days on a blanket moratorium against all development in the CA Zone within the next 30 days.

57.     The proceedings of the January 10, 2007 Town Board meeting were recorded on streaming video at the Town's website.  Some pertinent comments made at the meeting were as follows:

    a.     Robert Bernstein, President of the Greenridge Civic Association (a member organization of the ECC) stated that the ECC would do whatever it took to impose the moratorium.  He urged the Town Council to schedule a public hearing on it for January 24, 2007.

    b.     A Nature Center representative immediately followed.  He stated that the Nature Center's board had voted unanimously to support the moratorium.

    c.     Ms. McNally, the President of the ECC, urged the Town Board to place the moratorium on its agenda as soon as possible.  She also stated that she had been "working with Mark" (*i.e.*, Commissioner Stellato), who "has been great."

    d.     Bill Greenawalt, Chairman of the Parks Commission and a former candidate for Town Supervisor, expressed his support for the moratorium, stating that he wanted it on the Town Board's agenda quickly.  He referred to "a serious problem on Central Avenue" and specifically mentioned the Property and negative effects that the moratorium would avoid, but he never identified those purportedly negative effects.

58.     Two days later, on January 12, 2007, a special meeting of the Greenburgh Town Board was held to consider enactment of a local law imposing a 180-day moratorium on the filing, acceptance and approval of all applications for site plan and subdivision approvals in the CA Zone.  There was no discussion of the moratorium's usefulness or purpose.  The Town Board did not have the benefit of any studies by the Town's Planning Commission. Additionally, the moratorium resolution falsely asserted that the moratorium was being imposed pursuant to a comprehensive plan, while in fact there was no plan, comprehensive or otherwise, other than to prevent development of the Property.

59.     On the same day, January 12, 2007, Town officials instructed Mark Stellato, Commissioner of the Town's Department of Community Development and Conservation, to

submit to the Town's Planning Board a new version of the Town's proposed local law imposing a moratorium amended by a private citizen with a false claim that it was actually submitted previously to the Town Board and considered by the Board in its original moratorium legislation.

60.    On January 17, 2007, S&R wrote to the Town Board to provide detailed objections to the proposed moratorium.  Nevertheless, the Town Board's sudden pro-moratorium steam roller generated enormous pressure on S&R to reach a compromise with defendants.

61.    On January 18, 2007, the Troys, their father Stuart Troy and S&R's lead land-use counsel (Mark Weingarten of the DelBello Donnellan law firm) met with Supervisor Feiner, Town Board Member Bass, and several representatives of the Nature Center, including its then President (Michael Sims), a board member who later became the Nature Center's President (Margaret Goldberg), at least one other board member and its Executive Director, Mr. Lawyer. At the meeting, Richard Troy stated that, financially, S&R could not afford a long moratorium (Greenburgh's last moratorium, enacted in 2001, had lasted more than 30 months notwithstanding an initial term of six months announced at the time of its enactment).  In response, the Nature Center's then President, Mr. Sims, stated that the Nature Center supported the moratorium to give it more time to decide what to do with the Property.  Nevertheless, S&R offered the following compromise proposal to dramatically reduce the scope of its development of the Property in the hope of avoiding the pending absolute moratorium:

      a.    There would be no moratorium.

      b.    S&R would donate a substantial portion of Property to the Nature Center in the form of a conservation easement, and claim a tax deduction for the donation.

c.    S&R would grant to the Nature Center an option to purchase the rest of the Property at S&R's cost (*i.e.*, S&R's acquisition price for the Property, plus expenses, with no markup or profit for S&R).

d.    If the Nature Center or the Town did not raise the funds necessary to make the purchase or for any other reason declined to effectuate the purchase, the Nature Center, the Supervisor and the Town would support the development by S&R of ten residential units on the Property.

Ms. Goldberg, the Nature Center board member who subsequently became its President, rejected this proposal, insisting that the moratorium would be enacted and telling S&R to gift the conservation easement to the Nature Center immediately and just trust the Nature Center to raise the necessary funds and purchase the Property.

62.    On January 24, 2007, S&R wrote to the Town Board to express its willingness to reach a compromise, request a meeting with the Town Board's members, and ask for a delay in the enactment of the moratorium.

63.    Later that day, the Town Board conducted its public hearing on the proposed moratorium.  At that meeting:

a.    Commissioner Stellato spoke in favor of the moratorium, indicating that residential development in the CA Zone should be 50% less dense.

b.    Mr. Bernstein of the ECC spoke about schools and multifamily development, stating that there are enough multifamily dwellings in the Town and he did not want increased district enrollment.  He stated that the number of school children in the district was exceeding expectations and expressed concern about the Town's infrastructure, lack of sidewalks and traffic, and the burdens on taxpayers in the Edgemont school district.

c.    The ECC's President, Ms. McNally, spoke about a spike in school enrollment, mentioning the Property in particular, and the fact that S&R wanted to build 37 units.  She also read into the record her own extensive draft of proposed changes to the moratorium resolution, including her preference for a moratorium only as to residential development in the CA Zone.  She stated that she already had drafted a revised moratorium resolution and would give it to Commissioner Stellato.

17

64.     On Saturday, January 27, 2007, the Troys and their father hosted a meeting at S&R's office that was attended by Town Board Members Bass and Sheehan, Mr. Bernstein and Ms. McNally of the ECC, and the Nature Center's President, Mr. Sims. S&R's attorney, Mr. Weingarten, was barred from the meeting at the insistence of defendant Bass, who also insisted that S&R not even inform their attorney of the meeting. Town Board Member Sheehan stated that, if there was any discussion of the meeting with Supervisor Feiner, he would disavow any agreement that was reached. Moreover, S&R was specifically forbidden to relate any discussions that took place at the meeting to Hal Samis, an outspoken commentator on Greenburgh politics.

65.     At this January 27 meeting, the participants reached an agreement in principle that (a) the ECC would create a new park district that would accept a conservation easement over part of the Property, (b) if the to-be-created park district was unable to raise the money to purchase the Property at a price equal to S&R's out-of-pocket costs, the Town and the ECC would support S&R's development of ten residential town homes on the balance of the Property, and (c) the Property would be excluded from the moratorium.

66.     On January 31, 2007, S&R wrote to the Town Planning Board in anticipation of the Planning Board's February 7, 2007 meeting, protesting that, unlike the careful deliberation that had preceded the Town's enactment of a moratorium in 2001, the hasty process that then was under way to enact a moratorium was devoid of any proper basis or analysis.

67.     Simultaneously, by letter dated January 31, 2007, the Westchester County Planning Board questioned the intent underlying the proposed moratorium, because, under the then revised proposal then under consideration, only apartment development along Central Avenue within the Edgemont School District was singled out for a moratorium. The County Planning Board wrote that "[t]he fact that the proposed moratorium singles out multi-family

18

dwellings within the Edgemont School District as the only example of why this proposed moratorium is necessary, raises questions about the moratorium's intent."

68.    At the beginning of February, S&R received from Mr. Bernstein of the ECC a revised draft agreement dated February 2, 2007, which, unlike S&R's draft, provided for S&R's gifting the Property directly to Mr. Bernstein.  After S&R rejected this document, Mr. Bernstein immediately sent S&R a revised agreement that still provided for S&R's gifting the Property directly to him.  S&R rejected Mr. Bernstein's revised agreement.

69.    On February 2, 2007, S&R's application for Site Plan Approval for the Property was formally submitted to the Town's Department of Community Planning and Conservation.

70.    On Saturday, February 3, 2007, the Troys and their father hosted another meeting at S&R's office, which was organized by Town Board Member Bass and attended by Town Board Members Francis Sheehan, Eddie Mae Barnes and Diana Juettner, and by Mr. Bernstein and Ms. McNally of the ECC.  According to defendants Bass and Sheehan, the meeting was intended to allow the other members of the Town Board, defendants Barnes and Juettner, to meet S&R's principals in person, since they soon would be asked to vote on a memorandum of understanding with S&R.  At this meeting, the parties reiterated their agreement that:  (a) S&R would grant a conservation easement on a portion of the Property; (b) S&R would grant an option to the ECC's to-be-created Park District to purchase the Property for a price equal to S&R's actual investment in the Property; (c) the Town would exclude the Property from the proposed moratorium; and (d) the Town and the ECC would support development of the Property with a ten-unit residential development, instead of the contemplated 37-unit development, if the ECC Park District did not exercise its option to purchase the Property.

71.    At this meeting, Robert Bernstein said that he would cause the ECC to purchase the property through a bond offering by an Edgemont Park District that he would create, that

this special district could be created quickly, that a bond issue to fund the park district could be put to a vote in September 2007, that initially he would lease the Property to the Nature Center, and that thereafter he would use the Property as the site for an Edgemont Town Village Hall should Edgemont secede from the Town of Greenburgh and change its status.

72.    At the February 7, 2007 Planning Board meeting, a discussion concerning a temporary moratorium was held. Commissioner Stellato and Deputy Commissioner Madden distributed "hand-outs" and responses to previously-submitted questions. Included in the hand-outs were:

a)    "Comparison of School Districts in the Town of Greenburgh" (ostensibly prepared by Michelle McNally);

b)    "Overall Student Enrollment Percent Increase";

c)    "Standard Multipliers" – how many children live in each apartment in Stone Ridge Manor;

d)    "Residential Demographic Multipliers";

e)    "Town of Greenburgh School District Enrollment, 1998-2006";

f)    "Population Density, 2000"; and

g)    "Number of Potential School-Age Children Among Developable Sites Along Central Avenue" which lists S&R's Property as being within the CA zone.

In addition, two demonstrative poster board exhibits were utilized: (a) Town of Greenburgh – Central Avenue Land Use; and (b) Town of Greenburgh Central Avenue Vacant Properties (which identified S&R's Property as being in the CA Zone).

73.    On February 14, 2007, the Troys, one of their attorneys and two engineers met with Deputy Commissioner Madden regarding the formal submission of S&R's planned development, which called for the development of 37 two-bedroom units on the Property. Again, for the third time in as many meetings with the Town's land use officials, they raised no questions regarding the Property's zoning classification as CA. Deputy Commissioner Madden's comments were directed exclusively to technical details regarding S&R's planned

multi-family development, including the creation of open space, the possibility that steep slope disturbances might require SEQRA review, the possible future commissioning by S&R of a traffic study, the creation of a tree protection program, the possible inclusion in the building of a truck loading dock, the submission of a lighting plan showing Con Edison easements, and the identification of any drainage channels.

74.    On February 14, 2007, the scheduled Town Board meeting at which the moratorium was to be further considered was cancelled due to inclement weather, but S&R again wrote to the Town Board, arguing that the moratorium should not be enacted and asking that the Town Board avoid "surrendering to political pressure and hysteria from certain members of the Edgemont community."

75.    Approximately one week later, Richard Troy received a telephone call from Town Board Member Bass, who told Mr. Troy that he wanted to arrange for a referendum to be placed on the September primary election ballot to approve a bond offering for the to-be-created Edgemont Park District to purchase the Property.  During this conversation, defendant Bass expressed confidence that the bond offering would be approved, and asked Mr. Troy to "trust" him and cause S&R to make a gift of part of the Property immediately.  Mr. Troy declined to accept this proposal.

J.    **The Attack on the Property's Zoning Designation**

76.    On February 26, 2007, defendant Bass sent out a night-time "blast" e-mail to subscribers to the Town's e-mail program, in which he stated that the Property was zoned R-20, not CA.  R-20 is classified as a "One Family Residence District" in the Town Code.  On the same day, defendant Stellato issued a determination in which he stated that the Property is situated in an R-20 zone.

21

77.     Commissioner Stellato thereafter directed Michael Lepre, the Town Engineer, to alter the Town's Official Zoning Map to, among other things, change the zoning designation of the Property from CA to R-20.

78.     No prior notice was published regarding the foregoing alteration of the Town's Official Zoning Map. No public hearing was held prior to this alteration of the Town's Official Zoning Map. No action of the Town Board was taken to authorize this alteration of the Zoning Map.

79.     Commissioner Stellato made no mention in his determination of the numerous public and private meetings at which Town officials had uniformly acknowledged that the Property is in the CA Zone.

80.     Subsequent to Commissioner Stellato's February 26, 2007, determination, no further steps were taken by the Town Board to enact the proposed moratorium.

81.     In an open letter published in July 2007, Supervisor Feiner admitted that the moratorium was directed only at the Property.

82.     A March 2, 2007 article in *The Scarsdale Inquirer*, referring to the CA zoning of the Property, reported that defendant Francis Sheehan purportedly had "caught the mistake last week while tracing the map's evolution over the years." Robert Bernstein of the ECC was quoted in the article as stating that, while he felt that "the town is on solid legal ground in disclaiming reliance on an apparently erroneous zoning map ... the matter is not entirely free from doubt," because the Town Code provides that the Official Zoning Map is "the final authority as to the current zoning classification of any land within the boundaries of the unincorporated Town of Greenburgh," and S&R could argue that the erroneous map was still the official one, and thus, the final authority. Mr. Bernstein also was reported to have stated that

22

more oversight was necessary in the future, and to have admitted that "[t]he ultimate bible is the town's zoning map."

83.     Shortly after this article's publication, defendant Bass telephoned Richard Troy and asked him whether S&R would sell the Property for $2 or $3 million.

**K.     The Proceedings Before the ZBA**

84.     By letter dated March 9, 2007, attorneys for S&R submitted to the Town a request for documents pursuant to the New York Freedom of Information Law, Public Officers Law § 84, *et seq.* ("FOIL"). Among other things, S&R's FOIL request sought all versions of the Town's Official Zoning Map and all legislation relating to the CA Zone. Town Attorney Timothy Lewis, acting as the Town's public information officer, approved S&R's FOIL request on or about March 25, 2007.

85.     In April 2007 S&R timely initiated an appeal to the ZBA from Commissioner Stellato's purported determination that the Property is zoned R-20.

86.     The ZBA established a deadline of July 9, 2007, for the submission by S&R of additional papers in support of its appeal. On that day, S&R submitted an affidavit by Richard Troy in which, among other things, he recounted the numerous meetings and hearings at which Town officials had confirmed that the Property is in the CA Zone, as well as his extensive communications with Town officials and representatives of the Nature Center and the ECC regarding a possible compromise solution entailing the grant of a conservation easement over part of the Property and a sale of the remainder of the Property at a price equal to S&R's actual costs.

87.     Although the Town's public information officer had approved S&R's FOIL request on March 25, 2007, the Town did not make any responsive documents available to S&R

until July 11, 2007, which was two days after the ZBA's deadline for the submission of papers by S&R.

88.     The Town's response to S&R's FOIL request included a computer disc that contained depictions of the Town's Official Zoning Map as of, respectively, September 29, 1932, April 25, 1952, August 6, 1957, June 2000, June 2006 and February 2007 – the last map being the one that reflects the change directed by Commissioner Stellato, the legitimacy and propriety of which S&R disputes. The Town's response did not include any copies of its Official Zoning Map published in the years from 1957 through 1999.

89.     On October 19, 2007, the ZBA voted to sustain Commissioner Stellato's determination that the Property is zoned R-20, with five members of the ZBA voting in favor of denying S&R's appeal and one member dissenting.

90.     On November 9, 2007, the ZBA's written decision was filed in the office of the Town Clerk. This decision contained a two-page statement of findings that essentially held that the then-current version of the Official Zoning Map, which had been changed in February 2007 at Commissioner Stellato's direction, indicated that the Property was zoned R-20, and that S&R had failed to sustain its burden of presenting documentation that established that the Property ever had been zoned CA. The dissenter, Rohan F. Harrison, a lawyer, issued a 19-page opinion in which he concluded that the Town had a legal obligation to preserve the relevant historical zoning maps and documentation but had failed to fulfill that duty and had lost the documentation covering a period of decades, that the ZBA was wrong to place the burden on S&R to produce documentation showing that the Property had been zoned CA when it was undisputed that for many years the Town's Official Zoning Map showed the Property to be zoned CA, that Commissioner Stellato had not changed the Official Zoning Map pursuant to legislative authorization, and that S&R had provided significant evidence of collusive conduct

by Town officials and activists to change the Official Zoning Map to prevent development of the Property and coerce S&R into selling the Property for a bargain price to a purchaser favored by the Town.

**L.    S&R's Notice of Claim**

91.    S&R presented to the Town a timely notice of claim setting forth the nature of its claim, and the time, place and manner in which it had sustained injuries.  The notice of plaintiffs' claim was served within ninety days after this cause of action accrued, and prior to the commencement of this action.  On September 10, 2007, in response to the Town's demand, S&R appeared for an examination under oath to testify to the facts relevant to its claim.

92.    More than 30 days have elapsed since the claim was presented, but the persons having the power to adjust or pay the claim have failed to do so.  S&R has commenced this action within all applicable time limits.

**FIRST CLAIM FOR RELIEF**
**(Due Process Clauses and Just Compensation Clause)**

93.    S&R repeats and realleges the allegations set forth in paragraphs 1 through 92 as fully as if here set forth at length.

94.    S&R has a constitutionally protected property right to develop the Property in accordance with the regulations applicable to the CA Zone, or to receive just compensation for the Property if the Town or any other public agency determines that the Property should be taken from S&R.

95.    Defendants and their agents were acting under color of state law to deprive S&R of those rights.

96.    Defendants' conduct constituted official activity of the Town, as a result of which the Town is liable to S&R for the consequences of defendants' actions.

97.    In the alternative, to the extent, if any, that the Supervisor, the Town Board members and the Nature Center, or any combination of them, acted for their own private interests rather than in furtherance of the Town's interests, then those defendants are individually liable to S&R for the consequences of their actions.

98.    The property rights of S&R that defendants have violated are protected by the Due Process Clauses of the Fifth and Fourteenth Amendments and the Just Compensation Clause of the Fifth Amendment, which applies to the State and its political subdivisions, including the Town, pursuant to the Fourteenth Amendment.

99.    By reason of the foregoing, S&R is entitled pursuant to 42 U.S.C. § 1983 to a judgment against defendants that (a) permanently enjoins them from interfering with the development of the Property in accordance with the zoning regulations applicable in the CA Zone, (b) awards to S&R compensatory damages in an amount to be determined at trial but believed to be in excess of $9 million, and (c) awards S&R such other and further relief as is just and proper, including its attorneys' fees pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF
### (Due Process Clauses)

100.    S&R repeats and realleges the allegations set forth in paragraphs 1 through 99 hereof as fully as if here set forth at length.

101.    At all relevant times, the Town had a duty, both under State law and under the Due Process Clauses of the Fifth and Fourteenth Amendments, to provide reasonable notice to owners of real properties within the Town and to prospective purchasers of such properties within the Town of the zoning regulations applicable to those properties.

102.    At all relevant times commencing when S&R and its principals began to consider the possibility of purchasing the Property, S&R was entitled to reasonable notice from the Town of the zoning regulations applicable to the Property.

26

103.    In the event that it is determined that the correct zoning of the Property is R-20 rather than CA, then, in that event, the Town has failed to provide S&R with the notice to which S&R is entitled under the Due Process Clauses of the Fifth and Fourteenth Amendments.

104.    In that event, too, S&R will have been deprived of a substantial proportion of its investment in the Property without the notice to which it was entitled by due process.

105.    At all times relevant to this claim, the Town and its agents were acting under color of state law.

106.    By reason of the foregoing, S&R is entitled pursuant to 42 U.S.C. § 1983 to a judgment against the Town that awards it compensatory damages for the violation of its constitutionally protected rights and such other relief as is just and proper, including its attorneys' fees under 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF
**(Equal Protection Clause)**

107.    S&R repeats and realleges the allegations set forth in paragraphs 1 through 106 as fully as if here set forth at length.

108.    The actions of the defendants discriminated against S&R in the application of the Town's zoning ordinance and in the application of the moratorium that was under consideration by the Town Board until the designation of the Property's zoning classification was changed from CA to R-20 on the Official Zoning Map.

109.    The actions of the defendants were intentionally designed to treat S&R differently from other property owners within the Town.

110.    The actions of the defendants were taken in bad faith and maliciously in an effort to coerce S&R to sell the Property for less than just compensation.

111.    The actions complained of in this complaint were taken by defendants under color of state law.

112.    Defendants' actions as complained of in this complaint violated S&R's rights under the Equal Protection Clause of the Fourteenth Amendment.

113.    By reason of the foregoing, S&R is entitled pursuant to 42 U.S.C. § 1983 to a judgment against defendants that (a) permanently enjoins them from interfering with the development of the Property in accordance with the zoning regulations applicable in the CA Zone, (b) awards to S&R compensatory damages in an amount to be determined at trial but believed to be in excess of $9 million, and (c) awards S&R such other and further relief as is just and proper, including its attorneys' fees pursuant to 42 U.S.C. § 1988.

## FOURTH CLAIM FOR RELIEF
**(Declaratory Judgment pursuant to 28 U.S.C. § 2201)**

114.    S&R repeats and realleges the allegations set forth in paragraphs 1 through 113 hereof as fully set as if here forth at length.

115.    The official Town of Greenburgh Zoning Map as of the date of the determination by Commissioner Stellato to change the Property's zoning designation was the June 25, 1980 Zoning Map, as duly amended in June 2006 (the "June 2006 Zoning Map").

116.    The June 2006 Zoning Map designates the Property as being located within a CA Zone.

117.    There is a justiciable controversy whether the February 2007 Map relied upon by the ZBA is a valid map in that it was altered by the Town Engineer at the direction of Commissioner Stellato in direct contravention of the Greenburgh Town Code.

118.    By reason of the foregoing, S&R is entitled to a declaration that the Property is zoned as shown on the 2006 Zoning Map – *i.e.*, as CA.

## FIFTH CLAIM FOR RELIEF
### (Judgment Pursuant to CPLR Article 78)

119.    S&R repeats and realleges the allegations set forth in paragraphs 1 through 118 hereof as fully as if here set forth at length.

120.    The decision of the ZBA upholding the determination that the Property is located within an R-20 zone rather than a CA Zone was affected by an error of law in that:

    a.    The ZBA failed to strictly construe the Greenburgh Zoning Ordinance against the municipality and in favor of the Plaintiff;

    b.    The ZBA failed to consider the relevant provisions of the Greenburgh Zoning Ordinance, which provided that the Town's Official Zoning Map is the final authority on a parcel's zoning classification; and

    c.    The ZBA relied on an invalid zoning map, the February 2007 map, rather than the Town's Official Zoning Map, the June 2006 Zoning Map.

121.    The decision of the ZBA upholding Commissioner Stellato's determination that the Property is located within an R-20 zone rather than a CA Zone was arbitrary, capricious and an abuse of discretion in that:

    a.    The ZBA's determination is without a foundation in fact;

    b.    The ZBA's determination is supported by the barest surmise, conjecture and speculation; and

    c.    The ZBA failed to consider the relevant provisions of the Greenburgh Zoning Ordinance, which provided that the Town's Official Zoning Map is the final authority on a parcel's zoning classification.

122.    The decision of the ZBA upholding Commissioner Stellato's determination that the Property is located within an R-20 zone rather than a CA Zone was not supported by substantial evidence in that:

    a.    The ZBA's determination is without a foundation in fact;

    b.    The ZBA's determination is supported by the barest surmise, conjecture and speculation; and

     c.     Plaintiff established that the zoning map relied upon by the ZBA in rendering its decision was illegally altered by the Town Engineer at the direction of the Planning Commissioner.

123.    The ZBA's interpretation of the Greenburgh Zoning Ordinance in upholding Commissioner Stellato's determination that the Property is located within an R-20 zone rather than a CA Zone was irrational in that:

     a.     The ZBA failed to strictly construe the Greenburgh Zoning Ordinance against the municipality and in favor of the Plaintiff;

     b.     The Planning Commissioner relied upon the barest surmise, conjecture and speculation in reaching his Determination; and

     c.     The findings ignore the clear, unambiguous and undisputed provisions of the Greenburgh Zoning Ordinance.

124.    By reason of the foregoing, S&R is entitled to a judgment that annuls the ZBA's determination and determines that the June 2006 iteration of the Town's Official Zoning Map is the official Zoning Map of the Town and that, as a result, the Property is situated in the CA Zone.

## SIXTH CLAIM FOR RELIEF
### (Violation Of The Fair Housing Act)

125.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 124 as fully set forth herein.

126.    S&R's proposed development of multi-family housing on the Property is a permitted use in the CA Zone.

127.    The reasons advanced by the ZBA in its decision to uphold the Determination are false, and are known by the ZBA to be false, without merit and interposed solely to delay and disrupt S&R's ability to effectuate its business plan to provide multi-family housing for John Doe Nos. 1 through 75.

128.   In rendering its decision, defendant ZBA has discriminated against plaintiff S&R in the terms, conditions or privileges of rental of a dwelling, and in the provision of services or facilities in connection with the rental of a dwelling to plaintiffs John Doe Nos. 1 through 75 because of the familial status of plaintiffs John Doe Nos. 1 through 75.

129.   In rendering its decision, defendant ZBA has discriminated against plaintiff "John Doe" Nos. 1 through 75 in that they denied or made unavailable to "John Doe" Nos. 1 through 75 a dwelling to be constructed on the Property because of the familial status of "John Doe" Nos. 1 through 75.

130.   The reasons advanced by defendants Town Board, "John Doe" and "Jane Doe" in their statements and actions in support of adoption of a moratorium are false, and are known by the Town Board to be false, without merit and interposed solely to delay and disrupt S&R's ability to effectuate its business plan to provide multi-family housing for John Doe Nos. 1 through 75.

131.   In publishing statements and taking actions in support of adoption of a moratorium, defendants Town Board and "John and Jane Doe" have discriminated against plaintiff S&R in the terms, conditions or privileges of rental of a dwelling, and in the provision of services or facilities in connection with the rental of a dwelling to plaintiffs John Doe Nos. 1 through 75.

132.   In publishing statements and taking actions in support of adoption of a moratorium, defendants Town Board and "John and Jane Doe" have discriminated against plaintiff "John Doe" Nos. 1 through 75 in that they denied or made unavailable to "John Doe" Nos. 1 through 75 a dwelling to be constructed on the Property because of the familial status of "John Doe" Nos. 1 through 75.

133.    Each of the aforesaid discriminatory acts violate the Fair Housing Act, 42 U.S.C. §3601 et seq.

134.    As a result of the foregoing, plaintiffs have been irreparably damaged and are entitled to (a) a permanent injunction restraining and enjoining the Town, its officers, agencies, boards, commissions and employees from taking any action to situate the Property in any zoning district other than the CA Zone in the Town and (b) an award of monetary damages and attorneys' fees.

**WHEREFORE**, Plaintiffs demand a judgment as follows:

1.    For the First, Second and Third Claims for Relief:

   (a)    money damages of at least $9,000,000, in an amount to be proven at trial, for the loss of use of the Property, from February 26, 2007;

   (b)    attorney's fees pursuant to 42 U.S.C. §1988; and

   (c)    punitive damages in the amount of three million dollars ($3,000,000);

2.    For the Fourth Claim for Relief, a declaratory judgment that (i) the Property is located within a CA Zone as shown on the Town's official Zoning Map, as amended June 2006; and (ii) the Town illegally altered its official Zoning Map.

3.    For the Fifth Claim for Relief, final judgment be made herein pursuant to Article 78 of the CPLR:  (a) reversing, annulling and setting aside the decision of the Zoning Board of Appeals of the Town of Greenburgh, filed in the Town Clerk's office on November 9, 2007, which upheld the determination that the Property is located within an R-20 zone rather than a CA Zone and (b) awarding plaintiff the costs and disbursements of this proceeding;

4.    For the Sixth Claim for Relief, a permanent injunction restraining and enjoining the Town, its officers, agencies, boards, commissions and employees from taking

32

any action to situate the Property in any zoning district other than the CA Zone in the Town.

5.    For the First through Sixth Claims for Relief, such other and further relief that the Court deems just and proper, including statutory interest, costs and disbursements, and reasonable attorneys fees.

## JURY DEMAND

Plaintiffs demand a jury trial for all claims stated herein.

Dated:  White Plains, New York
         December 18, 2007

BLEAKLEY PLATT & SCHMIDT, LLP

By: _____
      John A. Risi (JR-6475)
      *Attorneys for Plaintiff*
      One North Lexington Avenue
      P.O. Box 5056
      White Plains, NY 10602-5056