UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
S&R DEVELOPMENT ESTATES, LLC and "JOHN
DOE" NOS. 1 THROUGH 75,

        Plaintiffs,

    - against -

STEVEN BASS, EDDIE MAE BARNES, PAUL
FEINER, DIANA JUETTNER and FRANCIS
SHEEHAN, Constituting the Town Board of the Town of
Greenburgh, Westchester County, New York, STEVEN
BELASCO, MALCOLM BAUMGARTNER, EVE
BUNTING-SMITH, NICHOLAS DECICCO,
LAWRENCE DOYLE, ROHAN HARRISON and
DANIEL ROSENBLUM, Constituting the Zoning Board
of Appeals of the Town of Greenburgh, Westchester
County, New York, MARK STELLATO, Commissioner
of the Department of Community Development and
Conservation of the Town of Greenburgh, TOWN OF
GREENBURGH and JOHN and JANE DOE,

        Defendants.

-----------------------------------------------------------------X

**DECLARATION OF THOMAS MADDEN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

07 Civ. 11112(WCC)(GAY)
ECF CASE

**THOMAS MADDEN** declares as follows:

1.    I am the Commissioner for the Town of Greenburgh's Department of Community Development and Conservation ("DCDC").

2.    This declaration is submitted in support of Defendants' motion to dismiss plaintiffs' Amended Complaint.

3.    I am fully familiar with the Town of Greenburgh's zoning ordinance. The DCDC also maintains copies of the Town's Official Zoning Maps.

4.    Attached are the following sections of the Greenburgh Town Code ("Town Code")

referenced in Defendants' supporting memorandum of law:

**Exhibit A** - Town Code § 285-7.

**Exhibit B** - Town Code § 285-10.

**Exhibit C** - Town Code § 285-12.

**Exhibit D** - Town Code § 285-29.1.

**Exhibit E** - Town Code § 285-48.

**Exhibit F** - Town Code § 285-50 to § 285-64.

**Exhibit G** - Town Code Chapter 520.

5.      Attached are the following Town of Greenburgh Official Zoning Maps referenced in Defendants' supporting memorandum of law:

**Exhibit H** - As adopted on June 25, 1980.

**Exhibit I** - As revised in January 1984.

**Exhibit J** - As revised in July 1987.

**Exhibit K** - As revised in January 1991.

**Exhibit L** - As revised July 1991.

**Exhibit M** - As revised June 2006.

**Exhibit N** - As revised in February 2007.

6.      The property in the Town of Greenburgh owned by plaintiff S&R Development Estates, LLC and located at 1 Dromore Road (also sometimes referred to as 62 Dromore Road) is identified with an arrow on the June 25, 1980 Official Map. (Exhibit H).

7.      I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on the 28
day of February 2008.

Thomas Madden

# Exhibit A

| | |
|---|---|
| Central Avenue Mixed-Use Impact District | CA |
| Hartsdale Center District | HC |
| Close Business District | CB |
| Intermediate Business | IB |
| Light Industrial District | LI |
| General Industrial District | GI |
| Nonresidential Planned Development District | PD |
| Urban Renewal District | UR |

## § 285-7. Zoning Map; interpretation of district boundaries.

A. Zoning Map. The boundaries of such districts and special building lines are hereby established as shown on the map entitled "Zoning Map, Town of Greenburgh," which map is annexed to and is hereby adopted and declared to be a part of this chapter and is hereinafter referred to as the "Zoning Map." Said Zoning Map may be amended in the same manner as any other part of this chapter. An official copy of said map, indicating the latest amendments, shall be kept up to date in the office of the Building Inspector and in the office of the Commissioner of Community Development and Conservation for the use and benefit of the public. Said Official Zoning Map shall be the final authority as to the current zoning classification of any land within the boundaries of the unincorporated Town of Greenburgh.

B. Boundaries.

(1) Except where referenced to a street line or by distance in feet therefrom, the district lines shown on said Zoning Map are intended to follow lot lines or the center lines of streets, railroads, streams or aqueducts or the boundaries of the Town, and, where any such district abuts upon a river, the boundary lines thereof shall be deemed to extend outward to the boundary of the Town in such river. In the case of unsubdivided land or where a district boundary divides a parcel or lot, the location of such boundary, if not indicated by dimensions shown upon such Zoning Map, shall be determined by the use of the scale appearing thereon.

(2) In all cases where a district boundary divides a lot in one ownership on the date of the enactment of this chapter and more than 50% of the area of such lot lies in the less restrictive district, the regulations prescribed by this chapter for the less restrictive district may be extended by the Zoning Board of Appeals to such portion of the more restrictive portion of said lot which lies within 30 feet of such district boundary. For purposes of this section, the more restrictive district shall be deemed that district subject to regulations which prohibit the use intended to be made of said lot or which require higher standards with respect to density, coverage, yards, screening, landscaping, lighting, parking, loading and similar requirements.

(3) In all cases where a district boundary line is located not farther than 15 feet away from a lot line of record, such boundary line shall be construed to coincide with such lot line.

(4) In all other cases where dimensions are not shown on the Map, the location of boundaries shown on the Map shall be determined by the Building Inspector by application of a scale thereto.

(5) Where natural or man-made features existing on the ground are at variance with those shown on the Zoning Map or in other circumstances not covered in the subsections above, the district boundaries shall be interpreted by the Zoning Board of Appeals.

## § 285-8. Schedule Controlling Land and Buildings.

To facilitate public understanding of this chapter and for the better administration thereof, the regulations establishing the permitted uses of land and buildings; the limitations on the size of lots, percent of coverage of land by height and maximum size of buildings; required open spaces and all other requirements for each of the districts established by Article III of this chapter are set forth in the schedule designated as "Schedule Controlling Land and Buildings," which is annexed hereto. Such schedule is hereby adopted and declared to be part of this chapter, is hereinafter referred to as the "schedule" and may be amended in the same manner as any other part of this chapter. Editor's Note: Said schedule is on file in the Town offices.

# Exhibit B

50% of the underlying zone requirement.

(5) Disturbance of natural areas. No natural areas or features shall be disturbed unless so indicated on the approved plan for the site. Any areas disturbed, for construction purposes, shall comply with all provisions of applicable state, federal or local ordinances.

(6) Landscape restoration.

    (a) A landscape restoration plan shall be submitted indicating plantings for all disturbed areas of the property. The plan shall graphically show all proposed plants and shall indicate, in chart form, common and botanical names, sizes at planting time and at maturity, root condition and quantities. The landscape plan shall be prepared by a landscape architect licensed in the State of New York.

    (b) Preference will be given to native plants in all planting plans, with a mixture of trees, shrubs and herbaceous material. Major trees shall be a minimum of two to 2 1/2 inches in caliper, 16 to 18 feet in height. Minor trees shall be a minimum of 1 1/2 to two inches in caliper, eight to 10 feet in height. Shrubs with a mature size of five feet or greater shall be 3 1/2 to four feet in height at planting. All other shrubs shall be a minimum of 1 1/2 to two feet in size at planting. All planting beds must be clearly marked on plans and must be mulched with two inches of seasoned hardwood chips or shredded hardwood mulch.

    (c) The planting plan shall indicate who is responsible for replacing and maintaining plant material. All plants must be replaced if dead or dying with the same or similar species within 120 days. Planted areas must be properly maintained, including weeded, trimmed, pruned and treated as necessary for diseases. All mulched areas shall be maintained with required depth of mulch.

D. Application procedure.

(1) Upon petition to the Town Board by an applicant, recommendation to the Town Board by the Planning Board or the CAC, or by the Town Board's own initiative, the Town Board shall consider a rezoning of subject property to include an Overlay Conservation District Zone.

(2) All provisions of Town Code § 285-64, Amendment procedure, shall apply to any Conservation District rezoning.

(3) The Town Board may place specific conditions on a rezone, including but not limited to location and extent of natural features to be conserved, guidelines for protecting natural features during and after construction, and specific access, layout or other design features intended to foster the conservation criteria, intent and objectives of this section.

(4) Upon rezoning any parcel to a Conservation District, said district shall continue in full force and effect in perpetuity or until the Town Board takes action to remove the Conservation District Zone in accordance with § 285-64 of the Town Code.

(5) Subsequent to or in conjunction with a rezoning to a Conservation District, the applicant shall be responsible for obtaining any and all necessary site plan, subdivision, special permits and/or variances required for development per the Greenburgh Town Code.

## § 285-10. R-40 One-Family Residence District.

A. Permitted uses. No building or premises shall be used and no building shall be erected, altered or added to unless otherwise provided in this chapter, except for the following uses:

(1) Principal uses.

    (a) One-family detached dwellings not to exceed one dwelling per lot.

    (b) Public parks, playgrounds or similar recreational areas, owned or operated by a governmental authority. No building or area designed for recreation shall be located nearer than 100 feet to any street line or lot line.

    (c) Firehouses, police stations or other public safety uses owned or operated by the Town of Greenburgh, Westchester County, or by any other governmental authority. No building shall be located nearer than 100 feet to any street line or lot line.

(d) Other municipal buildings or uses operated by the Town of Greenburgh. No building shall be located nearer than 40 feet to any street line. No building shall be located nearer than 100 feet to any lot line of adjacent property on which adjacent property there is an existing dwelling unit of any kind. No building shall be located nearer than 100 feet to any lot line of adjacent vacant property if such adjacent vacant property is located within a residential district as defined in this chapter. No building or structure shall be erected without adequate landscaping and screening being installed to the satisfaction of the Town Board. **[Amended 5-14-1991 by L.L. No. 20-1991]**

(e) Places of religious worship, including part-time religious schools and parish houses, convents, monasteries, rectories or parsonages, in each case subject to the following:

[1] The minimum lot area shall be two acres.

[2] No building shall be nearer than 100 feet to any street line or lot line.

(f) Regularly organized elementary or secondary schools having a curriculum approved by the Board of Regents of the State of New York, subject to the following;

[1] The minimum lot size shall be five acres.

[2] No building shall be nearer than 100 feet to any street line or lot line.

[3] Sleep-in or boarding facilities shall not be permitted, except as provided for in § 285-10A(2)(d) of this chapter.

(g) Existing railroad-related uses.

(2) Special permit uses.

(a) Private clubs or social clubs operated by nonprofit membership corporations exclusively for members and their guests, including ice-skating, tennis, swimming and similar facilities, subject to the following:

[1] The minimum lot size shall be five acres.

[2] No building and no area designated for recreation shall be located nearer than 200 feet to any street or lot line, except that, where the adjacent properties have not been substantially developed for residential purposes and are not reasonably susceptible to future residential development, courts for tennis, badminton, lawn bowling and similar recreational uses, which are unilluminated and designed for daylight use only and have no facilities for spectators, may be located less than 200 feet from any lot line or street line, but in no event less than 25 feet therefrom. **[Amended 7-8-1987 by L.L. No. 3-1987]**

[3] The State and County Departments of Health shall certify that said clubs are in compliance with all respective codes and regulations for which they have jurisdiction.

(b) (Reserved) Editor's Note: Former Subsection A(2)(b), regarding convalescent homes, rest homes, nursing homes and homes for the aged, was repealed 10-14-1992 by L.L. No. 6-1992.

(c) (Reserved) Editor's Note: Former Subsection A(2)(c), regarding hospitals, was repealed 10-14-1992 by L.L. No. 6-1992.

(d) Private, religious or sectarian schools accredited by the New York State Board of Regents, providing sleeping quarters, subject to the following:

[1] Minimum lot area shall be 25 acres.

[2] It shall accommodate not more than 300 students on a plot of 25 acres and not more than 10 additional students per acre in excess of 25 acres.

[3] If exempt from real estate taxes, it shall not provide sleeping quarters for more than one resident family in addition to boarding students, resident teachers and maintenance employees.

[4] No building or recreation area in connection with such private school shall be within 200 feet of any lot line or street line.

(e) Privately operated nursery schools, licensed or authorized by the Department of Education of the State of New York, subject to the following:

    [1]  The minimum lot size shall be two acres.

    [2]  An appropriately enclosed outdoor play area shall be provided, but said play area shall not be located nearer than 75 feet to any street line or lot line.

(f)  (Reserved) Editor's Note: Former § 285-10A(2)(f), regarding day-care centers, was repealed 10-8-1997 by L.L. No. 10-1997. See now § 280-10A(4)(e).

(g)  Roomers and boarders, provided that the following criteria are met: **[Amended 1-22-1986]**

    [1]  Roomers and boarders shall only be permitted in owner-occupied detached single-family dwellings.

    [2]  Not more than two roomers and/or boarders shall be permitted per dwelling unit.

    [3]  The resultant density for the entirety of any dwelling unit containing roomers and/or boarders shall not exceed two persons per separate bedroom.

    [4]  The rented quarters provided for roomers and/or boarders shall not be provided with separate cooking facilities, including but not limited to stoves, ovens and refrigerators.

    [5]  The rented quarters provided for roomers and/or boarders shall not be advertised on the premises.

    [6]  An off-street parking space shall be provided for each roomer and/or boarder in addition to the parking spaces otherwise required pursuant to this chapter.

    [7]  In the performance of his duties, the Building Inspector and his duly authorized representatives shall have the right, during daylight hours, to enter and inspect any building, structure and land for which a special permit has been issued. Unreasonable refusal of a property owner or resident to allow the Building Inspector to enter to make an inspection shall be grounds for revocation of the special permit by the Zoning Board of Appeals, after written notice is mailed to the special permit holder by registered or certified mail and a hearing is held.

    [8]  In addition to the normal inspections made from time to time by the Building Inspector, the Building Inspector shall make a physical inspection of the premises at least once every three years while the special permit is in effect to ensure compliance with the special permit requirements and any special conditions set by the Zoning Board of Appeals. The Building Inspector shall submit a written report to the Zoning Board of Appeals detailing the results of the inspection.

    [9]  Failure to adhere to the requirements of the special permit, or any special conditions, shall result in the immediate expiration of the special permit.

(h)  Commercial riding establishments, including stables and other accessory uses, subject to the following:

    [1]  The minimum lot size shall be 10 acres.

    [2]  No building shall be nearer than 200 feet to any street or lot line.

    [3]  A maximum of one horse per acre shall be kept in such establishment, excluding horses under the age of one year.

    [4]  All animal feed shall be stored in rodentproof facilities.

    [5]  No storage of manure or other odor- or dust-producing substance shall be permitted within 200 feet of a street, property line, watercourse or wetlands area.

(i)  Private seasonal camps, including swimming, tennis and other recreational facilities, subject to the following:

    [1]  The minimum lot size shall be 15 acres.

    [2]  No building and no area designated for recreation shall be located nearer than 200 feet from any street or lot line, except that, where the adjacent properties have not been substantially developed for residential purposes and are not reasonably susceptible to

future residential development, courts for tennis, badminton, lawn bowling and similar recreational uses, which are unilluminated and designed for daylight use only and have no facilities for spectators, may be located less than 200 feet from any lot line or street line, but in no event less than 25 feet therefrom. **[Amended 7-8-1987 by L.L. No. 3-1987]**

    [3] The State and County Departments of Health shall certify that said camps are in compliance with all respective codes and regulations to which they have jurisdiction.

(3) Accessory uses.

  (a) Off-street parking of passenger vehicles subject to conditions set forth in § 285-38 of this chapter. **[Amended 8-13-1996 by L.L. No. 7-1996; 4-29-1997 by L.L. No. 6-1997]**

  (b) Off-street parking of not more than one recreational vehicle and one boat, excluding the parking of such vehicles in private garages, subject to conditions set forth in § 285-36 of this chapter.

  (c) Professional offices, subject to conditions set forth in § 285-36 of this chapter.

  (d) Customary home occupations, subject to conditions set forth in § 285-36 of this chapter.

  (e) Private swimming pools and tennis courts, subject to the conditions set forth in § 285-36 of this chapter.

  (f) Domestic gardens, including the raising of field, fruit and garden crops.

  (g) On a lot in excess of 10,000 square feet, a noncommercial greenhouse for resident use only.

  (h) On a lot containing a farm, the keeping of one horse or one cow per acre and a reasonable number of other farm animals, but excluding pigs, bees and fowl.

  (i) The keeping of dogs and cats as household pets, provided that the total number of such pets above the age of six months shall not exceed three.

  (j) Private garages containing space for not more than one motor vehicle for each 5,000 square feet of lot area, except that garage space for two such motor vehicles shall be permitted on any lot. Farms under cultivation shall not contain more than one commercial motor vehicle belonging to the owner or lessee of such farm and shall be kept in a fully enclosed structure. Such accessory private garage may be within, under, directly connected to or separated from the principal building to which it is accessory and shall be located in a required front yard.

  (k) Signs, subject to the applicable provisions of the Sign and Illumination Law of the Town of Greenburgh. Editor's Note: See Ch. 240, Sign and Illumination Law.

  (l) Other accessory buildings or structures, such as playhouses, cabanas, trash containers, doghouses and outdoor fireplaces, provided that said uses shall be incidental to the principal uses, and further provided that said uses shall not include any activity conducted as a business or residence. All accessory buildings shall be maintained in good condition and shall be roofed and sided with conventional wood, metal, vinyl or other composite materials. **[Amended 12-20-1994 by L.L. No. 12-1994]**

  (m) Antennas, subject to the conditions set forth in § 285-37 of this chapter. **[Added 11-14-1984; amended 8-13-1996 by L.L. No. 7-1996; 4-29-1997 by L.L. No. 6-1997]**

(4) Uses under special permit by Town Board.

  (a) Agency group homes. In accordance with the purposes of this chapter as set forth in Article I hereof and in furtherance of the policy of the State of New York to deinstitutionalize those persons who cannot be cared for in their natural homes by placing them in small, dispersed group homes which are designed to give an outwardly similar appearance to other one-family dwellings, the following regulations shall apply:

    [1] Said home shall be operated or sponsored by a public social service agency or nonprofit agency authorized by the New York State Department of Social Services.

    [2] Said home shall have a maximum occupancy of 14 persons, excluding full-time sleep-in householder(s).

[3]  Said home shall be set up in size, appearance and structure to bear the general character of a family unit in a relatively permanent household. As such it shall not permit transients or transient living, nor shall it be established in an institutional-type arrangement.

[4]  For purposes of furthering the state's dispersal and deinstitutionalization policy, to prevent the undue concentration of agency group homes in any one area, and to preserve the social as well as the physical character of one-family residential neighborhoods, no agency group home shall be established if any portion of the lot in which said facility is situated is within 2,000 feet of any portion of any other lot on which another group home is situated.

[5]  Said home shall conform to and shall be maintained in accordance with the overall character and appearance of the surrounding neighborhood. No sign that advertises the use or occupancy of said home shall be erected.

[6]  Said home shall be provided with an outdoor recreation area suitably enclosed with a fence or hedge. Said area shall be a minimum of 50 square feet per each occupant of the group home and shall not be located nearer than 75 feet to any lot line or street line.

[7]  Any applicant for a special permit for an agency group home shall submit the following information to the Town Board:

[a]  The governmental authorization to operate said facility.

[b]  A complete statement of the proposed number, age and permanency of residence of the persons to be cared for and the number and qualifications of both resident and nonresident adult supervisory personnel.

[c]  A vicinity map indicating the location of the proposed facility in relation to other existing agency group homes or other similar types of care facilities within a radius of one mile of the subject site.

[8]  The procedure for the granting of a special permit by the Town Board shall follow § 285-25A(4)(h).

[9]  Any change in the nature, size or type of the operation of any approved group home shall be subject to a complete new application for a special permit in accordance with the same standards and procedures as required for the original application.

[10]  In the performance of his duties, the Building Inspector and his duly authorized representatives shall have the right, during daylight hours, to enter and inspect any building, structure and land for which a special permit has been issued. Unreasonable refusal of a property owner or resident to allow the Building Inspector to enter to make an inspection shall be grounds for revocation of the special permit by the Town Board, after written notice is mailed to the special permit holder by registered or certified mail and a hearing is held. **[Added 10-14-1992 by L.L. No. 6-1992]**

[11]  In addition to the normal inspections made from time to time by the Building Inspector, the Building Inspector shall make a physical inspection of the premises at least once every three years while the special permit is in effect to ensure compliance with the special permit requirements and any special conditions set by the Town Board. The Building Inspector shall submit a written report to the Town Board detailing the results of the inspection. **[Added 10-14-1992 by L.L. No. 6-1992]**

[12]  Failure to adhere to the requirements of the special permit or any special conditions shall result in the immediate revocation of the special permit. **[Added 10-14-1992 by L.L. No. 6-1992]**

(b)  Public utility structures. Public utility structures and utility rights-of-way, excluding utility business offices, garages or storage yards, and electric substations, when said facilities are needed to serve the Town or the immediate neighborhood, subject to a determination by the Town Board that no other reasonable location in this district or in a less restrictive district can be utilized for the proposed facility and further subject to such conditions as the Town Board may deem appropriate for the protection of adjoining uses and of the character of the given district. However, antennas which comply with the conditions set forth in § 285-37 of this chapter shall be

permitted pursuant to the provisions of that section. **[Amended 8-13-1996 by L.L. No. 7-1996; 4-29-1997 by L.L. No. 6-1997]**

(c) Convalescent homes, rest homes, nursing homes or homes for the aged approved, licensed or authorized by the Department of Health of the State of New York as residential health care facilities, subject to the following: **[Added 10-14-1992 by L.L. No. 6-1992]**

    [1] The minimum lot size shall be 10 acres.

    [2] The number of patient beds provided shall not exceed eight beds per acre.

    [3] No building or parking area shall be located nearer than 200 feet to any street or lot line.

    [4] The maximum height of all buildings shall not exceed two stories and shall not exceed 25 feet.

    [5] The maximum FAR shall not exceed 0.10.

    [6] The maximum coverage of principal buildings shall not exceed 10%.

    [7] The maximum coverage of accessory buildings shall not exceed 1%.

    [8] The maximum coverage of impervious surfaces shall not exceed 20%.

    [9] The maximum length of any building shall not exceed 300 feet.

    [10] A minimum distance of 50 feet shall be provided between all buildings, except that one-story enclosed hallways at grade or below ground may be permitted to connect buildings.

    [11] If independent living facilities are provided on the same lot or on an adjoining lot in conjunction with a residential health care facility, the number of dwelling units permitted as independent living facilities shall be twice the amount otherwise permitted, except that the gross floor area of each individual dwelling unit shall not exceed 1,000 square feet. The buffer area of a planned unit development containing independent living facilities may extend around an adjacent residential health care facility rather than between the independent living facility lot and the residential health care facility lot, so as to provide for a combined PUD/residential health care facility buffer. The density calculation to determine eligibility for a planned unit development shall include the additional dwelling units obtained pursuant to this subsection. **[Amended 9-8-1994 by L.L. No. 7-1994]**

(d) Hospitals authorized by the Department of Health of the State of New York, excluding hospitals with facilities for correctional purposes, subject to the following: **[Added 10-14-1992 by L.L. No. 6-1992]**

    [1] The minimum lot size shall be 10 acres.

    [2] No building or parking area shall be located nearer than 200 feet to any street or lot line.

    [3] The number of patient beds provided shall not exceed four beds per acre.

    [4] The maximum height of all buildings shall not exceed two stories and shall not exceed 25 feet.

    [5] The maximum FAR shall not exceed 0.07.

    [6] The maximum coverage of principal buildings shall not exceed 7%.

    [7] The maximum coverage of accessory buildings shall not exceed 1%.

    [8] The maximum coverage of impervious surfaces shall not exceed 20%.

    [9] The maximum length of all buildings shall not exceed 300 feet per building.

    [10] A minimum distance of 50 feet shall be provided between all buildings.

(e) Day-care centers, subject to the following: **[Added 10-8-1997 by L.L. No. 10-1997]**

    [1] The minimum lot size shall be two acres.

    [2] An appropriately enclosed outdoor activity area shall be provided, which area shall not be located nearer than 75 feet to any street or lot line.

B. Lot and bulk requirements shall be as follows:

    (1) Minimum lot area: 40,000 square feet, unless otherwise specified.

    (2) Minimum lot width: 150 feet, unless otherwise specified.

    (3) Maximum coverage:

        (a) Principal building: 14%.

        (b) Accessory building(s): 3.5%.

        (c) All buildings: 17.5%.

        (d) Impervious surfaces: 21.75%. **[Added 7-8-1987 by L.L. No. 3-1987]**

    (4) Minimum yards, unless otherwise specified:

        (a) Front: 40 feet.

        (b) One side: 25 feet. **[Amended 6-11-2003 by L.L. No. 5-2003]**

        (c) Two sides: 50 feet. **[Amended 6-11-2003 by L.L. No. 5-2003]**

        (d) Rear: 36 feet.

        (e) All yards must comply with § 285-39 of this chapter.

    (5) Minimum distance from detached accessory buildings or off-street parking areas to:

        (a) Principal building: 10 feet (detached accessory building only).

        (b) Side lot line: 20 feet.

        (c) Rear lot line: 20 feet.

    (6) Maximum height: 2 1/2 stories, not to exceed 25 feet. **[Amended 7-8-1987 by L.L. No. 3-1987]**

### § 285-11. R-30 One-Family Residence District.

A. Permitted uses. No building or premises shall be used and no building shall be erected, altered or added to unless otherwise provided in this chapter, except for the following uses:

    (1) Principal uses. All uses permitted in the R-40 District as specified in § 285-10A(1) of this chapter.

    (2) Special permit uses. All uses permitted in the R-40 District as specified in § 285-10A(2) of this chapter.

    (3) Accessory uses. All uses permitted in the R-40 District as specified in § 285-10A(3) of this chapter.

    (4) Uses under special permit by Town Board. All uses permitted in the R-40 District as specified in § 285-10A(4) of this chapter.

B. Lot and bulk requirements shall be as follows:

    (1) Minimum lot area: 30,000 square feet, unless otherwise specified.

    (2) Minimum lot width: 135 feet, unless otherwise specified.

    (3) Maximum coverage:

        (a) Principal building: 16%.

        (b) Accessory building(s): 4%.

        (c) All buildings: 20%.

        (d) Impervious surfaces: 25%. **[Added 7-8-1987 by L.L. No. 3-1987]**

    (4) Minimum yards, unless otherwise specified:

        (a) Front: 35 feet.

        (b) One side: 20 feet. **[Amended 6-11-2003 by L.L. No. 5-2003]**

        (c) Two sides: 45 feet. **[Amended 6-11-2003 by L.L. No. 5-2003]**

# Exhibit C

    (d) Rear: 34 feet.

    (e) All yards must comply with § 285-39 of this chapter.

  (5) Minimum distance from detached accessory buildings or off-street parking areas to:

    (a) Principal building: 10 feet (detached accessory building only).

    (b) Side lot line: 18 feet.

    (c) Rear lot line: 18 feet.

  (6) Maximum height: 2 1/2 stories, not to exceed 25 feet. **[Amended 7-8-1987 by L.L. No. 3-1987]**

### § 285-12. R-20 One-Family Residence District.

A. Permitted uses. No building or premises shall be used and no building shall be erected, altered or added to unless otherwise provided in this chapter, except for the following uses:

  (1) Principal uses. All uses permitted in the R-40 District as specified in § 285-10A(1) of this chapter.

  (2) Special permit uses. All uses permitted in the R-40 District as specified in § 285-10A(2) of this chapter.

  (3) Accessory uses. All uses permitted in the R-40 District as specified in § 285-10A(3) of this chapter.

  (4) Uses under special permit by Town Board. All uses permitted in the R-40 District as specified in § 285-10A(4) of this chapter.

B. Lot and bulk requirements shall be as follows:

  (1) Minimum lot area: 20,000 square feet, unless otherwise specified.

  (2) Minimum lot width: 120 feet, unless otherwise specified.

  (3) Maximum coverage:

    (a) Principal building: 18%.

    (b) Accessory building(s): 4.5%.

    (c) All buildings: 22.5%.

    (d) Impervious surfaces: 29%. **[Added 7-8-1987 by L.L. No. 3-1987]**

  (4) Minimum yards, unless otherwise specified:

    (a) Front: 30 feet.

    (b) One side: 18 feet. **[Amended 6-11-2003 by L.L. No. 5-2003]**

    (c) Two sides: 40 feet. **[Amended 6-11-2003 by L.L. No. 5-2003]**

    (d) Rear: 32 feet.

    (e) All yards must comply with § 285-39 of this chapter.

  (5) Minimum distance from detached accessory buildings or off-street parking areas to:

    (a) Principal building: 10 feet (detached accessory building only).

    (b) Side lot line: 16 feet.

    (c) Rear lot line: 16 feet.

  (6) Maximum height 2 1/2 stories, not to exceed 25 feet. **[Amended 7-8-1987 by L.L. No. 3-1987]**

### § 285-13. R-15 One-Family Residence District.

A. Permitted uses. No building or premises shall be used and no building shall be erected, altered or added to unless otherwise provided in this chapter, except the following uses:

  (1) Principal uses. All uses permitted in the R-40 District, as specified in § 285-10A(1) of this chapter.

# Exhibit D

| Yard | (feet) | (feet) | (feet) |
|------|--------|--------|--------|
| Front | 20 | 30 | 40 |
| 1 side | 15 | 40 | 45 |
| 2 sides | 30 | 80 | 90 |
| Rear | 50 | 50 | 60 |

All yards must comply with § 285-39 of this chapter.

(6) Minimum distance from off-street parking areas to:

    (a) Principal building: 10 feet.

    (b) Front lot line: 20 feet, unless otherwise specified.

    (c) Side lot line: 10 feet.

    (d) Rear lot line: 10 feet.

(7) Maximum height: three stories, not to exceed 40 feet. **[Amended 7-8-1987 by L.L. No. 3-1987]**

**§ 285-29. (Reserved)** Editor's Note: Former § 285-29, regarding the CA Central Avenue Mixed-Use Impact District, was redesignated as § 285-29.1 10-2-2001 by L.L. No. 13-2001.

**§ 285-29.1. CA Central Avenue Mixed-Use Impact District.**

A. Statement of purpose and intent.

    (1) The Central Avenue Mixed-Use Impact (CA) District is based upon the objectives and findings of the Comprehensive Development Program for the Central Avenue Corridor, dated October 1976.

    (2) The principal intent of the Central Avenue Mixed-Use Impact (CA) District is to relate the maximum density of development permitted for the Central Avenue Corridor as a whole to the present traffic-carrying capacity of the road and its intersections as well as to future improvements which will increase the traffic-carrying capacity (including allowances for existing traffic, traffic generated from new development and other traffic affecting the Central Avenue Corridor) as well as to economic, environmental and other impact factors.

    (3) The intent of the Central Avenue Mixed-Use Impact (CA) District is also to permit flexibility in the design and development of individual sites so that a mixture of various compatible types of land uses can be developed as multiple use developments at the discretion of the individual property owner. Thus, the external traffic impacts will be thereby reduced, and, therefore, an adjustment is made in the maximum intensity of development to account for this reduced impact.

    (4) In addition to balancing the traffic-carrying capacity of the road with future development, the Central Avenue Mixed-Use Impact (CA) District also takes into account the relationships between land use intensity and municipal services required, education costs and resources, land values, existing development per acre and the visual and aesthetic implications of various uses.

B. Permitted uses. No building or premises within the Central Avenue Mixed-Use Impact (CA) District shall be used and no building shall be erected or altered, unless otherwise provided in this District, except for the following uses:

    (1) Principal uses, Type I: office uses.

        (a) Office buildings for business, governmental and professional uses, including administrative, training, data processing, publication, financial and sales offices and related facilities in connection with such office uses, including retail or personal service uses that are specifically designed as accessory uses, such as but not limited to lunch counters, lunch stands, newsstands and barbershops, provided that said retail or personal service accessory use shall have no separate street frontage entrance and no exterior signs advertising said retail or personal service use. In addition, said accessory retail or personal service use shall not comprise more than 0.5% of the gross floor area of the office building to which it is accessory.

    (b) Offices or agencies for scientific research or technical development, including laboratories, libraries and administrative, training, data processing, publication and related facilities in connection with such uses, provided that:

        [1] No machinery or equipment shall be installed and no labor shall be engaged upon the premises for the manufacture, processing or assembly of goods or articles, except the manufacturing, processing or assembly of prototype or experimental products in which the close supervision by scientific personnel of a permitted research laboratory is required.

        [2] All mechanical and other apparatus and manual services employed in such use shall be devoted to scientific research and technical development of manufactured, processed or compounded products.

        [3] No such process or operation shall involve the handling, storage or discharge of explosives or radioactive materials or permit upon the premises any virus or other type of infectious organisms identified with diseases of animals or humans. This shall not preclude the practice of medicine, dentistry or pharmacy nor the activities of a diagnostic laboratory licensed by the State of New York. The containment of any potentially harmful substance shall conform to all rules and regulations of relevant federal, state, county or municipal agencies.

        [4] No manufacturing, processing or assembly of goods or articles of any kind for sale shall be permitted on the premises, except for the sale of prototype or experimental products which are the result of or the end product of scientific research, development or engineering.

        [5] No offensive noises, gases, fumes, smoke, odors, dust or vibrations shall emanate from such use, and no waste products of such character as to create a nuisance or to be injurious to health or safety shall be discharged therefrom.

        [6] Related retail and personal service accessory uses, such as but not limited to lunch counters, lunch stands, newsstands and barbershops, shall be permitted, subject to all conditions set forth for said uses in Subsection B(1)(a) above.

    (c) Telephone exchanges.

    (d) Conference centers.

    (e) Post offices.

  (2) Principal uses, Type II: commercial uses.

    (a) Fully enclosed commercial establishments, including:

        [1] Stores for the retail sale of consumer merchandise;

        [2] Personal service establishments, such as but not limited to barbershops, beauty parlors, shoe repair shops or similar uses, where such service is provided on the premises; and

        [3] Banks.

    (b) Fully enclosed, freestanding laundry or dry-cleaning establishments.

    (c) Fully enclosed, freestanding movie theaters or cinemas.

    (d) The retail sale of plants and supplies, including nursery-type operations.

    (e) Unified shopping center developments, including commercial establishments for the retail sale of consumer merchandise, personal service establishments, banks, laundry or dry-cleaning establishments, movie theaters or cinemas, retail sale of garden materials and supplies and ice cream stands. Restaurants, quick-service or fast-food establishments and cabarets shall be permitted in such unified shopping center developments, provided that said uses satisfy all conditions for such uses as set forth in this chapter, including securing a special permit from the Planning Board. **[Amended 4-13-1983]**

  (3) Principal uses, Type III: residential uses.

    (a) Multifamily developments of not more than four stories in height shall be permitted at a maximum density of 35 bedrooms per acre, provided that:

[1] The minimum lot size for a multifamily development shall be two acres in single-use developments. In multiple-use developments containing multifamily development, a minimum of two acres of the site shall be utilized for multifamily development.

[2] The minimum average livable floor area for each dwelling unit in a multifamily dwelling shall be 750 square feet as required in § 285-39 of this chapter.

[3] Accessory uses in all multifamily developments shall comply with the applicable requirements in Subsection B(7) of this section, except that suitable open space shall be provided at a minimum of 75 square feet of suitable open space for each bedroom contained in the multifamily development, but not less than 150 square feet for each dwelling unit contained in said development.

[4] Off-street parking for multifamily developments may be located in any required yard, provided that the minimum distances set forth in Subsection C(3) are provided.

[5] A minimum distance equal to the average height of the principal buildings on the site at the point where said buildings are most closely proximate to each other shall be provided between all buildings on the site. [Amended 4-8-1981]

(4) Principal uses, Type IV: public and quasi-public uses. Uses, such as but not limited to museums; art galleries; libraries; churches; public, private or religious schools which are accredited by the New York Board of Regents; cemeteries; and governmental uses.

(5) Special permit uses.

(5.1) Planning Board. special permit uses Type II: commercial uses. A special permit shall be required from the Planning Board in accordance with the procedures set forth in Subsection B(7) herein. Any such special permit use must comply with the general standards set forth below and the special standards enumerated in each subdivision applicable to the particular special permit use in the district specified. [Amended 4-13-1983; 8-17-2005 by L.L. No. 3-2005]

(a) General standards.

[1] Each special permit use shall be reasonably necessary for the public health or general interest or welfare.

[2] Each special permit use shall be of such character, intensity, size and location that, in general, it will be in harmony with the orderly development of the district in which the property concerned is situated and will not be detrimental to the orderly development of adjacent districts.

[3] Each special permit use shall be so located in order to be adequately serviced by transportation facilities, water supply, waste disposal, fire and police protection and similar services.

[4] Each special permit use sought which adjoins or abuts a residence district shall be so located in the lot involved that it shall not impair the use, enjoyment and value of adjacent residential properties.

[5] Each special permit use shall not create pedestrian or vehicular traffic hazards because of its location in relation to similar uses, necessity of turning movements in relation to its access to public roads and intersections, or its location in relation to other buildings or proposed buildings on or near the site and the traffic patterns from such buildings.

[6] Each special permit use shall not include the display of signs, noise, fumes or lights that will hinder normal development of the district or impair the use, enjoyment and value of adjacent land and buildings.

(b) Uses requiring special permit.

[1] Fully enclosed commercial recreation facilities, including bowling alleys, health spas and clubs, tennis, paddle tennis, handball and squash facilities. and uses accessory and

incidental to commercial recreation, such as locker rooms, eating and drinking facilities and retail sale of goods associated with the primary activity.

[2] Fully enclosed freestanding funeral homes or undertaking establishments.

[3] Fully enclosed freestanding animal hospitals, provided that:

   [a] All operations, including runways, shall be within a totally enclosed, fully soundproofed, mechanically ventilated or air-conditioned building.

   [b] All operations shall be conducted and the structure maintained in such a manner that they are not offensive, obnoxious or detrimental to adjoining properties by reason of noise or odors.

   [c] Permitted operations shall not include the boarding of animals or the operation of a kennel, except that the boarding of animals related to a course of medical treatment shall be permitted during the period of such treatment.

[4] Fully enclosed quick-service or fast-food establishments, provided that:

   [a] No such establishment shall be located nearer than 2,000 feet to another such establishment as measured from their property lines.

   [b] Together with the special permit application, there shall be submitted preliminary approvals from the appropriate state, county and Town authorities as to the following: curb cut approval; ingress and egress; acceleration and/or deceleration lanes; traffic signalization; internal traffic flow.

   [c] The applicant shall satisfy the Planning Board that there will be sufficient security to prevent the use of the premises as a loitering place during hours of operation and that there will be proper facilities and personnel for disposal of the trash and other debris of a quick-service eating and drinking establishment.

[5] Fully enclosed restaurant use, other than cabaret use, but in no event including diners or similar structures or outdoor counter service, drive-in or curb-service establishment. Such prohibitions shall not, however, prevent service at tables on a covered or uncovered terrace or porch incidental to a permitted restaurant, provided that there is no increase in the total capacity as approved by the Planning Board, and further provided that:

   [a] No such establishment shall be located nearer than 50 feet to a residential district line.

   [b] Together with the special permit application, there shall be submitted preliminary approvals from the appropriate state, county and Town authorities as to the following: curb cut approval; ingress and egress; acceleration and/or deceleration lanes; traffic signalization; internal traffic flow and adequacy of parking.

   [c] The applicant shall satisfy the Planning Board that there will be sufficient security to prevent the use of the premises as a loitering place during the hours of operation and that there will be proper facilities and personnel for disposal of the trash and other debris of a restaurant.

   [d] All restaurants in operation and those restaurants for which site plan approval has been granted as of the effective date of this amendment are exempt from this special permit requirement. However, should there be any alteration to either an existing restaurant or one which has received site plan approval as of the effective date of this chapter, this exemption shall not apply.

[6] Fully enclosed cabaret use, provided that:

   [a] No such establishment shall be located nearer than 2,000 feet to another such establishment, as measured from their property lines.

   [b] Together with the application, there shall be submitted preliminary approvals from the appropriate state, county and Town authority as to the following: curb cut approval; ingress and egress; acceleration and/or deceleration lanes; traffic signalization; internal traffic flow.

      [c] The applicant shall satisfy the Planning Board that there shall be sufficient security to prevent the use of the premises as a loitering place during hours of operation.

      [d] The applicant shall comply with all provisions of the Cabaret Law Editor's Note: See Ch. 330, Cabaret Law. of the Town of Greenburgh, and the issuance of the special permit shall be conditional upon obtaining and continuing to hold a cabaret license from the Town of Greenburgh, New York.

    [7] Fully enclosed freestanding ice cream stands.

  (c) Conditions for issuance of permit.

    [1] Upon finding that such general standards and any specific standards set forth in the special permit section of the CA District have been fully met, the Planning Board may grant such special permit and in so doing may impose any conditions that it may deem necessary to accomplish the reasonable application of such standards.

    [2] Said Board may require as a condition of the granting of any special permit that it shall be periodically renewed, or said Board may grant a temporary special permit subject to adequate guaranties that the use covered will be terminated at the end of the period specified or such extension thereof as may be granted by said Board, provided that any such renewal or extension shall be subject to the same procedure as specified herein to the original granting of the special permit involved and in conformity with the aforesaid general and special standards.

      (5.2)    Town Board special permit uses Type I: office uses.

            (a)    Clinic, dental or medical, pursuant to the procedures and standards set forth in § 285-25A(4)(j) of this chapter.

(6) Multiple-use developments. Combinations of Type 1, Type II principal and special permit, Type III or Type IV uses may be developed, provided that in no event shall the gross floor area from any type comprise less than 25% of the gross floor area of said development, and further provided that in no event shall Type II principal or Type II special permit uses comprise more than 33% of the gross floor area of said development. For the purposes of this subsection, each dwelling unit in a multiple-use development shall be deemed to comprise 1,000 square feet of gross floor area. However, under no circumstances shall a Type III principal use be combined in the same building with a Type I, Type II or Type IV principal or special permit use.

  (a) Method of calculation. The site area required for each individual use permitted in a multiple-use development shall be calculated as follows:

    [1] For Type I, Type II principal and special permit and Type IV uses: Divide the amount of development desired for each specific use in the multiple-use development by the FAR as indicated in Subsection B(3) above. This calculation indicates the square footage of site area required for each use in the multiple-use development.

    [2] For Type III uses: Divide the number of bedrooms desired in the multiple-use development by the number of bedrooms permitted per acre as indicated in Subsection B(3) above. This calculation indicates the number of acres required for the residential use. The minimum acreage for the use shall be two acres.

(7) Accessory uses.

  (a) The following accessory uses are permitted as incidental to the principal uses authorized by Subsection B(1).

    [1] Restaurants, cafeterias and lunchrooms, not including diners and similar facilities, for the use of executives, employees and visitors of the principal use, but excluding the general public, and provided that such accessory use is maintained within the principal building.

    [2] In-service training schools for employees of the principal use, provided that such training school is maintained within the principal building.

    [3] Private garage for the storage of private passenger vehicles used by executives, employees or visitors of the principal use, provided that such garage is located within the principal building.

    [4] Off-street parking area for private passenger vehicles used by executives, employees or visitors of the principal use.

    [5] Off-street loading area for the delivery of goods to and from the principal use.

    [6] Antennas, subject to the conditions set forth in § 285-37 of this chapter. **[Added 11-14-1984; amended 8-13-1996 by L.L. No. 7-1996; 4-29-1997 by L.L. No. 6-1997]**

(b) The following accessory uses are permitted as incidental to the principal uses authorized by Subsection B(2) and (5).

    [1] Off-street parking area for private passenger vehicles of visitors, shoppers and employees of the principal use.

    [2] Off-street loading area for the delivery of goods to and from the principal use.

    [3] Garage for the storage only of commercial vehicles used for the delivery of goods purchased within the principal use or for the storage of maintenance, cleaning and snow-removal equipment and material for the parking area used in connection with the principal use and only on that site, provided that it is located within the principal building.

    [4] Antennas, subject to the conditions set forth in § 285-37 of this chapter. **[Added 11-14-1984; amended 8-13-1996 by L.L. No. 7-1996; 4-29-1997 by L.L. No. 6-1997]**

(c) The following accessory uses are permitted as incidental to the principal uses authorized by Subsection B(3).

    [1] A professional office or studio maintained and only permitted with the principal building and as permitted and limited in § 285-18A(3), except that no professional office or studio shall be above the ground floor.

    [2] A private swimming pool as regulated in § 285-36; provided, however, that any such pool, wherever located on the premises, shall be completely enclosed by a security fence complying with all the requirements as set forth in § 285-36.

    [3] Suitable open space in accordance with Subsection B(3).

    [4] Roomers and boarders shall be prohibited except by special permit in detached single-family dwellings pursuant to the provisions of § 285-10A(2)(g).

    [5] Off-street parking area for private passenger vehicles of residents, visitors or employees of the principal use.

    [6] Off-street loading area for the delivery of goods to and from the principal use.

    [7] Private garage for private passenger vehicles of residents, visitors and employees of the principal use, located within or under the principal building to which it is accessory.

    [8] Antennas, subject to the conditions set forth in § 285-37 of this chapter. **[Added 11-14-1984; amended 8-13-1996 by L.L. No. 7-1996; 4-29-1997 by L.L. No. 6-1997]**

    [9] Common dining, laundry, security and housekeeping facilities, principally for the use of residents, in conjunction with dwelling units occupied as independent living facilities. **[Added 10-14-1992 by L.L. No. 6-1992]**

(d) The following accessory uses are permitted as incidental uses authorized by Subsection B(4):

    [1] Off-street parking areas for the private passenger vehicles of the officers, directors, members, visitors or employees of the principal use.

    [2] Off-street loading area for the delivery of goods to or from the principal use.

    [3] Antennas, subject to the conditions set forth in § 285-37 of this chapter. **[Added 11-14-1984; amended 8-13-1996 by L.L. No. 7-1996; 4-29-1997 by L.L. No. 6-1997]**

(e) For multiple-use developments, the accessory uses incidental to the principal uses (as set forth above) that comprise said multiple-use development.

(8) Central Avenue facade and signage regulations. **[Added 9-25-1996 by L.L. No. 10-1996]**

(a) Unified plan design. Any signage approved under this section must be in conformance with a unified facade, wall sign, landscape and yard sign plan, the "unified plan," for purposes of this chapter. All unified plans will be subject to provisions of Article VIII, Site Plan Approval, of the Greenburgh Zoning Code and will be subject to any other applicable regulations of the Town or other agencies with approval authority. The unified plan shall be a required component of any development application. The unified plan shall demonstrate the following criteria to the satisfaction of the Planning Board or, when meeting the criteria of the site plan exemption provisions of § 285-56D, shall satisfy the signatory individuals that:

[1] Building facades shall be in good repair. Individual building facades shall be coordinated in design and shall be complimentary to adjacent facades. The Planning Board may require other features, such as articulated rooflines, screening of rooftop or yard-located utilities or use of certain materials, as appropriate to achieve a harmonious relationship among facades on Central Avenue.

[2] Building wall signs shall be grouped in sign bands of uniform height, both above ground and within the sign bands. When some specific overall design objective is demonstrated which contributes to a more harmonious arrangement, these sign band regulations may be modified to accommodate approved designs.

[3] Landscaped areas along the street frontage must conform to all provisions of § 285-29.1D.

[4] Yard sign(s) shall be located only in front yard landscaped areas, with open sight lines for optimal viewing by passing motorists, and shall comply with the provisions of Subsection B (8)(b) below.

(b) Yard sign design standards. The following design standards shall apply to all new yard signs in the Central Avenue Mixed-Use Impact District and shall supersede all conflicting provisions of Chapter 240:

[1] All yard signs shall display, at the top of the sign, the building or business(es) address number, as appropriate. Addresses shall not be included in calculation of sign size.

[2] All sign lettering shall be a minimum of eight inches in height and shall have a minimum two-inch-letter-line width. Sign panels shall have uniformly colored backgrounds and shall be placed in an approved arrangement. In no event shall signs be allowed to interfere with necessary motor vehicle sight distances or to otherwise provide a distraction that may cause a negative impact on traffic safety.

[3] Yard signs shall not exceed 12 feet in height, above ground, by six feet in width, including posts. Sign panels shall have a minimum ground clearance of six feet. Exceptions for signs mounted at a lower height shall be made by the Planning Board only upon the recommendation of the Building Inspector, the Commissioner of Community Development and Conservation and the Town Engineer.

[4] No individual sign shall be greater than 30 square feet in size. Where the provisions of Chapter 240 allow a sign up to 50 square feet in area, said area shall be divided into two separate signs otherwise meeting all other provisions of this section.

(c) Unified shopping center signs. When the front yard facade of a building in a Unified Shopping Center on Central Avenue is 100 feet or more from the Central Avenue curbline and when that lot has a landscaped island of a minimum width of 20 feet separating it from the Avenue, the provisions of Chapter 240 may be modified to meet the following design standards:

[1] All wall signs may be increased by 10% in area over otherwise allowable sizes.

[2] The number and/or area of yard signs may be increased to accommodate separate name bands for each retail business which occupies 750 square feet or more and for each office use of 1,500 square feet or more of floor area.

[3] When a building or shopping center advertises its name on a yard sign, in addition to the

individual businesses, the building name shall not exceed in size twice that of any business when displayed on no more than one yard sign. When an approved unified plan yields more than one yard sign and the building or shopping center name is placed on more than one yard sign, said name shall be no more than 50% larger than that of any business. All new yard signs shall provide for three square feet of sign area, for individual businesses. No individual business name shall be placed on more than one yard sign. Business and building or shopping center names shall be aggregated onto the minimum possible number of yard signs.

[4] No greater yard or wall sign area shall be allowed for buildings with only office uses from that area stipulated in Chapter 240.

[5] When the total allowable yard sign area exceeds what would otherwise be allowed under Chapter 240, said area shall not exceed the total area resulting from the sum of all building and business name spaces as set forth in this subsection.

C. Lot and bulk requirements shall be as follows:

  (1) Maximum floor area ratios and maximum densities: as indicated in Table I. Editor's Note: Table I is included at the end of this chapter.

  (2) Minimum yards:

|  | Lots of 50,000 Square Feet or Larger (feet) | Lots of Less Than 50,000 Square Feet (feet) |
|---|---|---|
| Front | 80 | 40 |
| Side | 40 | 20 |
| Rear | 50 | 25 |

  (3) Minimum distance from detached accessory structure or use or off-street parking areas to:

|  | Lots of 50,000 Square Feet or Larger (feet) | Lots of Less Than 50,000 Square Feet (feet) |
|---|---|---|
| Principal building | 10 | 10 |
| Front lot line | 20 | 20 |
| Side lot line | 20 | 10 |
| Rear lot line | 25 | 15 |

  (4) Maximum height: As indicated in Table I, Editor's Note: Table I is included at the end of this chapter. except that all multiple-use buildings combining Type I principal uses, Type II principal and special permit uses and/or Type IV principal uses shall have a maximum of four stories, not to exceed 48 feet. **[Amended 7-8-1987 by L.L. No. 3-1987]**

  (5) Off-street parking requirements, as indicated in Table I. Editor's Note: Table I is included at the end of this chapter.

  (6) Off-street loading requirements, as indicated in Table II. Editor's Note: Table II is included at the end of this chapter.

  (7) Maximum coverage: **[Added 7-8-1987 by L.L. No. 3-1987]**

    (a) Impervious surfaces: 60%.

D. Required landscaping. The following landscaping requirements, in addition to those which may be required under Article VIII of the Zoning Ordinance, shall apply to all Central Avenue Mixed-Use Impact (CA) District properties:

  (1) All portions of improved properties which are not used for buildings, structures, off-street parking and loading, sidewalks, malls or similar purposes shall be appropriately landscaped with grass, shrubs,

trees and other ground cover in such manner as to minimize erosion and stormwater runoff and harmoniously relate such uses to the character of the Town as a whole.

(2) Landscape areas of a minimum of 10 feet in width shall be provided along all side and rear property lines. Such landscape areas shall comply with the following minimum standards as well as all applicable requirements set forth elsewhere in this chapter:

    (a) Landscape areas shall include evergreen planting, decorative fences, berms and other landscaping of such type, height, spacing and arrangement as, in the judgment of the Planning Board, will effectively screen the activity of the lot from neighboring uses.

    (b) A wall or fence of location, height, design and materials approved by the Planning Board may be required additionally or may be substituted for part or all of the required landscaping.

    (c) Where the existing topography and/or existing landscaping provides adequate screening, the Planning Board may waive or modify the planting and/or landscape requirements of this chapter.

(3) Landscape areas a minimum of 20 feet in width shall be provided along all front property lines and street lines. Such landscape areas shall contain trees and/or either shrubs, at least 50% of which shall be evergreen, and/or decorative fencing materials, and/or earth berms and/or grass, and/or decorative ground covers, or decorative fencing materials, or decorative paving materials. In accordance with the Town of Greenburgh Landscaping and Screening Maintenance Ordinance, such landscaped areas shall be suitably maintained and kept free of rubbish at all times. Such landscaped areas shall be separated from parking areas by a curb not less than six inches in height or by a bumper guard approved as to type and construction by the Building Inspector.

(4) Unless specifically waived by the Planning Board, outdoor parking spaces shall be divided into subareas with raised and curbed landscaped islands separating each subarea so designed as to assure a smooth flow of traffic. Said islands shall be a minimum width of 10 feet and shall be suitably landscaped with trees, grass or other ground cover deemed appropriate by the Planning Board. In addition and unless specifically waived by the Planning Board, not more than 15 spaces in a single line shall be permitted without such a suitably landscaped curbed island.

(5) Required separation of residential and nonresidential uses. Any multiple-use development comprised of Type III residential uses and either Type I, Type II principal and special permit or Type IV nonresidential uses shall provide a suitable landscaped buffer area between said residential and nonresidential uses of not less than 50 feet. Said buffer shall comply with all applicable landscaping requirements set forth above.

E. Prohibited uses. Any use not specifically set forth as a permitted use herein is prohibited, including but not limited to an automobile sales lot, motor vehicle salesroom, public garage, gasoline station, car washing establishment, tire store or repair auto parts store with installation, service or repair facilities on the premises, and any other use involving the sale, leasing or repair of automobiles, motel, hotel, automobile court, tourist home, rooming house, furnished room house, boardinghouse, game room or amusement arcade, storage, warehousing or wholesale establishment and the outdoor storage of maintenance, cleaning and snow-removal vehicles.

F. Site plan approval. Development within the CA District shall be subject to the provisions of Article VIII of the Zoning Ordinance of the Town of Greenburgh, New York, and any other applicable statutes, laws and ordinances.

G. Planning Board special permit procedure.

(1) Applications for a special permit.

    (a) All applications for special permit shall be submitted to the Secretary to the Planning Board, in writing, on forms prescribed by the Planning Board. Said application shall be accompanied by a site plan for the proposed development, and said site plan shall indicate the location and design of all buildings and structures, parking and truck-loading areas and access drives thereto, and existing and proposed grading at contour intervals of five feet or less. Said site plan shall also indicate the general landscaping, evergreen screening, fencing, architectural treatment, egress and ingress, curbing, sidewalks, retaining walls and lighting to be provided so as to minimize its impact upon the immediate area. The Planning Board may require the submittal of any other pertinent information as may be necessary to determine and provide for the proper consideration of the application for a special permit. An applicant may elect to submit, concurrently,

applications for a special permit and for site plan approval.

   (b) In the event that such a joint application is made, the site plan shall provide such information as is required under § 285-57C of this chapter.

(2) Public hearing required.

   (a) A public hearing on an application for a special permit shall be scheduled and conducted by the Planning Board within 45 days after certification to the Planning Board by the Secretary to the Planning Board of receipt of a properly completed application. To the extent possible, such public hearing shall take place at the same time as any other public hearing required to be held by the Planning Board in regard to the proposed development. Notice of such public hearing shall be published in the official newspaper of the Town and mailed to property owners within 500 feet of the perimeter of the subject property at least 10 days prior to such public hearing. The cost of such notice shall be borne by the applicant.

   (b) Within 45 days of the date of which a public hearing is closed, the Planning Board shall, by resolution, act to approve, disapprove or approve with conditions, if any are necessary.

   (c) All Planning Board actions on applications for special permits shall be recorded on forms prescribed by the Planning Board and shall fully set forth the circumstances of the case and the findings of the Planning Board upon which its action is based.

H. Nonconforming buildings and uses in Central Avenue Mixed-Use Impact (CA) District. The following regulations shall apply to nonconforming buildings and uses in the Central Avenue Mixed-Use Impact (CA) District:

(1) Definitions. For purposes of this section, a nonconforming use in the Central Avenue Mixed-Use Impact (CA) District shall be a use which does not conform to the requirements set forth herein respecting permitted uses. A nonconforming building shall be a building which does not conform to the requirements set forth herein respecting maximum floor area ratio or maximum density. In addition, a nonconforming use or building shall have lawfully existed prior to the adoption of this section as part of the Zoning Ordinance of the Town of Greenburgh, New York, and which use or building is maintained following the adoption of this section, although said use or building does not conform to the regulations of the Central Avenue Mixed-Use Impact (CA) District.

(2) Conditions governing nonconforming buildings and uses in the Central Avenue Mixed-Use Impact (CA) District.

   (a) Any nonconforming building shall not be enlarged beyond the exterior walls of said building or in any other manner that would increase said nonconformance.

   (b) Any nonconforming building may be altered by interior modifications, provided that the altered building does not increase the degree of nonconformity with respect to the permitted floor area ratio, density and parking and loading requirements as set forth in Table I hereof. Editor's Note: Table I is included at the end of this chapter.

   (c) Any building in which a nonconforming use is maintained may be altered by interior modifications, provided that the interior modifications do not increase the intensity of the nonconforming use. The provisions of Subsection H(2)(b) and (c) above shall not apply to any alteration which may be required by order of the Building Inspector to strengthen or restore a building or structure, or any part thereof, to a safe condition.

   (d) Any nonconforming use, if changed to another use which conforms to the permitted use provisions of this section, may not thereafter be changed back to a nonconforming use.

   (e) Any nonconforming use shall not be changed to another nonconforming use.

   (f) Any nonconforming use, if discontinued for causes other than fire or natural disaster for six months or longer, shall be deemed to be abandoned, and the nonconforming use shall not be resumed. Intent to resume a nonconforming use shall not confer the right to do so.

   (g) Any building which is nonconforming or which contains a nonconforming use, which is destroyed in whole or in part by fire or other natural disaster, may be repaired or reconstructed in a manner which does not increase the nonconformity of the building or use or which does not change the building to a different nonconforming use.

(3) Repair and maintenance of nonconforming uses. Nothing in this section shall be deemed to prevent normal maintenance and repair, and nothing shall prevent the carrying out, upon issuance of a building permit, of major structural alterations or demolition of nonconforming buildings and uses if undertaken in the interest of public safety.

## § 285-29.2. HC Hartsdale Center District. [Added 9-25-2001 by L.L. No. 12-2001]

A. Purpose and intent. The Hartsdale Center (HC) District is a commercial district intended to provide for a variety of intense commercial activities and services that serve persons in the immediate surrounding area as well as visitors to East Hartsdale Avenue. The purpose of this district is to promote improvements to the character and economic well-being of the hamlet through a well-balanced mix of uses, architectural guidelines, facade improvements, and safe conditions for pedestrians.

B. Permitted uses. No building or premises shall be used, and no building shall be erected, altered, or added to, unless otherwise provided in this chapter, except for the following uses:

(1) Principal uses.

(a) Fully enclosed stores and shops, excluding any drive-up facilities, for the conduct of any retail sale of consumer merchandise and fully enclosed personal service establishments;

(b) Business and professional offices;

(c) Mixed-use buildings containing retail, personal service uses, and offices;

(d) Ice cream stands and bakeries as defined in § 285-5 of this chapter, not to exceed 2,000 square feet of gross floor area;

(e) Banking offices and banks without drive-up windows;

(f) Post offices;

(g) Fully enclosed counter-service dropoff laundry or dry-cleaning establishments, excluding facilities with coin-operated laundry machines for public use;

(h) Pet grooming establishments;

(i) Public parks owned or operated by a governmental authority;

(j) Firehouses, police stations, or other public safety uses owned or operated by the Town of Greenburgh, Westchester County, or by any other governmental authority;

(k) Other municipal buildings or uses operated by the Town of Greenburgh; and

(l) Uses in existence and in operation at the time of adoption of this section specific to the location of the preexisting use. These uses may be continued in a new location so long as the preexisting use is extinguished at the previous site and carried to the new site. Such preexisting uses are permitted to also expand to immediately adjacent properties.

(2) Special permit uses. The Town Board may grant a special permit for any of the following special permit uses, provided that such special permit use complies with the general standards set forth below and any specified performance standards. The initial application for the special permit shall be made through the Department of Community Development and Conservation.

(a) General standards.

[1] Each special permit use shall be of such character, intensity, size and location that, in general, it will be in harmony with the orderly development of the district, will not be detrimental to the orderly development of the district, and will not be detrimental to the orderly development of adjacent districts.

[2] Each special permit application shall include, at the time of application, a detailed exterior and interior layout plan, schedule of activities, hours of operation, number of employees, and maximum capacities.

[3] Each special permit use within the Hartsdale Center District shall not create undue vehicular traffic and shall not include any display of signs, noise, fumes or lights that will hinder normal development of the District or impair the use, enjoyment and value of

# Exhibit E

violation may be available.

---

## ARTICLE VII Zoning Board of Appeals

### § 285-48. Zoning Board of Appeals.

Pursuant to the provisions of § 267 of the Town Law, there is hereby established a Board of Appeals consisting of seven members to be appointed by the Town Board, which Board of Appeals shall have all the powers and duties prescribed by law and this chapter. Such powers and duties are summarized and more particularly specified as follows, provided that none of the following provisions shall be deemed to limit any power of the Board of Appeals conferred by the Town Law.

A. Interpretation. On an appeal from an order, requirement, decision or determination made by an administrative official, or on a request made by an official, board or agency of the Town, such Board of Appeals shall have the power and authority to decide any question involving the interpretation of any provision of this chapter, including the determination of the exact location of any district boundary if uncertainty with respect thereto remains after exhausting the rules specified in § 285-7B of this chapter.

B. Variance.

   (1) After a public hearing held pursuant to the provisions of § 285-49 of this article, the Board of Appeals shall have the power to hear and decide appeals from and to review any order, requirement, decision or determination made by the Building Inspector, subject to the provisions of § 267 of the Town Law, and, in passing upon appeals, shall have the power, where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of this chapter, to vary or modify the application of any provisions of this chapter so that the spirit of this chapter shall be observed, public safety and welfare secured and substantial justice done. No variance in the strict application of any provision of this chapter shall be granted by the Board of Appeals unless it finds:

      (a) That there are special circumstances or conditions, fully described in the findings of the Board, applying to the land or building for which the variance is sought, which circumstances or conditions are unique to such land or building and do not apply generally to land or buildings in the neighborhood and have not resulted from any act of the appellant or applicant subsequent to the adoption of this chapter, whether in violation of the provisions hereof or not.

      (b) That for reasons fully set forth in the findings of the Board, the aforesaid circumstances or conditions are such that the strict application of the provisions of this chapter would deprive the appellant or applicant of the reasonable use of such land or building and the granting of the variance is necessary for the reasonable use of the land or building and that the variance which is granted by the Board is the minimum variance that will accomplish this purpose.

      (c) That the granting of the variance will be in harmony with the general purpose and intent of this chapter and will not be injurious to the neighborhood or otherwise detrimental to the public welfare.

      (d) Where the Zoning Board of Appeals grants a use variance for a use permitted in another district, the area standards shall be that of the district in which the use is permitted.

   (2) In granting any variance, the Board of Appeals shall prescribe any appropriate safeguards and conditions applying thereto that it may deem to be necessary or desirable in the public interest, and such determination shall be recorded on the building permit or the certificate of occupancy, as the case may be, issued pursuant to such variance.

C. Special permit. After public hearing held pursuant to the provisions of § 285-49 of this chapter, the Zoning Board of Appeals may grant a special permit for any of the special permit uses listed in Article III, District Regulations and Map, and in any other case set forth in this chapter wherein a special permit is required, provided that such special permit use complies with the general standards set forth below and the special standards enumerated in such schedule as applicable to the particular special permit use in the district specified. An application for such special permit shall be made through the Building Inspector.

   (1) General standards.

      (a) Each special permit use shall be of such character, intensity, size and location that, in general, it

will be in harmony with the orderly development of the district in which the property concerned is situated and will not be detrimental to the orderly development of adjacent districts.

   (b) Each special permit use sought in a residence district shall be so located on the lot involved that it shall not impair the use, enjoyment and value of adjacent residential properties.

   (c) The nature and intensity of a special permit use sought in a residence district and the traffic generated by it shall not be hazardous or detrimental to the prevailing residential character of the neighborhood.

   (d) Each special permit use in a business district shall be harmonious with the district in which its location is sought, shall not create undue pedestrian or vehicular traffic hazards and shall not include any display of signs, noise, fumes or lights that will hinder normal development of the district or impair the use, enjoyment and value of adjacent land and buildings.

(2) Zoning Board of Appeals may impose further conditions. Upon finding that such general standards and any specific standards set forth in Article III of this chapter have been fully met, the Board of Appeals may grant such special permit and in so doing may impose any conditions that it may deem necessary to accomplish the reasonable application of said standards. The Board may deny any application for a special permit which, in its judgment, is not in accordance with said general or special standards. Said Board may require, as a condition of the granting of any special permit, that it shall be periodically renewed, or said Board may grant a temporary special permit, subject to adequate guaranties that the use covered will be terminated at the end of the period specified or such extension thereof as may be granted by said Board, provided that any such renewal or extension shall be subject to the same procedure as specified herein for the original granting of the special permit involved and in conformity with the aforesaid general and special standards.

(3) Preexisting uses deemed to be conforming. Any lawful use existing at the time of the effective date of this chapter or any amendment thereof, which if newly created under this chapter would require a special permit in the district in which it is situated, may be continued and shall be deemed to be a conforming use, but any modification, change or extension thereof shall be subject to the granting of a special permit as provided in this chapter.

(4) Central Avenue Mixed-Use Impact District. This subsection shall not apply to special permit uses within the CA District. Such special permits shall be issued only by the Planning Board pursuant to Article VIII herein.

## § 285-49. Exercise of powers.

The powers and duties of the Zoning Board of Appeals shall be exercised in accordance with the Rules and Procedures adopted by the Zoning Board of Appeals or other procedure specified by Town Law, as well as the following procedure:

A. Public hearing required. The Board of Appeals shall hold a public hearing on every appeal and application made to it, upon public notice published in the official newspaper designated for that purpose at least five days before the date of such hearing and upon such other notice as it, by regulation, may require. The cost of such notice or notices shall be borne by the appellant or applicant, as the case may be.

B. Appeals and applications. All appeals and applications made to the Board of Appeals shall be in writing on forms prescribed by the Board. Each shall specify the provision of this chapter involved and shall set forth exactly the decision of the Building Inspector which is appealed from, the full circumstances or conditions involved therein, the ruling sought from the Board, the details of any variance applied for and the grounds on which it is claimed that the same shall be granted, or the use for which a special permit is sought and full details thereof.

C. Decisions of Board of Appeals; recording and filing. Every decision of the Board of Appeals shall be by resolution, with the vote thereon recorded on standard forms prescribed by the Board of Appeals, and shall fully set forth the circumstances of the case and the findings of the Board on which its decision is based.

D. Records to be filed. A certified copy of each such resolution shall be filed within 10 days after adoption thereof, in the office of the Town Clerk and Building Inspector, by case number under appropriate headings adopted by the Board of Appeals, together with all documents pertaining thereto.

# Exhibit F

**ARTICLE VIII Site Plan Approval [Amended 10-13-1982 by L.L. No. 9-1982; 5-11-1983]**

**§ 285-50. Title.**

This article shall be known as "Site Plan Approval of the Town of Greenburgh."

**§ 285-51. Purpose.**

In order to ensure that proposed development and use of land within the unincorporated area of the Town of Greenburgh will have a harmonious relationship with the existing or permitted use of contiguous land and of adjacent neighborhoods and so to ensure that the health, safety, welfare, comfort and convenience of the public is fully considered, this article is hereby enacted.

**§ 285-52. Definitions.**

As used in this article, the following terms shall have the meanings indicated:

SITE PLAN — A plan which shows the proposed development and use of land within the unincorporated portion of the Town of Greenburgh. Such plan shall consist of a map affirmatively demonstrating compliance with and adequate provision for all of the criteria, matters and items listed in § 285-57C herein.

**§ 285-53. Approving agencies.**

The approving agencies for site plans and all amendments to and modifications thereof shall be as follows:

A. The Town Board shall be the approving agency where a site plan application concerns property which is five acres or more in area, except for those applications filed pursuant to §§ 285-24 and 285-34 of this chapter.

B. Pursuant to § 274-a of the Town Law, the Town Board hereby delegates to the Planning Board the approval authority for all site plan applications which concern property less than five acres in area and for those applications filed pursuant to §§ 285-24 and 285-34 of this chapter.

**§ 285-54. Standards.**

In acting on any site plan application, the Planning Board, in addition to all other applicable laws, is hereby granted the powers set forth in Subdivision 1a of § 274-a of the Town Law of the State of New York and shall consider the standards set forth therein in granting site plan approval. The Town Board shall also consider the standards as aforementioned in its role as approving agency. The approving agency shall also take into consideration the following standards:

A. Traffic access and road. All proposed traffic access points and roads shall be adequate but not excessive in number, adequate in width, paving, grade, alignment and visibility and not located too near street corners or other places of public assembly. Necessary traffic signalization, signs, dividers and other safety controls, devices and facilities shall be given proper consideration and duly provided wherever appropriate or warranted.

B. Pedestrian safety and access. Safe, adequate and convenient pedestrian access and circulation shall be provided both within the site and to adjacent streets with particular attention to all intersections with vehicular traffic.

C. Circulation and parking. Off-street parking and loading spaces shall be arranged with consideration given to their location, sufficiency and appearance and to prevent parking in public streets of vehicles of persons connected with or visiting the use. The interior circulation system shall be adequate to provide safe accessibility to, from and within all required off-street parking areas.

D. Screening and landscaping. All structures, recreational, parking, loading, public and other service areas shall be reasonably landscaped and/or screened by fencing so as to provide adequate visual and noise buffers in all seasons from neighboring lands and streets. The scale and quality of the landscaping and screening on site shall be harmonious with the character of and serve to enhance the neighborhood.

E. Environmental quality. All bodies of water, wetlands, steep slopes, hilltops, ridgelines, major stands of trees, outstanding natural topography, significant geological features and other areas of scenic, ecological and historic value shall be preserved insofar as possible; soil erosion shall be prevented insofar as possible; flood hazard shall be minimized; air quality shall be well within legal limits; and all potentially ecologically disruptive elements of site preparation, such as blasting, diversion of watercourses and the like, shall be conducted according to the highest standards of professional care.

F. Fire protection. All proposed structures, service areas, fire lanes, hydrants, equipment and material shall be adequate and readily accessible for the protection of the proposed uses from fire.

G. Drainage. A storm drainage system which demonstrates affirmative compliance with the form, scope and substance of all applicable design criteria shall be provided to accommodate expected loads from the tributary watershed when developed to the maximum density permitted under the existing zoning standards. Drainage shall be conducted to a point of adequate and suitable disposal. Where appropriate, retention shall be provided so as to limit overflow from the site to zero increase in the rate of runoff as related to existing conditions.

H. Refuse and sewage disposal. The public and/or private disposal systems shall be sufficient to safely and adequately handle the type and volume of refuse and sewage which can reasonably be anticipated to be generated by the land uses on site.

I. Water supply. The public and/or private delivery systems for bringing potable water to each of the uses on site shall be shown to be sufficient.

J. Location and dimension of buildings. The location, arrangement, size and design of the buildings, lighting and signs shall be compatible with each other and with the site as a whole. At a minimum, the distance equal to the average height of the principal buildings on the site at the point where said buildings are most closely proximate to each other shall be provided between all buildings on the site unless, in the opinion of the approving agency, compelling considerations of topography or design dictate otherwise.

K. Impact of the proposed use on adjacent land uses. Adjacent and neighboring properties shall be protected against noise, glare, unsightliness or other objectionable features. Where a proposed use is a nonresidential use which would adjoin residential areas, special consideration shall be given by the approving agency to minimizing the impact of the proposed use on the residential properties.

## § 285-55. Approval required.

A. No building permit shall be issued until site plan approval shall have been obtained from the approving agency.

B. No certificate of occupancy for any structure or use upon or within the site shall be issued until all of the required conditions of the site plan approval have been met. The continued validity of any certificate of occupancy shall be subject to continued conformance with the approved site plan and conditions attached thereto.

C. Any amendment of a site plan shall be subject to the same approval procedure as provided in this article except where a waiver pursuant to § 285-57E(2), 285-57F(3), 285-58F(2) or 285-63 herein has been granted.

D. Following site plan approval pursuant to this article, multifamily lots in the Central Avenue (CA) District, the Planned Unit Development (PUD) District and any multifamily residence district may be apportioned for the purposes of financing or phased construction among two or more separate homeowners' associations, condominiums or cooperatives or any combination thereof, subject to the following conditions: **[Added 7-9-1986]**

  (1) Written approval for the apportionment must be received from the Town Attorney, Building Inspector and Planning Director, stating that the apportionment is in conformity with the spirit and intent of this section.

  (2) For lots in a PUD District, all common property and recreational facilities must be owned and maintained by a single umbrella homeowners' association, condominium or cooperative for the benefit of all the affected unit owners in accordance with the PUD District regulations.

  (3) Designation of common property areas and a single umbrella homeowners' association, condominium or cooperative may be required for any apportionment on a lot having recreation facilities or significant open space areas or when needed to assure adequate maintenance of roadways, parking areas,

utilities, drainage and other common facilities, in the discretion of the Town Attorney, Building Inspector and Planning Director.

(4) Cross easements or other agreements for the benefit of each unit owner to ensure the full enjoyment of the lot, including all open space areas, common facilities, roadways and parking areas, and to ensure the proper maintenance of all roadways, parking areas, utilities, landscaping and drainage facilities shall be provided to the satisfaction of the Town Attorney, Building Inspector and Planning Director.

(5) The Town Board or Planning Board may require that a preliminary apportionment plan be presented as part of a site plan application for their review.

(6) Nothing herein shall be construed as to allow the amendment of any site plan or site plan condition of approval in terms of physical layout or any specific condition relating to phased construction, financing or apportionment.

(7) Said apportionments shall not be considered a subdivision for the purposes of this chapter or the subdivision regulations. Editor's Note: See Ch. 250, Subdivision regulations.

(8) Any apportionment made pursuant to this section shall be subject to the approval of the Westchester County Department of Health.

## § 285-56. Exemptions.

The provisions of this article shall not apply in any of the following instances:

A. A single one-family dwelling.

B. A single two-family dwelling.

C. All property classified in the Urban Renewal District of the Town of Greenburgh, subject to a land disposition agreement.

D. All alterations to existing buildings or structures, whether or not there will be a change of use which is permitted within the zoning district, provided that the Building Inspector, Town Engineer and Secretary to the Planning Board make a written finding that the alteration will not substantially intensify the use or substantially modify the site with respect to generation of traffic, pedestrian movement, parking needs, noise, glare, exposure to hazard from fire or flood, utilization of water supply, sanitary sewer, drainage or other utility system and will not in any other way have a substantial impact upon the character or environment of the surrounding area; provided further that, if such written finding is not made, the application shall be referred to the appropriate approving agency for site plan review. **[Amended 7-8-1987 by L.L. No. 3-1987]**

E. Public parks, playgrounds or similar recreational areas owned or operated by a governmental authority, with permission of the Town Board. **[Added 7-8-1987 by L.L. No. 3-1987]**

F. Firehouses, police stations or other public safety uses owned or operated by the Town of Greenburgh, Westchester County, or by any other governmental authority, with permission of the Town Board. **[Added 7-8-1987 by L.L. No. 3-1987]**

G. Other municipal buildings or uses operated by the Town of Greenburgh, with permission of the Town Board. **[Added 7-8-1987 by L.L. No. 3-1987]**

## § 285-57. Applications to Planning Board.

A. The application procedure for site plan approval shall involve a three-stage process: presubmission conference, site plan application and public hearing by the Planning Board. The Planning Board may adopt such rules and regulations as may be required to implement the application procedure.

B. Presubmission conference.

(1) Prior to the submission of a site plan application, the applicant shall meet in person with the Planning Board and/or the Secretary to the Planning Board. The purpose of such conference shall be to discuss proposed uses or development in order that the necessary subsequent steps may be undertaken with a clear understanding of the approving agency's requirements in matters relating to site development.

(2) Because all applications for site plan approval must comply with this chapter, any application requiring a variance or special permit must show that such variance or special permit has been granted (or, where permitted by this chapter, that such special permit application is being simultaneously submitted to the approving agency) by the appropriate agency prior to the filing of the site plan application with the Secretary to the Planning Board.

C. Application for site plan approval.

(1) Within six months of the presubmission conference, 16 copies of the application for site plan approval shall be filed with the Secretary to the Planning Board, accompanied by a detailed development plan prepared by a licensed architect or professional engineer under his professional seal, provided on a certified survey of the site which shall be prepared by a licensed surveyor, which plan shall contain the information specified below. All site plans and accompanying plans and drawings shall be at a scale of not more than 30 feet to the inch and on sheets not greater than 24 inches by 36 inches in dimension. Site plans requiring multiple sheets shall be submitted with a cover sheet drawn at a scale of not more than 200 feet to the inch, generally showing the site plan and the relationship of the individual sheets to each other. Plans at a larger scale may be required for sites having steep slopes, wetlands or other characteristics necessitating closer scrutiny. **[Amended 7-8-1987 by L.L. No. 3-1987]**

(a) A map showing the applicant's entire property and adjacent properties, including all improvements thereon, and streets within a radius of 500 feet of the perimeter of the site, at a scale of not more than 50 feet to the inch; any relevant deed restrictions or covenants pursuant to deed, lease, mortgage or any other document where such restrictions or covenants affect the use of the land shall also be noted. A deed of ownership shall be submitted.

(b) The proposed use, location, height and design of all existing and proposed buildings and structures not designated for demolition or removal, including front elevation.

(c) Any proposed division of buildings and structures.

(d) Any proposed division of any building into units of separate occupancy.

(e) The proposed spatial arrangement of land uses.

(f) Existing topography and proposed grade elevations, at intervals of two feet or less.

(g) Location of all existing watercourses, intermittent streams, wetland areas, rock outcrops, wooded areas and other significant existing features.

(h) The general configuration of all existing and proposed public and private roads, drives and walkways.

(i) Proposed final grades, including detailed information relative to methods to be used to retain, stabilize and/or refurbish regraded areas.

(j) Location of all parking and truck loading areas, with access and egress drives thereto.

(k) Location of traffic safety devices and directional flow of traffic.

(l) Location of any outdoor storage.

(m) Location and description of all existing and proposed site improvements, including but not limited to drainage pipes, drains, culverts, ditches, bridges or other drainage works, retaining walls and medians, dividers and fences. Drainage information shall be provided by a licensed professional engineer, furnished under his seal.

(n) Location of all proposed and existing easements.

(o) Location of any special and/or zoning district lines.

(p) Description of method of water supply and sewage and garbage disposal and location of such facilities.

(q) Location, height and size of all signs.

(r) Location, height, quality and design of all landscaping and buffer areas, including information required by the Town of Greenburgh Ordinance entitled "Trees." Editor's Note: See Ch. 260, Trees.

(s) Location, height and design of lighting, power and communication facilities.

    (t)  Letters or permits from other agencies having jurisdiction as to their comments on the site development plan.

    (u)  Location of fire and other emergency zones, including the location of fire hydrants.

    (v)  Location, height, design and direction of all exterior and rooftop structures and facilities, including the placement of noise baffles and appropriate screening.

    (w)  The proposed location and design of all parking and access facilities as are required for the handicapped pursuant to the New York State Building Code.

    (x)  Any other pertinent information as may be necessary to determine and provide for the proper enforcement of this article as determined by the approving agency.

(2)  If the site plan indicates a development in stages, a supplementary plan shall be submitted simultaneously with the proposed site plan, indicating total contemplated development.

(3)  A site plan, following approval by the approving agency, shall be valid for a period of 24 months from the date of such approval unless a longer period of time is granted by the approving agency for cause shown. If there is no substantial change in the condition of the site and/or its environs, site plan approval may be extended by the approving agency for cause shown. **[Amended 7-8-1987 by L.L. No. 3-1987]**

(4)  After approval of a complete site plan, subsequent applications for alterations which are referred to the approving agency by the Building Inspector or Secretary to the Planning Board in accordance with § 285-56D herein need only contain documents and information which directly relate to the alteration under consideration. However, the alteration will be considered in relation to the entire site plan as previously approved.

D.  Referral. The Planning Board may forward one copy of the site plan application to the Town Engineer, the Building Inspector, the Water Department, the Fire District, the Police Department, the County Planning Department, the Greenburgh Environmental Quality Control Commission and the State Department of Transportation, if the site plan shows frontage along a state highway, and any other local, state, county, regional and federal agencies having jurisdiction, as well as to any technical consultant that the Planning Board, in its discretion, deems necessary or appropriate for a thorough review of the application.

E.  Public hearing.

    (1)  A public hearing on a site plan application shall be scheduled and conducted by the Planning Board, unless such hearing has been waived pursuant to § 285-57B, within 60 days after certification to the Planning Board by the Secretary to the Planning Board of receipt of a properly completed application. Public notices shall be as required by the Town Law of the State of New York.

    (2)  The Planning Board may, in its discretion, waive the hearing requirements after having made written findings setting forth why such waiver is not inconsistent with the purpose of this article.

    (3)  If the Planning Board fails to waive or to conduct a hearing within 60 days after certification, the application shall be deemed to be approved.

F.  Action by Planning Board.

    (1)  Within 60 days of the date of the public hearing held after the receipt of a properly completed application, or where the hearing is waived within 60 days after the Planning Board meeting at which the waiver was granted, the Planning Board shall act to either approve, disapprove or approve with conditions the site plan application and shall specify what conditions, if any, are necessary.

    (2)  Planning Board disapproval shall include written findings.

    (3)  Approval of amendments to an approved site plan shall be acted upon in the same manner as an application for the approval of an original site plan. The fact that a hearing was held or that it was waived upon the original application does not predetermine how an amended site plan application is to be processed. Each application should be judged on its own merits and by its potential impacts.

## § 285-58. Applications to Town Board.

A.

    The application procedure for site plan approval by the Town Board shall involve a four-stage process:

presubmission conference, site plan application referral to the Planning Board (during which a public discussion may be held by the Planning Board) for its recommendation to the Town Board and a public hearing by the Town Board.

B. Presubmission conference. The procedures set forth at § 285-57B shall apply equally to this section.

C. Application for site plan approval. The procedures set forth at § 285-57C shall apply equally to this section.

D. Referral.

    (1) The Town Board shall forward 16 copies of the site plan application to the Planning Board for review and recommendation.

    (2) The Town Board may forward one copy of the site plan application to the Town Engineer, the Building Inspector, the Water Department, the Fire District, the Police Department, the County Planning Department, the Greenburgh Environmental Quality Control Commission and the State Department of Transportation, if the site plan shows frontage along a state highway, technical consultants and any other local, state, county, regional and federal agencies having jurisdiction.

    (3) The Planning Board, with the assistance of the Department of Community Development and Conservation and other departments which they deem advisable to consult, shall review the site plan and, within 90 days from the date of referral, shall render a recommendation pursuant to its findings to the Town Board.

        (a) The Planning Board may call upon the Westchester County Planning Department, the Soil Conservation Service and for any other technical consultant that the Planning Board, in its discretion, deems necessary for a thorough review of the application.

        (b) The Planning Board, at its discretion, may hold a public discussion on the referred application within the ninety-day period allotted for review and recommendation. Notice of such public discussion shall be circulated as specified in § 285-57E.

        (c) The Planning Board may, at its discretion, recommend conditions or improvements in the site plan for review of the Town Board in its decision as to site plan approval.

E. Public hearings. After review of the recommendations of the Planning Board and within 45 days after the next regular meeting of the Town Board following receipt of those recommendations, the Town Board shall conduct a public hearing on the site plan application. Public notice shall be as required by the Town Law of the State of New York.

F. Action by Town Board.

    (1) The procedures set forth at § 285-57F, with the exception of the waiver provision in Subsection F(1) thereof, shall apply equally to the Town Board under this section.

    (2) The Town Board may, in its discretion, waive the hearing requirement on applications for amendments to previously approved site plans after having made written findings setting forth why such waiver is not inconsistent with the purpose of this article.

### § 285-59. Filing of approved site plan with Building Inspector.

The approved site plan shall be revised by the applicant to include all conditions imposed by the approving agency. It may then be signed and dated by the Secretary to the Planning Board. The approving agency shall submit a signed copy of the approved site plan, revised as set forth above, to the Building Inspector.

### § 285-60. Fees. [Amended 7-8-1987 by L.L. No. 3-1987]

Every application for site plan shall be accompanied by a fee of $300, plus $3 per each required off-street parking space, to help defray the costs of processing the site plan application. Additionally, should the approving agency deem it necessary to hire consultants for technical review, the applicant shall be required to bear the expense, not to exceed the total cost to the Town. In addition, if deemed necessary by the approving agency, the applicant shall be required to bear the costs of on-site inspection by technical consultants employed by the Town. In all cases, the applicant shall be required to bear the costs of on-site inspection by the Town Engineer and the Building Inspector and their employees.

### § 285-61. Performance guaranty.

The approving agency may require that public improvements and landscaping be secured by a performance guaranty in the same manner prescribed for such improvements in the Town Subdivision Regulations Editor's Note: See Ch. 250, Subdivision Regulations. and/or through the use of letters of credit approved as to form by the office of the Town Attorney and as to substance by the approving agency.

### § 285-62. Penalties.

Any violation of this article is subject to the same penalties as set forth in § 285-47 of this chapter.

### § 285-63. Waiver of requirements.

Upon a finding by the approving agency that, due to the particular character or limited nature of a development or change in use, or to special conditions peculiar to a site, the submission of a preliminary and/or final site plan or of certain portions of the information normally required as part of the site development plan is inappropriate or unnecessary or that strict compliance with said requirements will cause extraordinary and unnecessary hardship, the approving agency may vary or waive such submission or requirements wherever, in the opinion of the approving agency, such variance and waiver will be consistent with the goal of promoting the public health, safety, comfort, convenience and general welfare of the community. The findings for granting such waiver shall become a part of the public record.

## ARTICLE IX Amendments

### § 285-64. Amendment procedure.

This chapter or any part thereof, including the Zoning Map, Supplementary Zoning Map and schedules attached thereto, may be amended, supplemented, changed, modified or repealed, from time to time, by the Town Board on its own motion; upon recommendation by the Planning Board; or by petition of a property owner to the Town Board. Every proposed amendment shall be referred by the Town Board to the Planning Board for a report and recommendation thereon before a public hearing is held by the Town Board. Except by three-fourths vote, the Town Board shall not adopt any amendment, of whatever nature, to this chapter, if the Planning Board has not approved it, except in the instance where the Planning Board fails to convey its report to the Town Board within the sixty-day time limitation as established in Subsection B(3) of this section; in which case, such failure to report shall be construed by the Board as approval. Before adopting any amendment, the Town Board shall adopt a resolution setting forth the findings upon which the Town Board determined such amendment to be required by the public interest in furtherance of the purposes set forth in Article I herein.

A. Petition by a property owner. A petition for an amendment or change may be presented to the Town Board by the owner or owners of any property in the unincorporated area of the Town of Greenburgh who desires a change in the provisions of this chapter affecting his or their property. The petition shall be made on a standard form prescribed by the Town Board and shall set forth the full names and addresses of both the record and any beneficial owners of the property, an accurate description of the property and any improvements thereon, the location thereof, the exact change which the petitioner desires and such other information as the Town Board may require. Each such petition shall be verified by the petitioner, and, if different parties hold the record and beneficial ownerships of the property, all such parties must join in such petition and verify the same.

B. Report of the Planning Board. In making its report on any proposed amendment, the Planning Board shall make inquiry and determination concerning the items specified below:

   (1) Concerning a proposed amendment to or change in the text of this chapter.

      (a) Whether such change is consistent with the aims and principles embodied in the chapter as to the particular districts concerned;

      (b) Which areas, land uses, buildings and establishments in the Town will be directly affected by such change and in what way they will be affected;

      (c) The indirect implications of such change in its effect on other regulations; and

    (d) Whether such proposed amendment is consistent with the aims of the official planning policies of the Town of Greenburgh.

  (2) Concerning a proposed amendment involving a change in the Zoning Map.

    (a) Whether the uses permitted by the proposed change would be appropriate in the area concerned;

    (b) Whether adequate public school facilities and other public facilities, utilities and services, including roads, exist or can be reasonably expected to be created or serve the needs of any additional dwellings or other uses likely to be constructed as a result of such change;

    (c) Whether the proposed change is in accord with any existing or proposed plans in the vicinity; and

    (d) The effect of the proposed amendment upon the development of the Town as envisioned by the official planning policies of the Town of Greenburgh.

  (3) Timing of Planning Board report.

    (a) With respect to any proposed amendment or change referred to it by the Town Board, the Planning Board shall submit its report and recommendation to the Town Board not more than 60 days after the first meeting of the Planning Board held subsequent to such referral unless, within such 60 days, such proposal shall be withdrawn or amended or the Planning Board shall determine that, by reason of the complexity of the questions presented or like considerations, an additional period of time, not exceeding 30 days, is reasonably required for the proper disposition thereof.

    (b) If, during the thirty-day period aforesaid, the Planning Board decides that further time is necessary for a full and fair determination of the issues, then one more thirty-day period shall be permitted for its deliberations. [Amended 3-24-1982]

    (c) If the Planning Board shall not have submitted its report and recommendations within such original 60 days or additional periods not exceeding 60 days, the Town Board, in its discretion, may proceed to final consideration of the proposal as though the Planning Board has recommended approval of the proposal.

  (4) Contents of Planning Board report and recommendation. In recommending the adoption of any proposed amendment or change, the Planning Board shall report to the Town Board the reasons for such recommendation, describing any change in conditions that the Planning Board believes warrants the amendment or change and its relation to the applicable provisions of Subsection B(1) and (2) of this section. If the Planning Board recommends against the adoption of a proposed amendment or change, or modification of said proposed amendment or change, it shall include in its report a statement of its reasons for such disapproval or modification.

C. Required fee. Each petition for a zoning amendment shall be accompanied by the required fee. The amount of such fee shall be as may be determined from time to time by the Town Board. No fee shall be required for petitions filed in favor of or against any application previously filed.

D. Public hearing. By resolution adopted at a meeting of the Town Board, the Town Board shall fix the time and place of a public hearing on the proposed amendment and cause notice thereof to be given in accordance with the provisions of § 264 of Article 16 of the Town Law. In addition to meeting all other requirements under the law, all notices of public hearing shall specify the nature of any proposed amendment, the land or district affected and the date when and the place where the public hearing will be held. At least 10 days' notice of the time and place of such hearing shall be published in the official newspaper. No further proceedings on the part of the Town Board need be had with respect to a proposed amendment or change which has been disapproved by the Planning Board unless the Town Board shall, by resolution, determine that a public hearing should be held by reason of the particular facts and circumstances involved. When a proposed amendment or change is initiated by petition pursuant to Subsection A(1) of this section, the expenses of advertising notice of public hearing of such proposal shall be paid by the petitioner.

E. Referral to other communities. Should any proposed amendment consist of or include either of the two following conditions, the Town Clerk shall transmit to the clerk of the municipality affected a copy of the official notice of the public hearing not later than 10 days prior to the date of hearing.

    (1) Any change in the boundaries of any district, which change would occur within a distance of 500 feet of the boundary of any village, town or city.

    (2) Any change in the regulations prescribed for any district, any portion of which is located within 500 feet of the boundary of any village, town or city.

F.  Referral to Westchester County Planning Board. The proposed amendment shall be submitted to the Westchester County Planning Board, when so required by the Westchester County Administrative Code, prior to final action by the Town in said amendment.

G.  In the case of a protest against any amendment signed by the owners of 20% or more either of the area of the land included in such proposed change or of that immediately adjacent, extending 100 feet therefrom, or of that directly opposite thereof, extending 100 feet from the street frontage of such opposite land, such amendment shall not become effective except by the favorable vote of at least 3/4 of the members of the Town Board.

**§ 285-65. Applicability of certain amendments. [Added 7-8-1987 by L.L. No. 3-1987; amended 2-10-1988 by L.L. No. 1-1988]**

The amendments to this chapter adopted as Local Law No. 3-1987 shall not apply to any property for which a site plan, overall comprehensive development plan or preliminary subdivision has been approved prior to the effective date of Local Law No. 3-1987, and provided further that construction proceeds diligently as approved within the time period allowed by such approval, and shall not apply to any site plan amendment hereinafter approved amending such a site plan or overall comprehensive development plan, provided that said future site plan amendment does not increase the floor area ratio of the development (or maximum coverage where there is no floor area ratio requirement) above that previously approved or the currently permitted maximum floor area ratio (or maximum coverage where there is no floor area ratio requirement), whichever is greater.

## ARTICLE X Severability; Validity; Repealer; When Effective

### § 285-66. Severability.

Should any section or provision of this chapter be decided by the courts to be unconstitutional or invalid, such decision shall not affect the validity of the chapter as a whole or any part thereof other than the part so decided to be unconstitutional or invalid.

### § 285-67. Validity.

The Town Board hereby declares that it would have adopted every section, subsection, paragraph, subparagraph, sentence, clause or phrase of this chapter regardless of the fact that any other section, subsection, paragraph, subparagraph, sentence, clause or phrase is declared invalid.

### § 285-68. Repealer.

The Zoning Ordinance of the Town of Greenburgh, as revised and amended by the Town Board on August 6, 1957, effective September 17, 1957, and any and all amendments thereto, Editor's Note: This ordinance comprised former Ch. 65, Zoning, of the Code of the Town of Greenburgh. are hereby repealed. Such repeal shall not affect or impair any act done, offense committed or right accruing, accrued or acquired, or liability, penalty, forfeiture or punishment incurred, prior to the time such repeal takes effect, but the same may be enjoyed, asserted, enforced, prosecuted or inflicted as fully and to the same extent as if such repeal had not been effected.

### § 285-69. When effective.

This chapter shall take effect as provided for in §§ 133 and 265 of the Town Law of the State of New York.

# Exhibit G

## Chapter 520: CONSERVATION ADVISORY COUNCIL

[HISTORY: Adopted by the Town Board of the Town of Greenburgh 11-13-1991 by L.L. No. 32-1991. Amendments noted where applicable.]

**GENERAL REFERENCES**
Environmental quality review — See Ch. 200.
Excavations and soil removal — See Ch. 210.
Historic districts and landmarks — See Ch. 235.
Trees — See Ch. 260.
Watercourse protection — See Ch. 270.
Wetlands and watercourses — See Ch. 280.
Water conservation — See Ch. 465.

### § 520-1. Legislative intent.

A. The preservation and improvement of the quality of the natural and man-made environment within the Town of Greenburgh, in the face of population growth, urbanization and technological change, with their accompanying demands on natural resources, are found to be of increasing and vital importance to the health, welfare and economic well-being of present and future inhabitants and require forthright action by the governing body of the Town of Greenburgh. It is recognized that the biological integrity of the natural environment on which man is dependent for survival and the natural and functional beauty of our surroundings which affect the quality of our life experience cannot be protected without the full cooperation and participation of all the people of the Town working in partnership with local, state and federal officials and with various public and private institutions, agencies and organizations. Establishment of a council for conservation of the environment is a necessary step in fostering unified action on environmental problems.

B. This chapter shall be deemed an exercise of the powers of the Town to preserve and improve the quality of the natural and man-made environment on behalf of the present and future inhabitants thereof. The chapter is not intended and shall not be deemed to impair the powers of any other public corporation.

### § 520-2. Establishment.

A. There is hereby created for the Town of Greenburgh a Conservation Advisory Council, hereinafter referred to as the "CAC."

B. The CAC shall consist of nine members who shall be residents of the unincorporated area of the Town and shall be appointed by the Town Board. Each member shall be appointed for a two-year term, except that four initial appointees shall be appointed for one-year terms so that the terms shall thereafter be staggered. Vacancies on the CAC shall be filled in the same manner as for any other appointee, except that the replacement shall serve only for the unexpired term.

C. The Town Supervisor, the Chairman of the Planning Board, the Commissioner of the Department of Public Works, the Commissioner of the Department of Parks and Recreation, the Town Attorney and other officials that may hereafter be designated by the Town Board shall be ex officio members of the CAC.

D. The Town Board shall designate a member of the CAC to act as Chairman thereof. The members of the CAC shall elect from among themselves a recording secretary, who shall keep accurate records of its meetings and activities and shall file an annual report. The CAC shall adopt rules and regulations for its meetings.

E. No members of the CAC, including ex officio members, shall receive any compensation for their services as members thereof, but they may be reimbursed for reasonable and necessary expenses incurred in the performance of their duties within appropriations which are made available therefor.

### § 520-3. Powers and duties.

The powers and duties of the CAC shall be to:

A. Advise the Town Board on matters affecting the preservation, development and use of the natural and man-made features and conditions of the Town insofar as scenic and aesthetic qualities, geological, biological and hydrological integrity and other environmental factors are concerned and, in the case of human

activities and developments, with regard to any major threats posed to environmental quality, so as to enhance the environment.

(1) To this end, the CAC shall receive copies of any application submitted to the Town Board or any administrative agency thereunder which seeks approval for the use or development of any open area listed in the open space index. Copies of any environmental assessment form(s) shall be included with the application. Additionally, the CAC shall be provided with such other information as it may reasonably request from time to time.

(2) Within 45 days after receiving copies of the application, the CAC shall submit a written report to the appropriate body. This report shall examine, evaluate and make recommendations regarding the proposed use and its effect on the environment.

B. Develop and conduct a program which shall be designed to increase understanding of the nature of environmental problems and issues and support for their solutions in the community.

C. Conduct studies, surveys and inventories of the natural and man-made features within the Town and such other studies and surveys as may be necessary to carry out the general purposes of this chapter. The CAC shall prepare and maintain an open space plan and index and a natural resources inventory.

D. Seek to coordinate, assist and unify the efforts of private groups, institutions and individuals within the Town in accord with the purposes of this chapter.

E. Maintain liaisons and communications with public and private agencies and organizations of local, state and federal scope whose programs and activities have an impact on the quality of the environment or who can be of assistance to the CAC.

F. Prepare, print and distribute and obtain and maintain books, maps, charts, reports, pamphlets and other publications in accord with this chapter and to assist the Council in researching local environmental conditions.

G. When authorized by resolution of the Town Board, the CAC may accept, by gift, grant, devise, bequest or otherwise, property, both real and personal, in the name of the Town of Greenburgh as may be necessary to conserve, protect and otherwise properly utilize open spaces and other land and water resources within the boundaries of the Town. Such real property may be accepted in fee for land and water rights or as any lesser interest, development right, easement, including conservation easement, covenant or other contractual right, including a conveyance with limitations or reversions.

H. Carry out such other duties as may be assigned from time to time by the Town Board.

## § 520-4. Annual reports.

The CAC shall submit an annual report, in writing, to the Town Board, not later than the first day of April of each year, concerning the activities and work of the CAC and from time to time shall submit such reports and recommendations as may be necessary to fulfill the purposes of this chapter.

# Exhibit H

**Exhibit H** : Due to the large size of this exhibit,
a hard copy has been physically served upon opposing
counsel and filed with the Court by prior permission.

# Exhibit I

**Exhibit I** : Due to the large size of this exhibit,
a hard copy has been physically served upon opposing
counsel and filed with the Court by prior permission.

# Exhibit J

**Exhibit J** : Due to the large size of this exhibit,
a hard copy has been physically served upon opposing
counsel and filed with the Court by prior permission.

# Exhibit K

**Exhibit K** : Due to the large size of this exhibit,
a hard copy has been physically served upon opposing
counsel and filed with the Court by prior permission.

# Exhibit L

**Exhibit L** : Due to the large size of this exhibit,
a hard copy has been physically served upon opposing
counsel and filed with the Court by prior permission.

# Exhibit M

**Exhibit M** : Due to the large size of this exhibit,
a hard copy has been physically served upon opposing
counsel and filed with the Court by prior permission.

# Exhibit N

**Exhibit N** : Due to the large size of this exhibit,
a hard copy has been physically served upon opposing
counsel and filed with the Court by prior permission.

## AFFIDAVIT OF SERVICE VIA FEDERAL EXPRESS

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )

   **RYAN NEW**, being duly sworn, deposes and says, that deponent is not a party to the action, is over 18 years of age and resides at NEW YORK, NEW YORK.

   That on the 29th day of February, 2008, deponent served the within **DECLARATION OF THOMAS MADDEN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** upon:

>    John A. Risi, Esq. (JR 6475)
>    BLEAKLEY PLATT & SCHMIDT
>    One North Lexington Avenue
>    P.O. Box 5056
>    White Plains, New York 10602-5056

attorneys in this action, at the addresses designated by said attorneys for that purpose by depositing a true copy of same enclosed in a postpaid properly addressed Federal Express overnight mail wrapper, under the exclusive care and custody of Federal Express.

_____
                            Ryan New

Sworn to before me this
29th day of February, 2008

_____
        Notary

CHRISTOPHER FRETEL
NOTARY PUBLIC, State of New York
No. 02FR6123499
Qualified in New York County
Commission Expires March 7, 2009

457570.1 DocsNY