UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

S&R DEVELOPMENT ESTATES, LLC and "JOHN DOE" NOS. 1 THROUGH 75,

Plaintiffs,

- against -

STEVEN BASS, EDDIE MAE BARNES, PAUL FEINER, DIANA JUETTNER and FRANCIS SHEEHAN, Constituting the Town Board of the Town of Greenburgh, Westchester County, New York, STEVEN BELASCO, MALCOLM BAUMGARTNER, EVE BUNTING-SMITH, NICHOLAS DECICCO, LAWRENCE DOYLE, ROHAN HARRISON and DANIEL ROSENBLUM, Constituting the Zoning Board of Appeals of the Town of Greenburgh, Westchester County, New York, MARK STELLATO, Commissioner of the Department of Community Development and Conservation of the Town of Greenburgh, TOWN OF GREENBURGH and JOHN and JANE DOE,

Defendants.

---------------------------------------------------------------X

**DECLARATION OF CAROLE WALKER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

07 Civ. 11112(WCC)(GAY)
ECF CASE

**CAROLE WALKER** hereby declares as follows:

1. I am the secretary to the Town of Greenburgh Zoning Board of Appeals ("ZBA").

2. This declaration is submitted in support of Defendants' motion to dismiss plaintiffs' Amended Complaint.

3. As the ZBA Secretary, I am responsible for maintaining the ZBA's files relative to any appeals to the ZBA. The ZBA's files include any and all documents and submissions made by the parties to the appeal to the ZBA.

4.    On or about April 26, 2007, plaintiff S&R Development Estates, LLC ("S&R") appealed the decision and determination by defendant Mark Stellato (Greenburgh's former Commissioner of the Department of Community Development and Conservation) that property owned by S&R at 1 Dromore Road (also referred to as 62 Dromore Road) in the Town of Greenburgh, was located within an R-20 District, not a CA District.

5.    At that time, I assigned S&R's appeal case number 07-15. As secretary to the ZBA, I was responsible for maintaining the ZBA's file relative to S&R's appeal.

6.    Attached as Exhibit A is a true and correct copy of the July 9, 2007 Affidavit of Richard Troy submitted to the ZBA (without exhibits) ("the Troy Affidavit"). Mr. Troy submitted to the ZBA several of the Exhibits attached to this Declaration.

7.    Attached as Exhibit B is a true and correct copy of the July 19, 2007 Memorandum of Commissioner Stellato to the ZBA (with exhibits 1-6) ("the Stellato Memo"). Commissioner Stellato's memo referenced and attached several of the Exhibits attached to this Declaration.

8.    The following are true and correct copies of the documents which were filed with the ZBA as part of S&R's appeal:

**Exhibit C** - the Town of Greenburgh Town Board's Resolution dated May 24, 1978, which was submitted to the ZBA as Exhibit 2 to the Stellato Memo.

**Exhibit D** - Local Law 5/97 enacted on April 9, 1997, which was submitted to the ZBA as Exhibit 4 to the Stellato Memo.

**Exhibit E** - a posting released on the Town of Greenburgh's website dated January 6, 2007 from Greenburgh's Conservation Advisory Council ("CAC") entitled "CAC favors acquisition of Dromore Road property," which was submitted to the ZBA as Exhibit 10 to the Troy Affidavit.

**Exhibit F** - a posting released on the Town of Greenburgh's website on January 1, 2007 entitled "Goals 2007," which was submitted to the ZBA as Exhibit 6 to the Troy Affidavit.

**Exhibit G** - Entries from defendant Paul Feiner's (Supervisor of the Town of Greenburgh) internet blog dated January 4, 2007, which was submitted to the ZBA as Exhibit 8 to the Troy Affidavit.

**Exhibit H** - a posting released on the Town of Greenburgh's website dated January 8, 2007 from Supervisor Feiner entitled "Moratorium on development: Central Ave recommended by Planning Commissioner," which was submitted to the ZBA as Exhibit 12 to the Troy Affidavit.

**Exhibit I** - Commissioner Stellato's February 26, 2007 letter to Janet Giris, Esq. (counsel for S&R), which was submitted to the ZBA as Exhibit 1 to the Troy Affidavit.

**Exhibit J** - a Memorandum dated February 27, 2007 from Commissioner Stellato to Town Engineer Michael LePre, which was submitted to the ZBA as Exhibit 5 to the Stellato Memo.

**Exhibit K** - the ZBA's Certificate of Decision filed with the Town Clerk on November 1, 2007 and my accompanying e-mail forwarding this decision to several individuals, including S&R's principal Richard Troy and S&R's counsel John Risi, Esq.

**Exhibit L** - My November 9, 2007 letter to Richard Troy and accompanying copy of the ZBA's Certificate of Decision filed with the Town Clerk on November 9, 2007.

9. I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on the 29 th
day of February 2008.

Carole Walker

Carole Walker

# EXHIBIT A



TOWN OF GREENBURGH
ZONING BOARD OF APPEALS

---------------------------------------------------------------X

In re: Appeal of S&R Development Estates, LLC Of Determination of Mark Stellato, Commissioner, Department of Community Development and Conservation for the Town of Greenburgh regarding zoning classification of Property located at 62 Dromore Road, Volume 8, Section 31, Sheet 37B, Block 1692, Parcels 14A, 70A, 70B and 70C.

Case No.: 07-15

**AFFIDAVIT**

---------------------------------------------------------------X

STATE OF NEW YORK )
)ss.
COUNTY OF WESTCHESTER )

RICHARD TROY, being duly sworn, deposes and says that:

1. I am a managing member of S&R Development Estates, LLC ("S&R") and submit this affidavit in connection with the appeal filed by S&R with the Zoning Board of Appeals.

2. S&R is appealing from a February 26, 2007 letter determination by Mark Stellato, Commissioner, Department of Community Development and Conservation for the Town of Greenburgh, wherein he determined that the property owned by S&R, 1 Dromore Road, Scarsdale, New York (the "Property") is not located within the Central Avenue Mixed Use Impact District ("CA-I Zone") of the Town of Greenburgh but rather is located within an R-20 zone (see Exhibit 1).

3. In fact, the Property is located within the CA-I Zone.

**Due Diligence Prior to Acquisition:**
**Acquired Title to Property May 24, 2006**

4. In September 2004, my brother, Stephen Troy (the other managing member of S&R) and I commenced our due diligence regarding the acquisition and

development of the Property. We obtained a copy of the year 2000 official Town of Greenburgh Zoning Map which clearly showed the Property in the CA-I Zone. Subsequently, I visited the Greenburgh Public Library and examined the earlier November 1997 Greenburgh Zoning Map, which was publicly displayed. That earlier map, along with the later 2006 Greenburgh Zoning Map, also clearly shows the Property located in the CA-I Zone. Further, our Property was designated as zoned CA-I in the following Official Town Maps: the 1996 Map, two separate 1997 Maps, the 2000 Map, the 2003 Map and the 2006 Map.

5. Continuing our due diligence efforts, we met with Peter Gaito, a licensed architect experienced with the zoning ordinance of the Town of Greenburgh. He reviewed his copy of the official Town of Greenburgh Zoning Map and confirmed to us that the Property was in the CA-I Zone. He informed us that since the Property is in excess of two acres, a permitted use of the Property would include a multifamily development of not more than four stories in height with a maximum density of 35 bedrooms per acre. See Town Code Section 285-29.1 (B) (3) (a). That would permit a development with 82 one bedroom apartments on 2.34 acres before deduction for steep slopes.

6. Section 285-7 (A) of the Greenburgh Town Code, entitled "Zoning Map; interpretation of district boundaries" states:

> The boundaries of such districts and special building lines are hereby established as shown on the map entitled "Zoning Map, Town of Greenburgh," which map is annexed to and is hereby adopted and declared to be a part of this chapter and is hereinafter referred to as the "Zoning Map." Said Zoning Map may be amended in the same manner as any other part of this chapter. An official copy of said map, indicating the latest amendments, shall be kept up to date in the office of the Building Inspector and in the office of the Commissioner of Community Development and

> Conservation for the use and benefit of the public. Said Official Zoning Map shall be the **final authority** [emphasis added] as to the current zoning classification of any land within the boundaries of the unincorporated Town of Greenburgh.

7. We also consulted legal counsel to confirm Mr. Gaito's zoning determination. Together with Mark Weingarten, Esq. and Janet Giris, Esq. of DelBello, Donellan Weingarten Tartaglia Wise & Wiederkehr, LLP, we confirmed that the Property was located in the CA-I Zone.

8. Thereafter, my brother and I attended a meeting with our architect Mr. Gaito and Thomas Madden, Deputy Commissioner, Department of Community Development and Conservation for the Town of Greenburgh. Deputy Commissioner Madden confirmed to us that the Property was zoned CA-I and reviewed pertinent CA-I Zoning provisions: open space rules, coverage issues, maximum height, side yards, the requirement for a minimum lot size of 2 acres (after deduction for "steep slopes") and the number of allowable bedrooms (35 per acre). Deputy Commissioner Madden expressed no concerns with regard to the development's potential impact on the environment, open space, Greenburgh Nature Center (GNC) or water/sewer capacity. He said there should be no obstacles to our multifamily development especially since our property adjoined an existing multifamily development known as Scarsdale Woods Condominiums (188 units). He raised no objection and was receptive to a new multifamily development of 35 bedrooms per acre (subject only to reduction for steep slopes) on the Property. He stated a preference that our development, to the extent possible, be consistent with the architectural style of the Scarsdale Woods multifamily development adjacent to the Property. He also

mentioned that we should explore the possibility of sharing a driveway with the Scarsdale Woods complex.

9.       In September 2005, still before purchasing the Property, we hired Howard Gelbtuch, MAI, CRE, FRICS, an MAI Appraiser, to give us an opinion as to the Property's value. As basis for Mr. Gelbtuch's opinion, Gary Spilatro, a licensed architect in New Rochelle with extensive zoning experience throughout Westchester County, provided his confirmation that the Property was in the CA-I Zone. His confirmation was formally set forth in his letter dated September 6, 2005 (Exhibit 2). Before issuing his letter and confirmation that the Property was in the CA-I Zone, Mr. Spilatro made his own due diligence investigation. He went directly to Town Hall to confirm the zoning. Before he provided his opinion, he consulted the official zoning map on the wall of the office of the Department of Community Development and Conservation, observed the Property's inclusion in the CA-I Zone and was told emphatically by an employee in the office that the "map controls" a particular parcel's zoning designation. Based upon Mr. Gelbtuch's own study and the Spilatro zoning letter, Mr. Gelbtuch valued the Property at $10,200,000 for a multifamily development of up to 82 one bedroom apartments (see Exhibit 3).

10.      On May 24, 2006, after our extensive due diligence – consultations with the Deputy Planning Commissioner of Greenburgh, local zoning counsel, two licensed Architects in Westchester and obtaining an Independent MAI appraisal, S&R closed on the acquisition of the Property in good faith reliance that it was located in the CA-I Zone.

**Demolition Of Single Family Home, Swimming Pool And Preparation Of Development Plans In Reliance On CA-I Zoning Designation**

11. After purchasing the Property, S&R engaged John Meyer Consulting as engineers for the development on the Property of a four story multi-family structure with 37 two bedroom apartments. Meyer Consulting is well known throughout Westchester having completed many successful projects for municipalities, institutions and private developers. In the Town of Greenburgh, Meyer Consulting has overseen the engineering for, among others, the following projects: the Midway Shopping Center on Central Avenue, the new Science Building and Middle School for the Hackley School and the Madison Square Garden Training Facility for the Knicks, Liberty and Rangers.

12. S&R also engaged John Sullivan of Sullivan Architecture (the architect for the large Cappelli/Trump Project in Yorktown as well as an addition to the monastery immediately adjoining and immediately east of the Property); the Munson Company as surveyors; and Galdun Frankel Environmental, all to serve on the development team for the Property together with attorneys and the appraiser.

13. On or about October 18, 2006 Sullivan Architecture provided its independent review of the zoning ordinance of the Town of Greenburgh confirming, yet again, that the Property is in the CA-I Zone and pursuant to that zoning designation and the property's size, less a deduction for "steep slopes" (based upon a survey by the Munson Company locating steep slopes and measuring them and also measuring the area of the Property free of steep slopes), a maximum of 75 one bedroom apartments could be built on the property (see Exhibit 4, Sullivan opinion letter). Prior to concluding his independent review of the zoning ordinance, Mr.

Sullivan called John Lucido, the Building Inspector of the Town of Greenburgh. Mr. Lucido spoke with Mr. Sullivan regarding the Property and then, in a subsequent phone call, confirmed that the Property is zoned CA-I.

14.    From December 6 through December 12, 2006, the demolition of the 3,200 square foot home and swimming pool which had been on the property was undertaken pursuant to a demolition permit by the Town issued December 1, 2006. The permit to demolish was conditioned upon S&R taking the following steps:

a)    First, Munson Company surveyed the Property and provided a new survey and topographical map.

b)    Second, Galdun Frankel Environmental performed a Phase I environmental review of the Property which confirmed that the Property contained no wetlands or water courses.

c)    Third, because the Phase I review indicated there was asbestos containing material in the existing home, S&R retained Even Air, Inc. which performed the necessary asbestos remediation and Testor Environmental Technologies, Inc. which undertook the asbestos monitoring during the course of remediation.

d)    Fourth, Consolidated Edison removed the electric facilities from the Property.

e)    Fifth, S&R worked with the Greenburgh Water and Sewer Department and the Town  obtained a street opening permit and performed a water main disconnect in the street and shut off water service to the Property pursuant to Town law.

f)    Sixth, phone and cable service to the Property were disconnected.

g)    Seventh, Robison Oil pumped out the remaining oil in the above ground oil tanks.

15.     After completing the aforementioned seven steps, S&R submitted to the Town of Greenburgh a Steep Slopes Survey and Slope Clearance Form (reviewed by John Meyer Consulting), a Wetland/Watercourse Clearance Form and a Phase I Environmental Assessment. The Town approved the Slope Clearance Form and the Wetland/Watercourse Clearance Form. The Town reviewed and approved S&R's Application for Plan Examination and Demolition Permit. Thereafter, the Town of Greenburgh issued its demolition permit dated December 1, 2006. The Town issued a certificate of completion of the work on December 15, 2006.

16.     That work resulted in the complete demolition of the previously existing 3,200 square foot home and the excavation and removal of its foundation; the excavation and removal of the swimming pool and the filling and re-grading of the Property to provide a completely vacant, clean and level well located parcel of 2.34 acres ready for the construction of an as-of-right apartment complex with 75 one-bedroom apartments (or as we then planned 37 two bedroom apartments).

17.     While we were pursuing the demolition of the Property, in July of 2006, we received an offer to purchase the Property at a price of $6,000,000.00. The proposed purchaser was a multi-billion dollar investment fund based in New York City. We rejected that offer in light of our appraisal and the greater value that we ascribed to the as-of-right development opportunity.

**Concerted Action And Conspiracy By Supervisor Feiner, Town Council Members, Greenburgh Nature Center And Edgemont Community Council To Deprive S&R Of Its Rights And To Prevent The Development Of The Property For Multifamily Apartments Permitted As-Of-Right**

18. Shortly after the commencement of physical demolition of the existing home and improvements on the Property, the Executive Director of the Greenburgh Nature Center ("GNC"), William Lawyer, telephoned our acquisition attorney, Michael Wien, of the firm Tannenbaum Helpern *et al.*, and asked about our proposed development plan. Mr. Lawyer stated that the GNC would oppose any development of more than one or two homes on the Property. Mr. Lawyer then contacted Town Supervisor Paul Feiner to enlist his support to oppose any development on the Property (see Exhibit 5). Supervisor Feiner publicly announced his opposition to any development on the Property, noting in a December 10, 2006 web log entry his desire to "[i]nitiate effort to protect Greenburgh Nature Center from possible development - 1 Dromore Road. Obtain appraisal of property. Reach out to state/county/private individuals for assistance in obtaining property."

19. On December 19, 2006, my brother and I attended a meeting with the following individuals: Mark Stellato, Planning Commissioner of Greenburgh Department of Planning and Conservation, Deputy Planning Commissioner Thomas Madden, John Sullivan (S&R's architect), Bob Roth of John Meyer Consulting (S&R's engineers) and Janet Giris, Esq. of DelBello Donellan *et al.* At the meeting, S&R presented a development plan (the "plan") that called for a four-story building of 37 two bedroom apartments. The plan was designed to create the most attractive structure and landscaping for the site. At the urging of John Sullivan, we proposed to

voluntarily forgo the commercial advantage of open air parking on the site despite the fact that the Scarsdale Woods Condominium immediately to the west of the Property had open air parking. Rather than building a surface parking lot for 82 cars as allowed, Sullivan Architecture prepared a plan for the entire first floor of the building to provide indoor parking for 82 cars. While such a plan would negatively impact the profitability of our project (both in terms of increased construction costs and the loss of saleable square footage) we adopted it as it minimized any negative impact to neighboring properties.

20.    The plan is "as-of-right." It requires no grant of a variance and meets the substantial conditions of setbacks of 80 feet in front, 50 feet in rear with at least 40 feet on each side. Under the plan, the building's footprint would cover only 30% of the overall site area, leaving generous green corridors. Further, S&R did not need, nor did S&R plan to obtain, any variance from the existing Town of Greenburgh Zoning Ordinance, as the plan placed us as-of-right within the requirements for development in the CA-I Zone.

21.    At the December 19, 2006 meeting, Commissioner Stellato raised no objections, doubts nor questions that the Property was in the CA-I Zone, and that the development plan was permitted as an "as-of-right" development for the project encompassing 37 two-bedroom units. Further, Commissioner Stellato did not advise us of his desire for a moratorium along Central Avenue nor express the need to limit residential development density along Central Avenue. His review resulted only in a minor finding that the development plan required amendment to provide for 5,000 square feet of open space within the building envelope. We discussed with the Commissioner the provision of a roof garden to comply with the open space

requirement.

22.    Deputy Commissioner Madden likewise raised no objections, doubts nor questions regarding zoning or the as-of-right qualification of the development plan.  He raised only a concern that one should avoid Type I (ostensibly referring to the State Environmental Quality Review Act or "SEQRA") disturbances of steep slopes over 20%.  He noted affirmatively that sewer and water service were already underneath the road bed of Dromore Road to service the project.  We asked Commissioner Stellato and Deputy Commissioner Madden if they saw any stumbling blocks to our development plan.  They mentioned only the possibility of a SEQRA Type I disturbance and the fact that they would like more of a "green" building.  After the meeting, Mr. Stellato privately told my brother and me that we should be aware of the public comments of the Town of Greenburgh officials in opposition to the development of the Property.

23.    After the meeting with Commissioner Stellato and Deputy Commissioner Madden, our development team met by chance Supervisor Feiner in the hallway of Town Hall.  Supervisor Feiner recognized Janet Giris, Esq. and we had an impromptu conversation while standing in the hallway.  Supervisor Feiner told us "don't listen to the Commissioner and Deputy Commissioner" and that we must go to speak to the Nature Center.  We asked the Supervisor to arrange a meeting with the Nature Center and to attend such a meeting.

24.    After the impromptu conversation with Supervisor Feiner, we again by chance met Mr. Lucido, Building Inspector of the Town of Greenburgh who recognized Janet Giris, Esq. and John Sullivan.  We were introduced to Mr. Lucido, who asked how our project was going.  He told us that that he was sure that the Town

would hold us up for a while but we would eventually get our development done.

25. On or about January 1, 2007, Supervisor Feiner, on the Town of Greenburgh Web Site, reiterated his prior stated position, noting that one of his "goals for 2007 included "[p]resent[ing the] Town Board with options (including acquisition of property/conservation overlay zones/compromise) to protect Greenburgh Nature Center from development that can have a negative impact on wildlife/habitats/eco system. Reach out to state/county/private individuals to determine if a partnership can be established regarding possible acquisition of the Property." See Exhibit 6.

26. Shortly after our acquisition and the demolition of the home and improvements on the Property and after our pre-submission conference with Commissioner Stellato and Deputy Commission Madden, which fulfilled the statutory pre-requisite to proceeding with development, the Town Board put into motion, on an accelerated basis (it was proposed on January 10 and adopted on January 12), a plan to prevent any development of our property by passage of a moratorium on all construction in the CA-I Zone, specifically citing the need to protect the Edgemont School System (see Exhibit 7, moratorium resolution).

27. On January 4, 2007 Supervisor Feiner stated in his web log (Exhibit 8) that he would ask for a resolution to hold a public hearing on the moratorium to be placed on the following Wednesday's agenda of January 12, 2007.

28. In a January 5, 2007 Scarsdale Inquirer article (Exhibit 9), Steve Bass, a Town Council Member, stated that he had spoken to Commissioner Stellato of Greenburgh's Planning Department the previous week and told him to put the moratorium on the board's agenda at one of its January meetings and that he urged the GNC Board to support the moratorium, and that the GNC Board agreed to do so.

29. On January 6, 2007 it came to light that the Greenburgh Conservation Advisory Council voted on December 18, 2006 to assist the Nature Center in acquiring the Property (Exhibit 10).

30. On January 7, 2007, the Journal News published an article noting the proposed moratorium, Westchester County Legislator Thomas Abinanti's desire to preserve land next to the GNC and Supervisor Feiner's statement that if the developer (S&R) wanted too much money for its land the Town could try to acquire the land through eminent domain. See Exhibit 11.

31. On January 8, 2007, in a surprising announcement in direct contradiction with our meeting with him less than three weeks earlier, Commissioner Stellato recommended a moratorium (Exhibit 12) which copied the language and statistics previously drafted by Michelle McNally, President of the Edgemont Community Council ("ECC"). It is apparent that Commissioner Stellato and Ms. McNally worked in concert with respect to the recommendation. Her language and statistics are set forth in a prior letter (Exhibit 13).

32. A tentative agenda was set for Greenburgh's Town Board meeting of Wednesday, January 10, 2007 including a proposal that the Town Board consider scheduling a public hearing establishing a moratorium on development in the CA-I Zone within the next 30 days.

33. The proceedings of the January 10, 2007 Town Meeting were recorded on streaming video at the Town's website. The discussion regarding the proposed moratorium started at one hour and eighteen minutes into meeting. Some pertinent comments made at the meeting were as follows:

- Robert Bernstein, President of the Greenridge Civic

Association (a member organization of the ECC) stated that the ECC would do whatever it takes to get the moratorium imposed. He urged the Town Council to schedule a public hearing for January 24, 2007.

- A GNC representative immediately followed. He stated the GNC was very concerned about a lot of things happening on Central Avenue and the impact on the GNC. He further noted that the GNC Board had voted unanimously to support the moratorium and hoped that it would be enacted "before a lot of things that are going on happen."

- Michelle McNally, President of the ECC, urged the Town Council to get the moratorium on the agenda as soon as possible. She also stated that she had been "working with Mark" (Commissioner Stellato) who "has been great" and she hoped "to get it done."

- Bill Greenawalt, Chairman of Parks Commission and former candidate for Town Supervisor of Greenburgh, supported the moratorium, wanting it placed on the Town Board agenda right away. He went on to reference "a serious problem on Central Avenue," specifically mentioning the Property and his hopes that vague negative effects, upon which he did not elaborate, could be avoided if a moratorium was adopted.

34. The hastily prepared moratorium was specifically directed at the Property. The thrust of the comments by those who spoke confirm this since the Property was mentioned by several speakers. Moreover, in our subsequent conversations with Town elected and appointed officials, none could point to any other property within the CA-I Zone that had development plans which would be adversely affected by enactment of the moratorium. In fact, to my knowledge, there were no other Central Avenue landowners at subsequent meetings regarding the moratorium and the Town received no correspondence from other potentially-affected landowners protesting the moratorium.

35. Two days later, on January 12, 2007 a special meeting of the Greenburgh Town Board was held to consider the passage of a local law imposing a 180 day moratorium on the filing, acceptance and/or approval of all applications for site plan and subdivision. I attended the meeting - there was no substantive discussion regarding the moratorium resolution with respect to either its usefulness or purpose. The Board did not have the benefit of any studies prepared by the Planning Commission. Additionally, the moratorium resolution falsely claimed it was being imposed pursuant to a comprehensive plan but in fact there was no comprehensive plan then in place (see Exhibit 7, at p. 2, ¶ B).

36. On January 17, 2007, S&R sent a letter to the Town Planning Board which detailed our analysis of the proposed moratorium (Exhibit 14). That analysis makes clear that the purpose of the Town's moratorium was to create a devastating leverage intended to force the sale of the Property to the Town at a discount or, failing to force such a sale, reduce the Property's value and thereby reduce the award of just compensation that would be payable if there were a condemnation as contemplated by Supervisor Feiner.

37. On January 18, my father, my brother and I attended a meeting with Supervisor Feiner, Councilman Bass, Michael Sims, Margaret Goldberg and two other GNC Board members, William Lawyer, Executive Director of the GNC, and our attorney, Mark Weingarten of DelBello Donellan et al. I stated at the meeting that we could not economically afford to be the subject of a long moratorium (Greenburgh's last moratorium enacted in 2001 lasted over two and one- half years, notwithstanding its initial stated term of six months). Regarding the moratorium, the GNC's President, Michael Sims, stated that "the GNC supported the moratorium to

give the GNC more time for the GNC to decide what to do with the Property."

38. At the meeting we made a proposal to the Supervisor and the GNC Board Members, including its President, Michael Sims. In the hope of avoiding the absolute moratorium, we proposed an agreement with a dramatic reduction in the scope of S&R's planned development, as follows:

- There would be no moratorium;

- We would donate a substantial portion of our land to the Nature Center in the form of a conservation easement (we would benefit from the resulting tax deduction);

- We offered to grant to the GNC an option to purchase the remaining balance of the property at our cost, *i.e.*, our acquisition price for the Property, plus expenses with no markup or profit for us; and

- If the GNC or the Town did not raise the necessary funds to purchase the remaining portion of the Property following S&R's grant of the conservation easement or if for any other reason the GNC or the Town, at their option, declined to purchase, the GNC, the Supervisor and the Town would commit to supporting a development by S&R of ten residential units on the Property.

In response, Margaret Goldberg (a GNC Board member in attendance, and its current President) told us to gift the conservation easement and just to trust her that the GNC would raise the money and would purchase our property, but the moratorium would be enacted (see Exhibit 15, William Lawyer's independently prepared summary of the meeting).

39. On January 24, 2007 S&R sent a short letter to the Town Board stating our willingness to compromise and asking for a delay in implementation of the moratorium and requesting a meeting (Exhibit 16).

40. At the January 24, 2007 Greenburgh Town Board meeting a public

hearing was held to consider the adoption of a Local Law imposing a 180-day moratorium on the filing, acceptance and/or approval of applications for site plan and subdivisions in the CA-I zone. The following persons spoke in favor of a moratorium:

- Commissioner Stellato indicated that the CA-I zone for residential development should be 50% less dense.

- Robert Bernstein spoke of schools and multifamily development, noting that there are enough multifamily dwellings in the Town and the fact that he did not want an expanded district enrollment. He continued to note that the number of school children in the district was exceeding expectation and stated his concerns regarding the Town's infrastructure, lack of sidewalks, traffic and burdens on taxpayers in the Edgemont school district.

- Michelle McNally spoke about the spike in school enrollment, discussing the number of multifamily units in different towns in Westchester - Ardsley, Hastings, Irvington and Bronxville. McNally mentioned the Property in particular and the fact that S&R wants to build 37 units. McNally went on to critique S&R's January 17, 2007 letter to the Greenburgh Town Planning Board in detail. McNally then read into the record her extensive draft of proposed changes to the moratorium resolution, including her preference for a moratorium only as to residential development in the CA-I Zone. She indicated that she had already drafted a new proposed moratorium resolution and would give it to Commissioner Stellato.

41. On January 27, 2007 my brother and I hosted a meeting at our office with Councilman Bass, Councilman Sheehan, Robert Bernstein and Michelle McNally of the ECC and Michael Sims of the GNC; my father and his friend, Andrew Roffe, were also present. Prior to the meeting, Councilman Bass directed that we could not have our attorney, Mark Weingarten, attend the meeting nor could we inform him that the meeting would take place. At the meeting Councilman Sheehan stated that if there was any discussion about this meeting with Supervisor

Feiner he would "walk away" from any agreement. Moreover, we were expressly forbidden to relate any discussions that took place at the meeting to Hal Samis, an outspoken commentator on Greenburgh politics. While we were uncomfortable with these gag orders and the *ad-hominem* attacks of Councilman Sheehan on Supervisor Feiner ("Feiner screws everything up. I have to stay up all hours fixing his screw-ups") and their attacks on Mr. Samis, we reluctantly accepted those conditions and proceeded with the meeting in the hope of working out an agreement to develop the Property. We reached an agreement that the ECC would create a new "park district" and accept a conservation easement covering a portion of the Property -- if the to-be-created park district was unable to raise the money to purchase the Property at a price equaling S&R's out-of-pocket costs, the Town and ECC would support S&R's development of ten residential town homes on the balance of the Property, free of any moratorium.

42.    On January 31, 2007 S&R sent a letter to the Town Planning Board (Exhibit 17) in anticipation of the Planning Board's February 7, 2007 meeting. The January 31 letter referenced our prior letter of January 17, 2007 and noted the distinction between the Town's thoughtful and deliberate approach to enacting the previous 2001 moratorium and the hasty process devoid of proper basis or analysis which characterized the current effort to adopt a new moratorium.

43.    Simultaneously, the Westchester County Planning Board, in a letter dated January 31, 2007 (Exhibit 18), critically questioned the underlying intent of Greenburgh's proposed moratorium, since only apartments along Central Avenue in the Edgemont School District were singled out. The County wrote "[t]he fact that the proposed moratorium singles out multi-family dwellings within the Edgemont School

District as the only example of why this proposed moratorium is necessary, **raises questions about the moratorium's intent**" (emphasis added).

44. Soon thereafter, S&R received a letter dated February 2, 2007 from Robert Bernstein of the ECC contemplating S&R's gifting of the Property directly to him. He sent us his draft of a Gift Agreement (Exhibit 19). We responded and we had multiple phone calls on this issue.

45. On February 2, 2007 S&R Development Estates, LLC's application for Site Plan Approval for the Property was submitted.

46. On February 3, 2007 my brother and I hosted another meeting, organized by Councilman Bass and attended by Councilman Francis Sheehan, Councilwoman Ettie Mae Barnes and Councilwoman Diana Juettner, Robert Bernstein and Michelle McNally of the ECC and our father. Councilman Bass and Councilman Sheehan had suggested that is would be appropriate for Councilwoman Barnes and Councilwoman Juettner to personally meet the principals of S&R since they would be formally voting to implement our Agreement. At this meeting, the parties again agreed: (a) S&R would grant a conservation easement on a portion of the Property; (b) S&R would grant an option to the ECC to purchase the Property for a price equal to S&R's investment in the Property in consideration of: (i) the Town's agreement to modify the language of the proposed moratorium so that the Property would be excepted from its application; and (ii) the agreement by the Town and ECC to support our development application of a ten-unit town home development instead of the contemplated 37-unit development if the ECC did not exercise its purchase option.

47. At the February 3rd meeting, Robert Bernstein said that he would have Edgemont purchase the property through a bond offering by an Edgemont Park District he would create. Bernstein noted that the special district could be quickly created and a bond issue could be put to a vote in September 2007. Bernstein indicated that initially he would want to lease the land to the GNC; thereafter, he would want to use the land as the possible site for an Edgemont Town Hall if and when Edgemont seceded from the Town of Greenburgh. He stated the Edgemont did not own any other land which it could use as a Town Hall in the future. Regarding the park district, Robert Bernstein explained that S&R would grant the conservation easement to the park district and after Edgemont raised the funds to purchase the balance of the land Edgemont would own the entire property and be able to create a new town hall for itself upon secession. The park district would be created before the September primary and one of the voting items would be for a bond issuance to purchase the Property. The voting would be limited to Edgemont voters and the Property would be solely for their use.

48. In order to implement the parties' agreement made at the meeting, the Town Board members and the ECC said that they would revise the moratorium's language to except properties meeting certain criteria which would include S&R's Dromore Property (see Exhibit 20, draft of the language discussed). It was agreed that we would join in a work session meeting to deal with technical drafting requirements and to insert language to effect the foregoing agreement.

49. At the February 7, 2007 Planning Board meeting a discussion concerning a temporary moratorium was held. Commissioner Stellato and Deputy Commissioner Madden distributed "hand-outs" and responses to previously-

submitted questions. Annexed as Exhibit 22 are copies of the agenda and hand-outs

that I received from Janet Insardi (the Greenburgh Planning Board Attorney).

Included in the handouts were:

      a)    "Comparison of School Districts in the Town of Greenburgh" (ostensibly prepared by Michelle McNally);

      b)    "Overall Student Enrollment Percent Increase;"

      c)    "Standard Multipliers" - how many children live in each apartment in Stone Ridge Manor;

      d)    "Residential Demographic Multipliers;"

      e)    "Town of Greenburgh School District Enrollment, 1998-2006;

      f)    "Population Density, 2000;" and

      g)    "Number of Potential School-Age Children Among Developable Sites Along Central Avenue" which lists our Property as being within the CA-I zone.

In addition, two demonstrative poster board exhibits were utilized: (a) Town of

Greenburgh - Central Avenue Land Use; and (b) Town of Greenburgh Central

Avenue Vacant Properties (which identified our property as being in the CA-I Zone).

However, significant information was not submitted to the Planning Board. The

Planning Board was not provided with the *Public School Review* nor other reports

that reveal that only 2% of the Edgemont School population is African-American or

Hispanic, while other school districts in the Town of Greenburgh have welcomed

minority students with 25% of their students being of African American and Hispanic

origin. See Exhibit 22.

      50.    When the Westchester County Planning Board questioned the intent of

the moratorium legislation, perhaps it may have been concerned over the potential

demographic impact and loss of multifamily housing opportunities caused by the moratorium and any changes in zoning regulations which would result therefrom.

51. On February 14, 2007 my brother and I attended a meeting regarding formal submission of our planned development, which called for 37 two-bedroom units, with Deputy Commissioner Madden, Peter Wise (Janet Giris' partner), Bob Roth and Diego Villareale of John Meyer Consulting. There was no mention of any zoning problem with our plan. Deputy Commissioner Madden's comments were all directed at details of our preliminary plan which he had analyzed, including showing in an amended plan the 5,000 feet of open space and identifying any possible steep slope disturbances. Deputy Commissioner Madden advised us that if our plan impacted a steep slope of 20% or greater, it would be a SEQRA Type I environmental action. He also asked our engineers to detail their description of steep slopes in 0-15%, 15-20% and 20-25% increments. He went on to encourage S&R to commission a traffic study at the appropriate time and requested a memorandum on trip generation rates. Deputy Commissioner Madden also wanted to make sure that native Westchester trees would be used on the Property and that a tree protection program be created, including the labeling of all trees on the site. He also expressed his desire that the building have a truck loading dock. He requested that S&R provide him with a lighting plan with any Consolidated Edison easements noted thereon. Finally he encouraged us to identify any drainage channels.

52. The February 14, 2007 Greenburgh Town Board Meeting at which a public hearing would be held to consider the adoption of the moratorium was cancelled due to inclement weather.

53. On February 14, 2007 S&R sent another letter to the Planning Board arguing against adopting the moratorium (Exhibit 23). We concluded the letter stating that "The Town Board is abjectly surrendering to political pressure and hysteria from certain members of the Edgemont community. Their resolution (the moratorium) reflects that unseemly pressure and should be rejected."

54. A week later, I received a telephone call from Councilman Bass, who told me that he wanted to arrange for a referendum to be placed on the September Democratic primary voting ballot to approve a bond offering for the to-be-created Edgemont Parks Board to purchase our Property. He expressed confidence the bond offering would be approved. He asked me to "trust" him that the bond offering would pass in September and asked me to make a gift of part of the Property immediately, without first being exempted from the moratorium. I declined his proposal.

**The Attack On The Property's Zoning Designation**

55. On February 26, 2007, breaching our prior agreements and after his "Trust Me" telephone call, Councilman Bass sent out a "blast" e-mail (Exhibit 24) to subscribers to the Town's e-mail program stating that our Property was zoned R-20 (single family homes on half an acre). He went on to write that "The Town Council understands that the Greenburgh Nature Center's board and Edgemont residents may prefer to see the Dromore Road Property not developed at all and to have it preserved instead as open space. The Town Council will continue to explore with community leaders that possibility." Councilman Bass' arrogance and his capitulation to the ECC and GNC is evident in this sentence. He continues to assert that the GNC and Edgemont residents should get to control our Property rights.

56.    A February 26, 2007 letter from Commissioner Stellato addressed to Janet Giris, Esq. stated that the Property is in an R-20 zone (Exhibit 1). Commissioner Stellato makes no mention therein of our prior meeting with him or prior meetings with the Deputy Commissioner.  Nor does he reference his and the Deputy Commissioner's presentation on February 7, 2007 to the Planning Board where he distributed materials showing the Property as being in the CA-I Zone with a maximum of 81.9 bedrooms permitted under current zoning.  At that meeting, Commissioner Stellato asserted that our Property was in the CA-I Zone and no member of the Planning Board disputed that fact.  In his February 26, 2007 letter Commissioner Stellato ignores the controlling Zoning Ordinance and the Town of Greenburgh Zoning Map incorporated in the Ordinance.

57.    A March 2, 2007 article appeared in the Scarsdale Inquirer (Exhibit 25), wherein it notes, referring to the CA-I Zoning of the Property, that "[Councilman] Francis Sheehan caught the mistake last week while tracing the map's evolution over the years."

58.    Robert Bernstein is quoted in the aforementioned article, stating that while he felt "the town is on solid legal ground in disclaiming reliance on an apparently erroneous zoning map... the matter is not entirely free from doubt."  The Town code states that the official zoning map is "the final authority as to the current zoning classification of any land within the boundaries of the unincorporated Town of Greenburgh" and the developer could argue that the erroneous map was still the official one, and thus, the final authority.  Bernstein said more oversight needs to be done in the future.  Bernstein admitted that "[t]he ultimate bible is the town's zoning map."

59. Within days after Councilman Bass's e-mail attack, the Determination Letter from Commissioner Stellato and the March 2, 2007 Scarsdale Inquirer article, Councilman Bass telephoned me and asked if S&R would sell the Property for two or three million dollars. Clearly, Councilman Bass believed that his group's political opposition, threats of condemnation, development moratorium, breaches of agreements, and zoning attacks had depressed and driven down the value of the Property so that it could be purchased at a price far below its true market value or failing that, the Property would be worth less in a condemnation proceeding.

**Conclusion**

60. The Property is zoned CA-I and has been so for at least eleven years since the amendment of the zoning ordinance by the enactment of the 1996 Zoning Map.

61. The Greenburgh Nature Center Board, and its Executive Director, the Edgemont Community Council and its President, Michelle McNally and Robert Bernstein utilizing their powerful political strength have unlawfully conspired and acted with members of the Town Council and Town Officials to prevent lawful as-of-right multifamily development of the Property by improper moratorium legislation and attacks on the Property's zoning classification.

62. They have expressed a number of reasons for their actions:

a) a desire to maintain open space environment with no development at all;

b) a desire to protect the Edgemont schools from students coming from new multifamily developments – such actions are in violation of Federal, State and County law and discriminates against families with children and serves to make unavailable housing for families with children;

- c) a desire to acquire the Property to serve as the Town Hall of a new Edgemont political entity, which would secede from the Town of Greenburgh.

63. To further these goals these parties have, individually and in conspiracy with each other, threatened opposition to development, threatened condemnation of the Property, drafted and enacted bad faith moratorium legislation, breached settlement agreements for reduced development and raised attacks and arguments based upon false information against the existing CA-I zoning of the Property.

64. In all of these actions those organizations, individuals and officials have acted unlawfully and in bad faith, and have significantly damaged the Property owners and have violated our rights under the United States Constitution as well as New York State Law.

65. Even at this moment, these same parties conspire to and refuse to comply with S&R's Freedom of Information Law requests submitted March 9, 2007, four months ago (Exhibit 26). They hope to make more difficult our ability to support our claims and to thereby avoid the consequences of their bad faith and unlawful activities. They continue their efforts to prevent our as-of-right development.

66. The Property's CA-I Zone status should be confirmed and Commissioner Stellato's determination of R-20 zoning should be rejected.

Richard Troy

Sworn to before me this
9th day of July, 2007

Notary Public
JOHN A. RISI
Notary Public, State of New York
No. 02RI6098381
Qualified in Westchester County
Commission Expires: September 8, 2011

# EXHIBIT B



Mark T. Stellato, AICP
Commissioner

# TOWN of GREENBURGH

**Community Development & Conservation**
**177 Hillside Avenue**
White Plains, New York 10607
Telephone (914) 993-1505
Telefax (914) 993-1518

RECEIVED
JUL 19 2007
TOWN OF GREENBURGH
ZONING BOARD

**MEMORANDUM**

TO: CHAIRMAN BELASCO AND MEMBERS, ZONING BOARD OF APPEALS

FROM: MARK T. STELLATO, Commissioner of Planning

SUBJECT: ZBA Case 07-15

DATE: July 19, 2007

---

On February 2, 2007 the Department of Community Development and Conservation received an application for site plan approval (See attached Exhibit 1) for property located at 62 Dromore Road, (Volume 8, Section 31, Sheet 37B, Parcels 14A, 70A & 70B), which is the subject of your Case No. 07-15.

In reviewing the site plan application sent to our Department, we conducted a zoning history study of the parcel and we have concluded that the parcel was never included in the CA District.

As you may be aware, in 1978 the Town Board created the CA District after completing a Comprehensive Development Program for the Central Avenue Corridor (the "Study"), which was commenced in 1976. The Town Board approved the zoning code and map changes within this new district based upon the 1976 Study (see attached resolution of the Town Board of 5-24-78, Exhibit 2). The Study, including the boundary map, did not include the subject property within the proposed new CA District.

Accordingly, the Town's Zoning map after adoption of the CA District in 1978 shows the subject property outside of the boundary of the district and within the R-20 One Family Residence District, in which it was already located.

By law, the only way for the Zoning Map to be amended is by action of the legislative body, in this case, the Town Board. Our research has failed to find any local law or other legislative enactment rezoning the subject parcel from R-20 to CA. The only amendments affecting the CA zone or its environs follow:

1. In 1980 there were amendments to the text of the CA district and a zoning map change. The text amendment related to reducing density in the CA District for multifamily sites and the map amendment related to the Golf Course property, which was not in the CA District (the bulk of the golf course was in the R-20 zoned and a small portion was DS. The map change rezoned that portion of the golf course from DS to R-20). (See attached Town Board Resolution Exhibit 3). The subject property was not related to these zoning changes.

2. The next amendment to the zoning code and map for this area occurred in 1997 with respect to the Conservation Overlay District when the Town Board adopted Amendments to the Zoning Code and Zoning map (see attached Exhibit 4) on certain properties adjacent to the Greenburgh Nature Center and abutting – but not including – the subject property, placing such properties in the CD overlay District. In preparing the EAF for the rezoning (see attached Exhibit 5), Town Planning Staff, in item C.2 of the EAF, indicated that the zoning classification of the properties that were to be rezoned CD, as well as the subject parcel, was R-20. A zoning map was attached to the EAF and identifies the subject property (referred to as the Okin parcel) as clearly located within the R-20 district, outside the boundaries of the CA district.

   In making the 1997 changes to the abutting properties on the Zoning Map, the Town Engineer apparently moved the CA District boundary over one parcel, to include the subject property. This was inadvertent and clearly not authorized by the local law that rezoned the abutting properties from R-20 to CD.

3. The only other rezoning of property in the CA district occurred in April of 1999 when the Town Board rezoned Block 1685, lots 89A, 90A, and 12 from R-10 to CA. None of those lots are the subject property.

Therefore, based upon all the Town planning actions related to the subject parcel, I found no credible evidence that the subject parcel was ever placed in the CA District by the Town Board and that the parcel, from a planning perspective, has always been in the R-20 One Family Residence District. Accordingly, in February 2007 I directed the Town Engineer to correct the Zoning Map to accurately reflect the zoning of this and other properties (see attached Exhibit 6), and the current Zoning Map reflects that the property in question is in the R-20 District.

If you have any further questions, please feel free to contact the Department.

Attachments.

# Exhibit 1

# DELBELLO DONNELLAN WEINGARTEN TARTAGLIA WISE & WIEDERKEHR, LLP

THOMAS R. BEIRNE
BRIAN T. BELOWICH*
ANN FARRISSEY CARLSON*
ALFRED B DELBELLO
ALFRED E. DONNELLAN†
JANET J. GIRIS*
FRANK J. HAUPEL
PAUL I. MARX†
FAITH G. MILLER
PATRICK M REILLY
DANIEL D TARTAGLIA
BRADLEY D. WANK*
MARK P. WEINGARTEN*
LEE S. WIEDERKEHR
PETER J. WISE, AICP†

JACOB E. AMIR
MATTHEW S. CLIFFORD†
JOHN-PAUL IANNACE
JENNIFER M. JACKMAN*
ALICE D. KORNFELD*
SUSAN CURRIE MOREHOUSE
JESSICA H. RESSLER
CHRISTINE M. SARRO†
MICHAEL J. SCHWARZ*
HEIDI WINSLOW

COUNSELLORS AT LAW
THE GATEWAY BUILDING
ONE NORTH LEXINGTON AVENUE
WHITE PLAINS, NEW YORK 10601
(914) 681-0200
FACSIMILE (914) 684-0288

ANDREW I. BALINT
RICHARD A. KATZIVE
BRANDON R. SALL*
ELIOT M. SCHUMAN
DAVID R. SELZNICK & CO., LLP
COUNSEL

* MEMBER OF NY & CT BARS
† MEMBER OF NY & NJ BARS
* MEMBER OF NY & DC BARS
* MEMBER OF NY, NJ & MA BARS
* MEMBER OF NY, NJ, CT & FL BARS

February 2, 2007

**By Hand Delivery**

Thomas Madden, Deputy Commissioner
Department of Community Development and Conservation
Town of Greenburgh
177 Hillside Avenue
White Plains, New York 10607

Re: **Application of S&R Development Estates, LLC, for Site Plan Approval for the Property Located at 62 Dromore Road, Scarsdale, New York**

Dear Thomas:

We represent S&R Development Estates, LLC (the "S&R Development"), in connection with its property located at 62 Dromore Road, Greenburgh, also known and designated on the tax assessment map of the Town as Volume 8, Section 31, Sheet 37B, Lots 14A, 70A, 70B, and 70C (the "Property"). On behalf of S&R Development we respectfully submit the enclosed application for site plan approval to permit the development of the Property with a three (3) story thirty-seven (37) unit multi-family development project, together with related parking and infrastructure. Please review these materials at your earliest convenience, and contact us upon your return so that we can schedule a conference to discuss this application with you in further detail.

We look forward to speaking with you soon. In the interim, please do not hesitate to contact me if you have any questions or if you need any additional information.

Very truly yours,

JANET J. GIRIS

Enclosures
Cc: Rick Troy
Robert Roth, John Meyer Consulting
John Sullivan, Sullivan Architecture
Mark Weingarten, Esq.

#195360

single family home which was recently demolished ... improved with a

# Exhibit 2

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

Westchester County Planning Board, Peter Q. Eschweiler, Commissioner --

The Westchester County Planning Board, pursuant to Section 451 of the Westchester County Administrative Code, has reviewed the proposed Central Avenue Mixed Use Impact (CA) District, which replaces portions of ten existing districts that now front on Central Avenue. The proposed CA District extends along Central Avenue from the City of Yonkers Line northward to the City of White Plains Line (S.H.5231).

The proposed District regulations have been developed through an extensive period of analysis of Central Avenue problems and public discussion. After effecting substantive revisions in response to local input the Town Planning Board has recommended to the Town Board that they adopt this amendment.

The basic intent of the proposal is to balance the traffic-carrying capacity of Central Avenue with future development, a highly desirable policy. Although there are aspects of the proposed zone that would benefit by further refinements, we would recommend its adoption at this time.

A copy of the County Planning Board's findings and recommendations is attachef for your information*

* On file in the Town Clerk's Office.

There being no one else who wished to speak, *Councilman Marasco moved to close the hearing.*
*Supervisor Veteran seconded.*

| *Roll Call:* | *Councilwoman Bronz* | *VOTING* | *AYE* |
|---|---|---|---|
| | *Councilman Marasco* | *VOTING* | *AYE* |
| | *Councilman Bender* | *VOTING* | *AYE* |
| | *Councilwoman Rosen* | *VOTING* | *AYE* |
| | *Supervisor Veteran* | *VOTING* | *AYE* |

*All voting aye, nays none, motion adopted.*

RECESS

Supervisor Veteran read the following resolution into the record and moved for its adoption:

*WHEREAS, the Town of Greenburgh has recognized that the existing zoning in the vicinity of Central Avenue in the Town of Greenburgh has caused and will, if unchanged, continue to cause significant adverse impacts in regard to traffic, economic, environmental and other factors which are detrimental to the interests of all property owners in the vicinity of Central Park Avenue as well as all residents of the Town, and*

*WHEREAS, the Town Planning Depantemnt in conjunction with the services of an outside consulting firm, namely Raymond, Parish, Pine & Weiner has heretofore developed a Comprehensive Development Plan for the Central Avenue Corridor, and*

*WHEREAS, a series of public discussions have heretofore been held on said Comprehensive Development Plan with residents, developers and other property owners within the Town of Greenburgh, and*

*WHEREAS, in furtherance of the recommendations of the Comprehensive Development Plan for the Central Avenue Corridor, a Comprehensive Amendment has been proposed to the Zoning Ordinance of the Town of Greenburgh which would establish a Central Avenue Mixed Use Impact Zoning District within the Town of Greenburgh and along the Central Avenue Corridor as defined on a proposed map of the area which is proposed to be adopted as part of the Zoning Ordinance, and*

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

WHEREAS, such proposed amendment to the Zoning Ordinance of the Town of Greenburgh and accompanying map has heretofore been referred to the Planning Board of the Town of Greenburgh pursuant to §65-14 of the Zoning Ordinance of the Town of Greenburgh, and

WHEREAS, the Planning Board of the Town of Greenburgh, after public discussion and on or about March 2nd, 1978 recommended approval of the proposed amendment to the Zoning Ordinance which would create a Central Avenue Mixed Use Impact Zoning District, and

WHEREAS, pursuant to public notice and pursuant to all legal requirements, a public hearing was held before the Town Board of the Town of Greenburgh on the 24th day of May, 1978 at 8:15 P.M. at Greenburgh Town Hall in regard to the proposed amendment to the Zoning Ordinance and map of the Town of Greenburgh in regard to the proposed adoption of S65-42.3 of the Zoning Ordinance of the Town of Greenburgh entitled "Central Avenue Mixed Use Impact (CA) District" and accompanying map indicating the boundaries of such proposed District and all persons having had an opportunity to be heard, and

WHEREAS, the Town Board having determined that the adoption of such Zoning amendment and district boundary map would be in the interests of the Town of Greenburgh

IT IS RESOLVED, that the Zoning Ordinance of the Town of Greenburgh is hereby amended by the adoption of a new section of the Zoning Ordinance of the Town of Greenburgh, namely §65-42.3, to be entitled "Central Avenue Mixed Use Impact (CA) District"; by the adoption of a map designating the boundaries of said District and with amendment as read earlier regarding non-conforming uses (Sec. H (2)(9),

AND IT IS FURTHER RESOLVED that the minutes of the Planning Board's public discussion held on March 2nd, 1978 and its findings and recommendations dated March 19, 1978 are incorporated and become a part hereof,

AND IT IS FURTHER RESOLVED that the amendment of such Zoning Ordinance, the adoption of the map accompanying such Ordinance and the amendment regarding non-conforming uses shall take effect immediately,

AND IT IS FURTHER RESOLVED that the Town Clerk be directed to publish and post the amendment as required by law.

Councilman Marasco seconded.

| Roll Call: | | |
|---|---|---|
| Councilwoman Bronz | VOTING | AYE |
| Councilman Marasco | VOTING | AYE |
| Councilman Bender | VOTING | AYE |
| Councilwoman Rosen | VOTING | AYE |
| Supervisor Veteran | VOTING | AYE |

All voting aye, nays none, resolution adopted.

Supervisor Veteran -- Some very valid suggestions for changes have been made tonight and we will take them into consideration. This law is not written in stone and we can amend it if need be. We will do what we believe is in the best interests of the whole community.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

YONKERS LINE TO FOUR CORNERS AREA
SCHOOL
NATURE CENTER
GOLF COURSE
* Underhill Road: Proposed Intersection Re-alignment
CANINE CEMETERY
PLAYFIELD
CITY OF WHITE PLAINS
CENTRAL PARK AVENUE
FULTON STREET
* Four Corners: Proposed Grade Separated Interchange
FOUR CORNERS AREA TO COUNTY CENTER
Single Family Residential
Multi-Family Residential
Commercial
Office
Open Space
Mixed Use-Impact Zone
Public and Quasi-Public Land and Buildings
Land Use Plan

# Exhibit 3

DECISION
ON THE ADOPTION OF THE NEW ZONING ORDINANCE AND MAP OF THE TOWN OF GREENBURGH AND ITS ENVIRONMENTAL IMPACT

Supervisor Veteran read the following statement:

The draft of this ordinance has been in process for some four years.

I think we can agree that this project is vital to the orderly growth of the Town. This ordinance has been the subject of intensive review by Edith Silberstein, Town Planner -- John Saccardi of Raymond, Parish, Pine & Weiner, who was our consultant throughout the process; the Zoning Review Committee composed of members of the various boards of the Town; as well as staff employees.

In addition, we have had many valuable contributions from the citizens of Greenburgh.

I know that no legislation is perfect unless it was written by the "Master" (we couldn't get him because he is too busy with other problems.)

The Town Board is most grateful to all those who put in the time and the effort required to devise what I believe is a progressive and excellent ordinance.

Supervisor Veteran then read the following resolution into the record and moved for its adoption:

*WHEREAS, in May, 1980, the Town of Greenburgh, as lead agency, caused a Generic Environmental Impact Statement to be prepared by Raymond, Parish, Pine & Weiner, Inc. in accordance with Local Law No. 4 of 1977 of the Town of Greenburgh, and Part 617 of Title 6 of the New York Code of Rules and Regulations; and*

*WHEREAS, such Generic Environmental Impact Statement was accepted as complete and adequate by the lead agency and the Notice of Completion and the GEIS have been circulated by the lead agency in compliance with Part 617.6 and 617.8 of Title 6 NYCRR; and*

*WHEREAS, copies of the Environmental Impact Statement were made available for public inspection in the Office of the Town Clerk of the Town of Greenburgh; and*

*WHEREAS, a public hearing was advertised and held on the proposed action in compliance with Part 617-8 of the Environmental Conservation Law and Local Law No. 4 of 1977 providing an opportunity for the general public to comment upon the Environmental Impact Statement; and*

*WHEREAS, no comments were received either at the public hearing or in the ten days following, or as a result of the circulations to the appropriate local and state agencies; and*

*WHEREAS, a Notice of Non-Significance has been prepared and circulated in compliance with Part 617.10 of the Environmental Conservation Law and Local Law No. 4 of 1977; and*

DECISION CON'T.
ON THE ADOPTION OF THE NEW ZONING ORDINANCE AND MAP OF THE TOWN OF GREENBURGH AND ITS ENVIRONMENTAL IMPACT CON'T.

WHEREAS, the Environmental Review Record respecting the aforementioned project has been complied by the Town of Greenburgh Department of Community Development and Conservation, which record is on file at the Department of Community Development and Conservation in Town Hall, Greenburgh, New York, and is available for public inspection; and

WHEREAS, the members of this Board and staff of the Town of Greenburgh have reviewed the Environmental Impact Statement and supporting documents;

NOW, therefore be it RESOLVED, that the requirements of Local Law No. 4 of 1977 of the Town of Greenburgh providing for the Environmental Quality Review of actions which may have a significant effect on the environment, as well as Part 617 of the State Environmental Quality Review Act have been met; and

Be it further RESOLVED, that this Board finds that the proposed project is consistent with social, economic, and other essential considerations of state and local policy to the maximum extent practicable and that the adverse environmental affects considered through the Environmental Impact Statement process will be minimized or avoided; and

Be it further RESOLVED, that this Board finds that the project is consistent with the social, economic and other essential considerations of state and local policy from among the reasonable alternatives available thereto, and that the proposed ordinance is one which minimizes or avoids environmental affects to the maximum extent practicable and is, in itself, a mitigating measure with regard to the affects discussed in the Environmental Impact Statement.

Councilwoman Rosen seconded.

| Roll Call: | Councilwoman Bronz | VOTING | AYE |
|---|---|---|---|
| | Councilman Abinanti | VOTING | AYE |
| | Councilman Bender | VOTING | AYE |
| | Councilwoman Rosen | VOTING | AYE |
| | Supervisor Veteran | VOTING | AYE |

All voting aye, nays none, resolution adopted.

Supervisor Veteran read the following resolution into the record and moved for its adoption:

WHEREAS, Chapters 65 and 66 of the Code of the Town of Greenburgh, entitled "Zoning", were adopted by the Town Board of the Town of Greenburgh on August 6, 1957, and

WHEREAS, the aforesaid chapters have been amended from time to time during the past twenty-three years, and

WHEREAS, the Town Board believes it in the best interest of the community to adopt a revised Zoning Ordinance to better meet the current needs of the Town, and

WHEREAS, Section 261 of the Town Law empowers the Town Board to adopt such a revised Zoning Ordinance, and

WHEREAS, pursuant to Section 274 of the Town Law the Town Board referred this matter to the Planning Board of the Town of Greenburgh on January 23, 1980, and

DECISION CON'T.
ON THE ADOPTION OF THE NEW ZONING ORDINANCE AND MAP OF THE TOWN OF GREENBURGH AND ITS ENVIRONMENTAL IMPACT CON'T.

WHEREAS, on February 20, 1980 and March 5, 1980 the Planning Board held Public Information meetings concerning the said Zoning Ordinance, and

WHEREAS, on March 19, 1980, the Planning Board held a public discussion concerning the subject Zoning Ordinance, and

WHEREAS, the Planning Board made a recommendation to the Town Board on May 7, 1980, and

WHEREAS, the Town Board held a public hearing in this matter on May 28, 1980, and

WHEREAS, all the requirements of the State Environmental Quality Review Act and Local Law No. 4 of 1977 have been fulfilled, and

WHEREAS, a completely revised Zoning Ordinance has been drafted, and

WHEREAS, the Town Board of the Town of Greenburgh finds it in the public interest that a new Zoning Ordinance be adopted to replace Chapters 65 and 66 of the Town Code of the Town of Greenburgh,

NOW, THEREFORE, BE IT RESOLVED, that the Town Board of the Town of Greenburgh hereby repeals in its entirety the 1957 Zoning Ordinance of the Town of Greenburgh, as amended, effective on the effective date of the 1980 ordinance, and

BE IT FURTHER RESOLVED, that the Town Board of the Town of Greenburgh hereby adopts the 1980 Town of Greenburgh ordinance in its entirety, and

BE IT FURTHER RESOLVED, that such ordinance shall take effect pursuant to Sections 133 and 265 of the Town Law of the State of New York.

Councilwoman Rosen seconded.

| Roll Call: | Councilwoman Bronz | VOTING | AYE |
|---|---|---|---|
| | Councilman Abinanti | VOTING | AYE |
| | Councilman Bender | VOTING | AYE |
| | Councilwoman Rosen | VOTING | AYE |
| | Supervisor Veteran | VOTING | AYE |

All voting aye, nays none, resolution adopted.

Environmental Impact Statement and Zoning Ordinance on file in the Town Clerk's Office.

At this point, Councilman Abinanti stated that he was voting on the zoning ordinance even though he was not present at the May 28th public hearing, but that he had reviewed the entire trnascript of those proceedings. He added that adopting this ordinance was one of the most important actions the Town Board has taken in 20 years, affecting the character and nature of the Town. It is an example of what can be accomplished when partisan, political, and personal differences all put aside. He stated that the zoning ordinance is vastly superior to our present law and perhaps is one of the best in the state.

Ordinance, include the following:

"a) The deletion of the LOB-1 and PB Office Districts. LOB-1 is quite similar to LOB and the PB District is also similar to LOB, except for smaller lot size and smaller yard requirements.

"b) Other miscellaneous changes to OB, OB-1 and LOB Districts include modifying the maximum floor area ratio, setbacks, and certain permitted use provisions. Certain uses have been deleted from Office Districts such as rest homes and nursing homes, public auction rooms, funeral homes.

"7. DS - Designed Shopping District

"The DS District has been revised to incorporate the previous DS and NS regulations. As a result, several new uses are permitted in the DS District, but with modified requirements, relating to minimum lot sizes and other controls.

"Other major changes in this Zone relate to eliminating outdoor display and storage in connection with stores and regulating outdoor seasonal service in relation to restaurants.

"8. CA - Central Avenue Mixed Use Districts

"Recommendation to reduce residential density 10%, or from forty bedrooms per acre to thirty-five bedrooms per acre.

"9. CB - Close Business and HC - Heavy Commercial Districts

"The addition of new permitted uses are the principal changes to these commercial districts. Also the HC District name is changed from its previous title - IB Intermediate Business. The HC Zone allows single family development as a permitted principal use, and the area west of the urban renewal area and north of Tarrytown Road is proposed to be remapped to this District from its present Light Industrial designation.

"10. LI, GI and PD Industrial Districts - The IL-Light Industrial and GI - General Industrial Districts (formerly the MI) remain basically unchanged. The major change is the placement of previously 'permitted' uses into a 'special permit' category. The PD District, however, includes the addition of several new permitted uses as well as more restrictive controls regarding the intensity of development permitted in

propose a comprehensive revision to the Zoning Map at this time. The changes that are made can basically be described as housekeeping in nature. They are minor revisions, and as I said, they are of three types.

First, there are changes in Zone to reflect the deletion of four Districts: The LOB-1, an Office District; the PB, another Office District; the RR, rather unusual railroad District; and the NS, one of the shopping center Districts has been deleted from the Ordinance.

NS, for example, is incorporated with DS, another shopping District. It was determined that there was no need to have two separate shopping center Zones in the Town of Greenburgh, so we've consolidated where appropriate.

The Zoning Map changes for these categories are merely to put those properties in another District where the same kind of uses are permitted.

The second area of the Zoning change -- Zoning Map change that is proposed includes some minor modifications along the Central Avenue Mixed Use Zone. When the Central Avenue Zone was enacted, several parcels along the perimeter of that Zone were not changed from their previous Zoning designation to an appropriate one.

For example, adjacent to Central Avenue, near Four Corners, and behind the Central Avenue frontage, there is some DS Zoning that is really golf course property. The bulk of the golf course property is Zoned R-20. The proposed map change calls for a change in that Zone from DS to R-20. That DS property has no frontage on Central Avenue. It is just a sliver Zone that was not changed when Central Avenue was put into effect.

Third and last, several changes, minor in nature, for the most part, have been made to attempt to make land use and Zoning compatible.

For example, the Heavy Commercial Zone in the Yosemite area of Town, an area that allows both commercial and residential uses, has been proposed, replacing the previous Zone that allowed only the commercial and industrial uses. The area has a number of residences and the new Zoning reflects that mixture of uses.

Basically, without going into any more detail -- because I think

# Exhibit 4



# TOWN OF GREENBURGH

TOWN CLERK'S OFFICE

P.O. Box 205, Elmsford, New York 10523

(914) 993-1500

Case 96-20

ALFREDA A. WILLIAMS
Town Clerk

May 27, 1997

Ms. Janice G. Durfee
Principal File Clerk
State Records and Law Bureau
Department of State
162 Washington Avenue
Albany, New York 12231

Dear Ms. Durfee:

Enclosed please find one copy of Local Law No. 5 - 1997 of the Town of Greenburgh -- A Local Law to amend the Zoning Ordinance of the Town of Greenburgh, Chapter 285, Section 285-7, by rezoning certain properties in the Town of Greenburgh to Conservation District (CD) zone pursuant to New York Home Rule Law, Section 10, and New York Town Law Section 271.

Said local law was duly adopted by the Town Board on April 9, 1997.

Sincerely,

Alfreda A. Williams
Town Clerk

AAW:emw

cc: Frederick W. Turner, Town Attorney
Steve Lopez, Commissioner of Community Development and Conservation
John Lucido, Building Inspector



# T WN OF GREENBURGI.

**Local Law No. 5 /97**

A local law to amend the Zoning Ordinance of the Town of Greenburgh, Chapter 285, Section 285-7, by rezoning certain properties in the Town of Greenburgh to Conservation District (CD) zone pursuant to New York Municipal Home Rule Law, Section 10, and New York Town Law, Section 271.

**WHEREAS**, on September 17, 1996, the above referenced matter was referred by the Town Board to the Planning Board for review and recommendation; and

**WHEREAS**, the Planning Board held a Public Discussion on the proposed rezone of certain properties designated on the Tax Map of the Town of Greenburgh as Volume 8, Sheet 37B, Parcels, 11, 21, 23, 24 and 25B, Volume 8, Sheet 37B, Block 1692, Lot 32 for Conservation District Designation, on November 6, 1996; and

**WHEREAS**, the Planning Board, after hearing positive testimony from various parties, and after considering the positive impact that the proposed rezone would have on the property including environmental conservation, recommended that the above referenced parcels currently zoned R-20 be rezoned to Conservation Overlay (CD); and

**WHEREAS,** the proposed rezone would have a positive impact on the health, safety, and welfare of the residents of the Town of Greenburgh;

**NOW, THEREFORE, BE IT ENACTED** by the Town Board of the Town of Greenburgh as follows:

Section 1. The Zoning Ordinance of the Town of Greenburgh, Section 285-7 is hereby amended by rezoning the properties known and designated on the tax map of the Town of Greenburgh as Volume 8, Sheet 37B, Parcels, 11, 21, 23, 24 and 25B, Volume 8, Sheet 37B, Block 1692, Lot 32 to Conservation Overlay (CD).

Section 2. Should any section, paragraph, sentence, clause, word, or provision of this chapter be declared void, invalid or unenforceable, for any reason, such decision shall not affect the remaining provisions of this chapter.

Section 3. Pursuant to New York Municipal Home Rule Law §22, the provisions of this chapter are intended to supersede any inconsistent provision of law.

Section 4. Pursuant to New York Municipal Home Rule Law §27, this local law shall take effect immediately upon filing with the New York Secretary of State.

# Local Law Filing

NEW YORK STATE DEPARTMENT OF STATE
162 WASHINGTON AVENUE, ALBANY, NY 12231

(Use this form to file a local law with the Secretary of State.)

Text of law should be given as amended. Do not include matter being eliminated and do not use italics or underlining to indicate new matter.

~~County~~
~~City~~ of GREENBURGH
Town
~~Village~~

Local Law No. 5 of the year 1997

A local law to amend the Zoning Ordinance of the Town of Greenburgh, Chpater 285, Section 285-7, by rezoning certain properties in the Town of Greenburgh to Conservation District (CD) zone pursuant to New York Home Rule Law, Section 10, and New York Town Law, Section 271
(Insert Title)

Be it enacted by the TOWN BOARD of the
(Name of Legislative Body)

~~County~~
~~City~~ of GREENBURGH as follows:
Town
~~Village~~

(If additional space is needed, attach pages the same size as this sheet, and number each.)

DOS-239 (Rev. 7/91)

(Complete the certification in the paragraph that applies to the filing of this local law and strike out that which is not applicable.)

1. (Final adoption by local legislative body only.)

I hereby certify that the local law annexed hereto, designated as local law No. 5 of 19 97 was duly passed by the of the ~~(County)(City)~~(Town)~~(Village)~~ of GREENBURGH TOWN BOARD on APRIL 9, 19 97, in accordance with the applicable provisions of law.
(Name of Legislative Body)

2. (Passage by local legislative body with approval, no disapproval or repassage after disapproval by the Elective Chief Executive Officer*.)

I hereby certify that the local law annexed hereto, designated as local law No. ---------- of 19----- was duly passed by the of the (County)(City)(Town)(Village) of ---------- on ---------- 19 ---, and was (approved)(not approved)(repassed after
(Name of Legislative Body)
disapproval) by the ---------- and was deemed duly adopted on ---------- 19----,
(Elective Chief Executive Officer*)
in accordance with the applicable provisions of law.

3. (Final adoption by referendum.)

I hereby certify that the local law annexed hereto, designated as local law No. ---------- of 19----- was duly passed by the of the (County)(City)(Town)(Village) of ---------- on ---------- 19----, and was (approved)(not approved)(repassed after
(Name of Legislative Body)
disapproval) by the ---------- on---------- 19----. Such local law was submitted
(Elective Chief Executive Officer*)
to the people by reason of a (mandatory)(permissive) referendum, and received the affirmative vote of a majority of the qualified electors voting thereon at the (general)(special)(annual) election held on ---------- 19---, in accordance with the applicable provisions of law.

4. (Subject to permissive referendum and final adoption because no valid petition was filed requesting referendum.)

I hereby certify that the local law annexed hereto, designated as local law No. ---------- of 19----- was duly passed by the of the (County)(City)(Town)(Village) of ---------- on ---------- 19----, and was (approved)(not approved)(repassed after
(Name of Legislative Body)
disapproval) by the ---------- on ---------- 19 ---. Such local law was subject to
(Elective Chief Executive Officer*)
permissive referendum and no valid petition requesting such referendum was filed as of ---------- 19---, in accordance with the applicable provisions of law.

* Elective Chief Executive Officer means or includes the chief executive officer of a county elected on a county-wide basis or, if there be none, the chairperson of the county legislative body, the mayor of a city or village, or the supervisor of a town where such officer is vested with the power to approve or veto local laws or ordinances.

5. (City local law concerning Charter revision proposed by petition.)

I hereby certify that the local law annexed hereto, designated as local law No. ------------------------------- of 19------ of the City of ---------------------------------------- having been submitted to referendum pursuant to the provisions of section (36)(37) of the Municipal Home Rule Law, and having received the affirmative vote of a majority of the qualified electors of such city voting thereon at the (special)(general) election held on------------------ 19----, became operative.

6. (County local law concerning adoption of Charter.)

I hereby certify that the local law annexed hereto, designated as local law No. ------------------------------- of 19------ of the County of ---------------------------------------------- State of New York, having been submitted to the electors at the General Election of November -------------------- 19----, pursuant to subdivisions 5 and 7 of section 33 of the Municipal Home Rule Law, and having received the affirmative vote of a majority of the qualified electors of the cities of said county as a unit and a majority of the qualified electors of the towns of said county considered as a unit voting at said general election, became operative.

**(If any other authorized form of final adoption has been followed, please provide an appropriate certification.)**

I further certify that I have compared the preceding local law with the original on file in this office and that the same is a correct transcript therefrom and of the whole of such original local law, and was finally adopted in the manner indicated in paragraph------1-----, above.

Clerk of the County legislative body, City, Town or Village Clerk or officer designated by local legislative body

Date: MAY 22, 1997

*(Seal)*

**(Certification to be executed by County Attorney, Corporation Counsel, Town Attorney, Village Attorney or other authorized attorney of locality.)**

STATE OF NEW YORK
COUNTY OF WESTCHESTER

I, the undersigned, hereby certify that the foregoing local law contains the correct text and that all proper proceedings have been had or taken for the enactment of the local law annexed hereto.

Signature

TOWN ATTORNEY
Title

~~County~~
~~City~~ of GREENBURGH
Town
~~Village~~

Date: MAY 22, 1997

# Exhibit 5

617.20
*Appendix A*
*State Environmental Quality Review*

# FULL ENVIRONMENTAL ASSESSMENT FORM

**Purpose:** The full EAF is designed to help applicants and agencies determine, in an orderly manner, whether a project or action may be significant. The question of whether an action may be significant is not always easy to answer. Frequently, there are aspects of a project that are subjective or unmeasurable. It is also understood that those who determine significance may have little or no formal knowledge of the environment or may not be technically expert in environmental analysis. In addition, many who have knowledge in one particular area may not be aware of the broader concerns affecting the question of significance.

The full EAF is intended to provide a method whereby applicants and agencies can be assured that the determination process has been orderly, comprehensive in nature, yet flexible enough to allow introduction of information to fit a project or action.

**Full EAF Components:** The full EAF is comprised of three parts:

**Part 1:** Provides objective data and information about a given project and its site. By identifying basic project data, it assists a reviewer in the analysis that takes place in Parts 2 and 3.

**Part 2:** Focuses on identifying the range of possible impacts that may occur from a project or action. It provides guidance as to whether an impact is likely to be considered small to moderate or whether it is a potentially-large impact. The form also identifies whether an impact can be mitigated or reduced.

**Part 3:** If any impact in Part 2 is identified as potentially-large, then Part 3 is used to evaluate whether or not the impact is actually important.

## DETERMINATION OF SIGNIFICANCE -- Type 1 and Unlisted Actions

**Identify the Portions of EAF completed for this project:** ☒ Part 1 ☒ Part 2 ☐ Part 3

Upon review of the information recorded on this EAF (Parts 1 and 2 and 3 if appropriate), and any other supporting information, and considering both the magnitude and importance of each impact, it is reasonably determined by the lead agency that:

☒ A. The project will not result in any large and important impact(s) and, therefore, is one which will not have a significant impact on the environment, therefore **a negative declaration will be prepared.**

☐ B. Although the project could have a significant effect on the environment, there will not be a significant effect for this Unlisted Action because the mitigation measures described in PART 3 have been required, therefore **a CONDITIONED negative declaration will be prepared.***

☐ C. The project may result in one or more large and important impacts that may have a significant impact on the environment, therefore **a positive declaration will be prepared.**

*A Conditioned Negative Declaration is only valid for Unlisted Actions

CONSERVATION DISTRICT REZONING: GREENBURGH NATURE CENTER & PAULIST PROPERTY
Name of Action

GREENBURGH TOWN BOARD
Name of Lead Agency

STEPHEN LOPEZ, AICP
Print or Type Name of Responsible Officer in Lead Agency

ENVIRONMENTAL OFFICER
Title of Responsible Officer

[signature]
Signature of Responsible Officer in Lead Agency

[signature]
Signature of Preparer (if different from responsible officer)

21
Date

5. Approximate percentage of proposed project site with slopes: ☐0-10% 90 % ☐10-15% 10 % ☐15% or greater ____ %

6. Is project substantially contiguous to, or contain a building, site, or district, listed on the State or the National Registers of Historic Places? ☐Yes ☒No

7. Is project substantially contiguous to a site listed on the Register of National Natural Landmarks? ☐Yes ☒No

8. What is the depth of the water table? ____ (in feet) VARIES

9. Is site located over a primary, principal, or sole source aquifer? ☐Yes ☒No

10. Do hunting, fishing or shell fishing opportunities presently exist in the project area? ☐Yes ☒No

11. Does project site contain any species of plant or animal life that is identified as threatened or endangered?
☐Yes ☒No According to ____
Identify each species ____

12. Are there any unique or unusual land forms on the project site? (i.e., cliffs, dunes, other geological formations)
☐Yes ☒No Describe ____

13. Is the project site presently used by the community or neighborhood as an open space or recreation area?
☒Yes ☐No If yes, explain GREENBURGH NATURE CENTER IS A PUBLIC EDUCATIONAL & ENVIRONMENTAL PRESERVE

14. Does the present site include scenic views known to be important to the community?
☒Yes ☐No

15. Streams within or contiguous to project area: ____
a. Name of Stream and name of River to which it is tributary ____

16. Lakes, ponds, wetland areas within or contiguous to project area:
a. Name WOODFROG POND & UNNAMED WETLANDS b. Size (In acres) @ 3.7 AC

17. Is the site served by existing public utilities? ☒Yes ☐No
a) If Yes, does sufficient capacity exist to allow connection? ☒Yes ☐No
b) If Yes, will improvements be necessary to allow connection? ☐Yes ☐No

18. Is the site located in an agricultural district certified pursuant to Agriculture and Markets Law, Article 25-AA, Section 303 and 304? ☐Yes ☒No

19. Is the site located in or substantially contiguous to a Critical Environmental Area designated pursuant to Article 8 of the ECL, and 6 NYCRR 617? ☐Yes ☒No

20. Has the site ever been used for the disposal of solid or hazardous wastes? ☐Yes ☒No

## B. Project Description

1. Physical dimensions and scale of project (fill in dimensions as appropriate) N/A: REZONING
a. Total contiguous acreage owned or controlled by project sponsor ____ acres.
b. Project acreage to be developed: ____ acres initially; ____ acres ultimately.
c. Project acreage to remain undeveloped ____ acres.
d. Length of project, in miles: ____ (if appropriate).
e. If the project is an expansion, indicate percent of expansion proposed ____ %.
f. Number of off-street parking spaces existing ____; proposed ____.
g. Maximum vehicular trips generated per hour ____ (upon completion of project).
h. If residential, Number and type of housing units:

| | One Family | Two Family | Multiple Family | Condominium |
|---|---|---|---|---|
| Initially | | | | |
| Ultimately | | | | |

i. Dimensions (in feet) of largest proposed structure ____ height; ____ width; ____ length.

25. Approvals Required:

| | | | Type | Submittal Date |
|---|---|---|---|---|
| City, Town, Village Board | ☒Yes | ☐No | ZONING AMENDMENT | |
| City, Town, Village Planning Board | ☒Yes | ☐No | REFERRAL | 11/20 RECOMMENDATION |
| City, Town Zoning Board | ☐Yes | ☐No | | |
| City, County Health Department | ☐Yes | ☐No | | |
| Other Local Agencies | ☐Yes | ☐No | | |
| Other Regional Agencies | ☐Yes | ☐No | | |
| State Agencies | ☐Yes | ☐No | | |
| Federal Agencies | ☐Yes | ☐No | | |

## C. ZONING and PLANNING INFORMATION

1. Does proposed action involve a planning or zoning decision? ☒Yes ☐No

   If Yes, indicate decision required:

   ☒zoning amendment ☐zoning variance ☐special use permit ☐subdivision ☐site plan

   ☐new/revision of master plan ☐resource management plan ☐other ____________

2. What is the zoning classification(s) of the site? R-20
3. What is the maximum potential development of the site if developed as permitted by the present zoning?
   ±/- 74 SINGLE FAMILY UNITS
4. What is the proposed zoning of the site? CD R-20
5. What is the maximum potential development of the site if developed as permitted by the proposed zoning?
   SAME
6. Is the proposed action consistent with the recommended uses in adopted local land use plans? ☐Yes ☐No N/A
7. What are the predominant land use(s) and zoning classifications within a 1/4 mile radius of proposed action?
   CA- CENTRAL AVENUE MIXED USE (COMMERCIAL AND MULTI-FAMILY); R-10
8. Is the proposed action compatible with adjoining/surrounding land uses within a 1/4 mile? ☒Yes ☐No
9. If the proposed action is the subdivision of land, how many lots are proposed? N/A

   a. What is the minimum lot size proposed? ____________
10. Will proposed action require any authorization(s) for the formation of sewer or water districts? ☐Yes ☒No
11. Will the proposed action create a demand for any community provided services (recreation, education, police, fire protection)? ☐Yes ☒No

    a. If yes, is existing capacity sufficient to handle projected demand? ☐Yes ☐No
12. Will the proposed action result in the generation of traffic significantly above present levels? ☐Yes ☒No

    a. If yes, is the existing road network adequate to handle the additional traffic? ☐Yes ☐No

## D. Informational Details

Attach any additional information as may be needed to clarify your project. If there are, or may be, any adverse impacts associated with your proposal, please discuss such impacts and the measures which you propose to mitigate or avoid them.

## E. Verification

I certify that the information provided above is true to the best of my knowledge.

Applicant/Sponsor Name ______________________ Date ____________

Signature ______________________ Title ____________

**If the action is in the Coastal Area, and you are a state agency, complete the Coastal Assessment Form before proceeding with this assessment.**



## COMPOSITE MAP

| | | | |
|---|---|---|---|
| Scarsdale Leasing Corp. (Scarsdale Golf Club) | Sheet 36 | Parcels | 3 and 8 |
| Greenburgh Nature Center | Sheet 37B | Parcels: 11, 21, 23 and 24 | |
| Okun | Sheet 37B | Block 1692 Lots: 14A, 70A, 70B, 70C | |
| Board of Education | Sheet 37B<br>Sheet 37H | Parcels: 23A, 24A, 26, 27<br>Parcel: 25 | |
| Missionary Society of Saint Paul | Sheet 37B<br>Sheet 37B | Block: 1692 Lot: 32<br>Parcel: 25B | |

Tree Covered Areas

# Exhibit 6



Paul J. Feiner
*Supervisor*
Mark T. Stellato, AICP
*Commissioner*

# TOWN of GREENBURGH
## Community Development & Conservation
177 Hillside Avenue
Greenburgh, New York 10607
Telephone (914) 993-1505
Telefax (914) 993-1518

**MEMORANDUM**

TO: Michael Lepre, P.E., Town Engineer

FROM: Mark Stellato, AICP, Commissioner

DATE: February 27, 2007

RE: Town of Greenburgh Zoning Map

---

The Department of CD&C has found errors to the Town of Greenburgh Zoning Map that we wish to bring to your attention. As you may know, the Town undertook a consolidation of the zoning districts along Central Avenue in accordance with the 1976 Central Avenue Comprehensive Development Plan for the Central Avenue Corridor. The Town Board approved in 1978 the zoning code amendments and map changes for this new district along the Central Avenue Corridor as set forth on the attached map. The following are what we believe to be discrepancies with respect to the Town Board's approved zoning map and the actual map that is available:

1) **Property located at Volume 8, Section 31, Sheet 37B, Parcels 20 (450-460 Central Avenue)**

   A portion of this parcel was excluded in the 1976 Central Avenue Comprehensive Development Plan for the Central Avenue Corridor. The current zoning line follows along the eastern edge of the property as has been in included in the CA district. The correct zoning line, as referenced in the 1976 Plan should include a portion of this property in the R-20 Single Family Residence District.

2) **Property located at Volume 8, Section 31, Sheet 37B, Block 1692, Parcels 14A, 70A & 70B (62 Dromore Road)**

   This parcel was never included in the 1976 Central Avenue Comprehensive Development Plan for the Central Avenue Corridor. It's current classification is that of CA and is incorrect. It's correct classification is that of R-20 One Family Residence District.

As indicated above, I have attached the appropriate backup for you to make the requisite adjustments to the Town's Zoning Map.

# EXHIBIT C

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

Westchester County Planning Board, Peter Q. Eschweiler, Commissioner --

The Westchester County Planning Board, pursuant to Section 451 of the Westchester County Administrative Code, has reviewed the proposed Central Avenue Mixed Use Impact (CA) District, which replaces portions of ten existing districts that now front on Central Avenue. The proposed CA District extends along Central Avenue from the City of Yonkers Line northward to the City of White Plains Line (S.H.5231).

The proposed District regulations have been developed through an extensive period of analysis of Central Avenue problems and public discussion. After effecting substantive revisions in response to local input the Town Planning Board has recommended to the Town Board that they adopt this amendment.

The basic intent of the proposal is to balance the traffic-carrying capacity of Central Avenue with future development, a highly desirable policy. Although there are aspects of the proposed zone that would benefit by further refinements, we would recommend its adoption at this time.

A copy of the County Planning Board's findings and recommendations is attachef for your information*

* On file in the Town Clerk's Office.

There being no one else who wished to speak, *Councilman Marasco moved to close the hearing.*
*Supervisor Veteran seconded.*

| *Roll Call:* | | | |
|---|---|---|---|
| | *Councilwoman Bronz* | *VOTING* | *AYE* |
| | *Councilman Marasco* | *VOTING* | *AYE* |
| | *Councilman Bender* | *VOTING* | *AYE* |
| | *Councilwoman Rosen* | *VOTING* | *AYE* |
| | *Supervisor Veteran* | *VOTING* | *AYE* |

*All voting aye, nays none, motion adopted.*

RECESS

Supervisor Veteran read the following resolution into the record and moved for its adoption:

*WHEREAS, the Town of Greenburgh has recognized that the existing zoning in the vicinity of Central Avenue in the Town of Greenburgh has caused and will, if unchanged, continue to cause significant adverse impacts in regard to traffic, economic, environmental and other factors which are detrimental to the interests of all property owners in the vicinity of Central Park Avenue as well as all residents of the Town, and*

*WHEREAS, the Town Planning Departemnt in conjunction with the services of an outside consulting firm, namely Raymond, Parish, Pine & Weiner has heretofore developed a Comprehensive Development Plan for the Central Avenue Corridor, and*

*WHEREAS, a series of public discussions have heretofore been held on said Comprehensive Development Plan with residents, developers and other property owners within the Town of Greenburgh, and*

*WHEREAS, in furtherance of the recommendations of the Comprehensive Development Plan for the Central Avenue Corridor, a Comprehensive Amendment has been proposed to the Zoning Ordinance of the Town of Greenburgh which would establish a Central Avenue Mixed Use Impact Zoning District within the Town of Greenburgh and along the Central Avenue Corridor as defined on a proposed map of the area which is proposed to be adopted as part of the Zoning Ordinance, and*

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

WHEREAS, such proposed amendment to the Zoning Ordinance of the Town of Greenburgh and accompanying map has heretofore been referred to the Planning Board of the Town of Greenburgh pursuant to §65-14 of the Zoning Ordinance of the Town of Greenburgh, and

WHEREAS, the Planning Board of the Town of Greenburgh, after public discussion and on or about March 2nd, 1978 recommended approval of the proposed amendment to the Zoning Ordinance which would create a Central Avenue Mixed Use Impact Zoning District, and

WHEREAS, pursuant to public notice and pursuant to all legal requirements, a public hearing was held before the Town Board of the Town of Greenburgh on the 24th day of May, 1978 at 8:15 P.M. at Greenburgh Town Hall in regard to the proposed amendment to the Zoning Ordinance and map of the Town of Greenburgh in regard to the proposed adoption of S65-42.3 of the Zoning Ordinance of the Town of Greenburgh entitled "Central Avenue Mixed Use Impact (CA) District" and accompanying map indicating the boundaries of such proposed District and all persons having had an opportunity to be heard, and

WHEREAS, the Town Board having determined that the adoption of such Zoning amendment and district boundary map would be in the interests of the Town of Greenburgh

IT IS RESOLVED, that the Zoning Ordinance of the Town of Greenburgh is hereby amended by the adoption of a new section of the Zoning Ordinance of the Town of Greenburgh, namely §65-42.3, to be entitled "Central Avenue Mixed Use Impact (CA) District"; by the adoption of a map designating the boundaries of said District and with amendment as read earlier regarding non-conforming uses (Sec. H (2)(9),

AND IT IS FURTHER RESOLVED that the minutes of the Planning Board's public discussion held on March 2nd, 1978 and its findings and recommendations dated March 19, 1978 are incorporated and become a part hereof,

AND IT IS FURTHER RESOLVED that the amendment of such Zoning Ordinance, the adoption of the map accompanying such Ordinance and the amendment regarding non-conforming uses shall take effect immediately,

AND IT IS FURTHER RESOLVED that the Town Clerk be directed to publish and post the amendment as required by law.

Councilman Marasco seconded.

| Roll Call: | | | |
|---|---|---|---|
| | Councilwoman Bronz | VOTING | AYE |
| | Councilman Marasco | VOTING | AYE |
| | Councilman Bender | VOTING | AYE |
| | Councilwoman Rosen | VOTING | AYE |
| | Supervisor Veteran | VOTING | AYE |

All voting aye, nays none, resolution adopted.

Supervisor Veteran -- Some very valid suggestions for changes have been made tonight and we will take them into consideration. This law is not written in stone and we can amend it if need be. We will do what we believe is in the best interests of the whole community.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.





YONKERS LINE TO FOUR CORNERS AREA
COTSWOLD
SCHOOL
NATURE CENTER
GOLF COURSE
* Underhill Road: Proposed Intersection Realignment
CANINE CEMETERY
PLAYFIELD
CITY OF WHITE PLAINS
CENTRAL PARK AVENUE
FULTON
STREET
ROAD
* Four Corners: Proposed Grade Separated Interchange
FOUR CORNERS AREA TO COUNTY CENTER
Single Family Residential
Multi-Family Residential
Commercial
Office
Open Space
Mixed Use-Impact Zone
Public and Quasi-Public Land and Buildings
Land Use Plan
0
400
FEET

# EXHIBIT D



# TOWN OF GREENBURGH

TOWN CLERK'S OFFICE

P.O. Box 205, Elmsford, New York 10523

(914) 993-1500

ALFREDA A. WILLIAMS
Town Clerk

Case 96-20

May 27, 1997

Ms. Janice G. Durfee
Principal File Clerk
State Records and Law Bureau
Department of State
162 Washington Avenue
Albany, New York 12231

Dear Ms. Durfee:

Enclosed please find one copy of Local Law No. 5 - 1997 of the Town of Greenburgh -- A Local Law to amend the Zoning Ordinance of the Town of Greenburgh, Chapter 285, Section 285-7, by rezoning certain properties in the Town of Greenburgh to Conservation District (CD) zone pursuant to New York Home Rule Law, Section 10, and New York Town Law Section 271.

Said local law was duly adopted by the Town Board on April 9, 1997.

Sincerely,

Alfreda A. Williams
Town Clerk

AAW:emw

cc: Frederick W. Turner, Town Attorney
Steve Lopez, Commissioner of Community Development and Conservation
John Lucido, Building Inspector



# T WN OF GREENBURGI

Local Law No. 5 /97

A local law to amend the Zoning Ordinance of the Town of Greenburgh, Chapter 285, Section 285-7, by rezoning certain properties in the Town of Greenburgh to Conservation District (CD) zone pursuant to New York Municipal Home Rule Law, Section 10, and New York Town Law, Section 271.

**WHEREAS**, on September 17, 1996, the above referenced matter was referred by the Town Board to the Planning Board for review and recommendation; and

**WHEREAS**, the Planning Board held a Public Discussion on the proposed rezone of certain properties designated on the Tax Map of the Town of Greenburgh as Volume 8, Sheet 37B, Parcels, 11, 21, 23, 24 and 25B, Volume 8, Sheet 37B, Block 1692, Lot 32 for Conservation District Designation, on November 6, 1996; and

**WHEREAS**, the Planning Board, after hearing positive testimony from various parties, and after considering the positive impact that the proposed rezone would have on the property including environmental conservation, recommended that the above referenced parcels currently zoned R-20 be rezoned to Conservation Overlay (CD); and

**WHEREAS,** the proposed rezone would have a positive impact on the health, safety, and welfare of the residents of the Town of Greenburgh;

**NOW, THEREFORE, BE IT ENACTED** by the Town Board of the Town of Greenburgh as follows:

Section 1. The Zoning Ordinance of the Town of Greenburgh, Section 285-7 is hereby amended by rezoning the properties known and designated on the tax map of the Town of Greenburgh as Volume 8, Sheet 37B, Parcels, 11, 21, 23, 24 and 25B, Volume 8, Sheet 37B, Block 1692, Lot 32 to Conservation Overlay (CD).

Section 2. Should any section, paragraph, sentence, clause, word, or provision of this chapter be declared void, invalid or unenforceable, for any reason, such decision shall not affect the remaining provisions of this chapter.

Section 3. Pursuant to New York Municipal Home Rule Law §22, the provisions of this chapter are intended to supersede any inconsistent provision of law.

Section 4. Pursuant to New York Municipal Home Rule Law §27, this local law shall take effect immediately upon filing with the New York Secretary of State.

# Local Law Filing

NEW YORK STATE DEPARTMENT OF STATE
162 WASHINGTON AVENUE, ALBANY, NY 12231

(Use this form to file a local law with the Secretary of State.)

Text of law should be given as amended. Do not include matter being eliminated and do not use italics or underlining to indicate new matter.

~~County~~
~~City~~ of GREENBURGH
Town
~~Village~~

Local Law No. 5 of the year 1997

A local law to amend the Zoning Ordinance of the Town of Greenburgh, Chpater 285, Section 285-7, by rezoning certain properties in the Town of Greenburgh to Conservation District (CD) zone pursuant to New York Home Rule Law, Section 10, and New York Town Law, Section 271
(Insert Title)

Be it enacted by the TOWN BOARD of the
(Name of Legislative Body)

~~County~~
~~City~~ of GREENBURGH as follows:
Town
~~Village~~

(If additional space is needed, attach pages the same size as this sheet, and number each.)

DOS-239 (Rev. 7/91)

(Complete the certification in the paragraph that applies to the filing of this local law and strike out that which is not applicable.)

1. (Final adoption by local legislative body only.)

I hereby certify that the local law annexed hereto, designated as local law No. 5 of 19 97 was duly passed by the of the (County)(City)(Town)(Village) of GREENBURGH TOWN BOARD on APRIL 9, 19 97, in accordance with the applicable provisions of law.
(Name of Legislative Body)

2. (Passage by local legislative body with approval, no disapproval or repassage after disapproval by the Elective Chief Executive Officer*.)

I hereby certify that the local law annexed hereto, designated as local law No. ---------- of 19----- was duly passed by the of the (County)(City)(Town)(Village) of ---------- on ---------- 19 ---, and was (approved)(not approved)(repassed after
(Name of Legislative Body)
disapproval) by the ---------- and was deemed duly adopted on ---------- 19----,
(Elective Chief Executive Officer*)
in accordance with the applicable provisions of law.

3. (Final adoption by referendum.)

I hereby certify that the local law annexed hereto, designated as local law No. ---------- of 19----- was duly passed by the of the (County)(City)(Town)(Village) of ---------- on ---------- 19----, and was (approved)(not approved)(repassed after
(Name of Legislative Body)
disapproval) by the ---------- on---------- 19----. Such local law was submitted
(Elective Chief Executive Officer*)
to the people by reason of a (mandatory)(permissive) referendum, and received the affirmative vote of a majority of the qualified electors voting thereon at the (general)(special)(annual) election held on ---------- 19---, in accordance with the applicable provisions of law.

4. (Subject to permissive referendum and final adoption because no valid petition was filed requesting referendum.)

I hereby certify that the local law annexed hereto, designated as local law No. ---------- of 19----- was duly passed by the of the (County)(City)(Town)(Village) of ---------- on ---------- 19----, and was (approved)(not approved)(repassed after
(Name of Legislative Body)
disapproval) by the ---------- on ---------- 19 ---. Such local law was subject to
(Elective Chief Executive Officer*)
permissive referendum and no valid petition requesting such referendum was filed as of ---------- 19---, in accordance with the applicable provisions of law.

* Elective Chief Executive Officer means or includes the chief executive officer of a county elected on a county-wide basis or, if there be none, the chairperson of the county legislative body, the mayor of a city or village, or the supervisor of a town where such officer is vested with the power to approve or veto local laws or ordinances.

5. (City local law concerning Charter revision proposed by petition.)

I hereby certify that the local law annexed hereto, designated as local law No. ---------------------------------- of 19------ of the City of ------------------------------------------ having been submitted to referendum pursuant to the provisions of section (36)(37) of the Municipal Home Rule Law, and having received the affirmative vote of a majority of the qualified electors of such city voting thereon at the (special)(general) election held on------------------ 19----, became operative.

6. (County local law concerning adoption of Charter.)

I hereby certify that the local law annexed hereto, designated as local law No. ---------------------------------- of 19------ of the County of ------------------------------------------------ State of New York, having been submitted to the electors at the General Election of November -------------------- 19----, pursuant to subdivisions 5 and 7 of section 33 of the Municipal Home Rule Law, and having received the affirmative vote of a majority of the qualified electors of the cities of said county as a unit and a majority of the qualified electors of the towns of said county considered as a unit voting at said general election, became operative.

(If any other authorized form of final adoption has been followed, please provide an appropriate certification.)

I further certify that I have compared the preceding local law with the original on file in this office and that the same is a correct transcript therefrom and of the whole of such original local law, and was finally adopted in the manner indicated in paragraph------1-----, above.

Clerk of the County legislative body, City, Town or Village Clerk or officer designated by local legislative body

Date: MAY 22, 1997

(Seal)

(Certification to be executed by County Attorney, Corporation Counsel, Town Attorney, Village Attorney or other authorized attorney of locality.)

STATE OF NEW YORK
COUNTY OF WESTCHESTER

I, the undersigned, hereby certify that the foregoing local law contains the correct text and that all proper proceedings have been had or taken for the enactment of the local law annexed hereto.

Signature

Title TOWN ATTORNEY

~~County~~
~~City~~ of GREENBURGH
Town
~~Village~~

Date: MAY 22, 1997

# EXHIBIT E

Print | Close

## Town of Greenburgh

http://www.greenburghny.com/Cit-e-Access/news/index.cfm?NID=6786&TID=10&jump2=0

News & Information

## CAC favors acquisition of Dromore Road property

*Release Date: January 06, 2007*

The Conservation Advisory Council issued the following statement regarding the property near the Greenburgh Nature Center. Earlier this week Legislator Tom Abinanti advised town officials that he would be pushing the county to help the town preserve this land.
PAUL FEINER

---

At the CAC meeting on Dec. 18, 2006, all present voted in favor of recommending to the Town that every effort be made to assist the Nature Center in acquiring the Dromore Road Property.

While small, this parcel is a link between two larger open spaces; the Nature Center and the Edgemont High School Campus. When the Town established its Open Space Plan, the importance to local fauna of connecting open space was recognized as an element in identifying land to be acquired.

Greenburgh is fortunate in having large underdeveloped swath that runs from the Metropolis County Club, to the Woodlands Campus, to the Farm on 100A, to the Ridge Road Park, to Hart's Brook Park, to the Nature Center, Edgemont High School, and the Scarsdale Golf Club. Every effort should be made to maintain and enhance the connectivity between these sites.

In addition the land would provide direct access from the Edgemont High School to the Nature Center. The high school and the Nature Center currently run joint programs.

If there is any way the CAC can assist in this acquisition effort, please let us know.

Theresa Mae Tori
Chairperson CAC

| Current News & Information | |
|---|---|
| Title | (Posted) |
| CAC favors acquisition of Dromore Road property | (1-6-07) |
| ABINANTI OFFERS TO HELP TOWN PROTECT NATURE CENTER | (1-3-07) |
| YOUTH BASKETBALL CLINIC | (1-3-07) |
| 2007 Sanitation Schedule (2MB pdf) | (1-2-07) |
| Illuminated road signs can help those with poor vision... live streaming of Board meetings suggested | (1-2-07) |
| GOALS 2007---work in progress | (1-1-07) |
| Senator Andrea Stewart Cousins to be sworn into office at Town Board meeting | (1-1-07) |
| Greenburgh Public Library to open satellites on January 24 | (12-26-06) |
| Year in review 2006 | (12-23-06) |
| Mad Science program | (12-21-06) |
| FEINER GIVES BACK $1029.41 TO TAXPAYERS FOR NOT COMPLETING GOALS | (12-14-06) |
| Adjustments to 2007 Tenative Budget | (12-12-06) |
| WANTED: SNOW ANGELS | (12-1-06) |
| Snow Parking Ordinance Commences Dec. 1st | (11-18-06) |
| Greenburgh forms CERT Team | (4-24-06) |
| 2006 Supervisors Goals | (1-1-06) |

Copyright © 2007 Town of Greenburgh. All Rights Reserved.

# EXHIBIT F

Print | Close

## Town of Greenburgh

http://www.greenburghny.com/Cit-e-Access/news/index.cfm?NID=6636&TID=10&jump2=0

News & Information

## GOALS 2007

*Release Date: January 01, 2007*

GOALS 2007

Every year, since 1999, Greenburgh Town Supervisor Paul Feiner has released goals at the beginning of the year. He voluntarily places $5000 of his salary in an escrow account. At the end of the year the Town Board evaluates his performance, based on implementation of goals. Feiner returns part of his salary to the taxpayers. On January 1, 2006 the NEW YORK TIMES wrote an editorial. They said the concept of performance base pay "feels right. It respects the voters' desire for accountability in spending and provides a useful reminder of promises made, kept,, broken or deferred." Last year Feiner gave back $1,029.41. 79.41% of his 2006 goals were achieved.

### AFFORDABLE HOUSING

1. Appoint members of the Affordable Housing Committee that the Town Board established last year

### ASSESSOR

2. Move the STAR office into the actual Assessment Department in order for better utilization of space

3. Update GIS to facilitate better usage between departments and the public

### ATTORNEY

4. Have all departments utilize standard documentation retention and email retention policy

5. Reduce the use of outside counsel

6. Finalize policy of subdivision by deed

7.Increase fines for construction work without permits

| Current News & Information | |
|---|---|
| Title | (Posted) |
| Hampshire Management Decision Order | (1-30-07) |
| CUSTOMER SERVICE SUGGESTION TO MAKE SATELLITE LIBRARY MORE ACCESSIBLE | (1-29-07) |
| TOWN WINS COURT DECISION RE: HAMPSHIRE MANAGEMENT | (1-29-07) |
| COMMUTER TRANSPORTATION ALTERNATIVES INFORMATION EVENT | (1-26-07) |
| Library contract update... | (1-26-07) |
| NEED READING AREA AT THE LIBRARY | (1-25-07) |
| SAVE THE DATE: Feb 15th -- meeting with Con Ed to address Con Ed power outages | (1-22-07) |
| SENATOR COUSINS EFFORTS TO SAVE COMMUNITY HOSPITAL AT DOBBS FERRY GENERATING MOMENTUM FOR HOSPITAL | (1-20-07) |
| Town Council statement on comptroller's report | (1-13-07) |
| WestHELP audit report Jan2007.pdf | (1-12-07) |
| 2007 Sanitation Schedule (2MB pdf) | (1-2-07) |
| GOALS 2007 | (1-1-07) |
| Adjustments to 2007 Tenative Budget | (12-12-06) |
| Snow Parking Ordinance Commences Dec. 1st | (11-18-06) |
| Greenburgh forms CERT Team | (4-24-06) |

**BUILDING**

8. Scan historic permits into database

9. Post and update court dispositions on website

**CABLE TV**

10. Approve franchise agreement with cablevision

**COMMUNITY CENTER OUTREACH**

11. Start SAT preparation summer camp for students

12. Initiate at least one new program to prepare young people to meet challenges of adolescence and young adulthood. Also, initiate a new program for entire family. The program could include family fun night, game night, movie or leisure trips

13. Upgrade internal communications– provide Board with memo indicating how this was done

**COMMUNITY HOSPITAL**

14. Save Community Hospital at Dobbs Ferry – work with State lawmakers, hospital administrators & community on plan so hospital will not close down at end of 2007

**COMPTROLLER/FINANCES**

15. Conduct an actuarial review to determine the cost of projected post employment benefits, other than pension benefits, as required by the Governmental Accounting Standards Board (GASB) Statement No 45

16. Review policies for computer and Internet usage

17. Approve fund balance policy

CON ED

18. Hold meeting with representatives of Con Ed and residents who have experienced frequent power outages. Work with Con Ed to develop proactive measures to help reduce possibility of future outages on streets that have experienced outages.

COURT

19. Obtain funding to keep drug court operational

20. Designate additional funds in fund balance for courthouse expansion

EAST HARTSDALE AVE. PARKING

21. Improve security at Hartsdale parking – parking garage, pipeline using updated technology

22. Formally appoint committee to review parking needs for East Hartsdale Ave residents. Develop preliminary recommendations as to next steps town should take to address parking

EMPLOYEE RECOGNITION

23. Recognize employees of the town who have worked for the town for 20 years, 30 years

ENERGY CONSERVATION

24. Approve energy conservation policy for commercial development

25. Hold public educational event about climate change action

26. Hold event on energy efficiency for businesses, focusing on Central Ave. area

27. Develop a clean transportation plan for town vehicles to include expanding the town's use of alternative fuel vehicles in its fleet, diesel emissions reductions and vehicle idling reduction in compliance with applicable statute

28. Implement program to introduce ride sharing and commuter choice options to the public as well as town employees (in order to reduce VMTs, Vehicle Miles Traveled)

FARMERS MARKET

29. Increase the number of farmer's participating in the farmer's market on East Hartsdale Avenue

GREENBURGH NATURE CENTER

30. Present Town Board with options (including acquisition of property/conservation overlay zones/compromise) to protect Greenburgh Nature Center from development that can have a negative impact on wildlife/habitats/eco system. Reach out to state/county/private individuals to determine if a partnership can be established regarding possible acquisition of property

LEAF COLLECTION- PUBLIC WORKS

31. Provide additional resources to leaf collection – including additional overtime to employees

32. Prepare RFP – investigate use of outside contractors to assist town in collection of leaves

LIBRARY

33. DemolishOld Town Hall. Provide public with periodic updates at Town Board meetings. Stay within budget

34. Work with library on satellite library services(East Hartsdale Ave., Greenburgh Nature Center) if requested by library board

35. Present public with quarterly usage reports – indicating how many books taken out of each of the satellite locations

PARKS

36. Landscape and improve park: Webb Field –with funds obtained from federal government

37. Build Dog Park,East Rumbrook Park, as part of the Phase II East Rumbrook Park Improvement Project

38. Assist the Cornell Cooperative Extension of Westchester County in developing a children's garden program at the Hart's Brook Park & Preserve

39. Create a new Halloween-Fall Festival special event at the Hart's Brook Park & Preserve that will utilize the facilities to include a hayride, entertainment and games

40. Go out to bid and complete construction of the first phase of for the Travis Hill Park Improvement Project

41. Re-shingle the restroom roofs at the Anthony Veteran Pool complex

42. Complete entrance beautification for Washington Ave. Park

43. Increase shading at the Massaro Park and Anthony Veteran Park Pool complex

44. Finalize trail design and complete the building of trails for the Taxter Ridge Park Preserve

45. Organize and host a local Hershey Track and Field Development meet for Greenburgh residents ages 7-14. This track meet will be held in conjunction with the National Recreation and Park Association. Co-sponsorship will also be sought with other village recreation departments in Greenburgh

46. In addition to the outdoor movie shown at the annual Celebrate Greenburgh Day at Veteran Park, show two other outdoor movies during the summer in other town owned neighborhood parks

**POLICE: CERT TEAM**

47. Assist CERT team with efforts to promote program. Publish color brochures

48. Place a prominent display in the Town Hall lobby encouraging volunteers

**POLICE**

49. Complete procedures for and implementation of a credit card bail program that will expedite the release of defendant from police custody

50. Completion of the federal requirements to make the town compliant with the National Incident Management System (NIMS)

51. Implementation of pilot project using broadband technology to remotely monitor an area where specific offenses have taken place

**PUBLIC WORKS**

52. Install generator at Town Hall

53. Conduct feasibility review: regarding illuminating some signs on key roads. Work with state officials to review feasibility of placing illuminated signs on Central Ave, 119 and 9A

**PURCHASING**

54. Prepare an assessment, which shall be retained as a document (3 ring binders) available to management of products and use practices that will reduce or minimize the risks of harmful effects to employees, custodial workers, visitors and other building occupants and to the environment

**QUALITY OF LIFE**
55. Town Board should vote on tree law legislation

56. Present to Town Board proposed abandoned homes legislation

57. Approve moratorium on residential development on Central Avenue

58. Hold public hearing on modified sidewalk policy

59. Hold meeting with federal/state/county officials re: flood control along Bronx River

**RIDGE HILL**

60. Appoint members of Direct Access Task Force – Ridge Hill Committee. . Provide periodic updates to public regarding status of direct access

**TAPPAN ZEE BRIDGE**

61. Select consultant to assist in reviewing TZ bridge options

**TOWN BOARD**

62. All meetings of Town Board should end no later than 11:15 PM, unless there is unanimous consent

**VILLAGES**

63. Appoint Joint Task Force consisting of Ardsley/Greenburgh representatives to determine future of waterwheel property. Develop plans for affordable housing at the site for volunteer firefighters, municipal employees

64. Dispose of property at 27 Main Street, Dobbs Ferry. Work with Dobbs Ferry officials

65. Incorporate recommendations of State Comptroller re: A & B budget. Continue to have dialogue with village/unincorporated leaders regarding A & B budget issues

**WESTHELP**
66. Review state comptroller's opinion, renegotiate agreement with neighborhood so that intent of WESTHELP partnership agreement previously approved by the Town Board can continue

**HISTORIAN**

67. Assist Greenburgh Library in making its local history collection available to the public during its stay as a satellite libraryat Town Hall. The collection will be located in the town historian's office. New programs and exhibits to be initiated.

68. Participate in on going planning stages of Hudson Fulton Champlain celebration scheduled for 2009. Explore town's role as an original river town.

69. Work to preserve the town's important historical buildings and sites, which have been investigated and compiled in a reconnaissance level historic resource survey.

---

Copyright © 2007 Town of Greenburgh. All Rights Reserved.

# EXHIBIT G

Post a Comment On: Supervisor Feiner

## "PUBLIC HEARING REQUESTED ON CENTRAL AVE RESIDENTIAL DEVELOPMENT MORATORIUM"

12 Comments - Show Original Post

Collapse comments

**hal samis said...**

Is a "spot" moratorium legal? It would penalize only some of the Town's property owners.

Residential construction on Central Avenue in Hartsdale should not be a concern the Edgemont School District.
Therefore why encumber these owners?

Thus, you are proposing a Hearing for a three mile moratorium along just one roadway?

How long would such a moratorium last? The last moratorium (town-wide) was two years in duration.

These are matters that should influence the wording of the Resolution.

And I presume that what is proposed for January 10 is just a Resolution to hold a Hearing in the future.

1/04/2007 12:28 PM

**paul feiner said...**

I will ask the Town Board on Wednesday to schedule a hearing sometime within the next month.
I had a dept head meeting today. The consensus was that we could have a moratorium but would have to tie it into the districts school capacity- the impact additional residential development have on school infrastructure.

1/04/2007 1:03 PM

## Leave your comment

You can use some HTML tags, such as <b>, <i>, <a>

### Choose an identity

Blogger  Other  Anonymous

USERNAME

PASSWORD

Switched to the beta?
Sign in with your Google Account

No *Blogger* account? Sign up here.

Preview

no logic
no difference
between this area + town
Should be Town Wide

1. Find the post you wish to comment about, and click the "# comments" link below it.
2. On the next page, under "Choose an identity", click the button indicating "Other."
3. Type your full name into the "Name" box.
4. Type your comment into the provided comment box.
5. Click "Publish your comment."

I hope this tutorial helps everyone out, and makes this blog more popular!

-Marc Herman

posted by Marc Herman @ 1:54 PM 0 comments

THURSDAY, JANUARY 04, 2007

## YOU'LL BE ABLE TO WATCH LENO AND LETTERMAN INSTEAD OF THE TOWN BOARD--MEETINGS OF TOWN BD TO END BY 11:15 pm

I have asked the Town Board to agree to a Board rules change. All meetings of the Town Board should end no later than 11:15 PM, unless there is unanimous consent to extend the time. Public comments should close by 11 PM. Department heads who are currently required to attend all Town Board meetings should be able to leave and go home to their families after 10:45 PM.

When members of the Board vote on important laws - we should all be awake and concentrating.

posted by Paul Feiner @ 2:39 PM 7 comments

## PUBLIC HEARING REQUESTED ON CENTRAL AVE RESIDENTIAL DEVELOPMENT MORATORIUM

In recent months Edgemont civic associations have requested a moratorium on residential development along the Central Ave corridor. The concern: Residential development will have more of an impact on the school district than commercial development. During a moratorium a study of the Central Ave corridor would take place. At the conclusion of the study a determination would be made whether a zoning change

FACT: WHY COMMON HOUSEHOLD BATTERIES ARE NOT RECYCLED...

LEGISLATOR ABINANTI URGES COUNTY TO ASSIST TOWN PROTECT PROPERTY NEAR NATURE CENTER

LIVE STREAMING OF TOWN BOARD MEETINGS SUGGESTED

ILLUMINATED ROAD SIGNS - does it make sense in Greenburgh?

Senator Andrea Stewart Cousins to be sworn into office at first meeting of the Town Board-January 10th

December: Miscellaneous

### Archives

August 2006

September 2006

October 2006

November 2006

December 2006

January 2007

December 2007

To leave a comment, click "# comments" then follow the directions on the next page.



should be approved.
I believe that the Town Board should schedule a public hearing on this requested moratorium and have placed the item on the agenda for next Wednesday, January 10th at 7:00 PM. I am requesting the Town Board to direct the Town Attorney/Commissioner of Planning to draft a resolution and to schedule the hearing within 30 days.
Some people do not support the moratorium. Holding a public hearing on this matter will provide all residents of Edgemont and Greenburgh with the opportunity to express their views.

posted by Paul Feiner @ 10:09 AM 12 comments

WEDNESDAY, JANUARY 03, 2007

## FACT: WHY COMMON HOUSEHOLD BATTERIES ARE NOT RECYCLED...

I frequently receive calls regarding household batteries - why they are not recycled. According to the Public Works department "in 1992 an international standard was implemented requiring manufacturers to produce common household non rechargeable batteries with a significantly lower mercury content. According to the NYS Dept of Environmental Conservation, most household batteries can be disposed of safely in the trash."
Those wishing to learn more about recycling or about the disposal of other batteries as well as other chemical disposal information are invited to e mail me at pfeiner@greenburghny.com or dpw@greenburghny.com.
The recent sanitation schedule that the town sent out has some interesting info about recycling.

posted by Paul Feiner @ 7:39 PM 0 comments

TUESDAY, JANUARY 02, 2007

## LEGISLATOR ABINANTI URGES COUNTY TO ASSIST TOWN PROTECT PROPERTY NEAR NATURE CENTER

County Legislator Tom Abinanti is calling on the county to assist the town and Greenburgh Nature Center in acquiring additional land near the Greenburgh Nature Center as open space. A developer is proposing to build on the property-which now links the nature center and Edgemont High School's northern playing fields. The protection of this



# EXHIBIT H

**Town of Greenburgh**
http://www.greenburghny.com/Cit-e-Access/news/index.cfm?NID=6798&TID=10&jump2=0

**News & Information**

## Moratorium on development: Central Ave recommended by PLanning Commissioner

*Release Date: January 08, 2007*

Mark Stellato, Commissioner of Planning, has recommended a development moratorium on site plans and subdivisions for residential development in the Central Avemixed use impact district be established so that the town and its consultants can fully study the matter and make recommendations back to the Town Board. In the last 15 years the Edgemont school district's enrollment has increased from 1,355 to 1,923, an increase in 42%. The increase in school population has required the need for additional educational facilities not contemplated when the current plan was developed and zoning enacted.

The portion of Central Aveserved by the Edgemont school district includes 909 apartments in various multifamily dwellings, representing 32% of total residential component of the school district and a 60 percent increase in the number of residential units from 1976.

Other factors besides increased enrollment: no major roadway infrastructure improvements undertaken since the adoption of the 1976 plan. In 2000, to accommodate a growing student population, the EdgemontSchool districtundertook a capital improvement program which expanded facilities at all 3 schools. Those facilities are at full capacity.

I support the proposed moratorium and hope that the Town Board will schedule a hearing date this Wednesday night – our next Town Board meeting. This proposed moratorium has the support of Edgemont civic leaders.

PAUL FEINER

GreenburghTownSupervisor

| Title | (Posted) |
|---|---|
| | (1-20-07) |
| | (1-19-07) |
| | (1-19-07) |
| | (1-15-07) |
| | (1-13-07) |
| | (1-13-07) |
| | (1-12-07) |
| | (1-12-07) |
| | (1-11-07) |
| | (1-11-07) |
| | (1-10-07) |
| | (1-9-07) |
| | (1-8-07) |
| | (1-6-07) |
| | (1-2-07) |
| | (1-1-07) |
| | (12-26-06) |
| | (12-23-06) |
| | (12-12-06) |
| | (12-1-06) |
| | (11-18-06) |
| | (4-24-06) |
| | (1-1-06) |

# EXHIBIT I



**TOWN of GREENBURGH**
**Community Development & Conservation**
**177 Hillside Avenue**
**Greenburgh, New York 10607**
**Telephone (914) 993-1505**
**Telefax (914) 993-1518**

**Paul J. Feiner**
*Supervisor*
**Mark T. Stellato, AICP**
*Commissioner*

February 26, 2007

Attention: Janet Giris
DelBello Donnellan Weingarten Tartaglia, Wise & Wiederkehr, LLP
One North Lexington Avenue
White Plains, NY 10601

Re: 62 Dromore Lane

Dear Ms. Giris:

In reviewing the information you sent to our Department on February 2, 2007, we have conducted an initial zoning history of the parcel and it has come to our attention that the property in question located at 62 Dromore (Volume 8, Section 31, Sheet 37B, Block 1692, Parcels 14A, 70A & 70B), is actually in the R-20 Zone.

As you may be aware, the Town of Greenburgh amended the zoning along Central Avenue corridor after completing the 1976 Central Avenue Comprehensive Development Plan for the Central Avenue Corridor. The Town Board approved the zoning code and map changes within this new district. At that time, the property located on 62 Dromore (Volume 8, Section 31, Sheet 37B, Block 1692, parcels 14A, 70A & 70B) was, and still is, located in the R-20 One Family Residence District and not included in the Town Board's resolution of rezoning to the new Central Avenue Mixed Use Impact District (see attached Board Resolution).

I have enclosed a copy of the 1976 map of the "Central Avenue Mixed Use Impact District" that was used by the Town Board in rezoning the area. The map indicates which properties are to be located in the new Central Avenue Mixed Use Impact District.

If you have any further questions, please feel free to contact the Department.

MARK STELLATO, AICP
Commissioner

Attachment

Cc: Tim Lewis, Town Attorney
John Lucido, Building Inspector

# EXHIBIT J



Paul J. Feiner
*Supervisor*
Mark T. Stellato, AICP
*Commissioner*

# TOWN of GREENBURGH
**Community Development & Conservation**
177 Hillside Avenue
Greenburgh, New York 10607
Telephone (914) 993-1505
Telefax (914) 993-1518

**MEMORANDUM**

TO: Michael Lepre, P.E., Town Engineer

FROM: Mark Stellato, AICP, Commissioner

DATE: February 27, 2007

RE: Town of Greenburgh Zoning Map

---

The Department of CD&C has found errors to the Town of Greenburgh Zoning Map that we wish to bring to your attention. As you may know, the Town undertook a consolidation of the zoning districts along Central Avenue in accordance with the 1976 Central Avenue Comprehensive Development Plan for the Central Avenue Corridor. The Town Board approved in 1978 the zoning code amendments and map changes for this new district along the Central Avenue Corridor as set forth on the attached map. The following are what we believe to be discrepancies with respect to the Town Board's approved zoning map and the actual map that is available:

1) **Property located at Volume 8, Section 31, Sheet 37B, Parcels 20 (450-460 Central Avenue)**

   A portion of this parcel was excluded in the 1976 Central Avenue Comprehensive Development Plan for the Central Avenue Corridor. The current zoning line follows along the eastern edge of the property as has been in included in the CA district. The correct zoning line, as referenced in the 1976 Plan should include a portion of this property in the R-20 Single Family Residence District.

2) **Property located at Volume 8, Section 31, Sheet 37B, Block 1692, Parcels 14A, 70A & 70B (62 Dromore Road)**

   This parcel was never included in the 1976 Central Avenue Comprehensive Development Plan for the Central Avenue Corridor. It's current classification is that of CA and is incorrect. It's correct classification is that of R-20 One Family Residence District.

As indicated above, I have attached the appropriate backup for you to make the requisite adjustments to the Town's Zoning Map.

# EXHIBIT K

**Carole Walker**

**From:** Carole Walker
**Sent:** Thursday, November 01, 2007 10:40 AM
**To:** Michelle McNally (mmcnally2@verizon.net); 'Miriam Widmann'; 'Gncdirectr@aol com'; 'John A. Risi'; 'Rick Troy'
**Cc:** Mark T Stellato
**Importance:** High

Carole Walker
Secretary to Zoning Board of Appeals
Department of Community Development and Conservation
Phone: (914)-993-1507
Fax: (914)-993-1518
E-mail: cwalker@greenburghny.com

Town of Greenburgh
177 Hillside Ave.
Greenburgh, NY 10607
Homepage: www.greenburghny.com

Certificate of Decision

Case No. 07-15

# Town of Greenburgh
## *Zoning Board of Appeals*

## Certification of Decision

For the meeting held at Town Hall, Town of Greenburgh, on the 18th day of October 2007.

**MEMBERS PRESENT:** Chairman Belasco, Mr. Doyle, Mr. Harrison, Mr. DeCicco, Ms. Bunting-Smith, Mr. Rosenblum

**MEMBERS ABSENT:** Mr. Baumgarten

**NAME AND ADDRESS OF APPLICANT:** **S & R Development Estates, LLC**
62 Dromore Road
Scarsdale, NY 10583

**PROPERTY LOCATION:** **62 Dromore Road**

**VOLUME:** 8 **SHEET:** 31 **SHEET:** 37B **BLOCK:** 1692 **LOTS:** 14A, 70A, 70B, 70C

**PRESENT ZONING: R-20– One-Family Residence District**

**NEWSPAPER AND PUBLICATION DATE:** "Journal News", July 9, 2007

**RELIEF APPLIED FOR:** Applicant is appealing from a decision of the Commissioner of Community Development & Conservation that denied that the property was in the CA-Mixed Use Impact District and determined that the property is in the R-20 District.

**ON A MOTION DULY MADE BY:** Chairman Belasco
**AND SECONDED BY:** Mr. Doyle

**RESOLVED:** That the appeal from the Commission of Planning and Community Development determination, dated February 26, 2007 that the applicant's property is zoned R-20 be **DENIED.**

**VOTING AYE:** Chairman Belasco, Mr. Doyle, Mr. Baumgarten, Mr. DeCicco, Ms. Bunting-Smith, Mr. Rosenblum

**ABSTAINING:** -0-
**OPPOSED:** Mr. Harrison,

**THE BOARD MADE THE FOLLOWING FINDINGS:**

Applicant is appealing a determination of the Commissioner of Planning and Community Development that its property is zoned R-20. It contends that before it purchased the property in question, it inquired as to its zoning with the Building and Planning Depts. of the Town, and conducted its own investigation of the zoning of the property it intended to purchase. At all times it was told that the property was in the CA District, which permits multi-family and mixed commercial development. Moreover, it is alleged that the Zoning Maps of the Town from 1997-January 2007, showed the property in question to be in the CA District. Accordingly, applicant is seeking a determination from this Board that the property is in the CA District. However, it is also uncontroverted that on or about February 27, 2007 -- before the filing of this application -- the Zoning Map was changed to reflect that the property is in the R-20 District.

Thus, in effect, applicant is asking this Board to declare the Zoning Map in existence on the date of its application invalid. However, this Board lacks the authority to do so. The power to zone a particular property and to enact and create the Zoning Map is a legislative function. This Board, as an administrative agency, has no power to amend or modify the Zoning Ordinance or the Map that reflects its provisions. Nor does this Board have the authority to declare the Zoning Map invalid or confiscatory. Such power is reserved to the Courts.

The applicant contends that the 2007 revision of the Zoning Map to place its property in the R-20 District was invalid because it was not accomplished pursuant to an act of the Town Board. However, the Commissioner has presented us with several official Zoning Maps dating from 1980, *when the CA District was first adopted, to 1991, showing that the applicant's property was* not a part of the CA District when it was adopted, and, further, with a statement and a report from Town staff that a comprehensive review of the Town Board minutes for the relevant period establishes that the Town Board never rezoned the property to CA from its former designation as R-20. In essence, it is the Commissioner's position that the Zoning Maps showing the property to be in the CA District were, themselves, in error, apparently created when adjoining properties were rezoned from R-20 to CD (Conservation District) in 1997, and that the 2007 revision to the Map did not "rezone" applicant's property; rather, it merely constituted a ministerial correction of an error in the previous maps.

It is our opinion that the proof presented by the Commissioner in our record was sufficient to shift the burden of proof to the applicant to establish that its property was at some time rezoned by the legislative body to CA. It has failed to do so, despite our having adjourned the hearing to enable applicant to respond to the documents submitted to us. Instead, applicant's representative has refused our request to provide any such information beyond the 1996-2006 zoning maps and, incredibly, has claimed that it cannot provide any, relying solely on its claim that the Town's response to a FOIL request apparently submitted in connection with a Notice of Claim it has submitted preparatory to bringing suit against the Town for damages was incomplete. Therefore, we find on the record before us that the proper zoning designation of the property in question is R-20. Although we understand and sympathize with the applicant's alleged reliance upon the previous zoning maps, for us to rule otherwise would amount to a perpetuation of what we find

to have been an erroneous designation of the property. In effect, were we to rule that the property is in the CA District without being presented with any proof that the legislative body ever designated it to be in such district, such a decision would be tantamount to an ultra vires rezoning of the property by an administrative body, and would not be supported by substantial evidence in the record before us.

Moreover, we find significant flaws in applicant's argument that it relied upon the CA designation when it purchased the property. Applicant submitted to the Board an appraisal dated the year before it purchased the property, appraising the property at $10,400,000 as of September 2005 and $9,100,000 as of November 2004, based upon its CA District designation. It purchased the property, however, for only $1,414,000, which is consistent with a zoning designation of R-20, which is how the property was listed for sale. Significantly, a Substitute Certificate of Occupancy for the premises issued in July 1999, which would have been part of any title search for the acquisition of the property, indicated that the zoning designation of the property at that time was R-20, and, even after applicant purchased the property, it received a demolition permit to demolish an existing residence on the property, which also indicated the zoning of the property as being in the R-20 District. At no time did applicant question or contest this document.

We note the opinions expressed in a separate opinion written by one of our members. In it, he relies heavily on allegations made in an affidavit of one of the applicant's principals, which he describes as raising issues of concerted actions in support of a conspiracy against the applicant by our elected officials. Such allegations are obviously addressed to issues relevant to a Notice of Claim for damages that applicant has filed with the Town. It is our opinion that these allegations, addressed to the good faith of our elected officials during the period after it acquired the property, are not particularly relevant to the application before us, which is to determine only one issue: whether the property in question is in the CA or R-20 District.

In addition, our dissenting member takes the Town to task for its allegedly poor bookkeeping practices, as evidenced by its allegedly inadequate response to the applicant's FOIL request in connection with its Notice of Claim. While all this may be true, the fact remains that we must make our decision on the record before *us*. That record contains most, if not all of the Zoning Maps that have been promulgated since 1980, together with a memorandum from Town staff that an examination was made of the Town Board's proceedings during the relevant period and that, based upon such examination, the Town Board never adopted a resolution or local law rezoning the property in question from R-20 to CA. The Board raised this issue directly with the applicant and adjourned the hearing to give the applicant an opportunity to rebut these documents or to conduct its own examination of the records, which are readily available to the public. Applicant failed to do so. Indeed, it refused to do so, choosing to rely solely upon the Town's response to its FOIL request, despite the timely submission to us of the previous Zoning Maps showing the property to be in the R-20 District. Even the dissenting member recognizes that the applicant, in relying solely on Zoning Maps after 1997, failed to adequately perform its due diligence.

We therefore find that, whether or not the February 2007 Zoning Map is ultimately found to be invalid by a competent authority to do so, the record before us establishes that the applicant's property was never zoned CA by the legislative body, and therefore it remains in the R-20 District in which it was placed by the legislature in 1980.

For the above reasons, we hereby DENY the Applicant's appeal from the determination of the Commissioner of Planning that the property in question is properly zoned R-20.

**ON A SEPARATE MOTION**
**DULY MADE BY:** Chairman Belasco
**AND SECONDED BY:** Mr. Baumgarten
**RESOLVED:** That the subject application is a **TYPE II** action requiring no further S.E.Q.R.A consideration.
**VOTING AYE:** Chairman Belasco, Mr. Doyle, Mr. Harrison, Mr. DeCicco, Ms. Bunting-Smith, Mr. Rosenblum
**ABSTAINING:** -0-
**OPPOSED:** -0-

Carole Walker
Secretary to the Zoning Board of Appeals

***APPROVED:***
Member of the Board

# EXHIBIT L

CASE NO. 07-15

TOWN of GREENBURGH
**ZONING BOARD OF APPEALS**
**177 HILLSIDE AVE., GREENBURGH, NY 10607**
**Telephone (914) 993-1507**
**Telefax (914) 993-1518**

**Steven Belasco**
***Chairman***

November 9, 2007

Mr. Richard Troy
S & R Development Estates, LLC
600 Mamaroneck Avenue
Harrison, NY 10528

**RE:** **ZBA CASE 07-15 – S & R Development Estates, LLC**

Dear Rick:

Enclosed, please find a corrected copy of the Certificate of Decision for the above referenced *Case 07-15, S & R Development Estates.* Please use the Decision that is date stamped by the Town Clerk of Greenburgh November 9, 2007.

If you have any questions, please don't hesitate to contact me.

Sincerely,

Carole Walker

Carole Walker,
Secretary to the Zoning Board of Appeals

CC: John Risi

# Town of Greenburgh
*Zoning Board of Appeals*

## Certification of Decision

For the meeting held at Town Hall, Town of Greenburgh, on the 18th day of October 2007.

**MEMBERS PRESENT:** Chairman Belasco, Mr. Doyle, Mr. Harrison, Mr. DeCicco, Ms. Bunting-Smith, Mr. Rosenblum

**MEMBERS ABSENT:** Mr. Baumgarten

**NAME AND ADDRESS OF APPLICANT:** **S & R Development Estates, LLC**
62 Dromore Road
Scarsdale, NY 10583

**PROPERTY LOCATION:** **62 Dromore Road**

**VOLUME:** 8 **SHEET:** 37B **BLOCK:** 1692 **LOTS:** 14A, 70A, 70B, 70C

**PRESENT ZONING: R-20– One-Family Residence District**

**NEWSPAPER AND PUBLICATION DATE:** "Journal News", July 9, 2007

**RELIEF APPLIED FOR:** Applicant is appealing from a decision of the Commissioner of Community Development & Conservation that denied that the property was in the CA-Mixed Use Impact District and determined that the property is in the R-20 District.

**ON A MOTION DULY MADE BY:** Chairman Belasco
**AND SECONDED BY:** Mr. Doyle

**RESOLVED:** That the appeal from the Commission of Planning and Community Development determination, dated February 26, 2007 that the applicant's property is zoned R-20 be **DENIED.**

**VOTING AYE:** Chairman Belasco, Mr. Doyle, Mr. DeCicco, Ms. Bunting-Smith, Mr. Rosenblum

**ABSTAINING:** -0-
**OPPOSED:** Mr. Harrison,

**THE BOARD MADE THE FOLLOWING FINDINGS:**

Applicant is appealing a determination of the Commissioner of Planning and Community Development that its property is zoned R-20. It contends that before it purchased the property in question, it inquired as to its zoning with the Building and Planning Depts. of the Town, and conducted its own investigation of the zoning of the property it intended to purchase. At all times it was told that the property was in the CA District, which permits multi-family and mixed commercial development. Moreover, it is alleged that the Zoning Maps of the Town from 1997-January 2007, showed the property in question to be in the CA District. Accordingly, applicant is seeking a determination from this Board that the property is in the CA District. However, it is also uncontroverted that on or about February 27, 2007 -- before the filing of this application -- the Zoning Map was changed to reflect that the property is in the R-20 District.

Thus, in effect, applicant is asking this Board to declare the Zoning Map in existence on the date of its application invalid. However, this Board lacks the authority to do so. The power to zone a particular property and to enact and create the Zoning Map is a legislative function. This Board, as an administrative agency, has no power to amend or modify the Zoning Ordinance or the Map that reflects its provisions. Nor does this Board have the authority to declare the Zoning Map invalid or confiscatory. Such power is reserved to the Courts.

The applicant contends that the 2007 revision of the Zoning Map to place its property in the R-20 District was invalid because it was not accomplished pursuant to an act of the Town Board. However, the Commissioner has presented us with several official Zoning Maps dating from 1980, when the CA District was first adopted, to 1991, showing that the applicant's property was not a part of the CA District when it was adopted, and, further, with a statement and a report from Town staff that a comprehensive review of the Town Board minutes for the relevant period establishes that the Town Board never rezoned the property to CA from its former designation as R-20. In essence, it is the Commissioner's position that the Zoning Maps showing the property to be in the CA District were, themselves, in error, apparently created when adjoining properties were rezoned from R-20 to CD (Conservation District) in 1997, and that the 2007 revision to the Map did not "rezone" applicant's property; rather, it merely constituted a ministerial correction of an error in the previous maps.

It is our opinion that the proof presented by the Commissioner in our record was sufficient to shift the burden of proof to the applicant to establish that its property was at some time rezoned by the legislative body to CA. It has failed to do so, despite our having adjourned the hearing to enable applicant to respond to the documents submitted to us. Instead, applicant's representative has refused our request to provide any such information beyond the 1996-2006 zoning maps and, incredibly, has claimed that it cannot provide any, relying solely on its claim that the Town's response to a FOIL request apparently submitted in connection with a Notice of Claim it has submitted preparatory to bringing suit against the Town for damages was incomplete. Therefore, we find on the record before us that the proper zoning designation of the property in question is R-20. Although we understand and sympathize with the applicant's alleged reliance upon the previous zoning maps, for us to rule otherwise would amount to a perpetuation of what we find

to have been an erroneous designation of the property. In effect, were we to rule that the property is in the CA District without being presented with any proof that the legislative body ever designated it to be in such district, such a decision would be tantamount to an ultra vires rezoning of the property by an administrative body, and would not be supported by substantial evidence in the record before us.

Moreover, we find significant flaws in applicant's argument that it relied upon the CA designation when it purchased the property. Applicant submitted to the Board an appraisal dated the year before it purchased the property, appraising the property at $10,400,000 as of September 2005 and $9,100,000 as of November 2004, based upon its CA District designation. It purchased the property, however, for only $1,414,000, which is consistent with a zoning designation of R-20, which is how the property was listed for sale. Significantly, a Substitute Certificate of Occupancy for the premises issued in July 1999, which would have been part of any title search for the acquisition of the property, indicated that the zoning designation of the property at that time was R-20, and, even after applicant purchased the property, it received a demolition permit to demolish an existing residence on the property, which also indicated the zoning of the property as being in the R-20 District. At no time did applicant question or contest this document.

We note the opinions expressed in a separate opinion written by one of our members. In it, he relies heavily on allegations made in an affidavit of one of the applicant's principals, which he describes as raising issues of concerted actions in support of a conspiracy against the applicant by our elected officials. Such allegations are obviously addressed to issues relevant to a Notice of Claim for damages that applicant has filed with the Town. It is our opinion that these allegations, addressed to the good faith of our elected officials during the period after it acquired the property, are not particularly relevant to the application before us, which is to determine only one issue: whether the property in question is in the CA or R-20 District.

In addition, our dissenting member takes the Town to task for its allegedly poor bookkeeping practices, as evidenced by its allegedly inadequate response to the applicant's FOIL request in connection with its Notice of Claim. While all this may be true, the fact remains that we must make our decision on the record before *us*. That record contains most, if not all of the Zoning Maps that have been promulgated since 1980, together with a memorandum from Town staff that an examination was made of the Town Board's proceedings during the relevant period and that, based upon such examination, the Town Board never adopted a resolution or local law rezoning the property in question from R-20 to CA. The Board raised this issue directly with the applicant and adjourned the hearing to give the applicant an opportunity to rebut these documents or to conduct its own examination of the records, which are readily available to the public. Applicant failed to do so. Indeed, it refused to do so, choosing to rely solely upon the Town's response to its FOIL request, despite the timely submission to us of the previous Zoning Maps showing the property to be in the R-20 District. Even the dissenting member recognizes that the applicant, in relying solely on Zoning Maps after 1997, failed to adequately perform its due diligence.

We therefore find that, whether or not the February 2007 Zoning Map is ultimately found to be invalid by a competent authority to do so, the record before us establishes that the applicant's property was never zoned CA by the legislative body, and therefore it remains in the R-20 District in which it was placed by the legislature in 1980.

For the above reasons, we hereby DENY the Applicant's appeal from the determination of the Commissioner of Planning that the property in question is properly zoned R-20.

**ON A SEPARATE MOTION**
**DULY MADE BY:** Chairman Belasco
**AND SECONDED BY:** Mr. Doyle
**RESOLVED:** That the subject application is a **TYPE II** action requiring no further S.E.Q.R.A consideration.
**VOTING AYE:** Chairman Belasco, Mr. Doyle, Mr. Harrison, Mr. DeCicco, Ms. Bunting-Smith, Mr. Rosenblum
**ABSTAINING:** -0-
**OPPOSED:** -0-

Carole Walker
Secretary to the Zoning Board of Appeals

***APPROVED***:
Member of the Board

# AFFIDAVIT OF SERVICE VIA FEDERAL EXPRESS

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

**RYAN NEW**, being duly sworn, deposes and says, that deponent is not a party to the action, is over 18 years of age and resides at NEW YORK, NEW YORK.

That on the 29th day of February, 2008, deponent served the within **DECLARATION OF CAROLE WALKER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** upon:

John A. Risi, Esq. (JR 6475)
BLEAKLEY PLATT & SCHMIDT
One North Lexington Avenue
P.O. Box 5056
White Plains, New York 10602-5056

attorneys in this action, at the addresses designated by said attorneys for that purpose by depositing a true copy of same enclosed in a postpaid properly addressed Federal Express overnight mail wrapper, under the exclusive care and custody of Federal Express.

Ryan New

Sworn to before me this
29th day of February, 2008

Notary

CHRISTOPHER FRETÈL
NOTARY PUBLIC, State of New York
No. 02FR6123499
Qualified in New York County
Commission Expires March 7, 2009