UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

S&R DEVELOPMENT ESTATES, LLC and "JOHN
DOE" NOS. 1 THROUGH 75,

                             Plaintiffs,

           - against -

STEVEN BASS, EDDIE MAE BARNES, PAUL FEINER,
DIANA JUETTNER and FRANCIS SHEEHAN, Constituting the
Town Board of the Town of Greenburgh, Westchester County,
New York, STEVEN BELASCO, MALCOLM
BAUMGARTNER, EVE BUNTING-SMITH, NICHOLAS
DECICCO, LAWRENCE DOYLE, ROHAN HARRISON and
DANIEL ROSENBLUM, Constituting
the Zoning Board of Appeals of the Town of Greenburgh,
Westchester County, New York, MARK STELLATO,
Commissioner of the Department of Community Development
and Conservation of the Town of Greenburgh, TOWN OF
GREENBURGH and JOHN and JANE DOE,

                           Defendants.
--------------------------------------------------------------------X

07 Civ. 11112 (WCC)(GAY)

**DECLARATION OF
JOHN A. RISI IN
OPPOSITION TO
DEFENDANTS' MOTION
TO DISMISS THE
AMENDED COMPLAINT**

**ECF CASE**

    1.     I am a member of Bleakley Platt & Schmidt, LLP, counsel to S&R Development

Estates, LLC ("S&R"), plaintiff herein. I submit this declaration in opposition to defendants' motion

to dismiss. My knowledge is based upon my handling of this matter, including but not limited to my

appearances before the Town of Greenburgh's Zoning Board of Appeals ("ZBA") on behalf of S&R.

    2.     For the sake of completeness, the following exhibits are annexed hereto:

        <u>Exhibit 1</u>:    a complete copy of the July 9, 2007 Affidavit of Richard
        Troy, a managing member of S&R, submitted to the Zoning Board of
        Appeals. Defendants only annexed a small number of the exhibits to the Troy
        Affidavit.

        <u>Exhibit 2</u>:    the July 19, 2007 Supplemental Affidavit of Richard Troy,
        with accompanying exhibits.

        <u>Exhibit 3</u>:    the 20-page dissent of Rohan Harrison to the November 9,
        2007 decision of the ZBA regarding the zoning classification of S&R's
        property.

3.      Plaintiff's memorandum of law addresses the substantive differences between the November 1, 2007 ZBA decision and the subsequent November 9, 2007 ZBA decision that S&R was directed to "use" by the Town (Pltf. Memorandum at pp. 36-7).  However, certain aspects of the November 1, 2007 decision merit attention.

4.      First, the November 1st decision lists Zoning Board member Malcolm Baumgartner as voting against S&R even though he was absent from the October 2007 meeting and had affirmatively stated in executive session at the September 2007 meeting during a straw vote that he would cast his vote in favor of S&R.

5.      Second, I was rather surprised by the vote of Mr. Rosenblum against S&R at the October 2007 ZBA meeting since he did not sit with the ZBA during either the July, August or September 2007 ZBA meetings, missing each presentation made on behalf of S&R, as well as the discussions held between counsel for S&R and the ZBA during those meetings.

6.      Finally, it should be noted that the Town never provided sworn testimony to the ZBA despite repeated requests that it do so.  Despite being served with a subpoena (prepared by our office) to appear at the ZBA hearing, Commissioner Stellato did not appear.  The Chairman of the ZBA, defendant Steven Bellasco, indicated that even if Mr. Stellato were to appear before the ZBA, he would not permit Mr. Stellato to be questioned regarding any issue relating to the matter before the ZBA, whether it be the bases of the decision which was the subject of the appeal, his cryptic memos to the ZBA or the origin, provenance and veracity of the "mystery maps," (Pltf. Memorandum of Law at pp. 3, 13 [fn 6] and 35).  Commissioner Stellato did not appear before the ZBA with respect to S&R's appeal and was subsequently fired by the Town from his position in January 2008.

Dated:  White Plains, New York
       April 16, 2008

*John A. Risi*

JOHN A. RISI (JR-6475)

TOWN OF GREENBURGH
ZONING BOARD OF APPEALS
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~X

In re:  Appeal of S&R Development Estates, LLC          Case No.:  07-15
Of Determination of Mark Stellato, Commissioner,
Department of Community Development and
Conservation for the Town of Greenburgh regarding          **AFFIDAVIT**
zoning classification of Property located at 62
Dromore Road, Volume 8, Section 31, Sheet 37B,
Block 1692, Parcels 14A, 70A, 70B and 70C.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~X

STATE OF NEW YORK                    )
                                     )ss.
COUNTY OF WESTCHESTER                )

RICHARD TROY, being duly sworn, deposes and says that:

1.      I am a managing member of S&R Development Estates, LLC ("S&R")

and submit this affidavit in connection with the appeal filed by S&R with the Zoning

Board of Appeals.

2.      S&R is appealing from a February 26, 2007 letter determination by

Mark Stellato, Commissioner, Department of Community Development and

Conservation for the Town of Greenburgh, wherein he determined that the property

owned by S&R, 1 Dromore Road, Scarsdale, New York (the "Property") is not located

within the Central Avenue Mixed Use Impact District ("CA-I Zone") of the Town of

Greenburgh but rather is located within an R-20 zone (see Exhibit 1).

3.      In fact, the Property is located within the CA-I Zone.

### Due Diligence Prior to Acquisition:
### Acquired Title to Property May 24, 2006

4.      In September 2004, my brother, Stephen Troy (the other managing

member of S&R) and I commenced our due diligence regarding the acquisition and

development of the Property. We obtained a copy of the year 2000 official Town of Greenburgh Zoning Map which clearly showed the Property in the CA-I Zone. Subsequently, I visited the Greenburgh Public Library and examined the earlier November 1997 Greenburgh Zoning Map, which was publicly displayed. That earlier map, along with the later 2006 Greenburgh Zoning Map, also clearly shows the Property located in the CA-I Zone. Further, our Property was designated as zoned CA-I in the following Official Town Maps: the 1996 Map, two separate 1997 Maps, the 2000 Map, the 2003 Map and the 2006 Map.

5.    Continuing our due diligence efforts, we met with Peter Gaito, a licensed architect experienced with the zoning ordinance of the Town of Greenburgh. He reviewed his copy of the official Town of Greenburgh Zoning Map and confirmed to us that the Property was in the CA-I Zone. He informed us that since the Property is in excess of two acres, a permitted use of the Property would include a multifamily development of not more than four stories in height with a maximum density of 35 bedrooms per acre. See Town Code Section 285-29.1 (B) (3) (a). That would permit a development with 82 one bedroom apartments on 2.34 acres before deduction for steep slopes.

6.    Section 285-7 (A) of the Greenburgh Town Code, entitled "Zoning Map; interpretation of district boundaries" states:

> The boundaries of such districts and special building lines are hereby established as shown on the map entitled "Zoning Map, Town of Greenburgh," which map is annexed to and is hereby adopted and declared to be a part of this chapter and is hereinafter referred to as the "Zoning Map." Said Zoning Map may be amended in the same manner as any other part of this chapter. An official copy of said map, indicating the latest amendments, shall be kept up to date in the office of the Building Inspector and in the office of the Commissioner of Community Development and

> Conservation for the use and benefit of the public. Said
> Official Zoning Map shall be the **final authority** [emphasis
> added] as to the current zoning classification of any land
> within the boundaries of the unincorporated Town of
> Greenburgh.

7.     We also consulted legal counsel to confirm Mr. Gaito's zoning

determination.  Together with Mark Weingarten, Esq. and Janet Giris, Esq. of

DelBello, Donellan Weingarten Tartaglia Wise & Wiederkehr, LLP, we confirmed

that the Property was located in the CA-I Zone.

8.     Thereafter, my brother and I attended a meeting with our architect Mr.

Gaito and Thomas Madden, Deputy Commissioner, Department of Community

Development and Conservation for the Town of Greenburgh.   Deputy Commissioner

Madden confirmed to us that the Property was zoned CA-I and reviewed pertinent

CA-I Zoning provisions: open space rules, coverage issues, maximum height, side

yards, the requirement for a minimum lot size of 2 acres (after deduction for "steep

slopes") and the number of allowable bedrooms (35 per acre). Deputy Commissioner

Madden expressed no concerns with regard to the development's potential impact on

the environment, open space, Greenburgh Nature Center (GNC) or water/sewer

capacity. He said there should be no obstacles to our multifamily development

especially since our property adjoined an existing multifamily development known as

Scarsdale Woods Condominiums (188 units). He raised no objection and was

receptive to a new multifamily development of 35 bedrooms per acre (subject only to

reduction for steep slopes) on the Property.  He stated a preference that our

development, to the extent possible, be consistent with the architectural style of the

Scarsdale Woods multifamily development adjacent to the Property.  He also

mentioned that we should explore the possibility of sharing a driveway with the Scarsdale Woods complex.

9.     In September 2005, still before purchasing the Property, we hired Howard Gelbtuch, MAI, CRE, FRICS, an MAI Appraiser, to give us an opinion as to the Property's value. As basis for Mr. Gelbtuch's opinion, Gary Spilatro, a licensed architect in New Rochelle with extensive zoning experience throughout Westchester County, provided his confirmation that the Property was in the CA-I Zone. His confirmation was formally set forth in his letter dated September 6, 2005 (Exhibit 2). Before issuing his letter and confirmation that the Property was in the CA-I Zone, Mr. Spilatro made his own due diligence investigation. He went directly to Town Hall to confirm the zoning. Before he provided his opinion, he consulted the official zoning map on the wall of the office of the Department of Community Development and Conservation, observed the Property's inclusion in the CA-I Zone and was told emphatically by an employee in the office that the "map controls" a particular parcel's zoning designation. Based upon Mr. Gelbtuch's own study and the Spilatro zoning letter, Mr. Gelbtuch valued the Property at $10,200,000 for a multifamily development of up to 82 one bedroom apartments (see Exhibit 3).

10.     On May 24, 2006, after our extensive due diligence – consultations with the Deputy Planning Commissioner of Greenburgh, local zoning counsel, two licensed Architects in Westchester and obtaining an Independent MAI appraisal, S&R closed on the acquisition of the Property in good faith reliance that it was located in the CA-I Zone.

**Demolition Of Single Family Home, Swimming Pool And Preparation Of Development Plans In Reliance On CA-I Zoning Designation**

11.    After purchasing the Property, S&R engaged John Meyer Consulting as engineers for the development on the Property of a four story multi-family structure with 37 two bedroom apartments. Meyer Consulting is well known throughout Westchester having completed many successful projects for municipalities, institutions and private developers. In the Town of Greenburgh, Meyer Consulting has overseen the engineering for, among others, the following projects: the Midway Shopping Center on Central Avenue, the new Science Building and Middle School for the Hackley School and the Madison Square Garden Training Facility for the Knicks, Liberty and Rangers.

12.    S&R also engaged John Sullivan of Sullivan Architecture (the architect for the large Cappelli/Trump Project in Yorktown as well as an addition to the monastery immediately adjoining and immediately east of the Property); the Munson Company as surveyors; and Galdun Frankel Environmental, all to serve on the development team for the Property together with attorneys and the appraiser.

13.    On or about October 18, 2006 Sullivan Architecture provided its independent review of the zoning ordinance of the Town of Greenburgh confirming, yet again, that the Property is in the CA-I Zone and pursuant to that zoning designation and the property's size, less a deduction for "steep slopes" (based upon a survey by the Munson Company locating steep slopes and measuring them and also measuring the area of the Property free of steep slopes), a maximum of 75 one bedroom apartments could be built on the property (see Exhibit 4, Sullivan opinion letter). Prior to concluding his independent review of the zoning ordinance, Mr.

5

Sullivan called John Lucido, the Building Inspector of the Town of Greenburgh. Mr. Lucido spoke with Mr. Sullivan regarding the Property and then, in a subsequent phone call, confirmed that the Property is zoned CA-I.

14.     From December 6 through December 12, 2006, the demolition of the 3,200 square foot home and swimming pool which had been on the property was undertaken pursuant to a demolition permit by the Town issued December 1, 2006. The permit to demolish was conditioned upon S&R taking the following steps:

a)      First, Munson Company surveyed the Property and provided a new survey and topographical map.

b)      Second, Galdun Frankel Environmental performed a Phase I environmental review of the Property which confirmed that the Property contained no wetlands or water courses.

c)      Third, because the Phase I review indicated there was asbestos containing material in the existing home, S&R retained Even Air, Inc. which performed the necessary asbestos remediation and Testor Environmental Technologies, Inc. which undertook the asbestos monitoring during the course of remediation.

d)      Fourth, Consolidated Edison removed the electric facilities from the Property.

e)      Fifth, S&R worked with the Greenburgh Water and Sewer Department and the Town  obtained a street opening permit and performed a water main disconnect in the street and shut off water service to the Property pursuant to Town law.

f)      Sixth, phone and cable service to the Property were disconnected.

g)      Seventh, Robison Oil pumped out the remaining oil in the above ground oil tanks.

15.     After completing the aforementioned seven steps, S&R submitted to the Town of Greenburgh a Steep Slopes Survey and Slope Clearance Form (reviewed by John Meyer Consulting), a Wetland/Watercourse Clearance Form and a Phase I Environmental Assessment.  The Town approved the Slope Clearance Form and the Wetland/Watercourse Clearance Form.  The Town reviewed and approved S&R's Application for Plan Examination and Demolition Permit.  Thereafter, the Town of Greenburgh issued its demolition permit dated December 1, 2006.  The Town issued a certificate of completion of the work on December 15, 2006.

16.     That work resulted in the complete demolition of the previously existing 3,200 square foot home and the excavation and removal of its foundation; the excavation and removal of the swimming pool and the filling and re-grading of the Property to provide a completely vacant, clean and level well located parcel of 2.34 acres ready for the construction of an as-of-right apartment complex with 75 one-bedroom apartments (or as we then planned 37 two bedroom apartments).

17.     While we were pursuing the demolition of the Property, in July of 2006, we received an offer to purchase the Property at a price of $6,000,000.00.  The proposed purchaser was a multi-billion dollar investment fund based in New York City.  We rejected that offer in light of our appraisal and the greater value that we ascribed to the as-of-right development opportunity.

**Concerted Action And Conspiracy By Supervisor Feiner,
Town Council Members, Greenburgh Nature Center And
Edgemont Community Council To Deprive S&R Of Its Rights
And To Prevent The Development Of The Property For
Multifamily Apartments Permitted As-Of-Right**

18.      Shortly after the commencement of physical demolition of the existing

home and improvements on the Property, the Executive Director of the Greenburgh

Nature Center ("GNC"), William Lawyer, telephoned our acquisition attorney,

Michael Wien, of the firm Tannenbaum Helpern *et al.*, and asked about our proposed

development plan.  Mr. Lawyer stated that the GNC would oppose any development

of more than one or two homes on the Property.  Mr. Lawyer then contacted Town

Supervisor Paul Feiner to enlist his support to oppose any development on the

Property (see Exhibit 5).  Supervisor Feiner publicly announced his opposition to any

development on the Property, noting in a December 10, 2006 web log entry his desire

to "[i]nitiate effort to protect Greenburgh Nature Center from possible development -

1 Dromore Road. Obtain appraisal of property. Reach out to state/county/private

individuals for assistance in obtaining property."

19.      On December 19, 2006, my brother and I attended a meeting with the

following individuals:  Mark Stellato, Planning Commissioner of Greenburgh

Department of Planning and Conservation, Deputy Planning Commissioner Thomas

Madden, John Sullivan (S&R's architect), Bob Roth of John Meyer Consulting

(S&R's engineers) and Janet Giris, Esq. of DelBello Donellan *et al.*  At the meeting,

S&R presented a development plan (the "plan") that called for a four-story building of

37 two bedroom apartments.  The plan was designed to create the most attractive

structure and landscaping for the site.  At the urging of John Sullivan, we proposed to

8

voluntarily forgo the commercial advantage of open air parking on the site despite the fact that the Scarsdale Woods Condominium immediately to the west of the Property had open air parking. Rather than building a surface parking lot for 82 cars as allowed, Sullivan Architecture prepared a plan for the entire first floor of the building to provide indoor parking for 82 cars. While such a plan would negatively impact the profitability of our project (both in terms of increased construction costs and the loss of saleable square footage) we adopted it as it minimized any negative impact to neighboring properties.

20.     The plan is "as-of-right." It requires no grant of a variance and meets the substantial conditions of setbacks of 80 feet in front, 50 feet in rear with at least 40 feet on each side. Under the plan, the building's footprint would cover only 30% of the overall site area, leaving generous green corridors. Further, S&R did not need, nor did S&R plan to obtain, any variance from the existing Town of Greenburgh Zoning Ordinance, as the plan placed us as-of-right within the requirements for development in the CA-I Zone.

21.     At the December 19, 2006 meeting, Commissioner Stellato raised no objections, doubts nor questions that the Property was in the CA-I Zone, and that the development plan was permitted as an "as-of-right" development for the project encompassing 37 two-bedroom units. Further, Commissioner Stellato did not advise us of his desire for a moratorium along Central Avenue nor express the need to limit residential development density along Central Avenue. His review resulted only in a minor finding that the development plan required amendment to provide for 5,000 square feet of open space within the building envelope. We discussed with the Commissioner the provision of a roof garden to comply with the open space

requirement.

22.     Deputy Commissioner Madden likewise raised no objections, doubts nor questions regarding zoning or the as-of-right qualification of the development plan. He raised only a concern that one should avoid Type I (ostensibly referring to the State Environmental Quality Review Act or "SEQRA") disturbances of steep slopes over 20%. He noted affirmatively that sewer and water service were already underneath the road bed of Dromore Road to service the project. We asked Commissioner Stellato and Deputy Commissioner Madden if they saw any stumbling blocks to our development plan. They mentioned only the possibility of a SEQRA Type I disturbance and the fact that they would like more of a "green" building. After the meeting, Mr. Stellato privately told my brother and me that we should be aware of the public comments of the Town of Greenburgh officials in opposition to the development of the Property.

23.     After the meeting with Commissioner Stellato and Deputy Commissioner Madden, our development team met by chance Supervisor Feiner in the hallway of Town Hall. Supervisor Feiner recognized Janet Giris, Esq. and we had an impromptu conversation while standing in the hallway. Supervisor Feiner told us "don't listen to the Commissioner and Deputy Commissioner" and that we must go to speak to the Nature Center. We asked the Supervisor to arrange a meeting with the Nature Center and to attend such a meeting.

24.     After the impromptu conversation with Supervisor Feiner, we again by chance met Mr. Lucido, Building Inspector of the Town of Greenburgh who recognized Janet Giris, Esq. and John Sullivan. We were introduced to Mr. Lucido, who asked how our project was going. He told us that that he was sure that the Town

10

would hold us up for a while but we would eventually get our development done.

25.    On or about January 1, 2007, Supervisor Feiner, on the Town of Greenburgh Web Site, reiterated his prior stated position, noting that one of his "goals for 2007 included "[p]resent[ing the] Town Board with options (including acquisition of property/conservation overlay zones/compromise) to protect Greenburgh Nature Center from development that can have a negative impact on wildlife/habitats/eco system. Reach out to state/county/private individuals to determine if a partnership can be established regarding possible acquisition of the Property." See Exhibit 6.

26.    Shortly after our acquisition and the demolition of the home and improvements on the Property and after our pre-submission conference with Commissioner Stellato and Deputy Commission Madden, which fulfilled the statutory pre-requisite to proceeding with development, the Town Board put into motion, on an accelerated basis (it was proposed on January 10 and adopted on January 12), a plan to prevent any development of our property by passage of a moratorium on all construction in the CA-I Zone, specifically citing the need to protect the Edgemont School System (see Exhibit 7, moratorium resolution).

27.    On January 4, 2007 Supervisor Feiner stated in his web log (Exhibit 8) that he would ask for a resolution to hold a public hearing on the moratorium to be placed on the following Wednesday's agenda of January 12, 2007.

28.    In a January 5, 2007 Scarsdale Inquirer article (Exhibit 9), Steve Bass, a Town Council Member, stated that he had spoken to Commissioner Stellato of Greenburgh's Planning Department the previous week and told him to put the moratorium on the board's agenda at one of its January meetings and that he urged the GNC Board to support the moratorium, and that the GNC Board agreed to do so.

11

29.    On January 6, 2007 it came to light that the Greenburgh Conservation Advisory Council voted on December 18, 2006 to assist the Nature Center in acquiring the Property (Exhibit 10).

30.    On January 7, 2007, the Journal News published an article noting the proposed moratorium, Westchester County Legislator Thomas Abinanti's desire to preserve land next to the GNC and Supervisor Feiner's statement that if the developer (S&R) wanted too much money for its land the Town could try to acquire the land through eminent domain.  See Exhibit 11.

31.    On January 8, 2007, in a surprising announcement in direct contradiction with our meeting with him less than three weeks earlier, Commissioner Stellato recommended a moratorium (Exhibit 12) which copied the language and statistics previously drafted by Michelle McNally, President of the Edgemont Community Council ("ECC").  It is apparent that Commissioner Stellato and Ms. McNally worked in concert with respect to the recommendation.  Her language and statistics are set forth in a prior letter (Exhibit 13).

32.    A tentative agenda was set for Greenburgh's Town Board meeting of Wednesday, January 10, 2007 including a proposal that the Town Board consider scheduling a public hearing establishing a moratorium on development in the CA-I Zone within the next 30 days.

33.    The proceedings of the January 10, 2007 Town Meeting were recorded on streaming video at the Town's website.  The discussion regarding the proposed moratorium started at one hour and eighteen minutes into meeting.  Some pertinent comments made at the meeting were as follows:

- Robert Bernstein, President of the Greenridge Civic

12

Association (a member organization of the ECC) stated that the ECC would do whatever it takes to get the moratorium imposed. He urged the Town Council to schedule a public hearing for January 24, 2007.

- A GNC representative immediately followed. He stated the GNC was very concerned about a lot of things happening on Central Avenue and the impact on the GNC. He further noted that the GNC Board had voted unanimously to support the moratorium and hoped that it would be enacted "before a lot of things that are going on happen."

- Michelle McNally, President of the ECC, urged the Town Council to get the moratorium on the agenda as soon as possible. She also stated that she had been "working with Mark" (Commissioner Stellato) who "has been great" and she hoped "to get it done."

- Bill Greenawalt, Chairman of Parks Commission and former candidate for Town Supervisor of Greenburgh, supported the moratorium, wanting it placed on the Town Board agenda right away. He went on to reference "a serious problem on Central Avenue," specifically mentioning the Property and his hopes that vague negative effects, upon which he did not elaborate, could be avoided if a moratorium was adopted.

34. The hastily prepared moratorium was specifically directed at the Property. The thrust of the comments by those who spoke confirm this since the Property was mentioned by several speakers. Moreover, in our subsequent conversations with Town elected and appointed officials, none could point to any other property within the CA-I Zone that had development plans which would be adversely affected by enactment of the moratorium. In fact, to my knowledge, there were no other Central Avenue landowners at subsequent meetings regarding the moratorium and the Town received no correspondence from other potentially-affected landowners protesting the moratorium.

35.    Two days later, on January 12, 2007 a special meeting of the Greenburgh Town Board was held to consider the passage of a local law imposing a 180 day moratorium on the filing, acceptance and/or approval of all applications for site plan and subdivision. I attended the meeting - there was no substantive discussion regarding the moratorium resolution with respect to either its usefulness or purpose. The Board did not have the benefit of any studies prepared by the Planning Commission. Additionally, the moratorium resolution falsely claimed it was being imposed pursuant to a comprehensive plan but in fact there was no comprehensive plan then in place (see Exhibit 7, at p. 2, ¶ B).

36.    On January 17, 2007, S&R sent a letter to the Town Planning Board which detailed our analysis of the proposed moratorium (Exhibit 14). That analysis makes clear that the purpose of the Town's moratorium was to create a devastating leverage intended to force the sale of the Property to the Town at a discount or, failing to force such a sale, reduce the Property's value and thereby reduce the award of just compensation that would be payable if there were a condemnation as contemplated by Supervisor Feiner.

37.    On January 18, my father, my brother and I attended a meeting with Supervisor Feiner, Councilman Bass, Michael Sims, Margaret Goldberg and two other GNC Board members, William Lawyer, Executive Director of the GNC, and our attorney, Mark Weingarten of DelBello Donellan et al. I stated at the meeting that we could not economically afford to be the subject of a long moratorium (Greenburgh's last moratorium enacted in 2001 lasted over two and one- half years, notwithstanding its initial stated term of six months). Regarding the moratorium, the GNC's President, Michael Sims, stated that "the GNC supported the moratorium to

14

give the GNC more time for the GNC to decide what to do with the Property."

38.    At the meeting we made a proposal to the Supervisor and the GNC

Board Members, including its President, Michael Sims.  In the hope of avoiding the

absolute moratorium, we proposed an agreement with a dramatic reduction in the

scope of S&R's planned development, as follows:

- There would be no moratorium;

- We would donate a substantial portion of our land to the Nature Center in the form of a conservation easement (we would benefit from the resulting tax deduction);

- We offered to grant to the GNC an option to purchase the remaining balance of the property at  our cost, *i.e.,* our acquisition price for the Property, plus expenses with no markup or profit for us; and

- If the GNC or the Town did not raise the necessary funds to purchase the remaining portion of the Property following S&R's grant of the conservation easement or if for any other reason the GNC or the Town, at their option, declined to purchase, the GNC, the Supervisor and the Town would commit to supporting a development by S&R of ten residential units on the Property.

In response, Margaret Goldberg (a GNC Board member in attendance, and its current

President) told us to gift the conservation easement and just to trust her that the GNC

would raise the money and would purchase our property, but the moratorium would be

enacted (see Exhibit 15, William Lawyer's independently prepared summary of the

meeting).

39.    On January 24, 2007 S&R sent a short letter to the Town Board stating

our willingness to compromise and asking for a delay in implementation of the

moratorium and requesting a meeting (Exhibit 16).

40.    At the January 24, 2007 Greenburgh Town Board meeting a public

hearing was held to consider the adoption of a Local Law imposing a 180-day

moratorium on the filing, acceptance and/or approval of applications for site plan and

subdivisions in the CA-I zone.  The following persons spoke in favor of a

moratorium:

> • Commissioner Stellato indicated that the CA-I zone for residential development should be 50% less dense.
>
> • Robert Bernstein spoke of schools and multifamily development, noting that there are enough multifamily dwellings in the Town and the fact that he did not want an expanded district enrollment.  He continued to note that the number of school children in the district was exceeding expectation and stated his concerns regarding the Town's infrastructure, lack of sidewalks, traffic and burdens on taxpayers in the Edgemont school district.
>
> • Michelle McNally spoke about the spike in school enrollment, discussing the number of multifamily units in different towns in Westchester - Ardsley, Hastings, Irvington and Bronxville.  McNally mentioned the Property in particular and the fact that S&R wants to build 37 units. McNally went on to critique S&R's January 17, 2007 letter to the Greenburgh Town Planning Board in detail.  McNally then read into the record her extensive draft of proposed changes to the moratorium resolution, including her preference for a moratorium only as to residential development in the CA-I Zone.  She indicated that she had already drafted a new proposed moratorium resolution and would give it to Commissioner Stellato.

41.    On January 27, 2007 my brother and I hosted a meeting at our office

with Councilman Bass, Councilman Sheehan, Robert Bernstein and Michelle

McNally of the ECC and Michael Sims of the GNC; my father and his friend,

Andrew Roffe, were also present.  Prior to the meeting, Councilman Bass directed

that we could not have our attorney, Mark Weingarten, attend the meeting nor could

we inform him that the meeting would take place.  At the meeting Councilman

Sheehan stated that if there was any discussion about this meeting with Supervisor

Feiner he would "walk away" from any agreement. Moreover, we were expressly

forbidden to relate any discussions that took place at the meeting to Hal Samis, an

outspoken commentator on Greenburgh politics. While we were uncomfortable with

these gag orders and the *ad-hominem* attacks of Councilman Sheehan on Supervisor

Feiner ("Feiner screws everything up. I have to stay up all hours fixing his screw-

ups") and their attacks on Mr. Samis, we reluctantly accepted those conditions and

proceeded with the meeting in the hope of working out an agreement to develop the

Property. We reached an agreement that the ECC would create a new "park district"

and accept a conservation easement covering a portion of the Property -- if the to-be-

created park district was unable to raise the money to purchase the Property at a price

equaling S&R's out-of-pocket costs, the Town and ECC would support S&R's

development of ten residential town homes on the balance of the Property, free of any

moratorium.

     42.    On January 31, 2007 S&R sent a letter to the Town Planning Board

(Exhibit 17) in anticipation of the Planning Board's February 7, 2007 meeting. The

January 31 letter referenced our prior letter of January 17, 2007 and noted the

distinction between the Town's thoughtful and deliberate approach to enacting the

previous 2001 moratorium and the hasty process devoid of proper basis or analysis

which characterized the current effort to adopt a new moratorium.

     43.    Simultaneously, the Westchester County Planning Board, in a letter

dated January 31, 2007 (Exhibit 18), critically questioned the underlying intent of

Greenburgh's proposed moratorium, since only apartments along Central Avenue in

the Edgemont School District were singled out. The County wrote "[t]he fact that the

proposed moratorium singles out multi-family dwellings within the Edgemont School

District as the only example of why this proposed moratorium is necessary, **raises questions about the moratorium's intent**" (emphasis added).

44.    Soon thereafter, S&R received a letter dated February 2, 2007 from Robert Bernstein of the ECC contemplating S&R's gifting of the Property directly to him. He sent us his draft of a Gift Agreement (Exhibit 19). We responded and we had multiple phone calls on this issue.

45.    On February 2, 2007 S&R Development Estates, LLC's application for Site Plan Approval for the Property was submitted.

46.    On February 3, 2007 my brother and I hosted another meeting, organized by Councilman Bass and attended by Councilman Francis Sheehan, Councilwoman Ettie Mae Barnes and Councilwoman Diana Juettner, Robert Bernstein and Michelle McNally of the ECC and our father. Councilman Bass and Councilman Sheehan had suggested that is would be appropriate for Councilwoman Barnes and Councilwoman Juettner to personally meet the principals of S&R since they would be formally voting to implement our Agreement. At this meeting, the parties again agreed: (a) S&R would grant a conservation easement on a portion of the Property; (b) S&R would grant an option to the ECC to purchase the Property for a price equal to S&R's investment in the Property in consideration of: (i) the Town's agreement to modify the language of the proposed moratorium so that the Property would be excepted from its application; and (ii) the agreement by the Town and ECC to support our development application of a ten-unit town home development instead of the contemplated 37-unit development if the ECC did not exercise its purchase option.

47.     At the February 3rd meeting, Robert Bernstein said that he would have Edgemont purchase the property through a bond offering by an Edgemont Park District he would create.  Bernstein noted that the special district could be quickly created and a bond issue could be put to a vote in September 2007.  Bernstein indicated that initially he would want to lease the land to the GNC; thereafter, he would want to use the land as the possible site for an Edgemont Town Hall if and when Edgemont seceded from the Town of Greenburgh.  He stated the Edgemont did not own any other land which it could use as a Town Hall in the future.  Regarding the park district, Robert Bernstein explained that S&R would grant the conservation easement to the park district and after Edgemont raised the funds to purchase the balance of the land Edgemont would own the entire property and be able to create a new town hall for itself upon secession.  The park district would be created before the September primary and one of the voting items would be for a bond issuance to purchase the Property.  The voting would be limited to Edgemont voters and the Property would be solely for their use.

48.     In order to implement the parties' agreement made at the meeting, the Town Board members and the ECC said that they would revise the moratorium's language to except properties meeting certain criteria which would include S&R's Dromore Property (see Exhibit 20, draft of the language discussed).  It was agreed that we would join in a work session meeting to deal with technical drafting requirements and to insert language to effect the foregoing agreement.

49.     At the February 7, 2007 Planning Board meeting a discussion concerning a temporary moratorium was held.  Commissioner Stellato and Deputy Commissioner Madden distributed "hand-outs" and responses to previously-

submitted questions. Annexed as Exhibit 22 are copies of the agenda and hand-outs

that I received from Janet Insardi (the Greenburgh Planning Board Attorney).

Included in the handouts were:

> a)    "Comparison of School Districts in the Town of Greenburgh" (ostensibly prepared by Michelle McNally);
>
> b)    "Overall Student Enrollment Percent Increase;"
>
> c)    "Standard Multipliers" - how many children live in each apartment in Stone Ridge Manor;
>
> d)    "Residential Demographic Multipliers;"
>
> e)    "Town of Greenburgh School District Enrollment, 1998-2006;
>
> f)    "Population Density, 2000;" and
>
> g)    "Number of Potential School-Age Children Among Developable Sites Along Central Avenue" which lists our Property as being within the CA-I zone.

In addition, two demonstrative poster board exhibits were utilized: (a) Town of

Greenburgh - Central Avenue Land Use; and (b) Town of Greenburgh Central

Avenue Vacant Properties (which identified our property as being in the CA-I Zone).

However, significant information was not submitted to the Planning Board. The

Planning Board was not provided with the *Public School Review* nor other reports

that reveal that only 2% of the Edgemont School population is African-American or

Hispanic, while other school districts in the Town of Greenburgh have welcomed

minority students with 25% of their students being of African American and Hispanic

origin. See Exhibit 22.

　　　　50.    When the Westchester County Planning Board questioned the intent of

the moratorium legislation, perhaps it may have been concerned over the potential

demographic impact and loss of multifamily housing opportunities caused by the moratorium and any changes in zoning regulations which would result therefrom.

51.     On February 14, 2007 my brother and I attended a meeting regarding formal submission of our planned development, which called for 37 two-bedroom units, with Deputy Commissioner Madden, Peter Wise (Janet Giris' partner), Bob Roth and Diego Villareale of John Meyer Consulting.  There was no mention of any zoning problem with our plan.  Deputy Commissioner Madden's comments were all directed at details of our preliminary plan which he had analyzed, including showing in an amended plan the 5,000 feet of open space and identifying any possible steep slope disturbances.  Deputy Commissioner Madden advised us that if our plan impacted a steep slope of 20% or greater, it would be a SEQRA Type I environmental action.  He also asked our engineers to detail their description of steep slopes in 0-15%, 15-20% and 20-25% increments.  He went on to encourage S&R to commission a traffic study at the appropriate time and requested a memorandum on trip generation rates.  Deputy Commissioner Madden also wanted to make sure that native Westchester trees would be used on the Property and that a tree protection program be created, including the labeling of all trees on the site.  He also expressed his desire that the building have a truck loading dock.  He requested that S&R provide him with a lighting plan with any Consolidated Edison easements noted thereon. Finally he encouraged us to identify any drainage channels.

52.     The February 14, 2007 Greenburgh Town Board Meeting at which a public hearing would be held to consider the adoption of the moratorium was cancelled due to inclement weather.

53.     On February 14, 2007 S&R sent another letter to the Planning Board arguing against adopting the moratorium (Exhibit 23). We concluded the letter stating that "The Town Board is abjectly surrendering to political pressure and hysteria from certain members of the Edgemont community. Their resolution (the moratorium) reflects that unseemly pressure and should be rejected."

54.     A week later, I received a telephone call from Councilman Bass, who told me that he wanted to arrange for a referendum to be placed on the September Democratic primary voting ballot to approve a bond offering for the to-be-created Edgemont Parks Board to purchase our Property. He expressed confidence the bond offering would be approved. He asked me to "trust" him that the bond offering would pass in September and asked me to make a gift of part of the Property immediately, without first being exempted from the moratorium. I declined his proposal.

### The Attack On The Property's Zoning Designation

55.     On February 26, 2007, breaching our prior agreements and after his "Trust Me" telephone call, Councilman Bass sent out a "blast" e-mail (Exhibit 24) to subscribers to the Town's e-mail program stating that our Property was zoned R-20 (single family homes on half an acre). He went on to write that "The Town Council understands that the Greenburgh Nature Center's board and Edgemont residents may prefer to see the Dromore Road Property not developed at all and to have it preserved instead as open space. The Town Council will continue to explore with community leaders that possibility." Councilman Bass' arrogance and his capitulation to the ECC and GNC is evident in this sentence. He continues to assert that the GNC and Edgemont residents should get to control our Property rights.

22

56.    A February 26, 2007 letter from Commissioner Stellato addressed to Janet Giris, Esq. stated that the Property is in an R-20 zone (Exhibit 1). Commissioner Stellato makes no mention therein of our prior meeting with him or prior meetings with the Deputy Commissioner. Nor does he reference his and the Deputy Commissioner's presentation on February 7, 2007 to the Planning Board where he distributed materials showing the Property as being in the CA-I Zone with a maximum of 81.9 bedrooms permitted under current zoning. At that meeting, Commissioner Stellato asserted that our Property was in the CA-I Zone and no member of the Planning Board disputed that fact. In his February 26, 2007 letter Commissioner Stellato ignores the controlling Zoning Ordinance and the Town of Greenburgh Zoning Map incorporated in the Ordinance.

57.    A March 2, 2007 article appeared in the Scarsdale Inquirer (Exhibit 25), wherein it notes, referring to the CA-I Zoning of the Property, that "[Councilman] Francis Sheehan caught the mistake last week while tracing the map's evolution over the years."

58.    Robert Bernstein is quoted in the aforementioned article, stating that while he felt "the town is on solid legal ground in disclaiming reliance on an apparently erroneous zoning map... the matter is not entirely free from doubt." The Town code states that the official zoning map is "the final authority as to the current zoning classification of any land within the boundaries of the unincorporated Town of Greenburgh" and the developer could argue that the erroneous map was still the official one, and thus, the final authority. Bernstein said more oversight needs to be done in the future. Bernstein admitted that "[t]he ultimate bible is the town's zoning map."

59.    Within days after Councilman Bass's e-mail attack, the Determination

Letter from Commissioner Stellato and the March 2, 2007 Scarsdale Inquirer article,

Councilman Bass telephoned me and asked if S&R would sell the Property for two or

three million dollars.  Clearly, Councilman Bass believed that his group's political

opposition, threats of condemnation, development moratorium, breaches of

agreements, and zoning attacks had depressed and driven down the value of the

Property so that it could be purchased at a price far below its true market value or

failing that, the Property would be worth less in a condemnation proceeding.

## Conclusion

60.    The Property is zoned CA-I and has been so for at least eleven years

since the amendment of the zoning ordinance by the enactment of the 1996 Zoning

Map.

61.    The Greenburgh Nature Center Board, and its Executive Director, the

Edgemont Community Council and its President, Michelle McNally and Robert

Bernstein utilizing their powerful political strength have unlawfully conspired and

acted with members of the Town Council and Town Officials to prevent lawful as-of-

right multifamily development of the Property by improper moratorium legislation

and attacks on the Property's zoning classification.

62.    They have expressed a number of reasons for their actions:

a)    a desire to maintain open space environment with no
development at all;

b)    a desire to protect the Edgemont schools from students
coming from new multifamily developments – such actions are in
violation of Federal, State and County law and discriminates
against families with children and serves to make unavailable
housing for families with children;

24

• c) a desire to acquire the Property to serve as the Town Hall of a new Edgemont political entity, which would secede from the Town of Greenburgh.

63. To further these goals these parties have, individually and in conspiracy with each other, threatened opposition to development, threatened condemnation of the Property, drafted and enacted bad faith moratorium legislation, breached settlement agreements for reduced development and raised attacks and arguments based upon false information against the existing CA-I zoning of the Property.

64. In all of these actions those organizations, individuals and officials have acted unlawfully and in bad faith, and have significantly damaged the Property owners and have violated our rights under the United States Constitution as well as New York State Law.

65. Even at this moment, these same parties conspire to and refuse to comply with S&R's Freedom of Information Law requests submitted March 9, 2007, four months ago (Exhibit 26). They hope to make more difficult our ability to support our claims and to thereby avoid the consequences of their bad faith and unlawful activities. They continue their efforts to prevent our as-of-right development.

66. The Property's CA-I Zone status should be confirmed and Commissioner Stellato's determination of R-20 zoning should be rejected.

Richard Troy

Sworn to before me this
9th day of July, 2007

Notary Public
JOHN A. RISI
Notary Public, State of New York
No. 02RI6098381
Qualified in Westchester County
Commission Expires: September 8, 20 11

25

# EXHIBIT 1



**Paul J. Feiner**
*Supervisor*
**Mark T. Stellato, AICP**
*Commissioner*

# TOWN of GREENBURGH
## Community Development & Conservation
### 177 Hillside Avenue
### Greenburgh, New York 10607
### Telephone (914) 993-1505
### Telefax (914) 993-1518

February 26, 2007

Attention: Janet Giris
DelBello Donnellan Weingarten Tartaglia, Wise & Wiederkehr, LLP
One North Lexington Avenue
White Plains, NY 10601

   Re: 62 Dromore Lane

Dear Ms. Giris:

In reviewing the information you sent to our Department on February 2, 2007, we have conducted an initial zoning history of the parcel and it has come to our attention that the property in question located at 62 Dromore (Volume 8, Section 31, Sheet 37B, Block 1692, Parcels 14A, 70A & 70B), is actually in the R-20 Zone.

As you may be aware, the Town of Greenburgh amended the zoning along Central Avenue corridor after completing the 1976 Central Avenue Comprehensive Development Plan for the Central Avenue Corridor. The Town Board approved the zoning code and map changes within this new district. At that time, the property located on 62 Dromore (Volume 8, Section 31, Sheet 37B, Block 1692, parcels 14A, 70A & 70B) was, and still is, located in the R-20 One Family Residence District and not included in the Town Board's resolution of rezoning to the new Central Avenue Mixed Use Impact District (see attached Board Resolution).

I have enclosed a copy of the 1976 map of the "Central Avenue Mixed Use Impact District" that was used by the Town Board in rezoning the area. The map indicates which properties are to be located in the new Central Avenue Mixed Use Impact District.

If you have any further questions, please feel free to contact the Department.

MARK STELLATO, AICP

Commissioner

Attachment

Cc: Tim Lewis, Town Attorney
   John Lucido, Building Inspector

DECISIONS CON'T.
TO CONSIDER A CONSERVATION DISTRICT (CD) ZONE OVERLAY OF CERTAIN
PROPERTIES ON DROMORE ROAD

Supervisor Feiner moved the following:



# TOWN OF GREENBURGH

### Local Law No. 5 /97

A local law to amend the Zoning Ordinance of the Town of Greenburgh, Chapter 285, Section 285-7, by rezoning certain properties in the Town of Greenburgh to Conservation District (CD) zone pursuant to New York Municipal Home Rule Law, Section 10, and New York Town Law, Section 271.

WHEREAS, on September 17, 1996, the above referenced matter was referred by the Town Board to the Planning Board for review and recommendation; and

WHEREAS, the Planning Board held a Public Discussion on the proposed rezone of certain properties designated on the Tax Map of the Town of Greenburgh as Volume 8, Sheet 37B, Parcels, 11, 21, 23, 24 and 25B, Volume 8, Sheet 37B, Block 1692, Lot 32 for Conservation District Designation, on November 6, 1996; and

WHEREAS, the Planning Board, after hearing positive testimony from various parties, and after considering the positive impact that the proposed rezone would have on the property including environmental conservation, recommended that the above referenced parcels currently zoned R-20 be rezoned to Conservation Overlay (CD); and

WHEREAS, the proposed rezone would have a positive impact on the health, safety, and welfare of the residents of the Town of Greenburgh;

NOW, THEREFORE, BE IT ENACTED by the Town Board of the Town of Greenburgh as follows:

Section 1.    The Zoning Ordinance of the Town of Greenburgh, Section 285-7 is hereby amended by rezoning the properties known and designated on the tax map of the Town of Greenburgh as Volume 8, Sheet 37B, Parcels, 11, 21, 23, 24 and 25B, Volume 8, Sheet 37B, Block 1692, Lot 32 to Conservation Overlay (CD).

Section 2.    Should any section, paragraph, sentence, clause, word, or provision of this chapter be declared void, invalid or unenforceable, for any reason, such decision shall not affect the remaining provisions of this chapter.

Section 3.    Pursuant to New York Municipal Home Rule Law §22, the provisions of this chapter are intended to supersede any inconsistent provision of law.

Section 4.    Pursuant to New York Municipal Home Rule Law §27, this local law shall take effect immediately upon filing with the New York Secretary of State.

```
Councilwoman Weinberg seconded.
Roll Call:  Councilwoman Barnes      VOTING    AYE
            Councilman Adler         VOTING    AYE
            Councilwoman Juettner    VOTING    AYE
            Councilwoman Weinberg    VOTING    AYE
            Supervisor Feiner        VOTING    AYE

All voting aye, nays none, motion adopted.
```

-34-

5-24-78

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.



PROPOSED CENTRAL AVENUE
MIXED USE IMPACT DISTRICT
AUGUST 1977 REVISED SEPTEMBER 1977

YONKERS LINE TO FOUR CORNERS AREA

FOUR CORNERS AREA TO COUNTY CENTER

Town Clerk's Office
Town of Greenburgh

May 24, 1978

A meeting of the Town Board of the Town of Greenburgh was held in the Meeting Room, Town Hall, Tarrytown and Knollwood Roads, Elmsford, New York at 8:15 P.M., Wednesday, May 24, 1978.

PRESENT:    Supervisor Anthony F. Veteran
            Councilwoman Lois T. Bronz
            Councilman Carmine C. Marasco
            Councilman Joel C. Bender
            Councilwoman Barbara J. Rosen

ABSENT:     None

Supervisor Veteran commended Police Chief Donald Singer, Fairview Fire Chief Robert Mauro and their men for the rescue the previous day of a painter who was injured on the Fairview Water Tower and had to be brought down in a stretcher.

PUBLIC HEARINGS
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT

Town Clerk O'Connor read the notice of public hearing as published May 11, 1978 in the Record of Greenburgh and duly posted:

LEGAL NOTICE

PLEASE TAKE NOTICE that the Town Board of the Town of Greenburgh will hold a Public Meeting at its Meeting Room, Town Hall, Tarrytown and Knollwood Roads, Elmsford, New York at 8:15 P.M., Wednesday, May 24, 1978. At such meeting a public hearing will be held to discuss amending the Zoning Ordinance by changing the title of Article IIIB to Central Avenue and adding section 65-42.3 as follows:

SECTION 65-42.3 - CENTRAL AVENUE MIXED USE IMPACT (CA) DISTRICT

A.  STATEMENT OF PURPOSE AND INTENT

The Central Avenue Mixed Use Impact (CA) District is based upon the objectives and findings of the "Comprehensive Development Program for the Central Avenue Corridor", dated October 1976.

The principal intent of the Central Avenue Mixed Use Impact (CA) District is to relate the maximum density of development permitted for the "Central Avenue Corridor" as a whole to the present traffic carrying capacity of the road and its intersections as well as to future improvements which will increase the traffic carrying capacity (including allowances for existing traffic, traffic generated from new development and other traffic affecting the "Central Avenue Corridor") as well as to economic, environmental and other impact factors.

The intent of the Central Avenue Mixed Use Impact (CA) District is also to permit flexibility in the design and development of individual sites, so that a mixture of various compatible types of land uses can be developed

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

as multiple use developments, at the discretion of the individual property owner. Thus, the external traffic impacts will be thereby reduced, and therefore an adjustment is made in the maximum intensity of development to account for this reduced impact.

In addition to balancing the traffic-carrying capacity of the road with future development, the Central Avenue Mixed Use Impact (CA) District also takes into account the relationships between land use intensity and municipal services required, eduction costs and resources, land values, existing development per acre and the visual aesthetic implications of various uses.

B.  PERMITTED USES

No building or premises within the Central Avenue Mixed Use Impact (CA) District shall be used and no building shall be erected or altered, unless otherwise provided in this District, except for the following uses:

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

(1)  Principal Uses - Type I: Office Uses

    (a)  Office buildings for business, governmental,
and professional uses, including administrative,
training, data processing, publication, financial
and sales offices and related facilities in connection
with such office uses, including retail or personal
service uses that are specifically designed as
accessory uses, such as but not limited to lunch
counters, lunch stands, newsstands and barber shops,
provided that said retail or personal service
accessory use shall have no separate street frontage
entrance and no exterior signs advertising said retail
or personal service use. In addition, said accessory retail
or personal service use shall not comprise more than 0.5% of the
gross floor area of the office building to which it is accessory.

    (b)  Offices or agencies for scientific research or
technical development including laboratories,
libraries, administrative training, data processing,
publication, and related facilities in connection
with such uses, provided that:

        (i)  No machinery or equipment shall be installed
and no labor shall be engaged upon the premises
for the manufacture, processing or assembly
of goods or articles, except the manufacturing,
processing or assembly of prototype or experi-
mental products in which the close supervision
by scientific personnel of a permitted research

laboratory is required.

(ii)    All mechanical and other apparatus and
        manual services employed in such use shall
        be devoted to scientific research and
        technical development of manufactured,
        processed or compounded products.

(iii)   No such process or operation shall involve
        the handling, storage or discharge of ex-
        plosives, radio active materials, or permit
        upon the premises any virus or other type of
        infectious organisms identified with diseases
        of animals or humans.

(iv)    No manufacturing, processing or assembly of
        goods or articles of any kind for sale shall
        be permitted on the premises, except for the
        sale of prototype or experimental products
        which are the result of or the end product of
        scientific research, development or engineering.

(v)     No offensive noises, gases, fumes, smoke, odors,
        dust or vibrations shall emanate from such use
        and no waste products of such character so as
        to create a nuisance or to be injurious to
        health or safety, shall be discharged therefrom.

(vi)    Related retail and personal service accessory
        uses, such as but not limited to lunch counters,
        lunch stands, newsstands and barber shops,
        shall be permitted subject to all conditions

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

set forth for said uses in Section 65.44.B.1.(a) above.

(c)  Telephone exchanges.

(d)  Conference centers.

(e)  Post offices.

(2)  Principal Uses - Type II: Commercial Uses

(a)  Fully enclosed, free-standing commercial establish-
ments, including: (1) stores for the retail sale of
consumer merchandise, (2) personal service establish-
ments such as, but not limited to, barber shops,
beauty parlors, shoe repair shops or similar uses
where such service  is provided on the premises,
and (3) banks.

(b)  Fully enclosed, free-standing laundry or dry cleaning
establishments.

(c)  Fully enclosed, free-standing restaurants
(other than cabaret uses), but in no
event including diners or similar structures or
outdoor counter service, drive-in or curb service
establishments.  Such prohibitions shall not, however,
prevent service at tables on a covered or uncovered
terrace or porch incidental to a permitted restaurant.

(d)  Fully enclosed, free-standing movie theaters or
cinemas.

(e)  The retail sale and accessory storage and display of
garden materials, plants and supplies, including
nursery-type operations, provided that the outdoor
storage or display of plant materials does not

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

obstruct the flow of pedestrian or vehicular traffic and does not occupy any required yard or parking area.

(f) Unified shopping center developments, including commercial establishments for the retail sale of consumer merchandise, personal service establishments, banks, laundry or dry cleaning establishments, movie theaters or cinemas, retail sale of garden materials and supplies, restaurants (other than cabaret uses). Quick service or fast food establishments and restaurants with cabaret uses shall be permitted in such unified shopping center developments provided that said uses satisfy all conditions for such use as set forth in this ordinance, including securing a Special Permit from the Planning Board.

(3) Principal Uses - Type III: Residential Uses

(a) Multi-family developments, of not more than four (4) stories in height shall be permitted at the maximum density of forty (40) bedrooms per acre, provided that:

 

(i)   The minimum lot size for a multi-family develop-
      ment shall be two (2) acres.

(ii)  The minimum average livable floor area for each
      dwelling unit in a multi-family dwelling shall be 750 square
      feet as required in Section 65-6 of the ordinance.

(iii) Accessory uses in all multi-family develop-

      ments shall comply with the applicable re-

      quirements in the M-4 Multi-Family Residence

      District of the Zoning Ordinance of the Town

      of Greenburgh, except that suitable open space

      shall be provided at a minimum of seventy-five

      (75) square feet of suitable open space.

      for each bedroom contained in the multi-family

      development, but not less than one-hundred and

      fifty (150) square feet for each dwelling unit

      contained in said development.

(iv)  Off-street parking for multi-family developments

      may be located in any required yard, provided that

      the minimum distances set forth in Section 65.44.C.3

      are provided.

(4)  **Principal Uses - Type IV: Public and Quasi-Public Uses**

     Uses, such as but not limited to museums, art galleries,

     libraries, lodges, churches, public, private or

     religious schools which are accredited by the New

     York State Board of Regents, cemeteries, and govern-

     mental uses.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

(5)  <u>Special Permit Uses - Type II: Commercial Uses</u>

Certain Type II: Comercial Uses shall require a
Special Permit from the Planning Board in accordance
with the procedures set forth in Section Q herein.  Any such
Special Permit use must comply with the general standards
set forth below and the special standards enumerated in
each subdivision applicable to the particular Special
Permit use in the District specified.

(a)  <u>General Standards</u>

i.    Each Special Permit use shall be
reasonably necessary for the public health
or general interest or welfare.

ii.   Each Special Permit use shall be of such
character, intensity, size, and location
that in general it will be in harmony with
the orderly development of the District in
which the property concerned is situated
and will not be detrimental to the orderly
development of adjacent Districts.

iii.  Each Special Permit use shall be so located
in order to be adequately serviced by trans-
portation facilities, water supply, waste
disposal, fire and police protection, and
similar services.

iv.   Each Special Permit use sought which adjoins
or abuts a residence district shall be so

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

<div style="margin-left: 2em;">

located on the lot involved that it shall not impair the use, enjoyment and value of adjacent residential properties.

v.  Each Special Permit use shall not create pedestrian or vehicular traffic hazards because of its location in relation to similar uses, necessity of turning movements in relation to its access to public roads and intersections, or its location in relation to other buildings or proposed buildings on or near the site and the traffic patterns from such buildings.

vi.  Each Special Permit use shall not include any display of signs, noise, fumes, or lights that will hinder normal development of the District or impair the use, enjoyment and value of adjacent land and buildings.

(b)  Use Requiring Special Permit

i.  Fully enclosed, free-standing commercial recreation facilities, including bowling alleys, health spas and clubs, tennis, paddle tennis, handball and squash facilities and uses accessory and incidental to commercial recreation, such as locker rooms, eating and drinking facilities and retail sale of goods associated with the primary activity.

</div>

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

   ii.   Fully enclosed free-standing funeral
         homes or undertaking establishments.

  iii.   Fully enclosed free-standing animal hospitals
         provided that:

         (1)  All operations including runways,
              shall be within a totally enclosed,
              fully soundproofed, mechanically venti-
              lated or air-conditioned building.

         (2)  All operations shall be conducted and
              the structure maintained in such a
              manner that they are not offensive,
              obnoxious or detrimental to adjoining
              properties by reason of noise or odors.

         (3)  Permitted operations shall not include
              the boarding of animals or the operation
              of a kennel.

   iv.   Fully enclosed free-standing quick service
         or fast food establishments, provided that:

         (1)  No such establishment shall be located
              nearer than two thousand (2,000) feet
              from another such establishment as
              measured from their boundary line.

         (2)  Together with the Special Permit applica-
              tion there shall be submitted preliminary
              approvals from the appropriate state,
              county and town authority as to the
              following:

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

 

 

 

 

          a.  curb cut approval

          b.  ingress and egress

          c.  acceleration and/or deceleration
             lanes

          d.  traffic signalization

          e.  internal traffic flow

    (3)  The applicant shall satisfy the Planning
        Board that:

          a.  there will be sufficient security
             to prevent the use of the premises
             as a loitering place during hours
             of operation.

          b.  there will be proper facilities
             and personnel for disposal of
             the trash and other debris of
             a quick service eating and drinking
             establishment.

  v.  Fully enclosed free-standing cabaret uses,
      provided that:

    (1)  No such establishment shall be located
        nearer than two thousand (2,000) feet
        from another such establishment as
        measured from their boundary line.

    (2)  Together with the application there shall
        be submitted preliminary approvals from
        the appropriate state, county and town
        authority as to the following:

        a.  curb cut approval

        b.  ingress and egress

        c.  acceleration and/or deceleration lanes

        d.  traffic signalization

        e.  internal traffic flow

(3)  The applicant shall satisfy the Planning Board that there shall be sufficient security to prevent the use of the premises as a loitering place during hours of operation.

(4)  The applicant shall comply with all provisions of the Cabaret Law of the Town of Greenburgh, and the issuance of the Special Permit shall be conditional upon obtaining, and continuing to hold, a cabaret license from the Town of Greenburgh, New York.

(c)  Conditions for Issuance of Permit

i.  Upon finding that such general standards and any specific standard set forth in the Special Permit section of the CA District have been fully met, the Planning Board may grant such Special Permit and in so doing may impose any conditions that it may deem necessary to accomplish the reasonable application of such standards.

    ii.  Said Board may require as a condition of
the granting of any Special Permit, that
it shall be periodically renewed or said
Board may grant a temporary Special Permit
subject to adequate guaranties that the
use covered will be terminated at the end of
the period specified or such extension
thereof as may be granted by said Board,
provided that any such renewal or extension
shall be subject to the same procedure as
specified herein to the original granting
of the Special Permit involved and in con-
formity with the aforesaid general and special
standards.

(6)  Multiple Use Developments

Combinations of Type I, Type II  Principal and Special
Permit, Type III or Type IV uses may be developed, pro-
vided that in no event shall the gross floor area from
any type comprise less than twenty-five percent (25%) of
the gross floor area of said development, and further
provided that in no event shall Type II Principal or Type II
Special Permit uses comprise more than thirty-three per-
cent (33%) of the gross floor area of said development.
For the purposes of this paragraph, each dwelling unit
is a multiple use development shall be deemed to comprise
1,000 square feet of gross floor area.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

a) Method of Calculation

The site area required for each individual use
permitted in a multiple use development
shall be calculated as follows:

(i) For Type I, Type II Principal & Special
Permit and Type IV Uses:

Divide the amount of development desired for
each specific use in the multiple use development,
by the FAR as indicated in Section C below. This
calculation indicates the square footage of site
area required for each use in the multiple use
development.

(ii) For Type III Uses:

Divide the number of bedrooms desired in the
multiple use development by the number of bed-
rooms permitted per acre as indicated in Section
C below. This calculation indicates the number
of acres required for the residential use.

(7)      Accessory Uses

    (a)  The following accessory uses are permitted as
        incidental to the principal uses authorized by
        Section 65-42.3B (1):

        i.  Restaurants, cafeterias, and lunchrooms
            (not including diners and similar facilities)
            for the use of executives, employees and
            visitors of the principal use, but excluding
            the general public, and provided that such
            accesspry  use is maintained within the
            the principal building.

        ii.  In-service training schools for employees
            of the principal use provided such training
            school is maintained within the principal
            building.

       iii.  Private garage for the storage of
            private passenger vehicles used by executives,
            employees or visitors of the principal use,
            provided that such garage is located within
            the principal building.

       iv.  Off-street parking area for private passenger
            vehicles used by executives, employees, or
            visitors of the principal use.

       v.  Off-street loading area for the delivery of
            goods to and from the principal use.

    (b)  The following accessory uses are permitted as
        incidental to the principal uses authorized by
        Sections 65-42.3B (2)  and (5):

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

      i.  Off-street parking area for private
           passenger vehicles of visitors, shoppers,
           and employees of the principal use.

     ii.  Off-street loading area for the delivery
           of goods to and from the principal use.

   iii.  Garage for the storage only of commercial
           vehicles used for the delivery of goods
           purchased within the principal use, or for
           the storage of maintenance, cleaning and snow
           removal equipment and material for the parking
           area used in connection with the principal use
           and only on that site provided it is located
           within the principal building.

(c)  The following accessory uses are permitted as in-
     cidental to the principal uses authorized by Section 65-42.3B(3)

      i.  A professional office or studio maintained
           within the principal building and as permitted
           and limited in Section 65-18C(7), except that
           no professional office or studio shall be
           above the ground floor.

     ii.  A private swimming pool as regulated above in
           Section 65-18C(12), provided, however, that
           any such pool, wherever located on the premises,
           shall be completely enclosed by a security
           fence complying with all the requirements as
           for in Section 65-18C(12).

   iii.  Suitable Open Space in accordance with
           Section 65-42.3B (3) (iii).

    iv.  The keeping of not more than two (2) boarders or lodgers by a resident family, provided the resultant density shall not exceed two (2) persons per bedroom.

    v.  Off-street parking area for private passenger vehicles of residents, visitors and employees of the principal use.

    vi.  Off-street loading area for the delivery of goods to and from the principal use.

    vii.  Private garage for private passenger vehicles of residents, visitors and employees of the principal use, located within or under the principal building to which it is accessory.

(d)    The following accessory uses are permitted as incidental uses authorized by Section 65-42.3B (4):

    i.  Off-street parking area for the private passenger vehicles of the officers, directors, members, visitors, or employees of the principal use.

    ii.  Off-street loading area for the delivery of goods to or from the principal use.

(e)    For multiple use developments, the accessory uses incidental to the principal uses (as set forth above), that comprise said multiple use development.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

C.  LOT AND BULK REQUIREMENTS

    (1)  Maximum Floor Area Ratios and Maximum Densities

        As indicated in Table I.

    (2)  Minimum Yards

|  | Lots of 50,000 s.f. or larger | Lots of less than 50,000 s.f. |
|---|---|---|
| (a)  Front | 80 feet | 40 feet |
| (b)  Side | 40 feet | 20 feet |
| (c)  Rear | 50 feet | 25 feet |

    (3)  Minimum Distance from Detached Accessory

        Structure or Use or Off-Street Parking to:

| (a)  Principal Building | 10 feet | 10 feet |
|---|---|---|
| (b)  Front Lot Line | 20 feet | 20 feet |
| (c)  Side Lot Line | 20 feet | 10 feet |
| (d)  Rear Lot Line | 25 feet | 15 feet |

    (4)  Maximum Height

        As indicated in Table I, except that all multiple
use buildings combining Type I Principal Uses, Type II
Principal and Special Permit Uses and/or Type IV Principal Uses,
shall have a maximum height of 4 stories or 48 feet.

    (5)  Off-Street Parking Requirements

        As indicated in Table I.

    (6)  Off-Street Loading Requirements

        As indicated in Table II.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

## TABLE I

### MAXIMUM INTENSITY AND HEIGHT AND MINIMUM PARKING REQUIREMENTS

Central Avenue Mixed Use Impact (CA) District

| Type | Use | Maximum Floor Area Ratios As Single Use Development | In Multiple Use Development | Maximum Height | Minimum Parking Required |
|------|-----|-----|-----|-----|-----|
| I (a) | Office | .30 | .35 | 4 stories or 48 feet | 1 space for each 300 square feet G.F.A. |
| (b) | Research | .35 | .40 | 4 stories or 48 feet | 1 space for each 400 feet of G.F.A. |
| (c) | Telephone Exchange | .45 | .45 | 4 stories or 48 feet | 1 space for each 500 square feet of G.F.A. |
| (d) | Conference Center | .30 | .35 | 4 stories or 48 feet | 1 space for each 4 seats in major assembly hall plus 1 space for 4 seats in classroom facilities |
| (e) | Post Office | .15 | .18 | 2 stories or 24 feet | 1 space for each 100 square feet of G.F.A. |
| II (a) | Free-standing* Commercial | .10 | .125 | 2 stories or 24 feet | 1 space for each 200 square feet of G.F.A. |
| (b) | Free-standing* Laundry and Dry Cleaning | .10 | .125 | 2 stories or 24 feet | 1 space for each 200 square feet of G.F.A. |
| (c) | Free-standing* Restaurant Other than Cabaret Use | .10 | .125 | 2 stories or 24 feet | 1 space for each 4 seats or 1 space for each 100 square feet of G.F.A. whichever is greater. |
| (d) | Free-standing Movie Theater or Cinema | .10 | .125 | 2 stories or 24 feet | 1 space for each 3 seats or 1 space for each 100 square feet of G.F.A. whichever is greater |
| (e) | Sale of Materials* Plants and Supplies | .10 | .125 | 2 stories or 24 feet | 1 space for each 200 square feet of G.F.A. |

* Free-standing commercial uses on sites of two (2) acres or less shall be permitted a
  maximum FAR of .135 for single use developments and .16 for multiple use developments.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

| Type | Use | Maximum Floor Area Ratios | | Maximum Height | Minimum Parking Required |
|------|-----|--------------------------|--------------------------|----------------|--------------------------|
| | | As Single Use Development | In Multiple Use Development | | |
| (f) | Unified Shopping Center with no Quick Service Eating and Drinking Establishment* | .135 | .16 | 2 stories or 24 feet | 1 space for each 200 square feet of G.F.A. |
| III (a) | Multi-Family Development: | Maximum Density: 40 bed-rooms/acre | Maximum Density: 44 bed-rooms/acre | 4 stories or 48 feet | 1 space for each studio efficiency apartment; 1.5 spaces for each 1 bedroom apt., 2.0 spaces for each 2 bedroom or larger apt. plus an additional 10% of the above total for visitor parking. |
| IV (a) | Public & Quasi-Public Uses | .30 | .35 | 2 stores or 24 feet | 1 space for each 300 square feet of G.F.A. |
| II (Special Permit) (a) | Free-standing Commercial Recreation: | | | | |
| | Health Clubs and Spas | .35 | .40 | 4 stories or 48 feet | 1 space for each 200 square feet of G.F.A. |
| | Squash, handball and tennis facilities | .45 | .45 | 4 stories or 48 feet | 5 spaces per court |
| | Bowling Alleys | .15 | .18 | 2 stories or 24 feet | 5 spaces per lane |
| (b) | Free Standing Funeral Parlor | .35 | .40 | 2 stories or 24 feet | 1 space for each 3 seats provided therein or 1 space for each 60 square feet available for public use, whichever is greater |
| (c) | Free Standing Animal Hospital | .35 | .40 | 2 stories or 24 feet | 1 space for each 200 square feet of G.F.A. |
| (d) | Free-standing Quick Service Eating and Drinking Establishment, Ice Cream stand | .015 | .02* | 1 story or 12 feet | 1 space for each 35 square feet of G.F.A. |
| (e) | Free-standing Cabaret | .10 | .125 | 2 stories or 24 feet | 1 space for each 60 s.f. of G.F.A. |

Unified shopping centers with quick service eating and drinking establishments shall have a maximum FAR of .125 for single use developments and .15 for Multiple Use Developments.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

TABLE II

MINIMUM LOADING REQUIREMENTS

Central Avenue Mixed Use Impact (CA) District

| | Gross Floor Area or Major Fraction Thereof in Thousands of Sq. Ft Unless Otherwise Noted | | |
|---|---|---|---|
| | 1st Berth at | 2nd Berth at | Plus one Berth for each additional |
| ype I Uses | 50 | 100 | 100 |
| ype II Principal and Special Permit Uses except for Commercial Recreation | 5 | 15 | 25 |
| ommercial Recreation | 10 | 100 | 100 |
| ype III Uses | 10 (dwelling units) | 50 (dwelling units) | 50 (dwelling units) |
| ype IV Uses | 10 | 50 | 50 |

D.  REQUIRED LANDSCAPING

The following landscaping requirements in addition to those which may be required under the Site Plan Approval Ordinance shall apply to all Central Avenue Mixed Use Impact (CA) District properties.

(1)  All portions of improved properties which are not used for buildings, structures, off-street parking and loading, sidewalks, malls, or similar purposes, shall be appropriately landscaped with grass, shrubs, trees and other ground cover in such manner as to minimize erosion and storm water runoff and harmoniously relate such uses to the character of the Town as a whole.

(2)  Landscape areas shall be provided along all side and rear property lines and along all property lines abutting adjacent side and rear residential district lines.  Such landscape areas shall comply with the following minimum standards as well as all applicable requirements set forth elsewhere in this Ordinance:

(a)  Landscape areas shall include evergreen planting, decorative fences, berms and other landscaping of such type, height, spacing and arrangement as, in the judgment of the Planning Board, will effectively screen the activity of the lot from the neighboring uses.

    (b)  A wall or fence of location, height, design and materials approved by the Planning Board, may be substituted for part or all of the required landscaping.

    (c)  Where the existing topography and/or existing landscaping provides adequate screening, the Planning Board may waive or modify the planting and/or landscape requirements of this Ordinance.

(3)  Landscape areas a minimum of twenty (20) feet in width shall be provided along all front property lines and street lines.  Such landscape areas shall con-contain trees and/or either shrubs (at least 50% of which shall be evergreen) and/or decorative fencing materials, and/or earth berms and/or grass, and/or decorative ground covers, or decorative fencing materials, or decorative paving materials.  In accordance with the Town of Greenburgh Landscaping and Screening Maintenance Ordinance, such landscaped areas shall be suitably maintained and kept free of rubbish at all times.  Such landscaped areas shall be separated from parking areas by a curb not less than six (6) inches in height or by a bumper guard approved as to type and construction by the Building Inspector.

(4)  Unless specifically waived by the Planning Board, outdoor parking spaces shall be divided into sub-areas with raised and curbed landscaped islands separating each sub-area so designed as to assure a smooth flow

of traffic.  Said islands shall be a minimum width of ten (10) feet and shall be suitably landscaped with trees, grass,or other ground ocver deemed appropriate by the Planning Board.  In addition, and unless specifically waived by the Planning Board, not more than fifteen (15) spaces in a single line shall be permitted without such a suitably landscaped curbed island.

(5)  Required Separation of Residential and Non-Residential Uses

Any multiple use development comprised of Type III residential uses and either Type I, Type II Principal and Special Permit or Type IV non-residential uses shall provide a suitably landscaped buffer area between said residential and non-residential uses of not less than fifty (50) feet.  Said buffer shall comply with all applicable landscaping requirements set forth above.

E.  PROHIBITED USES

Any use not specifically set forth as a permitted use herein is prohibited, including but limited to an automobile sales lot, motor vehicle salesroom, public garage, gasoline station, car washing establishment, tire store or auto part store with installation service or repair facilities on the premises, motel, hotel, automobile court, tourist home, rooming house, furnished-room house, boarding house, game room or amusement arcade, storage, warehousing or wholesale establishment,and the outdoor storage of maintenance, cleaning and snow removal vehicles.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

F.    <u>SITE PLAN APPROVAL</u>

Development on Central Park Avenue shall be subject
to the provisions of the Site Plan Approval Ordinance
of the Town of Greenburgh, New York, and any other applicable
statutes, laws, and ordinances.

G.    <u>PLANNING BOARD SPECIAL PERMIT PROCEDURE</u>

(1)    <u>Applications for a Special Permit</u>

All applications for Special Permits shall be
submitted to the Secretary to the Planning
Board in writing, on forms prescribed by the
Planning Board. Said application shall be
accompanied by a site plan for the proposed
development and said site plan shall indicate
the location and design of all buildings and
structures; parking and truck loading areas
and access drives thereto; and existing and
proposed grading at contour intervals of five
(5) feet or less. Said site plan shall also
indicate the general landscaping, evergreen screening,
fencing, architectural treatment, egress and
ingress, curbing, sidewalks, retaining walls,
lighting, to be provided so as to minimize its impact
upon the immediate area. The Planning Board may
require the submittal of any other pertinent
information as may be necessary to determine and
provide for the proper consideration of the
application for a Special Permit.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

An applicant may elect to submit, concurrently,
applications for a Special Permit and for Site
Plan Approval under the Site Plan Approval Ordinance.
In the event that such a joint application is made,
the site plan shall provide such information as
is required under Section 46-8C of the Site Plan
Approval Ordinance.

(2)   <u>Public Hearing Required</u>

A public hearing on an application for a Special
Permit shall be scheduled and conducted by the
Planning Board within forty-five (45) days after
certification, to the Planning Board by the
Secretary to the Planning Board, of receipt of a
properly completed application. To the extent
possible, such public hearing shall take place at
the same time as any other public hearing required
to be held by the Planning Board in regard to the
proposed development. Notice of such Public Hearing
shall be published in the official newspaper of the
Town and mailed to property owners within five-
hundred (500) feet of the perimeter of the subject
property, at least ten (10) days prior to such
public hearing. The cost of such notice shall be
borne by the applicant.

(3)   <u>Action by the Planning Board</u>

Within forty-five (45) days of the date on which a
Public Hearing is closed, the Planning Board shall, by

resolution, act to approve, disapprove, or
approve with conditions said application and
shall specify what conditions, if any, are
necessary.

All Planning Board actions on applications for
Special Permits shall be recorded on forms pre-
scribed by the Planning Board and shall fully set
forth the circumstances of the case and the findings
of the Planning Board upon which its action is based.

H.  NON-CONFORMING BUILDINGS AND USES IN CENTRAL AVENUE
MIXED USE IMPACT (CA) DISTRICT

The following regulations shall apply to non-conforming
buildings and uses in the Central Avenue Mixed Use
Impact (CA) District:

(1)  Definitions

For purposes of this Section, a "non-conforming
use" in the Central Avenue Mixed Use Impact (CA)
District shall be a use, which does not conform
to the requirements set forth herein respecting
permitted uses.  A "non-conforming building" shall be
a building which does not conform to the requirements
set forth herein respecting maximum floor area ratio
or maximum density.  In addition, a non-conforming
use or building shall have lawfully existed prior
to the adoption of this Section as part of the
Zoning Ordinance of the Town of Greenburgh, New
York, and which use or building is maintained
following the adoption of this Section, although

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

said use or building does not conform to the
regulations of the Central Avenue Mixed Use Impact
(CA) District.

(2)   Conditions Governing Non-Conforming Buildings and
Uses in the Central Avenue Mixed Use Impact (CA)
District

(a)   Any non-conforming building shall not be enlarged
beyond the exterior walls of said building or
in any other manner that would increase said
non-conformance.

(b)   Any non-conforming building may be altered
by interior modifications provided that the
altered building does not increase the degree
of non-conformity with respect to the per-
mitted floor area ratio, density and parking
and loading requirements as set forth in Table
I hereof.

(c)   Any building in which a non-conforming use is
maintained may be altered by interior modifications
provided that the interior modifications do
not increase the intensity of the non-conforming
use.
The provisions of the paragraphs (b) and (c) above shall
not apply to any alteration which may be
required by order of the Building Inspector to
strengthen or restore a building or structure,
or any part thereof, to a safe condition.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

(d)  Any non-conforming use, if changed to another use which conforms to the permitted use provisions of this Section, may not thereafter be changed back to a non-conforming use.

(e)  Any non-conforming use  shall not be changed to another non-conforming use.

(f)  Any non-conforming use, if discontinued for causes other than fire or natural disaster for six (6) months or longer, shall be deemed to be abandoned and the non-conforming use shall not be resumed.  Intent to resume a non-conforming use shall not confer the right to do so.

(g)  If any building in which a non-conforming use is conducted or maintained is hereafter demolished or removed for causes other than fire or natural disaster, the subsequent use of the land on which said building was located and the subsequent location and size of any building erected thereon shall conform with all requirements of this Section.

(3)  Repair and Maintenance of Non-Conforming Uses
     Nothing in this Section shall be deemed to prevent normal maintenance and repair and nothing shall prevent the carrying out, upon issuance of a building permit, of major structural alterations or demolition of non-conforming buildings and uses if undertaken in the interest of public safety.

In addition by adding the following to section 65.2, Usage and Definitions of the present ordinance:

1. <u>Bedroom</u>:  In a multi-family dwelling, a bedroom is any room designed for sleeping purposes or capable of being converted for such purposes other than a kitchen, foyer, hallway, bathroom, living room or dining alcove, if said alcove is fully open on at least one side to any other room and contains no closet.

2. <u>Cabaret</u>:  Any room, place or space in the Town where for gain or profit, live or mechanically reproduced music is provided in connection with dancing or where, for gain or profit, any musician, group of musicians, floor show or similar live entertainment is provided.

3. <u>Conference Center</u>:  A building or buildings designed for classes, seminars, meetings and similar activities, which may include related uses for the exclusive use of conference center patrons, such as eating and drinking facilities, overnight lodgings and recreation facilities.

4. <u>Diner</u>:  Any premises where food is commercially sold primarily for on-premises consumption to patrons seated at counters rather than at tables.  Facilities that include both counter and table service shall be considered a diner, for purposes of this Ordinance.

5. <u>Floor Area, Aggregate or Gross:(GFA)</u>  The sum of the horizontal area of all floors of a building or buildings on a lot, measured from the exterior faces of exterior walls, excluding:

(1) roof areas,

(2) cellar areas used for storage,

maintenance or operation of the building,

(3) parking and loading areas.

6. <u>Floor Area Ratio (FAR)</u>:  The ratio of the aggregate floor
area of a building, divided by the total area of the given
parcel.

7. <u>Free-standing Building</u>:  A structure occupying a building
lot, containing not more than two (2) commerical establish-
ments with a combined gross floor area of less than 7,000
square feet.

8. <u>Lodge</u>: A clubhouse or clubroom of the local unit of a
nationally recognized fraternal or social order, the
majority of members of which local unit are residents of
the Town of Greenburgh.

9. <u>Lunch Counter or Lunch Stand</u>:  A facility within an office or
research building in which food and/or beverages are sold
at retail for consumption at the facility or building.

10. <u>Membership Club</u>:  An association of persons for social
intercourse or other common social purpose, which associa-
tion is not conducted for the purpose of pecuniary gain or
profit and is organized pursuant to the provisions of the
Not-For-Profit Corporation or the Benevolent Order Laws of
the State of New York and is not a part of, related to,
or associated with, a profit-making venture, and
whose officers or directors, serve without pay and are

chosen directly by members who form such association.

11. <u>Multiple Use Development:</u> A development in the Cen-
tral Avenue Mixed Use Impact (CA) District with a
combination of permitted Type I, Type II, Type III or
Type IV uses as specified in the Central Avenue
Mixed Use Impact (CA) District, which development meets
all requirements for such developments as set forth
in said district.

12. <u>Quick Service or Fast Food Establishment:</u>  An eating
or drinking establishment where the majority of service
is available from a counter-type installation, from
which quickly prepared or pre-prepared foods are taken
away by the customer, whether or not interior seating
facilities are provided.

13. <u>Restaurant:</u>  Any premises where food is commercially
sold for on-premises consumption to patrons seated at
tables.  Any facility making use of carhop or parking
lot service to cars or for the consumption of food to
be eaten in said cars or outdoors, shall not be con-
sidered a restaurant for the purpose of this Ordinance,
and shall be deemed to be a Quick Service or Fast Food
Establishment.

14. <u>Shopping Center, Unified:</u> A structure or group of
structures, planned as a whole, occupying a building
lot and containing three (3) or more Commercial/Type II
uses with a gross floor area of 7,000 square feet or
greater.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

15. <u>Suitable Open Space:</u>  A portion of the ground area
    of a lot which is available and accessible to all
    occupants of a dwelling unit, or dwelling units,
    on said lot for outdoor recreation use, which area
    is not devoted to driveways or parking spaces, is
    at least twenty-five (25) feet in minimum dimension,
    and has no more than ten percent (10%) of its area
    with a grade of more than five percent (5%).

16. <u>Telephone Exchange:</u>  A building erected or used
    exclusively for telephone, telegraph, data transmission,
    radio, district messenger, fire and burglar alarm
    central systems and similar central station systems;
    and telephone systems not connected to a central
    station system but using similar types of equipment,
    methods of installation and maintenance.

In addition by adding the following to section 65-3-A(1): Central
Avenue Mixed Use Impact (CA) District.

All persons interested in the subject thereof are invited to
attend and be heard at such meeting.

BY ORDER OF THE TOWN BOARD
OF THE TOWN OF GREENBURGH

MICHAEL W. O'CONNOR
TOWN CLERK

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.



PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

Copies of the proposal were sent to all property owners on Central
Avenue as well as all civic associations and citizens who had expressed
an interest.

Supervisor Veteran -- This hearing is going to be conducted on a
strict format. We will allow five (5) minutes per speaker the first
time around. Then if after everyone has spoken you want to speak again
and have something new to say you may take another five (5) minutes.

Stephan B. Gleich, Attorney at Law, 11 Middle Neck Road, Great
Neck --

I represent the Net Realty Holding Trust. The Net Realty Holding Trust
owns three large property developments within the Town of Greenburgh,
two of which are located in the proposed Central Avenue Mixed Use Impact
District. In total, my client's properties represent over four million
dollars in assessed values to the Town of Greenburgh for Real Estate
taxes. The Net Realty Holding Trust's properties are a substantial
portion of this community's tax base and my client is probably one of
the largest taxpayers in the municipality.

The purpose of this presentation is to make comment to the final draft
proposal regarding the creation of the Central Avenue Mixed Use Impact
District which is being considered by the Town Board for enactment.
We applaud the desire of the Town of Greenburgh for its efforts to
upgrade the Central Avenue area. The general intent of the proposed
zoning ordinance will serve to improve the aesthetics of this area
with attendant improvements in traffic safety and other such amenities.
This goal, however, must be balanced against the interests of the
property owners within the proposed zone and upon whom the cost of
compliance will be placed. No municipality may impose a heavy
financial burden upon private property owners for the benefit of
the municipality and its residents. The imposition of such a burden
would be unlawful. Nor may a municipality impose restrictions on the
use of private property unless such restrictions are reasonable and
within the police power. Any imposition of restrictions that exceed
the police power of the municipality constitutes a taking or condemnation,
and the property owner must be paid fair and just compensation for
the loss of valuable property rights.

This proposed ordinance is a substantial improvement over the draft
copy which the Planning Board presented to the public some months
ago at a public hearing. This proposed ordinance does, however,
in certain sections, overstep the bounds of legality. Those are
the sections that impose substantial financial burdens upon private
property owners; that provide for retroactive effect of this proposed
ordinance to existing uses; and by the failure of the ordinance to
define certain key terms so that the meaning of such terms are clear
and unambiguous.

The objections of the Net Realty Holding Trust will be taken seriatum.
We will only address those sections of the proposed ordinance that
affect the Net Realty Holding Trust's properties in the proposed
Central Avenue Mixed Use Impact District. We will not address the
problems of the ordinance relative to the future development of
other property within the proposed Central Avenue Mixed Use Impact
District Zone.

Section 65-42.3 B Permitted Uses. On the third line of that Section
the word "altered" is used. This word should be specifically defined
to resolve any ambiguity as to what, or what does not, constitute an
alteration to an existing building. For example: if a retail
store changes its storefront that would be considered an "alteration"
and yet that is not the type of alteration contemplated by this
ordinance. We propose that the word "alter" or "alteration" be
defined as follows:

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

> Any modification to an existing
> building which would tend to en-
> large same beyond the exterior
> walls of the existing building.
> Any modifications which enlarge
> the building beyond the exterior
> walls of the existing building
> by order of any municipal or
> governmental authority shall not
> be restricted by this ordinance.

Section 65-42.3 B 2 (f) Unified Shopping Center Development. The
enumeration of the specific types of business enterprises allowable
in a Unified Shopping Center Development is one of limitation. The
continued viability and success of shopping centers require the owner
to have flexibility in the leasing of store space in the shopping
center without the requirement that an application for a permit be
made because a specific tenant use has not been contemplated by the
draftsman of the ordinance. For example: does this ordinance permit
a Channel Lumber or Ricket Home Improvement Store? Granted, this
type of tenant does sell at retail to consumers but it also sells
wholesale to builders. Are lumber and home improvement materials
"consumer merchandise"? Does the proposed ordinance restrict the
sale at wholesale to consumers? It is this type of ambiguity that
must be resolved at this time. The ordinance also restricts, without
special permit, "quick-service or fastfood restaurants." Is a
chinese kitchen or pizzeria, with or without seating capacity a
"quick-service" or "fast food" establishment prohibited in a
Unified Shopping Center Development without a special permit?
The ordinance, as presently drafted, seems to indicate an affirmative
answer and yet, experience has dictated that this is not the type of
"quick-service" or "fast food" establishment being contemplated by
this ordinance. A clear distinction must be made distinguishing
an in-line food service establishment from the free standing self
contained units. It is suggested and strongly urged that subdivision
(f) should read as follows:

> Unified Shopping Center Developments,
> including but not limited to commer-
> cial establishments for the sale at
> retail or wholesale of goods, merchandise
> and services including restaurants,
> quick-service or otherwise, (provided
> that such quick-service restaurants
> are "in-line" and not free standing)
> and stores for such uses as are
> normally found in similar types of
> Unified Shopping Center Developments.

No special permit should be required for any type restaurant, in
fact, it is Net Realty's contention that the imposition of a special
permit requirement with the general standards as are outlined in the
proposed ordinance would be an unlawful imposition of restrictions upon
its property and the use thereof. The terms and conditions upon which
the special permit may be granted are overly broad, discretionary, and
unreasonable and are subject to arbitrary and capricious application.
As such, I am sure that they would be denied enforcement by a court
of law.

Section 65-42.3 D. The cost of implementing this section of the
ordinance is estimated by Net Realty to be $80,000.00 for the property.
No municipality may lawfully impose this kind of financial investment

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MISED USE IMPACT ZONING DISTRICT CON'T.

retroactively upon a property owner by amendment to its zoning
ordinance. Moreover, Subdivision 4 of Section D would increase
the non-conformity of any existing building with existing parking
areas in that it would require the reduction of actual parking area
by increasing landscaped areas. Furthermore, this Section of Subdivision
D has not been related in any manner to the off street parking require-
ments to Table One (1) and it is not indicated as to whether or not the
landscaped areas required are in addition to the number of parking spaces
required by the propsoed ordinance.

The landscaping requirement should be limited to new developments only
and not applied to existing buildings and uses. If enacted, this
Section must be the subject of a court challenge. The Net Realty
Holding Trust does not object to beautification efforts, but rather,
suggests that instead of the Town of Greenburgh attempting to impose
the burden and expense of beautifying the Central Avenue area onto
the property owners by enactment of an ordinance requiring landscaping,
that it develop a tax credit program whereby tax credits would be
granted for property owners who upgrade the appearance of their
properties along Central Avenue. It is important that the Town Board
remember that as the expenses of property owners increase, the valuation
of their properties for real estate tax purposes decrease. The more
money the Town of Greenburgh makes property owners spend, the less
it can expect to receive in real estate tax revenues which are necessary
to run the municipality. The Town of Greenburgh well knows that property
owners along Central Avenue are not afraid to take their tax reduction
cases in the Town of Greenburgh to the courts.

Section 65-42.3 E  Prohibited Uses.  The following should be deleted
from Subdivision E:

                    "Or auto part store with installation
                    service or repair facilities on the
                    premises", "game room or amusement arcade",
                    "or wholesale."

There is no basis to restrict these types of uses from a commercial
zone, in fact, these uses presently exist within the Net Realty Holding
Trust properties along Central Avenue.

Section 65-42.3 H 2 (b) (c).  These subsections should be stricken
from the proposed ordinance.  In a Unified Shopping Center Development
changes in the tenant's business may or may not increase or decrease
the "intensity" of the non-conforming use.  These are subjective
tests and are not appropriate in determining the abatement of a non-
conforming use.  Assume for the sake of argument that Channel Lumber
or Rickel Home Centers wish to replace the Macy's Furniture Clearance
Center in one of my client's shopping centers.  Under the ordinance
proposed it can be said that the "intensity" of the use will be increased
or that there will be a greater parking or loading requirement necessary.
To restrict the property owner from leasing to a tenant of this nature,
ipso facto, decreases the value of its property.  The enactment of
a zoning ordinance which could cause this result is confiscatory in
nature.

Lastly, Tables One (1) and Two (2), as well as Definitions Twelve (12)
and Thirteen (13) should be amended so that they are consistent with
the suggested changes that are being made in this presentation.
We urge the Town Board to seriously consider the comments and suggestions
which are being made in this presentation and that if this ordinance
is enacted, that the ordinance contain the modifications which we
propose.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

Town Clerk O'Connor -- Before we go any further I would like to call your attention to two (2) errors. On page five (5) of the proposal as mailed out under B. Permitted Uses, Roman Numeral (vi) should read Section 65.43.2 B.1.(a) instead of 65.44.B.1 (a). Also on page seven (7) under (3) Principal Uses, Roman Numeral (iv) it should be 65.43.2.C (3) not 65.44.C.3.

Supervisor Veteran -- I am going to take the opportunity to read from a memo of the Town Attorney an addition to section H (2) (g):

In conjunction with the public hearing to be held on May 24th, 1978, in regard to CA Impact Zone, it is proposed that the following language be added to Section H(2)(g) as follows:

Any building which is non-conforming or which contains a non-conforming use which is destroyed in whole or in part by fire or other natural disaster, may be repaired or reconstructed in a manner which does not increase the non-conformity of the building or use, or which changes the building to a different non-conforming use.

This addition merely clarifies the status of uses or structures destroyed by fire or natural disaster, and does not constitute a substantial change in the proposed ordinance.

Raphael Riverso, 1 Dorchester Drive -- What happens to a non-conforming use portion of an existing building? If we cannot rent a portion of the building for six (6) months do we have to tear it down?

Supervisor Veteran -- It would be the same as it is now.

John Saccardi, Raymond, Parish, Pine and Weiner -- It would just be a non-conforming use.

David Jutkowitz, Esq. of Farley, Jutkowitz, LoCascio and Balint, Counsellors at Law, with offices in Yonkers and Hastings spoke paraphrasing the following letter:

This letter is being addressed to you relative to the proposed final draft of the Central Avenue Mixed Use Impact District. When the first plan was presented, the undersigned appeared at the Planning Board meeting on September 20, 1977, in order to present the proposal affecting the property of our client, Pluto Construction Corporation, which borders on the City of Yonkers line. A photocopy of the proposed site plan of a Shopping Center is enclosed herewith. An examination of the site plan will indicate that the frontage has a decided indentation so that the proposed 80 ft. setback requirement of properties in excess of 50,000 sq. ft. as contained on page 15 of the proposed Amendment creates an undue hardship to this property. The enclosed plan will indicate that the topography of the area would require that a great deal of rock excavation take place in order to make this property buildable.

It is the opinion of the owners that this particular piece of property is one of the few that presents such a topographical problem in the entire Central Avenue Impact District.

To pass the proposal in its present position without providing for a change relative to this particular property would seriously affect the economic feasibility for its use in this fashion.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

This matter was discussed in the September meeting with the representative of the Planning Consultant and he stated that a change would be made in order to accommodate this property. It is for that reason that it is respectfully requested that before the proposed Zoning becomes effective that some modification be made. It is further suggested that the setback restriction should apply to the mean line of the entire frontage. In that way it would accommodate a piece of property such as this where the line is not parallel with the line of Central Park Avenue.

(sic)

* On file in the Town Clerk's Office.

Supervisor Veteran -- Pluto Construction was compensated when the State took part of his land. The Planning Board considered his plight and advised him that he has recourse to the Zoning Board of Appeals for variances if he can show a hardship. We cannot make an exception for one property owner.

Joseph Peikarski, 350 South Healey Avenue --

We all know that Central Avenue (Rt.100) is an arterial highway under the jurisdiction of the D. O. T., State of New York. We know that vast millions of dollars were spent by the State and County for drainage, sewers, lighting, beautification and new roads in our neighboring cities and towns, but what happened on Central Avenue in Greenburgh? The Brogan Construction Co. added 2 additional lanes 40 years ago making a four lane road which is today a bottleneck for traffic.

The regional population has quadrupled, Central Avenue traffic has increased, and yet Greenburgh proposes to control traffic by controlled zoning?

In Yonkers to the South, we finished a new 8 lane road bringing traffic to Greenburgh and according to the newspaper 3 days ago, White Plains is preparing a new $15 million egress and ingress road solving their traffic problem by dumping it onto Central Avenue, Greenburgh. Raymond, Parish, Pine and Weiner Inc. are listed as Planners and Traffic Solvers for the City of White Plains. The same Planners, Raymond, Parish, Pine and Weiner, Inc. propose Impact Zoning for Central Avenue, Town of Greenburgh.

I do not blame this Town Board alone. This is the FIFTH Master Plan and Zoning Plan that the taxpayers paid for and we still end up in the courts and let the lawyers and judges make the decisions while our neighbor cities and towns quietly work in harmony. They demand that their county and state representatives get results and assistance. Why then, does this become a circus in the Town of Greenburgh?

The D. O. T. told our town officials that there is no money for Central Avenue in Greenburgh, but the state arranged money for the Town of Harrison to accommodate the Nestle venture. White Plains is arranging money from the county and state ($15 million) to dump their traffic onto Central Avenue in Greenburgh.

I say, stop to retoric and the circus! The Town Board should give leadership and solve our problems and get the business community, taxpayers and businessmen involved, not just the lawyers and the courts. The Town of Greenburgh is one of the largest towns in the state and should get some recognition and its fair share of help from the state.

Two years of study and thousands of dollars have been expended for a plan that an experienced member of the Town of Greenburgh Planning Board reported as the wrong plan and the wrong time. I concur Central Avenue is not suited for residential zoning and the Impact Zoning Ordinance should be turned down.

(sic)

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

Sonny Mancuso, 17 Edgewood Road -- I am not a lawyer so I will not give you legal arguments. I wear three hats tonight; as a resident, a former businessman on the avenue and as a property owner. I'm no stranger to any of you. I respect this board and I have always received respect in return. My intent tonite is to agree when argument is fair - to disagree when there is injustice - to disclaim when there is falsehood and to enlighten when there is doubt or a lack of perception.

The purpose of the Comprehensive Plan for the Central Avenue Corridor suggests good intentions - we all want to see an orderly, prosperous, attractive and inviting avenue - whether we be merchant, resident, landowner or town official. We all despise decay and fall in love with beauty. The rub lies in how we avoid one and attract the other. First of all we must recognize the problem, then its cause and lastly the solution that is realistically applicable - "Realistically Applicable" - remember that phrase!

Anyone knows if you amputate a man's hands he'll no longer suffer with hangnails but it's not a realistic solution to his problem - The Comprehsive Plan embodying the Impact Zoning concept exemplifies this same principle of "overkill". Central Avenue might get rid of its hangnails but at a terrible price - to be paid by the merchants, property owners, school districts, residential taxpayers and each and every citizen of the Town of Greenburgh. Central Avenue properties presently contribute almost 4 million dollars in taxes. To insure revenue in a spiralling economy it must be assummed that these tax dollars have to increase and justifiably so - providing, of course, that the property owner is financially able to pay these increases. Full future development of Central Avenue properties with new assessables is and must be the catylyst to provide the additional tax monies that are constantly required. Impact Zoning is instant abortion to the goose which lays the golden tax dollar. It has the immediate effect of reducing building coverage which in turn has the immediate effect of reducing business income. With low income possibilities it follows that property values will fall. A person with a legitimate property investment will not be able to cope with this loss - he still has to make his mortgage payments to the bank and contend with raising taxes - he has no recourse with his bank - they must get their money - with his back pinned to the wall he seeks immediate justice in the courts. And so begins the long parade of zoning litigation, certiorari proceedings and God knows what else. Remember Land Owners are not all "Land Barons" - the majority of us are your friends and neighbors who have their life's work and savings invested on Central Avenue. To present them with this injustice would be a Holocaust of the second kind. But my friends and neighbors it doesn't stop there. With the Town government in legal turmoil, the residential taxpayer is immediately involved in this fiscal crisis. Court contests spend your tax dollars. Successful certiorari proceedings against the town will reduce the Central Avenue tax liability and in order for the Town to operate at its present efficiency it will fall upon the homeowner to pay the difference - and I know through excellent legal authority the problem is imminent and the cost will be most significant - to all of you.

Now , I have a few bones to pick...firstly, with the consulting firm of Raymond, Parish, Pine and Weiner who produced the original plan it is a matter of record that their major concurn was with the aesthetics and traffic problem on the avenue. Section 65.44 of Central Avenue Mixed Use Impact (CA) District does so state.

Allow me to burst one balloon. Let it be known tonite, once and for all and let the record indicate that most of the solutions of the problems discussed do not and I repeat do not fall within the powers of the property owners or the Town of Greenburgh to impliment. If the citizen of this town believes that this plan will provide all the niceties that the Town Planner's press releases portend he has been grieviously mis-informed and those planners should be brought to task for their failure to inform and for their insiduously contrived statements. To wit the truth follows:

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

      1. The State Department of Transportation has the <u>only</u> authority for changing <u>any</u> and <u>all</u> physical aspects of the entire avenue. This includes

    a)  road widening
    b)  intersectional improvements
    c)  curb cuts and island improvements
    d)  jug handle turns
    e)  traffic control and lights
    f)  medion barriers or central islands
    g)  any and all types of changes within the entire

Central Avenue right-of-way including drainage..for the Town Planning Commissioner to imply that the state will do these things only if the plan is implimented is an out and out misrepresentation of fact bordering on a baltant lie. I hereby demand from Mr. George Case any written proof or copy of any minutes from any meeting that he may have had with top officials of the State D. O. T. to this effect. The mere gall to suggest that he bartered my property to obtain concessions from the State infuriates me - especially without my knowledge or consent. It smacks of malfeasance and I'm certainly going to look into it. The City of Yonkers enjoys a beautifully widened and improved section of Central Avenue and it was accomplished without the rape of the bordering property owners. The reality is that <u>there is no state money</u> to be appropriated for the same improvement <u>in the Greenburgh sector - now</u> or in the <u>forseeable future</u> - and yet the public is led to believe that all these niceties are coming to Greenburgh - in this case "truth withheld must be labelled a lie"!

    The aforementioned firm of Raymond, Parish, etc. according to an article in the Reporter Dispatch has recently been commissioned by the City of White Plains to plan a shopping complex in the heart of that tremendously over-congested city. This complex has been described as including major department stores and other types of businesses totalin 100 establishments - I repeat 100 stores - all in an area of approximately 4 square blocks! - all this with the inclusion of one parking structure accommodating only 3,000 cars - and having accepted that commission one must assume they will come up with that plan. At the risk of being impertinent I say for shame Raymond & Co. you can plan for White Plains in 4 blocks what you couldn't plan for Greenburgh in 4 long miles. What the hell is wrong with our thinking - is central Avenue being sold down the river to White Plains interests. If only on the face of this one fact any and every proposal eminating from this firm must be termed unreasonable, inconsistent and possibly suspect - for 2 years this Town administration has been extolling the virtues of this plan - isn't it time dear town fathers and town mothers that you see the light - Yonkers booming - White Plains booming and Greenburgh's green valley dying on the vine - barren and unproductive.

    I recently heard the learned counsel to the Town Planning Board say to you Mr. Supervisor that if you can pull it off - meaning passing the Impact Zoning Plan - you will be so popular and unique that you can go on a tour of the U. S. A. lecturing on it. Just mull that comment over for a while then tell me how many people will be interested in your lectures should the plan be passed and then flop on its face. If I had any advice to give I would make Mr. Paul Karan's Planning Board minority report required reading - the full 12 or 14 pages - for some reason your Planning Department has not seen fit to publicize it to the extent it does all of its other propoganda. Mr. Karan must have some smarts - he was recently appointed to the Board of Assessors. He labels the proposed CA Impact Zone as "the wrong solution for the wrong place and at the wrong time". If I were you i'd heed his warning about "questionable legal enforcement" and then cancel the lecture tour.

    Mr. George Case the Director of Community Development has been quoted thusly, "a great deal of time has gone into this study and now we're going to have some action" - I wish I knew what he had in mind.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

     I have a feeling tonite's meeting is a fait 'daccompli.  I hope
we are still on a two-way street.  The plan has been mulled, culled
and dulled.  It tries to be everything for everybody and fails miserably.
Edgemont doesn't want apartments; civic groups are concerned about court
costs and possible home tax increases; school systems wonder about
decreases in school tax income and increased enrollments should apartments
cover Central Avenue; merchant's are disenchanted over their rents having to
be raised; property owners worry about losing their tenants and hanging
on to their investment; fire districts have registered complaints; Tina
Jackson's group, the Dalewood Area residents and the Venture People of
Hartsdale are placed in a "Catch 22" situation - I'm sure this Board will
deny Venture's zoning change request but I'm also sure you are aware that
the proposed plan allows for a shopping center - less ambitious, of course,
which would make Mr. Green unhappy - until he has his day in court -
then what?  Where is the gain to this proposal - who will it please?  Anyone
who thinks traffic will improve on Central Avenue in its present physical
state is an imbecile.  The major cause of traffic problems has little to
do with business development.  The tie-ups occur at intersections - between
intersections a veritable speedway exists.  The police regularly employ
speed traps on Central Avenue.  The head of the traffic division will attest
that more speeding tickets are issued there than anywhere else in town.
Ironically some of the biggest traffic problems occur during commuting
hours in the morning long before most business establishments are even open.
The solution to this particular problem should be quite obvious - over or
underpasses at each intersection such as at Tuckahoe Road in Yonkers are
needed - but there we go again, the plan does not call for them.  Only the
State can say when or where these improvements will take place and they say
no money will be provided in the foreseeable future.  To suggest that we
can cajole the state into spending 30 or 40 million dollars by implimenting
a penny-ante Impact Zoning Plan is a George Case illusion - don't drink
from the same well as he does.  You'll start hallucinating!  Town Planners
constantly refer to Central Avenue as a priority one blighted over-trafficked
area - have they ever travelled the Saw Mill River Road from Yonkers
through Elmsford.  Its a driver's nightmare and a veritable cesspool of
mish-mash structures.  Have they ever traveled Hartsdale Avenue from end to
end?
     Backed up traffic for almost a quarter of a mile is an every day
adventure at the Dobbs Ferry Road intersection and the less said about
the million dollar four corners improvement the better.  Tarrytown Road
presents little aesthetic charm but much can still be done there so I won't
knock it.  In passing however, it is interesting to note the complete
about face the town has taken towards business development on that road.
They sai "NO" to Central Avenue while on the other hand they joined forces
with business developers on Tarrytown Road.  They even supplied land at
discount prices to enable the construction of a shopping center.  I am in
total agreement with the arrangement as it returns property to the tax rolls
and will offer services to the community.  On Central Avenue we ask no such
special treatment.  We own our own land.  We demand the right to develop
it to its full potential.  We reject step-child treatment.  We are all born
of the same mother and lay claim to our heritage.
     Contrary to the Planners description of the avenue as being blighted
I can sight many fine examples of excellent construction.  Anything built
within the last 10 to 15 years such as office buildings, shopping areas,
health spas and free standing retail establishments would be a credit to
any community.  Older and less attractive structures are being phased out
in the natural course of events - let's call it progress - but progress
takes time as everyone is aware.
     Let's also be cognigant of the fact that any and every structure
on the avenue was at one time or another approved by this and all other
town administrations.  If there is fault it lies with the town governments.
Fault in forcing compliance with various ordinances.  You have the codes and
ordinances and laxity in their use should not be blamed on merchants or
property owners - your departments have the power to issue summonses or
warnings to negligant people - insist on reasonable cooperation.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

Another paranoia that bothers me concerns certain types of businesses so called fast food establishments, restaurants and cabarets. At one time there were almost 20 cabarets along the avenue - I think the present count is five or less and still declining and you still feel threatened. We have one legitimate free standing fast food spot and there's panic whenever another is suggested - I see no problem with Burger King and a dozen other places could be built servicing the community with the same ease and convenience.

Planners never seem to take the law of supply and demand into their deliberations. If there isn't enough business available to sustain 12 establishments they will dwindle down to whichever amount can survice - and, I might add, only the best survice. I might also add that like all other business establishments they offer a definite service to the community - not too many people would travel up from New York or down from Peekskill to eat a ½ pounder - it's Greenburgh patronage which will be served - once again we must be realistic.

New York City became a disaster area by succumbing to pressure groups who made business intolerable - without business there is no employment - without business there is no incentive for progress. Without business there is no revenue. Without business there is no hope for the overburdened taxpayers and home owners. Without business that city has died.

Many of our neighboring communities recognizing this dilemma are bending over backwards to entice commercial enterprise. If this plan is inacted Greenburgh will be taking its first step backwards towards failure. Establishing such a trend is flirting with disaster.

Two thousand years ago a young Jewish fellow got his message across by telling little related stories - they were called parables. I'd like to close with one --

A certain farmer worked his fertile fields with a team of strong horses. His crops were beautiful and his friends were eager to buy them. Occasionally on extremely hot days his horses perspired and they attracted horse flies. These pesky insects annoyed the farmer so he called in a horse fly specialist to solve the problem. The specialist reported that the only sure fire way to eliminate the flies was to shoot the horses. The farmer discussed this solution with his neighbors and after some deliberation one of them handed him a fly swatter. The farmer returned to his fields and swatted away until he got rid of most of the flies - some occasionally returned but his annoyance became mininal - he still had his farm, his horses and his crops and his fly swatter.

Mr. Supervisor the Town Board is that farmer. Those fertile fields represent Central Avenue. That team of healthy horses are hard working business people. Those horse flies are the pesky problems associated with Central Avenue. The shoot-em-up horse fly specialist could be your planning consultants. The solution you've chosen for Central Avenue is like killing a horse to get rid of his flies!       (sic)


Supervisor Veteran --  As long as you've got horse manure, you'll have flies.

Mr. Mancuso --  I am your neighbor, I present you with this fly swatter, use it realistically!

Louise Kleinbaum, 7 Algonquin Drive, Local Affairs Vice-President, League of Women Voters of Greenburgh --

The League of Women Voters of Greenburgh would like to reiterate its position in support of the Central Avenue Mixed Use Impact proposal. We feel that the intent of this proposal is ecologically and economically sound; we feel that the intent of this proposal is to balance the traffic carrying-capacity of Central Avenue with the future development of the area. We would like to see this plan adopted.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

The League realizes that many interest groups have raised objections to parts of the ordinance during preliminary hearings and is pleased to see that the Planning Board has made modifications responsive to public input without making the plan less effective.

We are also glad to see that provisions for apartment buildings have been retained.  Studies show that apartments can be an attractive solution to many of the problems of this area.  Compared to retail establishments, they generate less traffic and would bring more monies into the Town thereby offsetting the increased demand for Town services.

In addition, the League is pleased that landscaping requirements have been incorporated into this proposal.  We had also hoped that something would be done to beautify those properties already developed so that the total effect of the "new" Central Avenue would be uniform.  We intend to pursue this idea in the future.

Once again, we commend the Town for attacking such an unweildy problem. We urge the Town Board to adopt this proposal.  And finally, we hope that the adoption of this plan will be followed quickly by the presentation of the long-awaited, comprehensive Town Master Plan.          (sic)


     Annette Smith, 20 Evarts Avenue, Chairman of the Board of Governors of the Council of Greenburgh Civic Associations --

     The Central Avenue Impact Zone Plan has consumed much of the time of the Planning Board, the Town Board, and the affected business community as well as interested community organizations; not to mention the accumulated costs for consultants and staff time.

     In view of all that has been put into this proposal, the Board of Governors of the Council of Greenburgh Civic Association's regrets that it cannot whole heartedly support this plan, even with the recognition of adjustments you have made in response to objections made by segments of the community and by us.

     We do appreciate the reduction in height for apartment dwellings and the increase in FAR should be of some help to the owners of plots under two acres, but we still are troubled by some of the same issues.

     At an earlier hearing we did express concern with a new code which would make virtually 80% of the buildings non-conforming. We were concerned with the economic consequences on the individual owner and also with the potential impact on the town's assessable worth.  However, many of our members question the contitutionality of permission to rebuild a non-conforming building within the C A Impact Zone when destroyed by fire, but prohibiting this same privilege when 50% or more of a non-conforming building is destroyed by fire outside of the C A Zone.  They foresee this situation leading to possible grounds for a law suit by an owner of a non-conforming building outside of this special district.

     If a special immunity from provisions prohibiting re-construction after destruction by fire is given, most of the Council members present, felt that a time limitation should be imposed so that at some time in the not too far future, all properties in the Central Avenue corridor will come under the same non-conforming code which regulates the whole town.  We suggest, that the section on non-conformity be looked at again for definition and clarification.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

In reviewing the code, the regulations and limitations under Principal Uses Type 1: Office Uses; Type 11: Commercial Uses; Type 111: Residential Uses; Type 1V: Public and Quasi Public Uses and Accessory Uses; and including all Special Permit Uses, we find, the inclusion of necessary and laudable requirements which should in themselves lead to more orderly and controlled development. However, we found ourselves unable to determine the eventual hardship on property owners and the eventual economic ricochet onto the home-owner taxpayers; as well as the positive or negative effects of the muti-use designation on the quality of future development.

The Council does not feel that this code alone will improve the visual, and environmental impact or the traffic flow. The application of multi-use development may lead to more problems in some of the larger spaces as the Hartsdale Ventures property and the Webb property, when and if it is released to the open market. While the FAR restrictions will limit the size of commercial or retail development, there will be no way to legally prohibit commercial development of this type on these parcels if there is conformity to the special standards guidelines.

We remind you that these regulations for a new Impact District will not in themselves improve Central Avenue's many problems.  To accomplish this, improvements in traffic flow have to be implemented through reconstruction of several intersections; with ingress and egress curb-cut improvements; reconstruction of drainage conduits; as well as curb-side plantings and beautification efforts.

The Council realizes that implimentation of all these addi-tional necessary aspects will be forestalled by you until a determina-tion is made on the zoning regulations governing the Central Avenue District; so therefore, we say to you, do not prolong the agony, but do make a decision in which you will take into consideration the comments of your constituency.            (sic)

Thomas Abinanti, 100 Barnewll Drive, member of the Environmental Quality Control Commission, read the following letter signed by Trudy Battaly, Chairman:

The Environmental Quality Control Commission supports the proposed Central Avenue Mixed Use Impact (CA) Zone, with revisions as suggested by the Planning Board.  We believe the proposal will be a most beneficial means to control both the development of the remaining open parcels and the expansion or reconstruction of already developed parcels.  By improving the overall character of Central Avenue itself, the potential for a better blend with adjacent land uses could be realized.

We urge you to adopt the Central Avenue Mixed Use Impact Zone as an important first step forward in long range planning for Greenburgh.

Similarly, we suggest that you begin other aspects of the re-commendations made by Raymond, Parish, Pine & Weiner, Inc. on page 43 of the October, 1976 Summary Report.  In particular, a Central Avenue Beautification Program should be organized, "...incorporating tree plantings, voluntary clean-up programs, landscaping and fencing in rear yards, and design awards."  Also, a new Sign Ordinance, which reflects the design principles set forth in the conceptual plan, should be developed.

I would also like to add my personal comments and as an officer of the Orchard Hill Civic Association.  I want to commend the Town Board and the staff for the way this has been handled.  I am particularly pleased by the process.  There have been many meetings with the public to exchange views and a real effort seems to have been made to balance the needs of the business community with those of the residents.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

Raphael Riverso, President of the Central Avenue Association -- I
have spoken often on this subject not only because of a personal interest
but as a taxpayer. As a Civil Engineer I have been able to detect a lack
of competence on the part of the Consultants and errors of omission,
intentional errors of commission to justify the results of their study.
I called this to the attention of the press which for some reason wants to
ignore it while praising the high ideals.

Civic groups seem to carry a lot of weight but the businessman
is ignored. I heard a member of the Environmental Commission applaud
the plan. I made a personal attack on Mr. Parish and I could make one on
the member for the same reason, I doubt that he knows what it is all
about!

It says here that "the principal intent of the Central Avenue Mixed
Use Impact (CA) District is to relate the maximum density of development
permitted for the Central Avenue Corridor as a whole to the present traffic
carrying capacity of the road and its intersections as well as to future
improvements which will increase the traffic carrying capacity including
allowances for existing traffic, traffic generated from new development
and other traffic affecting the Central Avenue Corridor as well as to economic
environmental and other factors"

Is that why you want to see this passed? I don't see how you can
believe that it will happen. Central Avenue is ninety-five percent
developed! The figures in the report of the consultant are contradictory.

I would like to acknowledge the fourteen (14) page minority report
of Mr. Karan, a former member of the Planning Board, who said this was the
wrong solution for the wrong place at the wrong time! My Association would
largely concur with Mr. Karan's arguments. The other gentlemen have said
what I would say but I do want to point out a few things.

The table on yard dimensions for a 50,000 square foot lot would
require me to have a building no more than 30 feet deep! Table I calls for
two (2) stories or twenty-four (24) feet as maximum height. If Mr. Parish
knew anything about architecture he would know the minimum should be twenty-
five (25) feet. Twenty-four (24) feet is below standard!

Mr. Parish has not paid attention to details. I wonder if he
earned his money? I got an explanation on what happens on a non-conforming
use that I doubt would stand in court. If ten thousand (10,000) square
feet becomes vacant in a building that is a non-conforming use and we
cannot find a tenant in six (6) months, what happens to the vacant part?
Do we destroy it? Do we destroy down to the magic four thousand (4,000)
square feet?

I made a personal attack on Mr. Parish because he has done this to
property owners knowing they don't have the power to prevent it and knowing
that the residents who do have the power would not understand it. I did it
to save face for the administration. You could blame it on Raymond, Parish,
Pine and Weiner since it is their plan and cancel the whole thing. But if
you go ahead now and adopt it you will have no one else to blame it on...

Ramapo is used as an example of where this has been done before. I
doubt whether any judge would see a parallel between undeveloped Ramapo
and heavily developed Greenburgh.

The non-conforming uses that you will be creating will be more
than common. They will be the rule.

I would like to give you an example of what four thousand (4,000)
square feet of building on a fourty thousand (40,000) square feet lot
means. I say an acre of land on Central Avenue is worth $250,000.00 to
$325,000.00. With development costs and financing it would cost another
$220,000.00 to build. That would require a rent that no one would pay
for Central Avenue...

I would like to ask you who has been the prime mover in seeing
to it that this berserk zoning was prepared for Central Avenue? Was it a
Civic Association, an individual? How did this come about?

Supervisor Veteran -- When we first came into office there were a
number of things that needed doing on Central Avenue. We had a meeting
with our State and Federal Representatives at that time and the Department
of Transportation to see how we could get financial help for the work. They
pointed out that without a study identifying exactly what had to be done we
would not get far. We needed an overall plan showing that we were not going
to let Central Avenue continue to deteriorate and become a burden on the
rest of the Town.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

We had some Community Development money, most of it went to low income areas by necessity, but this was a way of getting some of the money into other areas of the Town because Central Avenue is a concern of the whole Town.  We had the study done and as a result we have 2.8 million dollars committed for next year.  We already received $460,000 worth of work at the four corners in Hartsdale.  Anyone really honest cannot tell me with a straight face that it has not been an improvement. An overpass has been mentioned for Hartsdale Avenue but most of the merchants there do not want that because it would isolate them.
Next year the Ardsley, Mount Joy and Underhill Road intersections will be improved and we will get sidewalks put in.  Down the road we expect eight to ten million and it is all because the State sees that we are serious about planning on Central Avenue.
I have gone through one Urban Renewal project and I am now trying to finish up the longest running one in the country.  I don't want to see another so we have to do something about Central Avenue!
I feel for the businessman, I don't want to hurt him or investments on the avenue but my responsibility is to all the citizens of this Town not just a select group who come out to fight something that might cut down their profits.  Land on Central Avenue is worth $325,000.00 an acre only if you could continue in the same vein as the last twenty-five years where you bought property at a depressed price and increased its value by getting a zoning change.

Mr. Riverso -- That is wrong.

Supervisor Veteran -- Does the value of land depend largely on the zoning?

Mr. Riverso -- Yes, but...

Supervisor Veteran -- Zoning is a large part of why I got into politics twenty years ago..I don't expect the builders and land speculators to approve but I do expect that the rank and file of residents, those who don't have time to be here at every meeting, will approve because good government is why they elected us.

Mr. Riverso -- Do you think this will help traffic?

Supervisor Veteran -- It will help traffic; allow for good future development and prevent deterioration.  We are going to protect that area against its self.  If we lose assessables there we will have to raise taxes for everyone so the blight has to be stopped.

Mr. Riverso -- I don't object to traffic improvements but there is no deterioration.  Each piece that is built is better than the one before it!

Ronald Koerner, 335 Old Army Road, President of The Edgemont Association --

Once again the Edgemont Association is pleased with the Central Avenue Impact Study but wishes to supplement our previous correspondence, which was submitted to the Planning Board, with the following additional comments.

We recommend that the distance between bars should be at least 2,000 feet.

We do not believe that sufficient information about multi-residential apartments of four or fewer storeys and the potential impact on the community has been developed to date.

We urge the Board to weigh in a thorough manner the impact of garden apartments against each of the goals and criteria set forth in the proposed plan.                    (sic)

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

Nelson Dubois, Jr., 124 Inverness Road, President of The Cotswold Association, Inc. --

The Town Board is to be commended for its effort to improve Central Avenue. The proposed amendment to the Zoning Ordinance is a step in the right direction. The Cotswold Association supports the proposed amendment to the Zoning Ordinance in concept, but there is one principal use identified that we have serious concerns about. The principal use of concern to us is multi-family developments (Apartment Houses).

At our November 1977 meeting, the Cotswold Board of Directors voted unanimously to oppose the multi-family development provision of the Central Avenue Impact Zone Study. At the Cotswold Association Annual Meeting three weeks ago, the Cotswold residents voted to oppose the multi-family development provision of the proposed amendment to the Zoning Ordinance.

You may recall that the Cotswold Association pointed out to the Town Board in December 1977 that we were concerned with the growing number of certiorari proceedings and actual and prospective loss of tax revenues as a result. The Town Board decision to come under the provisions of the Emergency Tenants Protection Act is a major cause of certain apartment house owners seeking reduction in assessed valuations of their properties. In the last few years some $4,000,000 to $5,000,000 of the apartment house properties have been erased from the tax rolls, while the Town currently stands to loose an even larger sum from proceedings currently underway. To the Cotswold Association, this means that the Community of predominantly single family home owners is subsidizing the apartment dwellers from the rest of the Town. In our view, additional apartments along Central Avenue and rent control will further complicate a very serious problem for the Town.

We also pointed out to the Town Board in December 1977 our concerns about strictly enforcing the current Zoning Ordinance. Specifically, we pointed to violations of sign and lighting ordinances along Central Avenue. The individual home owners in the Cotswold area are concerned about multi-family developments along Central Avenue and the enforcement of the proposed amendment, and believe strongly that the Town Board should not approve the multi-family provision of the proposed amendment.    (sic)

Steven Belasco, 437 Fort Hill Road, President of the Fort Hill Association --

I have previously written to the Planning Board expressing our opposition to multiple dwellings on Central Avenue.
We don't particularly understand some of the changes which have been made in this draft. We were pleased to find the height reduced to four stories but then the density has been increased which we do not understand. To have forth bedrooms per acre will require almost the entire acre to be covered. We urge you to revert back to a minimum of three acres for multiple dwellings. I appreciate your remarks Mr. Supervisor about representing the entire community.

Ralph Dorzback, 195 Pinewood Road, President of the Dalewood Civic Association -- What would be your guess on the ratio of commercial to residential taxpayers?

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

    Many commercial landowners are speculating.  In the last two
months the civic associations in our area have had meetings outlining to
residents what may lie ahead for development of areas like Hartsdale
Ventures.  We filled this room for a hearing before the Planning Board
and I challenged Mr. Grossman to find one vote in the room in favor of
a shopping center.  Central Avenue is the spine of Greenburgh.  I commend
the Town Board for this effort to protect the individual homeowner.
    Why can't the Town hold a referendum on whether there should be
more development?

    Joel Sachs, Town Attorney -- The Town cannot legally put such
questions to a referendum.

    Rosemary McConologue, 89 Randolph Road -- Five years ago the civic
community came to you and asked that you do something about Central
Avenue.  Though the plan is not perfect step one has to be taken.
    If this will bc followed by the State doing something it will
be well worthwhile.  You have to look at the entire Town, the Town
does not like Central Avenue the way it is.  We do not want to lose
businesses and this zoning will assure that they are not choked out
by impassable traffic.

    Samuel Schorr, 15 Kaateskill Place -- Have the studies gone into
the affect of 100% assessment?

    Supervisor Veteran -- Regardless of 100% assessment I feel this
will have to be an asset to business on Central Avenue though I hope
we never have to go to it.  Wc cannot make, or fail to make, changes
in zoning in light of the lawsuits that will be brought.

    Gerard O'Shea, 9 Edgemont Circle -- For nearly four years I have
bccn involved with one committee or another on this.  I want to
congratulate the Town Board for its foresight and for the way this has
been handled.  There have been many public meetings and other opportunitie
for input.  Obviously those responsible have listened to the public and
given some thought to the many amendments that have been made since the
original draft.

    Joel Holiber, 17 Kenneth Road -- I would like to take issue with
the last point.  The Town Board and the Planning Board did not take the
property owners comments into consideration.
    You say you do not want a decrease in assessables but this will
bring about further certiorari proceedings and a further decrease.  Some
place along the line the taxpayers in this Town have to get relief.
    You are allowing apartments, they will get decreases in assessment.
and the homeowners will have to pay.
    The civic associations at the Yonkers end of Central Avenue are
against apartments and those at the White Plains end are against shopping
centers.  Under this Impact Zoning everyone is going to get what he does
not want.

    The following letters were also received but not read:

Robert G. Cucinell, Attorney at Law, 110 Central Park Avenue South,
Hartsdale --

    I am a property owner of two parcels of vacant land on the
southwest and northwest corners of Central Park Avenue and Fort Hill
Road described on the tax map as indicated above (Section 31, Sheet 40,
Parcel 1E and Section 30, Sheet 31, Block 1681, Lot 161).  Both parcels
are under 10,000 square feet.  Under the proposed zoning amendment, the
area restrictions and set backs would virtually preclude the erection of
any building.  Approval of the plan is tantamount to a confiscatory action
by the Town with respect to these parcels.
    The area also lends itself to a more liberal use than proposed
including retail operations and business offices.
    Please file these objections to the proposed plan.

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

Westchester County Planning Board, Peter Q. Eschweiler, Commissioner --

    The Westchester County Planning Board, pursuant to Section 451 of
the Westchester County Administrative Code, has reviewed the pro-
posed Central Avenue Mixed Use Impact (CA) District, which replaces
portions of ten existing districts that now front on Central Avenue.
The proposed CA District extends along Central Avenue from the City
of Yonkers Line northward to the City of White Plains Line
(S.H.5231).

    The proposed District regulations have been developed through an
extensive period of analysis of Central Avenue problems and public
discussion.  After effecting substantive revisions in response to
local input the Town Planning Board has recommended to the Town
Board that they adopt this amendment.

    The basic intent of the proposal is to balance the traffic-carrying
capacity of Central Avenue with future development, a highly desir-
able policy.  Although there are aspects of the proposed zone that
would benefit by further refinements, we would recommend its adoption
at this time.

    A copy of the County Planning Board's findings and recommendations is
attachef for your information*

    * On file in the Town Clerk's Office.

    There being no one else who wished to speak, *Councilman Marasco moved
to close the hearing.*
    *Supervisor Veteran seconded.*
    *Roll Call: Councilwoman Bronz*        *VOTING*      *AYE*
                *Councilman Marasco*       *VOTING*      *AYE*
                *Councilman Bender*         *VOTING*      *AYE*
                *Councilwoman Rosen*       *VOTING*      *AYE*
                *Supervisor Veteran*        *VOTING*      *AYE*

    *All voting aye, nays none, motion adopted.*

RECESS

    Supervisor Veteran read the following resolution into the record and
moved for its adoption:

    *WHEREAS, the Town of Greenburgh has recognized that the
existing zoning in the vicinity of Central Avenue in the Town of
Greenburgh has caused and will, if unchanged, continue to cause
significant adverse impacts in regard to traffic, economic,
environmental and other factors which are detrimental to the
interests of all property owners in the vicinity of Central
Park Avenue as well as all residents of the Town, and*

    *WHEREAS, the Town Planning Departemnt in conjunction
with the services of an outside consulting firm, namely Raymond,
Parish, Pine & Weiner has heretofore developed a Comprehensive
Development Plan for the Central Avenue Corridor, and*

    *WHEREAS, a series of public discussions have heretofore
been held on said Comprehensive Development Plan with residents,
developers and other property owners within the Town of Greenburgh,
and*

    *WHEREAS, in furtherance of the recommendations of the
Comprehensive Development Plan for the Central Avenue Corridor, a
Comprehensive Amendment has been proposed to the Zoning Ordinance
of the Town of Greenburgh which would establish a Central Avenue
Mixed Use Impact Zoning District within the Town of Greenburgh
and along the Central Avenue Corridor as defined on a proposed
map of the area which is proposed to be adopted as part of the
Zoning Ordinance, and*

PUBLIC HEARINGS CON'T.
PROPOSED CENTRAL AVENUE MIXED USE IMPACT ZONING DISTRICT CON'T.

WHEREAS, such proposed amendment to the Zoning Ordinance of the Town of Greenburgh and accompanying map has heretofore been referred to the Planning Board of the Town of Greenburgh pursuant to §65-14 of the Zoning Ordinance of the Town of Greenburgh, and

WHEREAS, the Planning Board of the Town of Greenburgh, after public discussion and on or about March 2nd, 1978 recommended approval of the proposed amendment to the Zoning Ordinance which would create a Central Avenue Mixed Use Impact Zoning District, and

WHEREAS, pursuant to public notice and pursuant to all legal requirements, a public hearing was held before the Town Board of the Town of Greenburgh on the 24th day of May, 1978 at 8:15 P.M. at Greenburgh Town Hall in regard to the proposed amendment to the Zoning Ordinance and map of the Town of Greenburgh in regard to the proposed adoption of §65-42.3 of the Zoning Ordinance of the Town of Greenburgh entitled "Central Avenue Mixed Use Impact (CA) District" and accompanying map indicating the boundaries of such proposed District and all persons having had an opportunity to be heard, and

WHEREAS, the Town Board having determined that the adoption of such Zoning amendment and district boundary map would be in the interests of the Town of Greenburgh

IT IS RESOLVED, that the Zoning Ordinance of the Town of Greenburgh is hereby amended by the adoption of a new section of the Zoning Ordinance of the Town of Greenburgh, namely §65-42.3, to be entitled "Central Avenue Mixed Use Impact (CA) District"; by the adoption of a map designating the boundaries of said District and with amendment as read earlier regarding non-conforming uses (Sec. H (2)(9),

AND IT IS FURTHER RESOLVED that the minutes of the Planning Board's public discussion held on March 2nd, 1978 and its findings and recommendations dated March 19, 1978 are incorporated and become a part hereof,

AND IT IS FURTHER RESOLVED that the amendment of such Zoning Ordinance, the adoption of the map accompanying such Ordinance and the amendment regarding non-conforming uses shall take effect immediately,

AND IT IS FURTHER RESOLVED that the Town Clerk be directed to publish and post the amendment as required by law.

Councilman Marasco seconded.
Roll Call:

| | | |
|---|---|---|
| Councilwoman Bronz | VOTING | AYE |
| Councilman Marasco | VOTING | AYE |
| Councilman Bender | VOTING | AYE |
| Councilwoman Rosen | VOTING | AYE |
| Supervisor Veteran | VOTING | AYE |

All voting aye, nays none, resolution adopted.

Supervisor Veteran -- Some very valid suggestions for changes have been made tonight and we will take them into consideration. This law is not written in stone and we can amend it if need be. We will do what we believe is in the best interests of the whole community.

PUBLIC HEARINGS CON'T.
PROPOSED TRANSFER OF SPECIAL PERMITS AUTHORITY FROM ZONING BOARD TO
PLANNING BOARD FOR CENTRAL AVENUE IMPACT DISTRICT

Town Clerk O'Connor read the notice of public hearing as published
May 11, 1978 in the Record of Greenburgh and duly posted:

LEGAL NOTICE

PLEASE TAKE NOTICE that the Town Board of the Town of
Greenburgh will hold a Public Meeting at its Meeting Room,
Town Hall, Tarrytown and Knollwood Roads, Elmsford, New York
at 8:15 P.M., Wednesday, May 24, 1978. At such meeting
a public hearing will be held to discuss an amendment to section
65-11C of the Zoning Ordinance to place issuance of Special
Permits for the Central Avenue (CA) Mixed Use Impact Zone under
the Planning Board rather than the Zoning Board of Appeals.

All persons interested in the subject thereof are invited to
attend and be heard at such hearing.

BY ORDER OF THE TOWN BOARD
OF THE TOWN OF GREENBURGH

MICHAEL W. O'CONNOR
TOWN CLERK

Supervisor Veteran asked if anyone wished to speak.

There being no one wishing to speak, *Councilman Marasco moved that
the public hearing be closed.*
*Supervisor Veteran seconded.*
*Roll Call:  Councilwoman Bronz*        VOTING        AYE
*Councilman Marasco*        VOTING        AYE
*Councilman Bender*        VOTING        AYE
*Councilwoman Rosen*        VOTING        AYE
*Supervisor Veteran*        VOTING        AYE

*All voting aye, nays none, motion adopted.*

Supervisor Veteran read the following resolution into the record and
moved for its adoption:

*WHEREAS, in conjunction with the adoption of the
amendment to the Zoning Ordinance of the Town of Greenburgh
providing for the creation of the Central Avenue Mixed Use
Impact (CA) District, it is necessary to amend §65-11(c) of the
Zoning Ordinance in regard to granting special permit authority
to the Planning Board for special permit uses within the Central
Avenue Mixed Use Impact (CA) District, and*

*WHEREAS, pursuant thereto, the Town Board has
referred to the Planning Board a proposed amendment to
S65-11(c) of the Zoning Ordinance in regard to the issuance
of special permits within the CA District, and*

*WHEREAS, the Planning Board on or about May 17, 1978
has recommended the adoption of said amendment to the Zoning
Ordinance, and*

*WHEREAS, pursuant to public notice, a public hearing
was held by said Town Board of the Town of Greenburgh on
May 24, 1978 at 8:15 P.M. in regard to a proposed amendment
to S65-11(c) of the Zoning Ordinance of the Town of Greenburgh
relating to the authority for granting special permits on uses
requiring such special permit within the Central Avenue Mixed
Use Impact (CA) District and all persons having had an opportunity
to be heard,*

5-24-78
53

PUBLIC HEARINGS CON'T.
PROPOSED TRANSFER OF SPECIAL PERMITS AUTHORITY FROM ZONING BOARD TO
PLANNING BOARD FOR CENTRAL AVENUE IMPACT DISTRICT CON'T.

IT IS RESOLVED that §65-11(c) of the Zoning Ordinance
of the Town of Greenburgh is amended by the addition of the follow-
ing language to said section:

"This section shall not apply to special permit uses
in the Central Avenue Mixed Use Impact (CA) District.
Such special permits may only be issued by the
Planning Board pursuant to the terms and conditions
set forth in Sections 65-42.3B(5) and G."

AND IT IS FURTHER RESOLVED, that such amendment
shall take effect immediately.

Councilwoman Rosen seconded.
Roll Call:    Councilwoman Bronz          VOTING      AYE
              Councilman Marasco          VOTING      AYE
              Councilman Bender           VOTING      AYE
              Councilwoman Rosen          VOTING      AYE
              Supervisor Veteran          VOTING      AYE

All voting aye, nays none, resolution adopted.


## ASSESSMENT ROLL OF LONGVIEW SEWER DISTRICT

Town Clerk O'Connor read the notice of public hearing as published
May 11, 1978 in the Scarsdale Inquirer and duly posted:

NOTICE OF MEETING TO HEAR OBJECTIONS TO ASSESSMENT FOR IMPROVEMENT

TAKE NOTICE that the Town Board of the Town of Greenburgh,
Westchester County, New York, has completed its assessment roll
for and in connection with the construction of general sewers
in and for the Longview Sewer District of said Town of Greenburgh;
that the same was filed with the Town Clerk of said Town of Greenburgh
on the 5th day of May, 1978, and that the Town Board will meet at the
Town Hall, Tarrytown and Knollwood Roads, Elmsford, at 8:15 P.M.,
Wednesday, May 24, 1978, for the purpose of hearing and considering
any objections which may be made to the said assessment roll.

BY ORDER OF THE TOWN BOARD
OF THE TOWN OF GREENBURGH

MICHAEL W. O'CONNOR
TOWN CLERK

Town Clerk O'Connor mentioned that letters had been sent to
all property owners in the sewer district.

Supervisor Veteran asked if anyone wished to speak in reference
to the assessment roll.

Samuel Schorr, 15 Kaatskill Place -- What is the assessment?

Supervisor Veteran -- $320,000.00 or $5,000.00 per lot.

Mr. Schorr -- I am against this monetarily but more than that it
has become a political issue. This project was started by the Russo
Administration, they appointed the lawyer, but did not use the utmost
efforts to get federal money. They never applied for the eighty percent
funding that other sewer districts enjoy.

# EXHIBIT 2

# GARY SPILATRO, R.A.

September 6, 2005

Rick Troy
620 5th Avenue
3rd Floor
New York, NY 10020
V (212) 632-8397
F (212) 632-8399

## RE: 1 Dromore Road, Scarsdale, NY 10538

Zoning Analysis

Vol 8
Sheet 37B
Section 31
Block: 1692
Los: 14A, 70A, 70B & 70C

I reviewed the zoning map (24"x36" sheet, revised 2000), the "Map" for this Property and the survey of the property dated November 14, 1952, redated November 29, 1963 and updated by inspection dated July 8, 2004. The survey was prepared by Municipal Data Services and certified to by First American Title Company. Based on the survey the lot area is 101,930.4 square feet ("sf") *i.e.* 2.37 acres. There is an existing single family home on the property which is designated to be removed for purposes of this analysis. The proposed development is for residential use.

The property is zoned CA1 per 24x36 Sheet, revised 2000. Residential uses are permitted. The zoning permits a maximum of 35 bedrooms per acre as-of-right for residential use. As the lot contains 2.37 acres the calculation is 35 bedrooms multiplied by 2.37 = 82 permitted bedrooms as of right. Pursuant to the zoning code, each one bedroom apartment must have an area of at least 750 square feet. Accordingly, a total of 61,500sf can be constructed as residential housing. Parking is required for each of the units. The constructed building may be a maximum of four stories not to exceed 48 feet. 150sf must left as open space per dwelling unit and lot coverage may not be greater than 60% of the site. One potential development which would satisfy the aforesaid parking requirement, height restriction, open space requirement and coverage restriction would be as follows:

---

GARY SPILATRO, R.A.

Cellar:        Mechanicals
1st Floor:     15,000 ft
2nd Floor:     15,000 ft
3rd Floor:     15,000 ft
4th Floor:     15,000ft

Total:  82 apartments, 60,000 sf net saleable/rentable can be
        built in compliance with as-of-right zoning
        requirements.

Gary Spilatro R.A.

# EXHIBIT 3

RESEARCH
VALUATION
COUNSELING
LITIGATION SUPPORT
GLOBAL REAL ESTATE

22 September 2005

John Loveless, Esq.
Huff Wilkes LLP
200 White Plains Road
Suite 510
Tarrytown, New York 10591

**RE:    1 Dromore Road
Town of Greenburgh
Scarsdale, New York 10583**

Dear Mr. Loveless:

In accordance with your request, we recently prepared a limited appraisal of the market value of the fee simple interest in 1 Dromore Road in Scarsdale, Town of Greenburgh, New York as of September 1, 2005. The subject property consists of three adjacent parcels identified on the tax maps of the Town of Greenburgh as being within Section 31, Sheet 37B, Block 1692. In our report, we estimated the market value of a fee simple interest in the subject property to be $10,200,000 as of September 1, 2005. This letter should only be relied upon by someone familiar with our appraisal as of September 1, 2005.

We were subsequently asked to estimate the market value of the fee simple interest in the same property as of November 1, 2004. Based upon our investigation and analysis, and subject to all limiting conditions and assumptions contained in our appraisal report as of September 1, 2005, it is our opinion that the market value of the fee simple interest in 1 Dromore Road, New York, New York, as of November 1, 2004 was $9,100,000.

Howard C. Gelbtuch, MAI, CRE, FRICS inspected the subject property on August 28, 2005. Howard C. Gelbtuch, MAI, CRE, FRICS is a Certified General Real Estate Appraiser in the State of New York.

Please feel free to call with any questions or comments.

Very truly yours,
**GREENWICH REALTY ADVISORS, INCORPORATED**

Howard C. Gelbtuch, MAI, CRE, FRICS
Principal

**greenwich realty advisors**
INCORPORATED

RESEARCH
VALUATION
COUNSELING
LITIGATION SUPPORT
GLOBAL REAL ESTATE

22 September 2005

John Loveless, Esq.
Huff Wilkes LLP
200 White Plains Road
Suite 510
Tarrytown, New York 10591

RE:    **1 Dromore Road**
        **Town of Greenburgh**
        **Scarsdale, New York 10583**

Dear Mr. Loveless:

In accordance with your request, we have prepared a limited appraisal of the market value of the fee simple interest in 1 Dromore Road in Scarsdale, Town of Greenburgh, New York as of September 1, 2005. The results of our appraisal are presented here in this summary report format. Additional information supporting our opinions and conclusions has been retained in our work files.

The subject property consists of three adjacent parcels identified on the tax maps of the Town of Greenburgh as being within Section 31, Sheet 37B, Block 1692, as summarized below.

| Lot | Parcel | Street Address | Land Area | Improvements |
|-----|--------|----------------|-----------|--------------|
| 14A | 8518800 | 1 Dromore Road | 69,260 SF | One-family residence |
| 70A | 8518875 | Dromore Road | 8,712 SF | Pool |
| 70B-70C | 8518900 | Rear of Dromore Road | 24,088 SF | Vacant land |
| **Total** | | | **102,060 SF\*** **(2.34 acres)** | |

\*      101,930 square feet per survey.

Howard C. Gelbtuch, MAI, CRE, FRICS inspected the subject property on August 28, 2005. Howard C. Gelbtuch, MAI, CRE, FRICS is a Certified General Real Estate Appraiser in the State of New York.

Huff Wilkes LLP
22 September 2005
Page  - 2 -

**RE:  1 Dromore Road**
     **Town of Greenburgh**
     **Scarsdale, New York 10583**

---

## Market Value Definition

Market value can be defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.  buyer and seller are typically motivated;

2.  both parties are well informed or well advised, and acting in what they consider their best interests;

3.  a reasonable time is allowed for exposure in the open market;

4.  payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and

5.  the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[1]

## Legal Interest Appraised

A fee simple interest is herein defined as:

> Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.[2]

---

[1]    Appraisal Standards for Federally Related Transactions, Federal Register, Vol. 55, No. 163, August 22, 1990, Pages 34228 and 34229.

[2]    The Dictionary of Real Estate Appraisal, Fourth Edition, 2002, Appraisal Institute, Chicago, page 113.

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 3 -

**RE:  1 Dromore Road**
      **Town of Greenburgh**
      **Scarsdale, New York 10583**

_____

## History of the Subject Property

According to our review of public records, there have been no arm's length transfers of the subject property during the three years preceding our valuation date.  Further to our review, the subject property was the subject of an Operating Agreement dated August 27, 2004.  In addition, we understand that the subject property was not under current agreement or option for sale, nor offered for sale on the open market on the valuation date.

## Physical Description

Located on a tree-lined country road just east of Central Park Avenue (State Route 100), the subject property is ideally situated in a quiet country-like setting, yet with easy access to the commercial activity of nearby Central Avenue as well as to the Bronx River and Sprain Brook parkways, along with Interstate 287.  The grounds of the 100+ year old Scarsdale Golf Club are to the north, and the highly-rated Edgemont High School is to the south.  Immediately to the west is the Scarsdale Woods condominium development, built in two phases of approximately 107 units each, with frontage on both Dromore Road and Central Park Avenue.

The improvements to the subject site, a wood frame, two-story and partial basement single family dwelling totaling approximately 3,200 square feet plus an attached garage, were originally constructed prior to 1900, and have been periodically upgraded over the years.  A 45 X 20 foot swimming pool is located at the rear of the dwelling.

A single-family dwelling in an area zoned for commercial or multifamily use, the current improvements do not represent the highest and best use of the site.

Greenwich Realty Advisors, Incorporated



Huff Wilkes LLP
22 September 2005
Page - 5 -

RE: 1 Dromore Road
    Town of Greenburgh
    Scarsdale, New York 10583

_____

## Assessed Value and Real Estate Taxes

The subject property is identified on the tax rolls of the Town of Greenburgh as Section 31, Sheet 37B, Block 1692, Lots 14A, 70A, and 70B-70C, or as Account numbers 8518800, 8518875, and 8518900, respectively. A summary of the property's assessed value and real estate taxes due is presented below.

### 1 DROMORE ROAD, SCARSDALE, NEW YORK, 2005 REAL ESTATE ASSESSMENT DATA

| Lot Number | Land Assessment | Building Assessment | Total Assessment |
|---|---|---|---|
| 14A | $6,800 | $22,600 | $29,400 |
| 70A | $1,550 | $2,500 | $4,050 |
| 70B-70C | $3,600 | $0 | $3,600 |
| Total | $11,950 | $25,100 | $37,050 |

Source: Compiled by Greenwich Realty Advisors, Incorporated from various sources

### 1 DROMORE ROAD, SCARSDALE, NEW YORK, 2005 REAL ESTATE TAXES

| Tax District/Parcel | 14A | 70A | 70B-70C | Total |
|---|---|---|---|---|
| Westchester County | $2608.28 | $359.30 | $319.38 | $3286.96 |
| Town Tax | $3551.47 | $489.23 | $434.87 | $4475.57 |
| Greenville Sewer District | $7.38 | $1.02 | $0.90 | $9.30 |
| Greenville Fire District | $2318.63 | $319.40 | $283.91 | $2921.94 |
| Bronx Sewer District | $304.41 | $41.93 | $37.27 | $383.61 |
| County Refuse District | $316.73 | $43.63 | $38.78 | $399.14 |
| Con. Maint. SW District 1 | $61.06 | $8.41 | $7.48 | $76.95 |
| Edgemont UFSD #6 | $13,683.62 | $1885.00 | $1675.54 | $17,244.16 |
| Total Taxes | $22,851.58 | $3147.92 | $2798.13 | $28,797.63 |

Source: Compiled by Greenwich Realty Advisors, Incorporated from various sources

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 6 -

**RE: 1 Dromore Road**
      **Town of Greenburgh**
      **Scarsdale, New York 10583**

---

## Zoning

The subject property is currently located within an area zoned CA, Central Avenue Mixed-Use Impact District.  Excerpting from the Code and Zoning Ordinance of the Town of Greenburgh:

> The principal intent of the Central Avenue Mixed-Use Impact (CA) District is to relate the maximum density of development permitted for the Central Avenue Corridor as a whole to the present traffic-carrying capacity of the road and its intersections as well as to future improvements which will increase the traffic-carrying capacity (including allowances for existing traffic, traffic generated from new development and other traffic affecting the Central Avenue Corridor) as well as to economic, environmental and other impact factors.

> The intent of the Central Avenue Mixed-Use Impact (CA) District is also to permit flexibility in the design and development of individual sites so that a mixture of various compatible types of land uses can be developed as multiple use developments at the discretion of the individual property owner.  Thus, the external traffic impacts will be thereby reduced and, therefore, an adjustment is made in the maximum intensity of development to account for this reduced impact.

Representative principal permitted uses include:

**Office buildings** for business, governmental and professional uses;
**Stores** for the retail sale of consumer merchandise;
**Multifamily developments** of not more than four stories in height;
**Museums, libraries, art galleries, churches.**

Uses requiring a special permit include:

Freestanding **funeral homes** or **animal hospitals;**
Fully enclosed **quick-service or fast-food establishments;**
Fully enclosed **restaurant or cabaret use.**

Minimum lot and bulk requirements for a lot of 50,000 square feet or larger include a front yard of 80 feet; side yards of 40 feet; and a rear yard of 50 feet.

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 7 -

**RE: 1 Dromore Road**
 **Town of Greenburgh**
 **Scarsdale, New York 10583**

---

Further to the Code and Zoning Ordinance of the Town of Greenburgh:

> Any use not specifically set forth as a permitted use herein is prohibited.

> Any nonconforming building shall not be enlarged beyond the exterior walls of said building or in any other manner that would increase said nonconformance.

Thus, the subject property, as improved, is a legal non-conforming use.

## Highest and Best Use

The market value of the subject property is a function of its highest and best use. Highest and best use is defined as follows:

The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and results in the highest value. [3]

In estimating highest and best use, there are essentially four stages of analysis:

1. Possible Use - Uses to which it is physically possible to put the site in question.
2. Permissible (Legal) Use - Uses permitted by zoning and deed restriction on the site in question.
3. Feasible Use - Possible and permissible uses which produce a net return to the owner of the site.
4. Highest and Best Use - Among the feasible uses, that use which will produce the highest net return or highest present worth.

Highest and best use is analyzed for the land as though vacant and available for development, and for the property, as presently improved. The subject property does not make maximum use of the site.

---

[3]    The Dictionary of Real Estate Appraisal, Fourth Edition, 2002, Appraisal Institute, Chicago, p.135.

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 8 -

**RE:  1 Dromore Road**
      **Town of Greenburgh**
      **Scarsdale, New York 10583**

---

In making this determination, we relied, in part, upon a zoning analysis dated September 6, 2005 prepared by Gary Spilatro, R.A. His report states in part:

> The property is zoned CA1 per 24X36 Sheet, revised 2000. Residential uses are permitted. The zoning permits a maximum of 35 bedrooms per acre as-of-right for residential use. As the lot contains 2.37 acres, the calculation is 35 bedrooms multiplied by 2.37 = 82 permitted bedrooms as of right. Pursuant to the zoning code, each one bedroom apartment must have an area of at least 750 square feet. Accordingly, a total of 61,500 square feet can be constructed as residential housing. Parking is required for each of the units. The constructed building may be a maximum of four stories not to exceed 48 feet. 150 square feet must be left as open space per dwelling unit and lot coverage may not be greater than 60% of the site. One potential development which would satisfy the aforesaid parking requirement, height restriction, open space requirement, and coverage restriction would be as follows:

| | |
|---|---|
| Cellar: | mechanicals |
| 1st Floor | 15,000 square feet |
| 2nd Floor | 15,000 square feet |
| 3rd Floor | 15,000 square feet |
| 4th Floor | 15,000 square feet |

We note that while 82 units is the *maximum* number of allowable bedrooms, 61,500 square feet is the *minimum* amount of building area required to be developed. In light of the strength of the New York-area housing market, we would suggest slightly larger units of 1,000 square feet each. Construction of 82, 1,000 square foot units would result in an aggregate area of 82,000 square feet, and can be constructed within a four-story building having floorplates of 20,500 square feet per floor.

The highest and best use of the subject property, as vacant, is for residential condominium use.

As the current improvements do not contribute to value, i.e., the subject property is worth more vacant than improved, the highest and best use of the subject property, as improved, is to demolish the existing single-family house and replace it with a residential condominium building that makes maximum use of the site.

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 9 -

**RE:  1 Dromore Road**
     **Town of Greenburgh**
     **Scarsdale, New York 10583**

---

## Sales Comparison Approach

The subject property was valued using the **Sales Comparison Approach,** which is used to estimate the value of real property by comparing recent sales of similar properties in the surrounding or competing areas to the subject.

> The Sales Comparison Approach may be used to value improved properties, vacant land, or land being considered as though vacant; it is the most common and preferred method of land valuation when an adequate supply of comparable sales are available.[4]

Five sales and four current listings of comparable properties were selected as being relevant to our analysis, as presented in the table on the next page.  All of the comparables were deemed similar to the subject property.

---

[4]    The Dictionary of Real Estate Appraisal, Fourth Edition, 2002, Appraisal Institute, Chicago, p.255.

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 10 -

**RE: 1 Dromore Road**
   **Town of Greenburgh**
   **Scarsdale, New York 10583**

## COMPARABLE MULTIFAMILY LAND SALES

| No. | Date | Address | Location | Land Size | Units | Sale Price | Price PSF of Land | Price per Unit |
|---|---|---|---|---|---|---|---|---|
| 1. | 06/04 | 1100 Adams St. | Hoboken, NJ | 50,094 SF | 166 | $3,222,731 | $64 | $19,414 |
| 2. | 12/03 | 118 Church St. | White Plains | 34,412 SF | 106 | $5,500,000 | $160 | $51,887 |
| 3. | 2/03 | 500 Monroe | Belleville, NJ | 8,892 SF | 10 | $750,000 | $84 | $75,000 |
| 4. | 1/03 | 297 Hamilton | White Plains | 110,000 SF | 400 | $15,900,000 | $145 | $39,750 |
| 5. | 1/02 | 187 Erie Street | Jersey City, NJ | 10,000 SF | 16 | $900,000 | $90 | $56,250 |
| L1. | 9/05 | 121 N. High St. | Mt Vernon | 21,780 SF | 7 | $1,200,000 | $55 | $171,428 |
| L2. | 9/05 | 19 Olivia Street | Port Chester | 33,200 SF | 12 | $1,500,000 | $45 | $125,000 |
| L3. | 9/05 | Confidential | White Plains | 12,632 SF | 12 | $1,895,000 | $150 | $157,916 |
| L4 | 9/05 | Confidential | Yonkers | 24,829 SF | 8 | $999,000 | $40 | $124,875 |
| Avg. | | | | 33,982 SF | 82 | $3,540,748 | $93 | $91,280 |
| | | | | | | | | |
| Subj. | 09/05 | | | 101,930 SF | 82 | | | |

Source:  Compiled by Greenwich Realty Advisors, Incorporated from various sources.

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 11 -

**RE:  1 Dromore Road**
     **Town of Greenburgh**
     **Scarsdale, New York 10583**

---

The nine comparables considered averaged approximately $93 per square foot of land area, and approximately $91,000 per unit.

Based upon all of the above, we ascribed a value of $95 per square foot of land area to the subject property.

In addition, we ascribed a per-unit value at the lowest end of the four properties currently listed for sale, or $125,000 per unit.

- 101,930 square feet multiplied by $95 per square foot equals $9,683,350, which we rounded to $9,700,000.

- 82 units multiplied by $125,000 per unit equals $10,250,000, which we rounded to $10,300,000.

- **Value indicated by the Sales Comparison Approach**      **$10,000,000**

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 12 -

RE: **1 Dromore Road**
**Town of Greenburgh**
**Scarsdale, New York 10583**

---

## Land Residual Technique

As an additional check on our valuation, we applied the Land Residual Technique to the subject property. An appraiser first determines what actual or hypothetical improvements represent the highest and best use of the site, in this case, residential condominiums. Then the sales proceeds are estimated, as is the cost of constructing the building. Construction costs are deducted from sale proceeds, and the remainder is attributed to the land. The strength of the Westchester County residential condominium market can be discerned from the data presented in the following table.

### WESTCHESTER COUNTY, NEW YORK CONDOMINIUM SALES

| Year* | Number of Units Sold | Avg. Days on Market | Median Sale Price | Change |
|-------|---------------------|---------------------|-------------------|--------|
| 1996 | 241 | 190 | $159,000 | -- |
| 1997 | 509 | 255 | $162,000 | 1.9% |
| 1998 | 593 | 177 | $163,500 | 0.9% |
| 1999 | 656 | 156 | $162,000 | (0.9%) |
| 2000 | 543 | 125 | $170,000 | 4.9% |
| 2001 | 518 | 117 | $216,500 | 27.4% |
| 2002 | 543 | 114 | $254,000 | 17.3% |
| 2003 | 575 | 114 | $288,000 | 13.4% |
| 2004 | 772 | 118 | $308,000 | 6.9% |
| 2005 | 621 | 115 | $355,000 | 15.3% |

\*      Six-month periods from January to June.

Source: Compiled by Greenwich Realty Advisors Incorporated from data compiled by the Westchester/Putnam County Multiple Listing Service.

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 13 -

**RE: 1 Dromore Road**
     **Town of Greenburgh**
     **Scarsdale, New York 10583**

---

The application of the Land Residual Technique valuation of the subject property is summarized in tabular form below. In light of the new construction of the subject property and the strength of the local market (as evidenced by the rapid price appreciation of residential condominiums in Westchester County, we believe it is reasonable to assume a sale of the units at a modest ten percent premium to the 2005 median sale price.

**LAND RESIDUAL TECHNIQUE**

| Item | Derivation | Amount |
|------|-----------|--------|
| Potential Revenue from Sale of the Units as Condominiums | 82,000 SF @ $390 PSF Or: 82 Units of 1,000 SF @ $390,000 | $32,000,000 |
| Less: Construction Costs | 82,000 SF @ $200 PSF of NRA | $16,400,000 |
| Add: Entrepreneurial Profit | 20% of Total Construction Cost | $5,300,000 |
| Total Project Cost | | $21,700,000 |
| Attributable to Land | | $10,300,000 |

Source: Compiled by Greenwich Realty Advisors, Incorporated

- **Value indicated by the Land Residual Technique**       **$10,300,000**

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 14 -

**RE:  1 Dromore Road**
    **Town of Greenburgh**
    **Scarsdale, New York 10583**

---

## Reconciliation and Final Value Conclusion

The subject property was valued using two approaches to value.

- **Sales Comparison Approach**                    $10,000,000
- **Land Residual Technique**                       $10,300,000

Based upon our investigation and analysis, and subject to all limiting conditions and assumptions contained in this summary appraisal report, it is our opinion that the market value of the fee simple interest in 1 Dromore Road, New York, New York, as of September 1, 2005 is:

<div align="center">

US$ 10,200,000

**TEN MILLION TWO HUNDRED THOUSAND U.S. DOLLARS**

</div>

Please feel free to call with any questions or comments.

Very truly yours,
**GREENWICH REALTY ADVISORS, INCORPORATED**

Howard C. Gelbtuch, MAI, CRE, FRICS
Principal

Huff Wilkes LLP
22 September 2005
Page - 15 -

RE:  1 Dromore Road
     Town of Greenburgh
     Scarsdale, New York 10583

_____

## Assumptions and Limiting Conditions

This appraisal report has been made subject to the following general assumptions and limiting conditions:

1.   No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations.  Title to the property is assumed to be good and marketable unless otherwise stated.

2.   The property is appraised free and clear of any and all liens or encumbrances unless otherwise stated.

3.   Responsible ownership and competent property management are assumed.

4.   The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

5.   All engineering studies are assumed to be correct.  The plot plans and illustrative material in this report are included only to help the reader visualize the property.

6.   It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable.  No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.

7.   It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and considered in the appraisal report.

8.   It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a non-conformity has been identified, described, and considered in the appraisal report.

9.   It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use upon which the value estimate contained in this report is based.

10.  It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 16 -

RE:  **1 Dromore Road**
     **Town of Greenburgh**
     **Scarsdale, New York 10583**

---

## Assumptions and Limiting Conditions {continued}

11.  Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser.  We have assumed that the property does not contain potentially hazardous or toxic materials which may have been used in the construction or maintenance of the improvements, or may be located at or about the property.  These materials, such as formaldehyde foam insulation, asbestos insulation, and other potentially hazardous materials, may adversely affect the value of the property.  The appraisers are not qualified to detect such substances.

12.  Any allocation of the total value estimated in this report between land and improvements applies only under the stated program of utilization.  The separate values allocated to the land and buildings, if any, must not be used in conjunction with any other appraisal and are invalid if so used.

13.  Possession of this report, or a copy thereof, does not carry with it the right of publication.

14.  The appraiser, by reason of this appraisal, is not required to give further consultation or testimony or to be in attendance in court with reference to the property in question unless arrangements have been previously made.

15.  Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraiser.

16.  The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether it is in conformity with the various detailed requirements of the ADA.  Unless otherwise stated in this appraisal, we assume that the subject property complies with the requirements of the Americans with Disabilities Act.  Failure to comply with the requirements of the ADA may adversely affect the value of the property.

17.  This report was prepared in accordance with the Appraisal Institute's Standards of Professional Practice and Code of Professional Ethics, and the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation as outlined within Title XI of FIRREA.

Greenwich Realty Advisors, Incorporated

Huff Wilkes LLP
22 September 2005
Page - 17 -

**RE:  1 Dromore Road**
     **Town of Greenburgh**
     **Scarsdale, New York 10583**

---

## Certification

We certify that, to the best of our knowledge and belief:

- The statements of facts contained in this consulting report and used in the consulting process are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal unbiased professional analyses, opinions, and conclusions.

- We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

- Our compensation is not contingent upon an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this consulting report.

- Our analyses, opinions, and conclusions were developed, and this report has been prepared, in accordance with the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute, and in conformity with the Uniform Standards of Professional Appraisal Practice.

- The use of the report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, Howard C. Gelbtuch, MAI, CRE, has completed the requirements under the continuing education program of the Appraisal Institute.

- Howard C. Gelbtuch, MAI, CRE inspected the subject property on August 28, 2005. The date of value is September 1, 2005.

- No one provided significant professional assistance to the person signing this report.

Howard C. Gelbtuch, MAI, CRE, FRICS
Principal

Greenwich Realty Advisors, Incorporated

# EXHIBIT 4

# SULLIVAN ARCHITECTURE, PC

ARCHITECTURE

SITE PLANNING

URBAN DESIGN

October 18, 2006

Mr. Howard Gelbtuch
Greenwich Realty Advisors, Inc.
136 East 57th Street
New York, New York 10022

Re:    62 Dromore Road
       Scarsdale, New York ("the Property")

Dear Mr. Gelbtuch:

Based upon our review of the Town of Greenburgh zoning ordinance we are confirming that the above referenced property is located in a C.A. zone. This zone permits a multi-family development on the Property of a maximum of 75 bedrooms.

As a design is further advanced and a review of the property is undertaken by the Town a final unit and bedroom count will be established.

Sincerely,

John P. Sullivan, FAIA

cc: Steve and Rick Troy

31 Mamaroneck Avenue
White Plains, New York 10601
(914) 761-6006 Fax: (914) 761-4919
E-mail: jpsfaia@sullivanarch.com
www.sullivanarch.com

# EXHIBIT 5

**anonymous said...**

I certainly agree that this matter is reactionary because Feiner is seen as not being particularly pro-Edgemont. Also, his announcement about the potential plan is, as usual, unprofessional.

HOWEVER, let's move ahead with this idea. Seat-of-the-pants management and politics aside, it is a wise idea for the town to acquire this land.

12/16/2006 3:00 PM

**paul feiner said...**



I believe that I am being criticized unfairly for publicizing the effort to acquire the property. I received a number of calls from representatives of the Nature Center prior to my announcement of this effort. I was specifically asked to include the acquisition of the property in my 2007 goals by the nature center. The goals are announced publicly. In fact, I post the goals in progress on our town web site in December - before the goals are officially announced. In addition, an e mail I received from Bill Lawyer, executive director of the Nature Center, said that "we need to organize a campaign to acquire this property for preservation as open space." One can't organize a campaign in secret. Every open space acquisition that the town has been involved in since I have been Supervisor (more than 400 acres of open space out of our 600 acres of open space) succeeded because of public support and involvement. It would be wrong for the Town Board to finalize plans for the acquisition before we find out if the public supports the initiative. I do not believe in closed government. Before we spend a substantial amount of tax dollars on any open space acquisition - it's crucial to discuss the reasons with the public and answer questions. I believe that the approach I am taking will enhance our chances of acquiring this property. I have been in contact with Edgemont leaders - supporters and critics - about this initiative and am very pleased with the response that we are

getting.

12/16/2006 4:54 PM

**anonymous said...**

There's no question that the acquisition of this land is important to Edgemont. No Edgemont leader would disagree with that. It sits right behind the Scarsdale Woods condos, it's zoned for multi-dwelling residential development, and its development could be just as harmful to Edgemont as the development of Taxter Ridge would have been to Irvington.

But Feiner's PR campaign seems awfully misguided. He says he's doing it for the Nature Center, but the property does not really adjoin the Nature Center grounds, and is not really part of what anyone would ever think of as Nature Center woods. And Feiner doesn't deny that the Nature Center board has apparently not even met to discuss the matter. All he points to is an e-mail he got from the Nature Center's director, and some unspecified phone calls he claims to have gotten, all of which sounds ad hoc and seat of the pants.

He also defends his PR effort as necessary to galvanize public support. But at this point, no one even knows whether the property is for sale. So Feiner's PR effort, besides apparently annoying the hell out of Edgemont's leaders, is also calculated to raise public hopes without any expectation that he could deliver.

Feiner also says his PR is part of "open government." That's nonsense. Full disclosure is required when a municipality is about to spend public money and there's at least a proposal on the table for the public to evaluate. Here, when all that's being considered is the idea of acquiring certain property that may or may not be for sale, Feiner's full bore PR can only be music to the developer's ears.

# EXHIBIT 6

# Town of Greenburgh

http://www.greenburghny.com/Cit-e-Access/news/index.cfm?NID=6636&TID=10&jump2=0

Print | Close

---

**News & Information**

## GOALS 2007
*Release Date: January 01, 2007*

**GOALS 2007**

Every year, since 1999, Greenburgh Town Supervisor Paul Feiner has released goals at the beginning of the year. He voluntarily places $5000 of his salary in an escrow account. At the end of the year the Town Board evaluates his performance, based on implementation of goals. Feiner returns part of his salary to the taxpayers. On January 1, 2006 the NEW YORK TIMES wrote an editorial. They said the concept of performance base pay "feels right. It respects the voters' desire for accountability in spending and provides a useful reminder of promises made, kept, broken or deferred." Last year Feiner gave back $1,029.41. 79.41% of his 2006 goals were achieved.

### AFFORDABLE HOUSING

1. Appoint members of the Affordable Housing Committee that the Town Board established last year

### ASSESSOR

2. Move the STAR office into the actual Assessment Department in order for better utilization of space

3. Update GIS to facilitate better usage between departments and the public

### ATTORNEY

4. Have all departments utilize standard documentation retention and email retention policy

5. Reduce the use of outside counsel

6. Finalize policy of subdivision by deed

7. Increase fines for construction work without permits

| Current News & Information | |
|---|---|
| **Title** | **(Posted)** |
| Hampshire Management Decision Order | (1-30-07) |
| CUSTOMER SERVICE SUGGESTION TO MAKE SATELLITE LIBRARY MORE ACCESSIBLE | (1-29-07) |
| TOWN WINS COURT DECISION RE: HAMPSHIRE MANAGEMENT | (1-29-07) |
| COMMUTER TRANSPORTATION ALTERNATIVES INFORMATION EVENT | (1-26-07) |
| Library contract update... | (1-26-07) |
| NEED READING AREA AT THE LIBRARY | (1-25-07) |
| SAVE THE DATE: Feb 15th -- meeting with Con Ed to address Con Ed power outages | (1-22-07) |
| SENATOR COUSINS EFFORTS TO SAVE COMMUNITY HOSPITAL AT DOBBS FERRY GENERATING MOMENTUM FOR HOSPITAL | (1-20-07) |
| Town Council statement on comptroller's report | (1-13-07) |
| WestHELP audit report Jan2007.pdf | (1-12-07) |
| 2007 Sanitation Schedule (2MB pdf) | (1-2-07) |
| GOALS 2007 | (1-1-07) |
| Adjustments to 2007 Tentative Budget | (12-12-06) |
| Snow Parking Ordinance Commences Dec. 1st | (11-18-06) |
| Greenburgh forms CERT Team | (4-24-06) |

## BUILDING

8. Scan historic permits into database

9. Post and update court dispositions on website

## CABLE TV

10. Approve franchise agreement with cablevision

## COMMUNITY CENTER OUTREACH

11. Start SAT preparation summer camp for students

12. Initiate at least one new program to prepare young people to meet challenges of adolescence and young adulthood.  Also, initiate a new program for entire family. The program could include family fun night, game night, movie or leisure trips

13. Upgrade internal communications– provide Board with memo indicating how this was done

## COMMUNITY HOSPITAL

14. Save Community Hospital at Dobbs Ferry – work with State lawmakers, hospital administrators & community on plan so hospital will not close down at end of 2007

## COMPTROLLER/FINANCES

15. Conduct an actuarial review to determine the cost of projected post employment benefits, other than pension benefits, as required by the Governmental Accounting Standards Board (GASB) Statement No 45

16. Review policies for computer and Internet usage

17. Approve fund balance policy

**CON ED**

18. Hold meeting with representatives of Con Ed and residents who have experienced frequent power outages. Work with Con Ed to develop proactive measures to help reduce possibility of future outages on streets that have experienced outages.

**COURT**

19. Obtain funding to keep drug court operational

20. Designate additional funds in fund balance for courthouse expansion

**EAST HARTSDALE AVE. PARKING**

21. Improve security at Hartsdale parking – parking garage, pipeline using updated technology

22. Formally appoint committee to review parking needs for East Hartsdale Ave residents. Develop preliminary recommendations as to next steps town should take to address parking

**EMPLOYEE RECOGNITION**

23. Recognize employees of the town who have worked for the town for 20 years, 30 years

**ENERGY CONSERVATION**

24. Approve energy conservation policy for commercial development

25. Hold public educational event about climate change action

26. Hold event on energy efficiency for businesses, focusing on Central Ave. area

27. Develop a clean transportation plan for town vehicles to include expanding the town's use of alternative fuel vehicles in its fleet, diesel emissions reductions and vehicle idling reduction in compliance with applicable statute

28. Implement program to introduce ride sharing and commuter choice options to the public as well as town employees (in order to reduce VMTs, Vehicle Miles Traveled)

**FARMERS MARKET**

29. Increase the number of farmer's participating in the farmer's market on East Hartsdale Avenue

**GREENBURGH NATURE CENTER**

30. Present Town Board with options (including acquisition of property/conservation overlay zones/compromise) to protect Greenburgh Nature Center from development that can have a negative impact on wildlife/habitats/eco system.  Reach out to state/county/private individuals to determine if a partnership can be established regarding possible acquisition of property

**LEAF COLLECTION- PUBLIC WORKS**

31. Provide additional resources to leaf collection – including additional overtime to employees

32. Prepare RFP – investigate use of outside contractors to assist town in collection of leaves

**LIBRARY**

33. DemolishOld Town Hall. Provide public with periodic updates at Town Board meetings. Stay within budget

34. Work with library on satellite library services(East Hartsdale Ave., Greenburgh Nature Center) if requested by library board

35. Present public with quarterly usage reports – indicating how many books taken out of each of the satellite locations

**PARKS**

36. Landscape and improve park: Webb Field –with funds obtained from federal government

37. Build Dog Park,East Rumbrook Park, as part of the Phase II East Rumbrook Park Improvement Project

38. Assist the Cornell Cooperative Extension of Westchester County in developing a children's garden program at the Hart's Brook Park & Preserve

39. Create a new Halloween-Fall Festival special event at the Hart's Brook Park & Preserve that will utilize the facilities to include a hayride, entertainment and games

40. Go out to bid and complete construction of the first phase of for the Travis Hill Park Improvement Project

41. Re-shingle the restroom roofs at the Anthony Veteran Pool complex

42. Complete entrance beautification for Washington Ave. Park

43. Increase shading at the Massaro Park and Anthony Veteran Park Pool complex

44. Finalize trail design and complete the building of trails for the Taxter Ridge Park Preserve

45. Organize and host a local Hershey Track and Field Development meet for Greenburgh residents ages 7-14. This track meet will be held in conjunction with the National Recreation and Park Association. Co-sponsorship will also be sought with other village recreation departments in Greenburgh

46. In addition to the outdoor movie shown at the annual Celebrate Greenburgh Day at Veteran Park, show two other outdoor movies during the summer in other town owned neighborhood parks


**POLICE: CERT TEAM**

47. Assist CERT team with efforts to promote program. Publish color brochures

48. Place a prominent display in the Town Hall lobby encouraging volunteers


**POLICE**

49. Complete procedures for and implementation of a credit card bail program that will expedite the release of defendant from police custody

50. Completion of the federal requirements to make the town compliant with the National Incident Management System (NIMS)

51. Implementation of pilot project using broadband technology to remotely monitor an area where specific offenses have taken place


**PUBLIC WORKS**
52. Install generator at Town Hall

53. Conduct feasibility review: regarding illuminating some signs on key roads.
  Work with state officials to review feasibility of placing illuminated signs on Central Ave, 119 and 9A


**PURCHASING**

54. Prepare an assessment, which shall be retained as a document (3 ring binders) available to management of products and use practices that will reduce or minimize the risks of harmful effects to employees, custodial workers, visitors and other building occupants and to the environment

**QUALITY OF LIFE**
55. Town Board should vote on tree law legislation

56. Present to Town Board proposed abandoned homes legislation

57. Approve moratorium on residential development on Central Avenue

58. Hold public hearing on modified sidewalk policy



59. Hold meeting with federal/state/county officials re: flood control along Bronx River


**RIDGE HILL**

60. Appoint members of Direct Access Task Force – Ridge Hill Committee. . Provide periodic updates to public regarding status of direct access


**TAPPAN ZEE BRIDGE**

61. Select consultant to assist in reviewing TZ bridge options


**TOWN BOARD**

62. All meetings of Town Board should end no later than 11:15 PM, unless there is unanimous consent


**VILLAGES**

63. Appoint Joint Task Force consisting of Ardsley/Greenburgh representatives to determine future of waterwheel property. Develop plans for affordable housing at the site for volunteer firefighters, municipal employees

64. Dispose of property at 27 Main Street, Dobbs Ferry. Work with Dobbs Ferry officials

65. Incorporate recommendations of State Comptroller re: A & B budget. Continue to have dialogue with village/unincorporated leaders regarding A & B budget issues


**WESTHELP**
66. Review state comptroller's opinion, renegotiate agreement with neighborhood so that intent of WESTHELP partnership agreement previously approved by the Town Board can continue

**HISTORIAN**

67. Assist Greenburgh Library in making its local history collection available to the public during its stay as a satellite library at Town Hall. The collection will be located in the town historian's office. New programs and exhibits to be initiated.

68. Participate in on going planning stages of Hudson Fulton Champlain celebration scheduled for 2009. Explore town's role as an original river town.

69. Work to preserve the town's important historical buildings and sites, which have been investigated and compiled in a reconnaissance level historic resource survey.

Copyright © 2007 Town of Greenburgh. All Rights Reserved.

# EXHIBIT 7



# TOWN of GREENBURGH

## Local Law No.   /2007

A local law imposing a moratorium, for an interim period, on the filing, acceptance and/or approval of applications for site plans and subdivision by the Town Board and the Planning Board within the Town of Greenburgh pursuant to New York State Constitution Article IX, Municipal Home Rule Law §§ 10, 20 and 22 and Town Law §§ 261, 264, 265 and 272-a.

**BE IT ENACTED** by the Town Board of the Town of Greenburgh as follows:

Section 1. <u>Title</u>

This local law shall be known as Local Law No. ___/2007, the "Temporary Moratorium on Certain Applications and Approvals within the Central Avenue Mixed Use Impact District in the Town of Greenburgh."

Section 2. <u>Findings, Intent and Purpose</u>

The Town Board of the Town of Greenburgh hereby determines as follows:

(A)    <u>Background.</u>

In 1976, the Town of Greenburgh completed the Comprehensive Development Plan for the Central Avenue Corridor (the "Plan"). Through this planning process The Central Avenue Mixed Use Impact Zoning District was developed. The intent of this zoning concept was to create a match between land uses and the traffic capacity of Central Avenue under a contemplated road plan. Several other important factors were also considered in the development Plan including school services required, general municipal services, typical development per acre, and land values. The concept was not to create a purely retail zone, but to permit a variety of compatible land uses.

Thirty years (30) later, the underlying assumptions and objectives of the Plan and the resultant implementation of the CA-Mixed Use Zoning District need to be revisited. For example, the portion of Central Avenue served by the Edgemont school district now includes 909 apartments in various multifamily dwellings, representing 32% of total residential component of the school district, a 60% increase in the number of residential units from the time the Plan was developed.

In the last fifteen years, the district's enrollment has increased from 1,355 to 1,923, an increase of 42%. This increase in school population has required the need for additional educational facilities not contemplated when the Plan was first developed and the Zoning was enacted.

This increase in school district enrollment has exceeded even the school districts demographic reports prepared in preparation for its capital project to expand their facilities. For example, elementary enrollment, expected to reach a high of 928 in 2003, now stands at 1,005. The situation is similar at the junior-senior high school where class sizes have been growing in all grades, and overcrowding has become an issue.

In 2000, to accommodate a growing student population, the Edgemont School District undertook a capital improvement program which expanded facilities at all three (3) schools. Upon completion, those facilities were immediately at full capacity.

In addition to the increased enrollment, there have been no major roadway infrastructure improvements undertaken since the adoption of the Plan. This, coupled with limited parking and existing road access to the schools, has resulted in significant traffic congestion around the area of the schools during arrival and dismissal times as well as during school events.

Continued jumps in enrollment, such as those generated by multifamily developments where children need to be driven to school, would strain already expanded facilities and further exacerbate the existing burden on roadways both for residents and for emergency vehicles.

The Town is currently in the process of updating its comprehensive plan and revising its zoning code. The Town's consultant has identified Central Avenue as a priority target area.

The Town Board of the Town of Greenburgh hereby determines as follows:

(B)     Findings of Fact.

The Town Board of the Town of Greenburgh ("Town Board") does hereby find that, pending the completion of the necessary hearings and other actions incident to proper consideration and decisions upon the comprehensive master plan and revisions to amendments of the Town Zoning Code and subdivision regulations, appropriate measures must be taken for a reasonable interim period to protect the public interest by preserving the integrity of said comprehensive master plan and potential modifications to the Zoning Code and subdivision regulations. The Town Board also finds that the further review and any approvals of significant development where the comprehensive plan may recommend changes in the

2

existing Zoning Code may destroy the integrity of the comprehensive plan and the amendments' basic purposes, comprehensive aspects and intentions.

Section 3. <u>Scope and Controls</u>

A.     This law shall apply to CA Central Avenue Mixed Use Impact District in the Town of Greenburgh, § 285-29.1.

B.     This moratorium prohibits the filing, acceptance and/or approval of any and all applications for site plan, amended site plan, site plan waiver and subdivision approval and as a result prohibits all variances (use and area), tree permits, building permits, any other permit and/or any development that requires but has not yet received either site plan or subdivision approval.

C.     Notwithstanding the provisions of any other local law or resolution, during the term of this moratorium:

1.     The Town Board shall not accept or approve any document, application or request for site plan approval, amended site plan approval or any other request for approval of development that would require any approval for which this moratorium has been imposed with the exception of applications for the extension of site plan approval when site plan approval has been obtained prior to the effective date of this Local Law and has not expired.

2.     The Planning Board shall not accept or approve any document, application or request for site plan, amended site plan, subdivision or resubdivision approval or any other request for approval of development that would require any approval for which this moratorium has been imposed, with the exception of: (i), applications for final subdivision approval when preliminary subdivision approval has been obtained prior to the effective date of this Local Law and has not expired,  and (ii), applications for the extension of preliminary subdivision approval, and applications for the extension of final subdivision approval, and applications for the extension of site plan approvals when an approval has been obtained prior to the effective date of this Local Law and has not expired.

3.     The Zoning Board of Appeals shall not accept or approve any document, application or request for special permit, variances or for any other request for approval relating to any application that requires any approval referred to in subdivision 3(B)(1) or 3(B)(2) of this Local Law prior to development and such approval was not granted prior to the effective date of this Local Law.

3

4.   Town staff members and officials, including the Building Inspector, Engineer and Commissioner of Community Development and Conservation shall not issue any exemption pursuant to § 285-56 of the Code of the Town of Greenburgh, shall not issue any permit and shall not accept or approve any document, application or request for the issuance of any permits or document for any development that would require any approval referred to in subdivision 3(B)(1) or 3(B)(2) of this Local Law prior to development and such approval was not granted prior to the effective date of this Local Law. Development shall be deemed to require an approval referred to in subdivision 3(B)(1) or 3(B)(2) of this Local Law if such development would require such approval absent an exemption pursuant to § 285-56.

5.   This moratorium shall apply whether or not the application at issue has been filed with the Town and whether or not review of the application has begun. It shall not apply to any application that received an approval referred to in subdivision 3(B)(1) or 3(B)(2) of this Local Law prior to the effective date of this Local Law. Any expiration dates or other deadlines shall be tolled during the period of this moratorium with respect to applications delayed by this moratorium.

D.   All existing, unexpired permits, variances (use and area), special permit, site plan, amended site plan, subdivision or resubdivision applications for construction and/or development of properties, both residential and nonresidential, which have received or been granted preliminary approval by the appropriate board, agency and/or department of the Town of Greenburgh having jurisdiction thereof, prior to the effective date of the moratorium shall, during the pendency of said moratorium, be permitted to continue to proceed with the required approval process and to be considered for approval or denial as if the moratorium had not been enacted.

E.   Nothing contained in this Local Law is intended to preclude the continued review of previously submitted applications or the submission and review of additional documentation or applications related to these applications which were submitted prior to the enactment of this Local Law.  This provision does not permit the issuance of any findings or determination whether or not such finding or determination rises to the level of an approval.

Section 4. Appeals/Variance

Any person, firm or corporation who may be aggrieved by any provision of this local law shall have the right to appeal to the Town Board of the Town of Greenburgh, as follows:

A.    An application shall be submitted in writing setting forth: 1) the reasons for the appeal; 2), the specific hardship suffered by the applicant as a result of the implementation of this local law; 3), the manner in which a variance from the provisions of this local law will benefit the health, safety and welfare of the residents of the Town and 4) evidence that the application if permitted to proceed would not be affected by any legislation relating thereto. The application must contain all materials, including a detailed plan of the development proposed, that would be required for the particular development sought if the application were to be processed in the absence of this moratorium.

B.    Except as otherwise set forth herein, the Town Board shall consider said application pursuant to the pertinent portions of the procedure set forth in the Town Code of the Town of Greenburgh by which the Zoning Board of Appeals hears variance applications (§ 285-49) as soon as practicable after the application is determined to be complete. The fee for an appeal pursuant to this Local Law shall be $150.00. The Town Board shall have authority, in its legislative discretion, to vary or modify the application of any provision of this local law with respect to the applicant upon its determination either i) that such variance or modification is necessary to alleviate the unusual or unnecessary hardship proven by the applicant and that such variance or modification is consistent with the protection of the health, safety and welfare of the residents of the Town, ii) that the applicant has proven that the development for which relief is sought does not have significant impacts on areas in the Central Avenue Mixed Use Impact Zoning District or iii) that the applicant has proven that the development for which relief is sought would not be required to be significantly altered if all the measures discussed in the proposed new Comprehensive Plan were adopted as legislation. In the event the Town Board does not grant an application submitted pursuant to this section within thirty (30) days of receipt, the application shall be deemed denied.

C.    A variance, following approval as outlined in this section, shall expire upon expiration of this Moratorium Law unless an application for development of the subject property has been submitted and determined complete within that time or a longer period of time is granted by the approving agency for cause shown. Any complete applications for development once a variance has been granted shall be submitted and processed as provided in the Code of the Town of Greenburgh for that type of application as if this moratorium had not been enacted.

Section 5. <u>Penalties</u>

Except as herein otherwise expressly provided, any person, firm or corporation, whether as owner, developer, lessee, architect, engineer, contractor or builder, or the agent or employee of any of them, who constructs, erects, demolishes, enlarges or alters any building, structure or site or develops or uses any property in violation of the provisions of this Local Law, or is accessory to said violation and who fails to abate said violation within the time period specified on the violation notice and after written notice has been served upon him or her either by mail or personal service shall be liable to a fine of $1000.00 or imprisonment for a period not to exceed 15 days, or both for each such violation, in addition to any penalty or remedies for enforcement provided for any violation of the Code of the Town of Greenburgh, including the Zoning Law. Each and every day during which such violation of this Local Law exists shall be deemed a separate violation. Nothing herein shall be construed as depriving the town or the Town Board or any official thereof of the right to apply for an injunction to prevent any violation of this chapter or of the right to employ any other available remedy, including an order stopping all work. This Local Law shall be enforced by the Building Inspector of the Town of Greenburgh.

## Section 6. Severability/Validity

In the event any word, section, clause, paragraph, phrase, sentence, part or provision of this Local Law is found invalid, unenforceable or contrary to law by a court of competent jurisdiction, such determination shall not affect the validity of any other part hereof.

## Section 7. Judicial Review

Review of decisions of the Town Board with respect to any portion of this Local Law may be had by a proceeding commenced in Supreme Court of the State of New York, County of Westchester, within thirty (30) days after such determination is filed in the Office of the Town Clerk.

## Section 8. Supercession

All provisions of the law of the State of New and/or any ordinances and Local Laws of the Town of Greenburgh in conflict with the provisions of this Local Law, particularly including Town Law Sections 276(8) added by the laws of 1992, Chapter 727 as amended, 267-a and 267-b, both added by the laws of 1991, Chapter 692 § 3, as amended, are hereby superseded and rendered null and void to the extent necessary to give this Local Law full force and effect.

## Section 9. Effective Date

This local law shall take effect immediately, as provided by law, and shall remain in force for a consecutive period of six (6) months from its effective date, unless extended by local law adopted after public hearing upon no less than ten (10) days' notice published in the official newspaper of the Town.

# EXHIBIT 8

## Post a Comment On: Supervisor Feiner

### "PUBLIC HEARING REQUESTED ON CENTRAL AVE RESIDENTIAL DEVELOPMENT MORATORIUM"

12 Comments - Show Original Post

Collapse comments

**hal samis said...**

Is a "spot" moratorium legal? It would penalize only some of the Town's property owners.

Residential construction on Central Avenue in Hartsdale should not be a concern the Edgemont School District.
Therefore why encumber these owners?

Thus, you are proposing a Hearing for a three mile moratorium along just one roadway?

How long would such a moratorium last? The last moratorium (town-wide) was two years in duration.

These are matters that should influence the wording of the Resolution.

And I presume that what is proposed for January 10 is just a Resolution to hold a Hearing in the future.

1/04/2007 12:28 PM

**paul feiner said...**



I will ask the Town Board on Wednesday to schedule a hearing sometime within the next month.
I had a dept head meeting today. The consensus was that we could have a moratorium but would have to tie it into the districts school capacity- the impact additional residential development have on school infrastructure.

1/04/2007 1:03 PM

### Leave your comment

You can use some HTML tags, such as <b>, <i>, <a>

### Choose an identity

◉ Blogger    ○ Other    ○ Anonymous

USERNAME

PASSWORD

**Switched to the beta?**
Sign in with your Google Account
No *Blogger* account? Sign up here.

[Login and Publish]    [Preview]

*(handwritten)* ← no logic no difference between this area + town should be Town Wide

1. Find the post you wish to comment about, and click the "# comments" link below it.
2. On the next page, under "Choose an identity", click the button indicating "Other."
3. Type your full name into the "Name" box.
4. Type your comment into the provided comment box.
5. Click "Publish your comment."

I hope this tutorial helps everyone out, and makes this blog more popular!

-Marc Herman

posted by Marc Herman @ 1:54 PM                    0 comments

**THURSDAY, JANUARY 04, 2007**

## YOU'LL BE ABLE TO WATCH LENO AND LETTERMAN INSTEAD OF THE TOWN BOARD--MEETINGS OF TOWN BD TO END BY 11:15 pm

I have asked the Town Board to agree to a Board rules change. All meetings of the Town Board should end no later than 11:15 PM, unless there is unanimous consent to extend the time. Public comments should close by 11 PM. Department heads who are currently required to attend all Town Board meetings should be able to leave and go home to their families after 10:45 PM.
When members of the Board vote on important laws - we should all be awake and concentrating.

posted by Paul Feiner @ 2:39 PM                    7 comments

## PUBLIC HEARING REQUESTED ON CENTRAL AVE RESIDENTIAL DEVELOPMENT MORATORIUM

In recent months Edgemont civic associations have requested a moratorium on residential development along the Central Ave corridor. The concern: Residential development will have more of an impact on the school district than commercial development. During a moratorium a study of the Central Ave corridor would take place. At the conclusion of the study a determination would be made whether a zoning change

FACT: WHY COMMON HOUSEHOLD BATTERIES ARE NOT RECYCLED...

LEGISLATOR ABINANTI URGES COUNTY TO ASSIST TOWN PROTECT PROPERTY NEAR NATURE CENTER

LIVE STREAMING OF TOWN BOARD MEETINGS SUGGESTED

ILLUMINATED ROAD SIGNS - does it make sense in Greenburgh?

Senator Andrea Stewart Cousins to be sworn into office at first meeting of the Town Board- January 10th

December: Miscellaneous

### Archives

August 2006

September 2006

October 2006

November 2006

December 2006

January 2007

December 2007



To leave a comment, click "# comments" then follow the directions on the next page.

should be approved.
I believe that the Town Board should schedule a public hearing on this requested moratorium and have placed the item on the agenda for next Wednesday, January 10th at 7:00 PM. I am requesting the Town Board to direct the Town Attorney/Commissioner of Planning to draft a resolution and to schedule the hearing within 30 days.
Some people do not support the moratorium. Holding a public hearing on this matter will provide all residents of Edgemont and Greenburgh with the opportunity to express their views.

posted by Paul Feiner @ 10:09 AM                    12 comments

WEDNESDAY, JANUARY 03, 2007

## FACT: WHY COMMON HOUSEHOLD BATTERIES ARE NOT RECYCLED...

I frequently receive calls regarding household batteries - why they are not recycled. According to the Public Works department "in 1992 an international standard was implemented requiring manufacturers to produce common household non rechargeable batteries with a significantly lower mercury content. According to the NYS Dept of Environmental Conservation, most household batteries can be disposed of safely in the trash."
Those wishing to learn more about recycling or about the disposal of other batteries as well as other chemical disposal information are invited to e mail me at pfeiner@greenburghny.com or dpw@greenburghny.com.
The recent sanitation schedule that the town sent out has some interesting info about recycling.

posted by Paul Feiner @ 7:39 PM                    0 comments

TUESDAY, JANUARY 02, 2007

## LEGISLATOR ABINANTI URGES COUNTY TO ASSIST TOWN PROTECT PROPERTY NEAR NATURE CENTER

County Legislator Tom Abinanti is calling on the county to assist the town and Greenburgh Nature Center in acquiring additional land near the Greenburgh Nature Center as open space. A developer is proposing to build on the property-which now links the nature center and Edgemont High School's northern playing fields. The protection of this



# EXHIBIT 9

# Greenburgh eyes prime parcel near the nature center

### BY HEATHER MURRAY

A 2.34-acre piece of Edgemont, Central Avenue and neighboring the Greenburgh Nature Center has been spied as developers in recent months coveting a rare, empty piece and Edgemonters alike. Both groups realize that 1 Dromore Road, which until the Dec. 6 arrival of a demolition crew consisted of a single family dwelling surrounded by woods, could be converted into multifamily housing due to its current use zoning designation. Both groups are vehemently against this prospect, hoping instead to preserve the land as open space.

Although both groups favor open space, they have different motivations for keeping multifamily housing off this three-parcel tract of land. The land borders both the GNC and the playing fields of Edgemont Junior-Senior High School. GNC director Bill Lawyer tells the Inquirer Dec. 14 that ongoing construction and increased traffic to the area would disrupt the wildlife habitat of the nature center. Lawyer said the demolition of the house was a wake-up call to him. The home had been rented out to many different families over the years and he had expected the new owner to do the same. He contacted town councilman Steve Bass and town council aide Gil Kaminer to find out more about the land who bought it, what the owner would and could not do with it, and the like. What he found out was not encouraging. The property was sold in May to a development company, S & R Development Group, LLC. The property is zoned for mixed use, so either commercial property or residential housing could be built there. S & R has not filed any permits with Greenburgh's planning board as yet, but town supervisor Paul Feiner said the talk around town hall is that 36 units of townhouses are planned for the site.

Lawyer contacted Feiner to see if he could reach out to sophisticates at the local, regional and federal level to raise money to buy the property. Shortly after speaking with Lawyer, the supervisor called the Inquirer to get publicity and support for the cause. He then posted a press release to the Greenburgh e-mail list imploring residents to come together to save open space in Edgemont. These actions did not sit well with Edgemont civic leaders, who wondered first why the nature had not been discussed with them to begin with, and second, whether broadcasting Greenburgh's intent to buy or bid the public would help or hurt the prospects of that actually happening.

For Edgemonters, traditionally housing brings with it the possibility that more students would move into their already crowded school district and more cars would bring up Central Avenue. Edgemont Community Council president Michelle McNally said she thought it was "premature to publicize the town's interest in buying the property." There is no action plan in place yet for how to go about buying the property. The Edgemont community has not had a chance to weigh in on what, in fact, they would support the town in doing, if anything, McNally told the Inquirer the current situation could have been avoided to begin with if the board had adopted the moratorium on residential development along the Central Avenue corridor that Edgemont had asked them to do back in October. It was put off for the past couple of months. Bass and the Inquirer Jan. 3 he had spoken to Mark Stellato of Greenburgh's Planning Department last week to put the moratorium on the board's agenda at one of its January

meetings. Bass also suggested to the GNC board in its last meeting that it adopt the moratorium, and it agreed to do so in all this same meeting. Feiner said Jan. 4 that he would ask for a resolution to hold a public hearing on the moratorium to be placed on next Wednesday's agenda.

Greenburgh Civic Association president Bob Bernstein said, "Public discussion of this property right now would, at this point, only drive up the price, make an application even less likely, and in the end of the day, if the property is developed for multifamily housing (which is a distinct possibility), really hurt Edgemont taxpayers."

The Inquirer asked a Scarsdale realtor hypothetically what a locality should do in a situation similar to this one. She said ideally the town would have had a committee set up beforehand, preferably with someone trained in real estate on the board, to bid on the property before the developers snatched the deal up.

With Bernstein's park litigation still pending the town of Greenburgh could find itself in a bit of a bind over how to legally fund the nature center. Would the incorporated Greenburgh foot the bill in total as it does in the past, when the town acquired park land, or should the unincorporated villages contribute to the fund? Bernstein suggested that rather than fund it out directly, the town could set up a separate park district in Edgemont. The Edgemont park district would be paid for and frequented by Edgemonters alone.

Feiner noted that the property was bought back in May for $3.1 million. If Greenburgh were to pursue buying the property, it is highly likely the town could garner support from other localities. County legislator Tom Abinanti told the Inquirer more than that, he also said he supported preserving the land as open space and would force the matter up with county executive Andy Spano. In a Dec. 28 press release, Abinanti said, "The county's New Year's resolutions should include adding to the Greenburgh Nature Center. Open space is scarce in Greenburgh's Edgemont section and in the adjacent part of Yonkers, Scarsdale and Eastchester. This area needs much more."

The GNC board has its work cut out for it, quickly jumping on the property. Adam Sims, head of the GNC board, said, "In our discussions, we'd certainly like to see that area preserved as park land, if it's feasible. Questions still need to be answered. How would it be purchased? Who would run it? Who would be on the property? Sims said the GNC board would look at the issue and the town's leadership to make this happen. We're going to work with them in any way possible."

Bass, the town's liaison to the GNC, said, "I am continuing to work with the GNC, along with reaching out to the planning department, Edgemont community leaders and the Edgemont school district."

When asked what the next move should be, Bernstein, Bass and McNally agreed with Bass that open discussions including the Edgemont community, the GNC board and the town of Greenburgh would certainly be in order. Feiner added the town must make the case this acquisition is needed to preserve and protect the nature center. He suggested the town do a study to analyze the impacts development could have on the future of the nature center, appraise the property to determine the costs, and then approach the land trust, state lawmakers and private individuals who might contribute to the cause.

> *"It was premature to publicize the town's interest in buying the property."*
>
> — MICHELLE MCNALLY, ECC PRESIDENT

# EXHIBIT 10

# Town of Greenburgh

http://www.greenburghny.com/Cit-e-Access/news/index.cfm?NID=6786&TID=10&jump2=0

Print | Close

---

**News & Information**

## CAC favors acquisition of Dromore Road property
*Release Date: January 06, 2007*

The Conservation Advisory Council issued the following statement regarding the property near the Greenburgh Nature Center. Earlier this week Legislator Tom Abinanti advised town officials that he would be pushing the county to help the town preserve this land.
PAUL FEINER

---

At the CAC meeting on Dec. 18, 2006, all present voted in favor of recommending to the Town that every effort be made to assist the Nature Center in acquiring the Dromore Road Property.

While small, this parcel is a link between two larger open spaces; the Nature Center and the Edgemont High School Campus. When the Town established its Open Space Plan, the importance to local fauna of connecting open space was recognized as an element in identifying land to be acquired.

Greenburgh is fortunate in having large underdeveloped swath that runs from the Metropolis County Club, to the Woodlands Campus, to the Farm on 100A, to the Ridge Road Park, to Hart's Brook Park, to the Nature Center, Edgemont High School, and the Scarsdale Golf Club. Every effort should be made to maintain and enhance the connectivity between these sites.

In addition the land would provide direct access from the Edgemont High School to the Nature Center. The high school and the Nature Center currently run joint programs.

If there is any way the CAC can assist in this acquisition effort, please let us know.

Theresa Mae Tori
Chairperson CAC

| Current News & Information | |
|---|---|
| **Title** | **(Posted)** |
| CAC favors acquisition of Dromore Road property | (1-6-07) |
| ABINANTI OFFERS TO HELP TOWN PROTECT NATURE CENTER | (1-3-07) |
| YOUTH BASKETBALL CLINIC | (1-3-07) |
| 2007 Sanitation Schedule (2MB pdf) | (1-2-07) |
| Illuminated road signs can help those with poor vision... live streaming of Board meetings suggested | (1-2-07) |
| GOALS 2007---work in progress | (1-1-07) |
| Senator Andrea Stewart Cousins to be sworn into office at Town Board meeting | (1-1-07) |
| Greenburgh Public Library to open satellites on January 24 | (12-26-06) |
| Year in review 2006 | (12-23-06) |
| Mad Science program | (12-21-06) |
| FEINER GIVES BACK $1029.41 TO TAXPAYERS FOR NOT COMPLETING GOALS | (12-14-06) |
| Adjustments to 2007 Tentative Budget | (12-12-06) |
| WANTED: SNOW ANGELS | (12-1-06) |
| Snow Parking Ordinance Commences Dec. 1st | (11-18-06) |
| Greenburgh forms CERT Team | (4-24-06) |
| 2006 Supervisors Goals | (1-1-06) |

---

Copyright © 2007 Town of Greenburgh. All Rights Reserved.

# EXHIBIT 11



This is a printer friendly version of an article from the **The Journal News.**
To print this article open the file menu and choose Print.

---

# Greenburgh aims to save land near Nature Center

**By Rebecca Baker**
The Journal News
(Original Publication: January 7, 2007)

EDGEMONT - In this upscale neighborhood of Greenburgh, an undeveloped piece of property is as rare as a 70-degree day in New York in January.

So when a developer bought some vacant land on Dromore Road next to the Greenburgh Nature Center with plans to build condominiums, the 2.3-acre site became a target for preservation.

Civic activists in Edgemont have asked the Town Board to declare a moratorium on residential housing in the Central Avenue Zoning District, which includes Dromore Road, to stop the development in its tracks. Residents say more housing in the area would worsen traffic in congested Edgemont and could cause Edgemont schools to swell beyond capacity.

"We already are experiencing overcrowding in some of the grades," said Robert Bernstein, a lawyer who is arguably Edgemont's most outspoken advocate. "The logical thing to do is slow down. A moratorium is just a short-term halt."

Meanwhile, county Legislator Thomas Abinanti, D-Greenburgh, has asked County Executive Andrew Spano to help the town buy the property outright and give it to the Nature Center.

Abinanti said the property could create a bridge between the Nature Center and Edgemont High School, since the property borders some of the high school's ballfields. He said the money could come from Westchester's Legacy Program, which helps preserve local parks.

"I think it's important to the community and important to the county," he said. "Open space is scarce in Greenburgh's Edgemont section. This area desperately needs more."

The developer, S&R Development Estates of New York City, has not turned in a written request to build housing there. Mark Weingarten, a White Plains attorney representing S&R, said he could not comment without his client's permission.

Town Supervisor Paul Feiner said preliminary plans call for more than 30 units of multifamily housing on the site. He said S&R has asked for a meeting with the town and Nature Center to discuss the matter.

Feiner said the town may not have to preserve the entire parcel.

"Maybe you let them develop a little and preserve the rest," he said. "I just want to make sure that the Nature Center is protected."

The Nature Center's board of directors has not taken a formal position on plans for the site, said the board president, Mike Simms. But he said the property could be "a wonderful addition" to the 33-acre Nature Center.

"If it's practical, we would like to do it," he said. "Our mission is conservation. Green space in our area is getting harder and harder to come by."

Town Board member Steve Bass said the board wants to work with the Nature Center, Edgemont school and civic leaders, and town staff to see what's best.

"There are so many pieces of this that haven't been thought through yet," he said. "There are lots of financial, legal and political issues that have to be considered."

As with most governmental issues in Greenburgh, there is already disagreement.

Abinanti sent out a press release about preserving the parcel, and Feiner posted the press release and the town's interest in the site on his blog. Bernstein and Bass criticized Feiner, saying his public comments on the possibility of county money could drive up the price.

Feiner said any offer to buy the property would be based on a fair appraisal. The property, which includes four lots, was sold in May for about $1.4 million, according to the Town Assessor's Office. A home on the property was torn down last year.

If the developer wanted too much money for the property, Feiner said, the town could try to acquire the land through eminent domain. 

# EXHIBIT 12

**News & Information**

## Moratorium on development: Central Ave recommended by PLanning Commissioner
*Release Date: January 08, 2007*

Mark Stellato, Commissioner of Planning, has recommended a development moratorium on site plans and subdivisions for residential development in the Central Avemixed use impact district be established so that the town and its consultants can fully study the matter and make recommendations back to the Town Board. In the last 15 years the Edgemont school district's enrollment has increased from 1,355 to 1,923, an increase in 42%. The increase in school population has required the need for additional educational facilities not contemplated when the current plan was developed and zoning enacted.

The portion of Central Aveserved by the Edgemont school district includes 909 apartments in various multifamily dwellings, representing 32% of total residential component of the school district and a 60 percent increase in the number of residential units from 1976.

Other factors besides increased enrollment: no major roadway infrastructure improvements undertaken since the adoption of the 1976 plan. In 2000, to accommodate a growing student population, the EdgemontSchool districtundertook a capital improvement program which expanded facilities at all 3 schools. Those facilities are at full capacity.

I support the proposed moratorium and hope that the Town Board will schedule a hearing date this Wednesday night – our next Town Board meeting. This proposed moratorium has the support of Edgemont civic leaders.

PAUL FEINER

GreenburghTownSupervisor

| Title | (Posted) |
|---|---|
|  | (1-20-07) |
|  | (1-19-07) |
|  | (1-19-07) |
|  | (1-15-07) |
|  | (1-13-07) |
|  | (1-13-07) |
|  | (1-12-07) |
|  | (1-12-07) |
|  | (1-11-07) |
|  | (1-11-07) |
|  | (1-10-07) |
|  | (1-9-07) |
|  | (1-8-07) |
|  | (1-6-07) |
|  | (1-2-07) |
|  | (1-1-07) |
|  | (12-26-06) |
|  | (12-23-06) |
|  | (12-12-06) |
|  | (12-1-06) |
|  | (11-18-06) |
|  | (4-24-06) |
|  | (1-1-06) |

# EXHIBIT 13

# *THE EDGEMONT COMMUNITY COUNCIL, INC.*
## *P.O. Box 1161          Scarsdale, NY 10583*

October 10, 2006

Mr. Paul Feiner, Supervisor
Members of the Town Council
Town of Greenburgh
Greenburgh Town Hall
177 Hillside Ave.
White Plains, NY 10607

BY EMAIL AND REGULAR MAIL

Re: Comprehensive Development Program
   for the Central Avenue Corridor

Dear Supervisor Feiner and Members of the Town Council:

At the Town Board meeting on September 27, 2006, I asked during the public comment period that the Town institute a moratorium on all further residential development along the Central Avenue "Corridor" pending development of an updated comprehensive plan for Central Avenue as well as development of an updated comprehensive plan for the unincorporated areas of the Town as a whole. The purpose of this letter is to put that request in writing so that it may be part of the written record in support of the legislation we understand you have directed Town staff to prepare in order to enact that moratorium into law.

By way of background, as I explained at the meeting, on September 6, the Planning Board voted affirmatively to ask the Town Board to include funds in the 2007 B budget to update the Town's Comprehensive Master Plan. The Edgemont Community Council (ECC) supports that resolution, and, in addition, requests that the Town act further. Concurrent with updating the unincorporated area's Comprehensive Plan, ECC requests that the Town also update the "Comprehensive Development Program for the Central Avenue Corridor" as a part of this planning initiative.

The Central Avenue "Corridor" extends from the Yonkers line at its southern end to the White Plains border at its northern end, a distance of about four miles. Besides being a major traffic-carrying artery, Central Avenue is an important source of tax revenue to the Town. The current plan for Central Avenue, referenced above, was developed in 1976. It is now obsolete and needs to be updated for future development and redevelopment. Accordingly, ECC requests that funds for updating the "Comprehensive Development Program for the Central Avenue Corridor" also be included in the Town's 2007 B budget.

In connection with that, ECC requests that the Town institute an immediate moratorium on all applications for residential development in the Central Avenue zone. A principal objective of the Central Avenue plan was to create a mixed-use district that would include commercial, office, public and multi-family residential uses in densities that would take into account the traffic carrying capacity of the road as well as the impact on municipal service requirements and our schools.

Currently, the portion of Central Avenue served by the Edgemont School District has over 900 apartments, representing approximately 32% of total residential units for the school district, and an almost 60% increase in the number of residential units from the time of the Central Avenue plan. Edgemont schools are again at capacity, despite a recent capital project to expand all three facilities. An immediate moratorium on residential applications for development in the Central Avenue zone will enable the Town to study the mix of uses and their densities and to update the zoning to maintain the area's economic vitality.

ECC understands that the process of instituting a moratorium requires a public hearing. Please advise us of anything we need to do to assist in moving this process forward. ECC asks that a public hearing be held and a vote taken this fall so that the moratorium can be put into effect before the end of the year.

Thank you for your prompt attention to this matter.


Very truly yours,



Michelle McNally

Cc:    Tim Lewis
       Mark Stellato
       Thomas Madden
       Planning Board
       Gil Kaminer

# EXHIBIT 14

S&R Development Estates, LLC
600 Mamaroneck Avenue
Harrison, NY 10528


January 17, 2006


The Honorable Members of the Planning Board
of the Town of Greenburgh
177 Hillside Avenue
Greenburgh, NY  10607


Re:  Resolution of the Town Board Proposing a
     Moratorium on Construction in
     the Central Avenue Mixed-Use Impact
     District ("CA District").


Dear Honorable Members of the Planning Board of Greenburgh:


We are the owners of the premises known as 1 Dromore Road, a 2.34 acre parcel of land within the Central Avenue Mixed-Use Impact District (the "Property"). The Property is bordered on the easterly side by the Scarsdale Woods condominium development located on Central Avenue; on the northerly side by Dromore Road; on the westerly side by the monastery grounds of the Sisters of the Blessed Sacrament; and on the southerly side by the land owned by the School District which is the site of the Edgemont Junior/Senior High School.

The Property is virtually unique in the CA District.  It is vacant, contains more than 2 acres after deducting for steep slopes and is to our knowledge the only parcel in the CA District which now can be developed for multi-family housing.  The moratorium resolution speaks with broad

application but that is in fact a mask and bad faith subterfuge aimed specifically and exclusively at our Property. It is obvious that the purpose of the moratorium is to force us to sell the Property to the Town for a lower price, or to diminish the Property's value to reduce the award of just compensation that will be payable if there is a condemnation.

The true intent and purpose behind the resolution is evidenced by the statements of Supervisor Feiner and interested parties revealed in the Supervisor's website/blog, The Journal News and the Town of Greenburgh website.

Immediately after we demolished the house and all of the improvements on the Property in preparation for new construction, the Executive Director of the Greenburgh Nature Center called one of our acquisition attorneys and stated that the Greenburgh Nature Center would oppose development of more than one or two homes on the Property. That individual thereafter contacted Supervisor Feiner and apparently stated that it was very important to preserve our Property as open space between the Greenburgh Nature Center and the School Property to the South. Supervisor Feiner, himself, determined that our Property should be acquired by the Town and preserved as open space. The full text of a number of his recent public statements are set forth in the attached Exhibit "A".

Supervisor Feiner believed that he could obtain funding for the acquisition of our Property from Westchester County, from New York State and from the Town of Greenburgh, but he did not receive commitments for such funding and as a result proposed that our property be condemned. But then, he came to realize that condemnation would require a payment to us of fair market value for the land, which is in excess of nine million dollars. This realization resulted in the Town's plan to prevent development of our Property, initially by moratorium and in the end by restrictive re-zoning. In this way the Town plans to restrict development of the Property, get its open space and avoid ever paying us just compensation for our Property, or for the destruction of its value.

Paul Feiner (Supervisor's website/blog): 1/8/2007
@ 8:30 am

"One of the council members expressed concern about
the legality of a moratorium only Central Ave.  He
brought this up at a recent work session.  I want to give
the town attorney time to provide members of the Board
with a legal opinion that a moratorium would withstand
court challenges.  If a hearing can be scheduled sooner I
would support that."

S&R Development Estates has acted in good faith and we have been
completely open with all Town officials throughout the course of our efforts
to develop the Property.   We consulted with the Town Planning Department
before taking title to the Property and undertook the extensive studies
required which we included with the public filings for our Demolition
Permit.  Only after our acquisition and demolition and after the
Presubmission Conference, required by Statute as a pre-requisite to
proceeding with development, during which the Commissioner and Deputy
Commisioner reviewed our studies and our plans for the development, did
the Town put into motion its plan to restrict development of our Property
and proclaim that the Town needed the Property to be preserved as open
space.

Belatedly, Supervisor Feiner realized that a moratorium would not
succeed if the stated concern of the Town were limited to its true goal - to
win our property as open space.  He was advised or himself came to the
realization that the Town would have to tie the moratorium to a concern
about limiting the growth of the number of students in the schools:

3

Paul Feiner (Supervisor's website/blog: 1/4/2007 @ 1:03 PM

"I will ask the Town Board on Wednesday to schedule a hearing sometime within the next month. I had a dept head meeting today. The consensus was that we could have a moratorium but would have to tie it into the districts school capacity-the impact additional residential development have on school infrastructure."

It was no coincidence that Supervisor Feiner announced on January 8, 2008 that Mark Stellato, Planning Commissioner, recommended a development moratorium in the CA District on the ground that the population of the Edgemont School District has increased over the last 15 years.

Putting aside the improper motivation behind this claim, it is in fact not applicable to the Property nor to the CA District as a whole.

We refer you to the First Interim Report to the Edgemont School Board and Community dated February 28, 2006. That report reflects the following:

1. Only 27% of multifamily units send students to the public schools – compared with 45% of single family homes which send students to the public schools.
2. Those few multifamily units which do send students generate only 1.4 students per unit – while the greater percentage (45%) of single family homes send an even greater number of students per home to the public schools – 1.7 per home with the result that single family homes send 1,531 students to the public schools and apartments send only 348 students to the public schools.
3. 37 two bedroom condos should generate fewer than 15 additional students for the public schools.

Our proposed condominium development proposes no units with more than two bedrooms. This fact argues for our proposed development generating even fewer than the expected average of 15 students since the

4

Committee's report contained a significant number of three bedroom apartments.

Our proposed development contemplates market rate two bedroom apartments with no subsidies from the Town or County. These apartments would probably be priced between $1,000,000 - $1,250,000. They are designed to attract young professionals who do not yet have school age children and empty nesters seeking to enjoy the beauty and peaceful environment of our Property.

If the Schools are overcrowded and there is a need to limit student population the remedy is a moratorium on single family home development not on apartment development in the CA District. Currently the CA District has only one site available for multi-family development – that is our Property - and our Property will likely generate fewer than 15 students. Even that number will not be a near term burden, with construction and sell-out of the units being 2-3 years hence and many more years before our likely purchasers would have school age children.

Even the claim that the schools are overcrowded is not a whole truth. The entering Kindergarten class in the Edgemont School District for the year 2005 was only 122 students, that is significantly fewer than the students in the then current 1st through 8th grades. We are not aware of any demographics which will cause this trend to be reversed. No material increase in student population, during the last 15 years, came from multi-family housing construction in the CA District. We venture to say that during the last 20 years there has been only one multi-family housing development in the CA District. Further, there is no foreseeable future multi-family construction in this district given the actual commercial use of the other properties in the district and the fact that the other few remaining vacant sites do not contain the requisite two acres after subtraction of steep slopes.

In fact, there is no school problem coming from the CA District. If there is a problem it comes from outside the CA District. It comes from single family homes and in the future will come from single family homes.

With regard to traffic problems, multi-family housing construction will not create or exacerbate problems since as pointed out above there are

5

no such other developments planned or likely in the foreseeable future. The development of our parcel will create *de minimus* traffic and certainly much less traffic than a comparable commercial development would create. Much of the traffic on Central Avenue is generated by developments to the North and South of the CA District and is either thru traffic or traffic for which commercial units in the zone (not residential) are the destination.

We project a total sellout of our condominium apartments in excess of $37,000,000.00. Generally, real estate taxes average about 1.8% of true value. At that rate our development will generate real estate taxes of approximately $666,000.00 per annum. Currently, approximately 60% of those taxes would go to the School District. If as we project, the Development sends (many years from now) 15 students to the public schools the School Taxes, alone, generated by our Development (which will be even greater in those future years) will be $26,640.00 per student. That is significantly greater than the $15,000 tuition charged by the School District to their 24 non-resident students and we believe substantially greater than the cost to educate each student. The balance of taxes would go mostly to the Town and Fire District and will be significant. The Government and Demographics Committee pleads for an increase in the tax base and the Planning Board itself desires that as a goal. Our project certainly does that and with minimal burden on the school system.

On 12/19/06 at the Presubmission Conference we met with the Planning Commissioner and Deputy Planning Commissioner to describe our project. We are proud of our building design by Sullivan Architecture and the site planning by John Meyer Consulting. Our plan is "as of right." It requires no grant of variance and meets the substantial conditions for setbacks of 80 feet in front, 50 feet in rear and 40 feet on each side. At a significant additional cost to the project and in limitation of the size of potential apartments, our plan provides for all required parking to be within the building and for only six optional spaces to be provided on the surface of the land. Our plan maximizes the preservation of open space where the law otherwise would have permitted almost all of the Property (except for Steep Slopes) to be used for surface parking.

We would not have been surprised at the Presubmission Conference had the suggestion been made that we consider some special effort to provide apartments for teachers, police, firefighters, first responders, town

6

employees and for those retired from civic employment. We would not have been surprised at that meeting had the suggestion been made that we consider providing some apartments as affordable housing. We know that the Town of Greenburgh has accepted the obligation to provide a total of 700 units of affordable housing by the year 2015. Clearly, multi-family developments are the logical way to provide most of those units. However, none of these suggestions were made to us and none of these concerns were voiced. At our first meeting with the Deputy Planning Commissioner we agreed that an effort be made for the development to be equally attractive and consistent with the Scarsdale Woods development of 188 units adjoining our Property to the West. At the most recent meeting with the Planning Commissioner we all agreed that our design had, at the very least, met or exceeded that goal. No one believed that our project would adversely impact schools or traffic on Central Avenue.

Only four years ago the Town completed and adopted a comprehensive plan for the Town of Greenburgh. The Town did not then believe that any change was required in the CA District to further limit potential multi-family housing. Nothing of substance has changed since then. You are being asked to assist in a rush to injustice to impose a moratorium directed solely at our Property. It is intended to create a devastating leverage with the intent to force us to abandon our Development. We ask that you resist the vocal effort of those who would confiscate our rights and compromise the integrity and long term best interests of the Town.

We have asked for a meeting with Supervisor Feiner and the officials of the Greenburgh Nature Center. We cannot afford this "taking" of our property. We are willing to make meaningful concessions to avoid the moratorium and a possible change in zoning. We believe that we can reach an Agreement which will allow all of us to move forward with dignity and achieve mutually agreeable ends and results without improper means.

We believe that the moratorium and potential rezoning of our property would be a substantial violation of our rights under the United States Constitution as well as New York State law. Our willingness to pursue a compromise with the Town is genuine, but it is without prejudice to our rights and our ability to obtain redress in appropriate state and federal courts, including monetary damages and attorneys' fees from the Town and from responsible individuals.

Very truly yours,

S&R Development Estates, LLC

By: _____
　　　Richard Troy
　　　Managing Member

cc:　Town Supervisor, Hon. Paul Feiner
　　　The Honorable Members of the Town Board of Greenburgh

8

**Exhibit A**

1.          Greenburgh Town Website:  12/10/06

"Goals 2007 – work in progress

6) Initial effort to protect Greenburgh Nature Center from possible development – 1 Dromore Road.  Obtain appraisal of property.  Reach out to state/county/private individuals for assistance in obtaining property."

2.          Paul Feiner (Supervisor's website/blog):  12/14/06 @ 12:54 PM

"Response to Bloggers – Edgemont May Get More Open Space

Some Edgemont bloggers have posted comments in recent weeks about the failure of the town to acquire more open space in Edgemont.  They object to the open space acquisitions that have happened in other neighborhoods around the town.  The town has been asked by some members of the Board of the Greenburgh Nature Center to preserve a former single dwelling residence at 1 Dromore Road as open space.  A house on this property has been demolished – the property is included in the Central Ave mixed use zoning area. It is important to preserve the 3 parcels, totaling 2.34 acres, as open space.  It would be an important addition to the Center's 33 acre preserve and would provide a direct link to the Greenburgh Nature Center's open space and the Edgemont Jr.-Sr. High School open space. Coninguious (sic) open space is crucial to preservation of wildlife habitats.  If this property were developed for commercial or residential use it would have a very negative impact on the center's functioning as a sanctuary for wildlife in lower Westchester County. Preserving this property as open space is important on the

i

local, county and regional level. I will be reaching out to
Edgemont civic leaders, the school district and the
Westchester Land Trust – as well as other public officials
so we can preserve this precious parcel of land."

3.          Paul Feiner (Supervisor's website/blog):
    12/15/2006 @ 12:01 AM

    "paul feiner said...
    I anticipate that funding for this acquisition will come
    from a variety of sources: private donations, the town,
    hopefully the county & state will also contribute (they
    were partners in the taxter ridge, glenville and hartsbrook
    acquisitions). I have already received some
    communications from some individuals interested in
    assisting in this effort."

4.          Paul Feiner (Supervisor's website/blog):
    12/15/2006 @ 11:00 PM

    "paul feiner said...
    The remarks by anonymous are not true. I have been on
    the phone and have e-mailed community activists from
    Edgemont promoting this acquisition. I am very pleased
    so many people support this acquisition. I am also
    pleased that people want to help. Let's work together to
    make this happen. ANONYMOUS: Will you contact
    the Nature Center and help them raise private dollars to
    reduce the cost of this parkland acquisition? Be
    constructive! Positive energy can make this open space
    acquisition happen."

5.          Paul Feiner (Supervisor's website/blog):
    12/16/2006 @ 4:54 PM

    "paul feiner said...
    I believe that I am being criticized unfairly for
    publicizing the effort to acquire the property. I received

a number of calls from representatives of the Nature Center prior to my announcement of this effort. I was specifically asked to include the acquisition of the property in my 2007 goals by the nature center. The goals are announced publicly. In fact, I post the goals in progress on our town web site in December – before the goals are officially announced. In addition, an e mail I received from Bill Lawyer, executive director of the Nature Center, said that "we need to organize a campaign to acquire this property for preservation as open space." One can't organize a campaign in secret. Every open space acquisition that the town has been involved in since I have been Supervisor (more than 400 acres of open space out of our 600 acres of open space) succeeded because of public support and involvement. It would be wrong for the Town Board to finalize plans for the acquisition before we find out if the public supports the initiative. I do not believe in closed government. Before we spend a substantial amount of tax dollars on any open space acquisition – it's crucial to discuss the reasons with the public and answer questions. I believe that the approach I am taking will enhance our chances of acquiring this property. I have been in contact with Edgemont leaders – supporters and critics – about this initiative and am very pleased with the response that we are getting."

6.          Paul Feiner (Supervisor's website/blog): 1/2/2007 @ 11:07 PM


"Legislator Abinanti Urges County to Assist Town Protect Property Near Nature Center
County Legislator Tom Abinanti is calling on the county to assist the town and Greenburgh Nature Center in acquiring additional land near the Greenburgh Nature Center as open space. A developer is proposing to build on the property-which now links the nature center and Edgemont High School's northern playing fields. The

protection of this property, according to Legislator Abinanti, is "essential to protecting the wildlife habitats in the area."

The acquisition of this property as open space depends on a partnership with the county & state governments and private donors. The support of Legislator Abinanti is significant. In the past we have worked cooperatively acquiring Hartsbrook Preserve off of Ridge Road, Hartsdale; Glenville Woods near Tarrytown and Taxter Ridge park in E. Irvington."

7.          Paul Feiner (Supervisor's website/blog): 1/6/2007 @ 9:34

"Momentum is building for the acquisition of Dromore Road property as open space. The CAC voted to recommend to the town that every effort be made to assist the Greenburgh Nature Center in acquiring the Dromore Road property. While small this parcel is a link between two larger open spaces, the Nature Center and Edgemont High School campus. When the town established its open space plan, the importance to local fauna of connecting open space was recognized as an element in identifying land to be acquired. The CAC also pointed out that the land would provide direct access from the Edgemont High School to the Nature Center. The high school and the nature center run joint programs. Earlier this week Legislator Tom Abinanti expressed interest in working to persuade county officials to share in the expense of this acquisition. A number of Edgemont residents have also contacted me supporting this open space acquisition."

8.          Paul Feiner – The Journal News, 1/7/2007

"Maybe you let them develop a little and preserve the rest," he said. "I just want to make sure that the Nature Center is protected."

iv

9.                The Journal News, 1/7/2007

"If the developer wanted too much money for the property,
Feiner said, the town could try to acquire the land through
eminent domain."

# EXHIBIT 15

Offer From S&R Development Estates LLC
Regarding Property at 1 Dromore Rd
Summarized by Bill Lawyer - January 18, 2007

These are the terms of the offer presented orally by the developers (Stephen and Rick Troy and their father Stuart) at a Meeting of Developers, GNC board members Mike Sims, Sven Hoeger, and Margaret Goldberg, Town Councilman Steve Bass, Supervisor Paul Feiner, and GNC Executive Director Bill Lawyer

1. They are willing to modify their original proposal from 37 two bedroom units taking up 32,000 sq. feet (plus driveways) to a row of 10 townhouse units that would only develop 20% of the property; and, they would donate a conservation easement for the rest of the property, so it could never be developed; or

2. They are willing to give the GNC and Town a year to raise the funds to buy the property for their cost -- $1.4 million purchase plus about $400,000 in expenses so far, for a total of $1.8 million;

3. If we are unable to raise the full amount, they would be willing to scale back their development to a certain point based on how much money we did raise (e.g. back to perhaps 5-6 units);

Conditions and Consequences of their offer

They are willing to do these things if we "allow" them to proceed with their 10 unit proposal during the moratorium. We must be willing to publicly urge the Town Council to permit them to do this.

If they are not allowed to proceed with their proposal during the moratorium, they will submit plans for the 37 units before the moratorium takes effect.

Paul Feiner suggests that if we agree to their proposal, we should ask the Town Council to commit to providing $600,000 of the purchase price (i.e. 1/3 of the $1.8 million).

p.s. Rick Troy and his family are members of the GNC and live in New Rochelle.

# EXHIBIT 16

S&R Development Estates, LLC
600 Mamaroneck Avenue
Harrison, NY 10528

January 24, 2006

Supervisor Feiner and Honorable
Members the Town Board
Town of Greenburgh
177 Hillside Avenue
Greenburgh, NY 10607

Re:    Proposed Local Law for a Moratorium

Dear Supervisor Feiner and Honorable Members of the Town Board:

As you know, we are the owners of 1 Dromore Road.

We write this letter to be submitted to you at the meeting of the Town Board to be
held on January 24, 2007. We have not requested an allocation of time to address you at
the meeting. We believe that our position is fairly set forth in our letter of January 17,
2004, addressed to the Planning Board with copies to you, and we incorporate here, by
reference, the facts and positions set forth in that letter.

Another, and to us equally important, reason for not making a further presentation
at this meeting is that we hope that our dispute can be resolved by amicable settlement.
We believe that we can better resolve our differences in a meeting where compromises
can be offered and discussed.

We respectfully request that, at the very least, implementation of the moratorium
be delayed to allow for meaningful settlement efforts.

Very truly yours,

S&R Development Estates, LLC

By: _____
Richard Troy
Managing Member

# EXHIBIT 17

S&R Development Estates, LLC
600 Mamaroneck Avenue
Harrison, NY 10528

January 31, 2007

The Honorable Members of the Planning Board
of the Town of Greenburgh
177 Hillside Avenue
Greenburgh, NY  10607

<div style="text-align:center"></div>

Re:    Resolution of the Town Board Proposing a
       Moratorium on Construction in
       the Central Avenue Mixed-Use Impact
       District ("CA District").

Dear Honorable Members of the Planning Board of Greenburgh:

In anticipation of your meeting on this matter now scheduled for Feb. 7, 2007 we wish to repeat in the most forceful terms our letter to you of January 17, 2007.   We also wish to supplement that letter as follows:

There is no emergency situation requiring a moratorium.

The procedure adopted by the Town in the enactment of its moratorium of 2001 included a number of studies and prerequisites as follows:

1.    The Town Council appointed a Comprehensive Plan Committee; and

2.    A draft Phase I of a Comprehensive Plan report was prepared and reviewed; and

3.    A draft Phase II of a Comprehensive Plan report was released and presented to the public in a Town Board Meeting; and

4.    The Town Council instructed its consultants working on the Comprehensive Plan to prepare a report on the desirability of instituting a development moratorium; and

5.    After months of study, a moratorium on development was instituted.

Only after it was established by those prerequisite studies that a moratorium was required did the Town proceed with enactment.

Here, there is an unseemly to rush to judgment not supported by any scientific, impartial establishment of the facts demonstrating an emergency or a need for a moratorium.

In stark contrast to the careful planning taken before instituting the previous moratorium, in the instant case the Supervisor stated that he supported a moratorium on January 4, 2007. On January 8, 2007, the Planning Commissioner stated that he supported a moratorium and on January 12, 2007 the Town Council held a Special Meeting to vote on the moratorium – no other business was discussed and at that very meeting a moratorium resolution was enacted. Apparently the resolution was drafted before the meeting and discussion.

As we pointed out in our previous letter, we are the targets of this moratorium. Witness that no other owners of property in the CA-I District spoke at the Town Council meeting on January 24 or submitted written comments prior to or at the meeting.

Witness the shifting nature in the scope and purpose of the proposed moratorium and the reasons and purported findings put forth in support.

The moratorium prohibits all development, commercial and residential in the CA–I District. Now, as a result of statements made at the Town Council's meeting of January 24, it appears that the Town wishes to permit commercial development and restrict only residential development.

Note that the initial basis for a moratorium was the desire by the Supervisor and others to protect the Greenburgh Nature Center and create open space generally, for the benefit of the environment. That rationale was superceded by the claimed concerns about traffic and subsequently by a claim of supposed burden on the school system which would result from permitted residential development in the CA-I District. Those claims now appear to be muted (students from multifamily units along Central Avenue comprise only 18.5% of the student population in the Edgemont Schools – see Government and Demographics Advisory Committee Report dated February 28, 2006).

The new reason put forward for the moratorium is that Edgemont has too many apartments. This claim is not only false but unworthy of the Town. Multifamily units, including condominiums, cooperatives, rental apartments and, even including townhomes, constitute only 33% of the residential units in Edgemont. Demographic data on Westchester County's official website clearly show that Edgemont has a relatively low number of multifamily units as a percentage of total housing units. For example, the number of multifamily units as a percentage of total housing units is 50% for Westchester County, 39% for Greenburgh, 58% for Tarrytown, 51% for Dobbs Ferry, 40% for Irvington and 42% for Hastings-on-Hudson.

I doubt whether any one of you can honestly say that the resolution of the Town Board is based on the studies and true findings you would require. I believe, on reflection, you will find that the resolution is hastily drawn, improperly based and that a moratorium is not appropriate which discriminates against the CA-I District, which is targeted against our property, which does not resolve an emergency and is not enacted with proper basis.

S&R Development Estates, LLC

By: s/ Richard Troy
      Richard Troy
      Managing Member

# EXHIBIT 18



Andrew J. Spano
County Executive

County Planning Board

January 31, 2007

Timothy W. Lewis, Town Attorney
Town of Greenburgh
177 Hillside Avenue
Greenburgh, NY 10607

Subject: Referral File No. GRB 07-001 — Moratorium – Central Avenue Mixed Use Impact
District

Dear Mr. Lewis:

Thank you for notification of the above referenced action. We received a proposed local law that would
establish a six-month moratorium on the filing, acceptance and/or approval of applications for site plans
and subdivisions by the Town Board and the Planning Board within the CA – Central Avenue Mixed
Use Impact District. Exceptions to this moratorium will be made for applications for extension of
existing site plan or subdivision approvals, or for applications for final subdivision approval when the
preliminary subdivision approval has been obtained prior to the effective date of the moratorium.
Appeals to this moratorium can also be applied for on a case-by-case basis to the Town Board.

The proposed moratorium notes that the Town is currently in the process of updating its comprehensive
plan and revising its zoning code, and that Central Avenue has been identified as a "priority target area".
Because of this ongoing effort, the purpose of the moratorium is to allow for time to "protect the public
interest by preserving the integrity of (the) comprehensive master plan and potential modifications to the
Zoning Code and subdivision regulations" which are being considered by the Town.

With regards to the CA – Central Avenue Mixed Use District, the proposed moratorium states that the
objectives of this district must be re-examined, and specifically cites the growth of multi-family
dwellings within the Edgemont School District during the last 30 years as an example. (Multi-family
dwellings less than four stories in height and less than 35 bedrooms per acre are permitted in the CA
District.) In particular, the proposed moratorium specifically states:

- The Edgemont School District includes 909 apartments in various multifamily dwellings,
  representing 32% of the total residential component of the school district
- During the past 30 years, the number of apartments in multi-family residential dwelling units
  within the Edgemont School District has increased by 60%

432 Michaelian Office Building
148 Martine Avenue
White Plains, New York 10601    Telephone (914) 995-4400    Fax (914) 995-3780    website: westchestergov.com

Referral File No. GRB 07-001 — Moratorium — Central Avenue Mixed Use Impact District
January 31, 2007
Page 2

- During the past 15 years, the Edgemont School District's enrollment has increased by 42% and has necessitated additional educational facilities. This enrollment increase has exceeded previous projections of future enrollment.
- No major roadway infrastructure improvements have taken place during the past 30 years to accommodate traffic congestion around the area of the schools during arrival and dismissal times
- "Continued jumps in enrollment, such as those generated by multifamily developments where children need to be driven to school, would strain already expanded facilities and further exacerbate the existing burden on roadways both for residents and emergency vehicles."

We have reviewed this matter under the provisions of Section 239 L, M and N of the General Municipal Law and Section 277.61 of the County Administrative Code and have the following comments:

1. **Intent of moratorium.** The fact that the proposed moratorium singles out multi-family dwellings within the Edgemont School District as the only example of why this proposed moratorium is necessary, raises questions about the moratorium's intent. The CA District is the only zoning district within the Edgemont School District which permits multi-family dwellings. The multi-family dwellings permitted within the CA District are also lower in density than those permitted in other multi-family districts within the town. Therefore, it is conceivable that the intent of this moratorium is to limit or prevent future multi-family development along Central Avenue for an assumed benefit to the school district.

However, the placement of multi-family dwellings, mixed in with commercial and retail uses along Central Avenue, is consistent with *Patterns for Westchester*, the County's long-range land use policy document, which promotes the creation of a mix of uses along the county's developed corridors. In particular, *Patterns* states "the addition of multi-family housing to corridors developed primarily with commercial or office use could capitalize on some existing infrastructure without adding significant demands and help create mini-centers. Such development can enhance opportunities for public transportation services, bicycling and pedestrian movement."

Central Avenue is a particularly suitable place to locate multi-family housing due to the fact that commercial and retail areas are often nearby. We also note that the County Department of Transportation is currently pursuing a Bus Rapid Transit (BRT) *study* to consider improving Central Avenue as a transit corridor. Central Avenue is also on the Mid-Hudson South Region Bicycle and Pedestrian Master Plan as a future "road corridor route" for bicyclists. The fact that Central Avenue could potentially become a much more transit and bicycle friendly corridor in the future only reinforces the position that multi-family housing is appropriate along Central Avenue.

While the overcrowding of local schools is an important concern, the issues of school enrollment must be weighed against the "smart growth" benefits that multi-family developments along a major mixed-use, transit-oriented corridor can provide for a region in need of housing that is transit-oriented and near local commercial centers. We urge the Tom to take this into consideration before enacting this moratorium.

FEB-01-2007 13:38 2007

Referral File No. GRB 07-001 — Moratorium – Central Avenue Mixed Use Impact District
January 31, 2007
Page 3

**2. Safe Routes to Schools.** The proposed moratorium specifically calls attention to the traffic burden which may be placed on local roads due to vehicle trips "generated by multifamily developments where children need to be driven to school". However, instead of proposing a development moratorium to resolve this problem, we recommend that the Town and the School District consider taking advantage of an existing program administered by the County Department of Transportation specifically designed to deal with this issue through the promotion of walking and bicycling to schools. The "Safe Routes to Schools" program is funded through the federal SAFETEA-LU legislation and a workshop can be provided to the Town and the School District at little or no cost. We recommend that the Town and/or the School District contact the County DOT regarding this program.

Thank you for the opportunity to comment on this matter.

Respectfully,
WESTCHESTER COUNTY PLANNING BOARD

By:

Edward Buroughs, AICP
Deputy Commissioner

EEB/LH

cc:    Naomi Klein, Principal Planner, County Department of Transportation
       Thomas Madden, Deputy Commissioner, Greenburgh Department of Department of Community
       Development and Conservation

TOTAL P.04

# EXHIBIT 19

Draft

# **GIFT AGREEMENT**

This gift agreement dated as of February __. 2007 is between S&R Development Estates, LLC (S&R), a limited liability company having its principal place of business at 600 Mamaroneck Avenue, Harrison, New York, and Robert B. Bernstein, an individual residing at 48 Old Colony Road, Hartsdale, New York, and is in contemplation of a gift agreement to be entered into with the Town of Greenburgh.

WHEREAS, S&R owns certain vacant property (the "Property") located at 1 Dromore Road situated in the Edgemont School District in the Town of Greenburgh (the "Town");

WHEREAS, the Property is situated in the Town's Central Avenue Zoning District and is zoned for, among other things, multifamily development;

WHEREAS, S&R is planning to build a 37-unit two-bedroom condominium building on the Property and, in connection therewith, has completed a Phase I Environmental Site Assessment, a Survey, and topographical plan of the site, Wetlands, Watercourse investigations, and other studies, and such studies have been subject to a lengthy review by the Town's Building Department in which the Town reviewed and accepted S&R's Steep Slope Clearance Form and Wetland/Watercourse Clearance Form and issued a Demolition Permit pursuant to which S&R proceeded with the demolition of an existing single family house and swimming pool on the Property;

WHEREAS S&R obtained an independent appraisal of the Property as of August 14, 2006 valuing the land only portion of the development at $9,375,000;

WHEREAS, certain residents and public officials have suggested that the public would be benefited if the Property were left undeveloped and S&R agrees:

Now therefore, for good and valuable consideration, the sufficiency of which is hereby acknowledged, it is hereby agreed as follows:

1.      In lieu of proceeding with its planned 37-unit condominium development, S&R shall make a gift to the Town of the land value over and above S&R's cash investment in the Property (the "Cash Investment").

2.      For purposes of the gift, the Cash Investment shall be equal to S&R's purchase price for the property of $1,400,000, plus actual documented out-of-pocket expenses incurred in developing the Property through the date of this Agreement. The actual value of the gift would then be equal to the appraised value of the land portion of the development for the Property that was obtained by S&R as of August 14, 2006, less the Cash Investment.

3.    Bernstein or his designee (which may include the Town) shall have the right to make to S&R the Cash Investment payment, but such Cash Investment payment must be made no later than December 15, 2007.

4.    In contemplation that such payment will be made, upon entering into a gift agreement with the Town, S&R shall convey to the Town a conservation easement dedicating 100% of the Property for either active or passive recreation use by the Town, subject to certain development rights on 20% of the Property (the "Retained Development Rights"). Subject to approval by the Town's Planning Board and applicable law, the location of the Retained Development Rights shall be as marked on the proposed site plan attached hereto as Exhibit A.   Upon receipt of the Cash Investment payment, S&R will convey to the Town by deed outright ownership of the entire premises.

5.    Should the Cash Investment payment not be made as of the December 15, 2007 deadline,  S&R shall have the right thereupon to exercise its Retained Development Rights.  Subject to approval by the Town's Planning Board and applicable law, such Retained Development Rights shall involve the construction of a condominium building or buildings consisting of no more than 10 residential units, it being understood, however, that (i) subject to such approvals, such construction will remain confined to the 20% of the Property designated on Exhibit A (or as adjusted if required to do so by the Planning Board), (ii) the conservation easement covering the remaining 80% of the Property will be for passive recreation use only, and (iii) S&R shall bear the risk of any material alterations to the proposed site plan that the Planning Board may require.  Thus, for example, S&R shall bear the risk that  the Planning Board may condition approval of development by S&R of fewer than 10 residential units, it may require that one or more such units be classified as "affordable housing," it may require the installation of sidewalks and landscaping plans, and it may require adjustments to the site location.

6.    It is expressly understood and agreed that Bernstein may assign any rights he has hereunder to the Town, that the Town may enter into its own gift agreement with S&R along the lines set forth herein, and that if the Town does enter into its own such gift agreement as contemplated herein, that such agreement will automatically supersede this agreement and any other prior understandings or agreements that may exist.

7.    This agreement shall be governed by the laws of the State of New York.

8.    All disputes arising out of or in connection with this Agreement shall be resolved exclusively by arbitration under the Commercial Arbitration Rules of the American Arbitration Association before a three-member arbitration panel to be appointed in accordance with those rules.

9.    This agreement shall be kept confidential and shall not be disclosed to any third parties unless required by law to do so.

10.    The foregoing sets forth the complete agreement of the parties as of this date and supersedes all prior understandings and agreements.  This agreement may not be modified except by a writing signed by the parties hereto.

Executed this __ day of February, 2007.


S&R Development Estates, LLC


By:_____
        Richard Troy
        Managing Member



Robert B. Bernstein


_____

# EXHIBIT 20

Insert Where Appropriate:

However, at the same time and in large measure as a result of the facts stated above, the Town requires more open space to relieve the congestion caused by increased population, crowding and traffic. Such open space provides the greatest benefit and goes furthest to ameliorate the aforesaid adverse conditions, if that space is in close proximity to an established Conservation District. No moratorium should discourage or prevent the establishment or creation of such permanent open spaces. To the contrary, incentives should be created to encourage such permanent open space. Open space by its very nature limits the development which could otherwise have occurred in that space. Such permanent open space established by grant, permanent conservation easement or otherwise is especially desirable if:

1.     it adjoins/with a shared boundary other land already determined by the Town to be environmentally important as evidenced by its protection by Conservation District Overlay Provisions; and

2.     A qualified organization has indicated its willingness to accept the open space by grant of a permanent Conservation Easement or otherwise. For the purpose of this Local Law a qualified organization is one that is tax exempt under Sections 501 (c) (3) of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, and is a New York not-for-profit organization within the meaning of Article 49, Title 3 of the Environmental Conservation law of the State of New York; and

3.     the creation of such open space will reduce the square footage development of the structures otherwise permitted on the site by at least 50%.

Such development of reduced size on a site meeting the requirements of subparagraphs 1,2 and 3 above is hereby referred to as "Excepted and Permitted Open Space Development."

New Paragraph "F":

F.  This Local Law shall not preclude the acceptance for filing of any
    new site plan, subdivision or re-subdivision or any other new request
    or applications for construction and/or development for Excepted and
    Permitted Open Space Development nor shall it preclude the
    submission and review of additional documentation or applications
    related to these requests, plans or applications whether submitted prior
    to or after the enactment of this Local Law, and with respect to such
    Excepted and Permitted Open Space Development requests, plans or
    applications, additional documentation or additional applications, this
    Local Law shall not preclude the issuance of any findings,
    determinations or approvals.  Each board, agency and or department
    of the Town of Greenburgh having jurisdiction thereof shall during
    the pendency of said moratorium be permitted to proceed and to
    continue to proceed with the required approval process for Excepted
    and Permitted Open Space Development as if the moratorium had not
    been enacted.

# EXHIBIT 21



# TOWN OF GREENBURGH PLANNING BOARD
## GREENBURGH TOWN HALL
### AGENDA
**WEDNESDAY, February 7, 2007 – 7:30 P.M.**
*Meetings of the Planning Board will be adjourned at 11:00 p.m.*

---

## AGENDA

1. **ROLL CALL**

2. **APPROVAL OF MINUTES**

3. **CORRESPONDENCE**
   **a.** Discussion with Nikki Coddington, Energy Conservation Coordinator for the Town of Greenburgh.

4. **COMMITTEE REPORTS**

5. **REFERRALS FROM THE TOWN BOARD**
   **a.** Case No. PB 06-02 - Chase Bank (Heritage SPE, LLC), *353 North Central Park Avenue, White Plains, New York - Site Plan*
   A referral from the Town Board for a recommendation on a proposed project for site plan approval that involves the demolition of the existing +/-1,500 sq. ft. Mobil gas station and the construction of a 4,056 one-story Chase Bank building with two drive-thru lanes, parking stalls and drive aisles, landscaping, improved drainage and storm water collection, a landscaped buffer between the adjacent lot, and improved site lighting. The proposed action is located at 353 North Central Park Avenue, in the 259,984 sq. ft. (5.97-acres) Dalewood I Shopping Center, owned by Heritage SPE, LLC.. The property is located in the Central Avenue (CA) Impact District and the bank use is permitted as a principal use (Type II). The property is designated as Volume 8, Section 27, Sheet 27, Block 8271, Lots 14 &15 on the tax map of the Town of Greenburgh.

   **b.** Case No. TB 07-01 – Local Law - Temporary Moratorium on Certain Applications and Approvals within the Central Avenue Mixed Use Impact District in the Town of Greenburgh
   A referral from the Town Board for a recommendation on a proposed Local Law for the "Temporary Moratorium on Certain Applications and Approvals within the Central Avenue Mixed Use Impact District in the Town of Greenburgh," in which the Town Board will consider a Local Law imposing a 180 day moratorium on the filing, acceptance and/or approval of applications for site plan and subdivision pertaining to the CA-Mixed Use Zoning District

6. **OLD BUSINESS**
   **a.** Case No. PB 00-14 Kathwood Road (WBRC Corp.) – Kathwood Road, Elmsford, New York – *Preliminary Subdivision*
   Work session to review the proposed preliminary subdivision application that proposes to merge of Lots 1-8 and Lots 17-28 which are separated by Wellford Road (a paper street) in order to create a six-lot subdivision, located on Kathwood Road. The property is located in located R-7.5 One Family Residential District. The subject property is approximately 1.144 acres. The property is designated as Volume 7, Section 24, Sheet 43C and 43-D, Block 10 and 15, and includes Lots 1 through 8, and Lots 17 through 28 on the tax map of the Town of Greenburgh.

7. **NEW BUSINESS**

8. **ITEM FOR PUBLIC HEARING AND PUBLIC DISCUSSION (ITEMS WILL START AT 8:45 P.M.)**
   **a.** Case No. PB 05-32 Rama - *70 Old Army Road, Scarsdale, New York – Wetland/watercourse violation*
   
   Continuation of a public hearing to determine the restoration of the affected wetland buffer to its condition prior to violation. The affected wetland buffer is located on the east side of Old Army Road, on the corner of Old Army Road and Ardsley Road, in the R-15 One Family Residence District, and is designated as Volume 8, Section 35, Sheet 38, Block 1735, Lot 8, on the tax map of the Town of Greenburgh.

   **b.** Case No. PB 05-05 Dimarino - 34 West Prospect Avenue, White Plains, NY - *Site Plan, Preliminary Subdivision, Town Planning Board Steep Slopes permit*
   Continuation of a public hearing on a preliminary subdivision, site plan and Town Planning Board steep slopes permit application. The applicant is proposing a three (3) lot subdivision on 0.59 acres of land. The property is split between IB (Intermediate Business) District and R-7.5 Residential Zoning District. Two of the lots would be located in the R-7.5 Residential Zoning District and ingress and egress onto West Prospect Avenue. The other lot would be located in the IB (Intermediate Business) District and ingress and egress onto Fulton Street. The applicant proposes keep the existing house, located in the R-7.5 and build a new 2,688 sq. ft. single family residence on the proposed adjacent lot. The applicant is proposing to build a 960 sq. ft. building on the proposed lot located in the IB District. The applicant proposes to disturb up to 3,058 square feet (SF) of area classified as 15-25% slope (STEEP SLOPE), up to 674 square feet (SF) of area classified as 25-35% slope (VERY STEEP SLOPE) and up to 1,706 square feet (SF) of area classified as 35%+ slope (EXCESSIVELY STEEP SLOPE) on the property. The total of the disturbed area on the project for the project is 5,438 square feet (SF). The subject site is located at 34 West Prospect Avenue in the IB (Intermediate Business) District and R-7.5 Residential Zoning District, and is designated as Volume 8, Sheet 13 Block 162, Lots 19A3, 19B, 22, 23 on the tax map of the Town of Greenburgh.

c.  <u>Case No. PB 06-05</u> 57 Paret Lane (Gazivoda) – 57 Paret Lane, Hartsdale, New York - *Wetlands/Watercourse and Town Planning Board Steep Slopes Permit*
Public hearing to review the proposes to renovate and build an addition to an existing single family house located on an approximately 67,725 square foot (SF) lot. The propose work would disturb approximately 2,200 square feet of the approximately 3,810 square feet watercourse buffer area. The proposed disturbance is located approximately twenty six (26) feet away from an intermittent watercourse. This application, as proposed, cannot be done without slope disturbance. The applicant proposes to disturb 1,911 square feet (SF) of area classified as steep slope (15-25% slope) and 1,316 square feet (SF) of area classified as "very steep slope" (25-35% slope) and 678 square feet (SF) of area classified as "Excessively Steep Slope." The total of the disturbed area for the project is 4,380 square feet (SF) on a 40,443 square feet (SF) property. The subject site is located on the north side of Paret Lane, approximately 675 feet from Hawthorne Road, in the R-40 Single Family Residence District, and is designated as Volume 8, Section 30, Sheet 28, Block 1764, Lot 12 on the tax map of the Town of Greenburgh.

d.  <u>Case No. PB 06-15</u> Bryant Ave. Lots 21 & 22 (Poguio) – Elmsford, New York - *Town Planning Board Steep Slopes Permit*
Public hearing to review the Poguio application for a Town Planning Board Steep Slope permit construction of a single-family residence on a 5,000 square foot vacant lot. The applicant proposes to disturb 1,715 square feet of area classified as 15-25% slope (STEEP SLOPE), 691 square feet of area classified as 25-35% slope (VERY STEEP SLOPE) and 619 square feet of area classified as slope 35% or greater (EXCESSIVELY STEEP SLOPE). The subject property is located on the westerly side of Bryant Avenue approximately 125 feet from Payne Street in the R-5 One Family Residence District. The property is designated as Volume 7, Section 20, Sheet 14, Block 1353, and Lots 21 & 22 on the tax map of the Town of Greenburgh.

e.  <u>Case No. PB 06-28</u> Endicott Avenue Lots 30 & 31 (Casolaro) -  – Elmsford, New York - *Town Planning Board Steep Slopes Permit*
Public hearing to review the Casolaro application for a Town Planning Board Steep Slope permit to construct a new single family home and driveway. The applicant proposes to disturb up to 2,143 square feet (SF) of area classified as 15-20% slope (STEEP SLOPE), up to 744 square feet (SF) of area classified as 20-35% slope (VERY STEEP SLOPE). The proposed total of the disturbed slope area is on the property is up to 5,000 square feet (SF). The proposed action cannot be done without slope disturbance. The property is located in the R-5 One Family Residential Zoning District, approximately 50 feet from the corner of Payne Street and Endicott Avenue. The property is designated as Volume 7, Section 20, Sheet 14, Block 1353, Lots 30 & 31 on the tax maps of the Town of Greenburgh.

**ESTABLISH DATE FOR NEXT MEETING**

**TOWN OF GREENBURGH**
**PLANNING BOARD**
**TOWN HALL – GREENBURGH - NEW YORK**
**WEDNESDAY – FEBRUARY 7, 2007**

The Work Session of the Planning Board of the Town of Greenburgh was held on Wednesday, February 7, 2007, in the auditorium of Greenburgh Town Hall, 177 Hillside Avenue, White Plains, New York. Chairperson Frances McLaughlin called the meeting to order at 7:35 P.M..

1. **ROLL CALL**

   Present:  Chairperson Frances McLaughlin, Stephanie Kavourias, Thomas McNamara, Kevin Morgan, Walter Simon.

   Absent:  Hugh Schwartz

   Staff:  Mark T Stellato, AICP, Commissioner, CD&C.
   Thomas Madden, AICP, Deputy Commissioner, CD&C.
   Aaron Schmidt, Forestry Officer, CD&C
   Janet Insardi, Deputy Town Attorney.

2. **APPROVAL OF MINUTES**

   a. **January 3, 2007 Minutes**
   Ms. Insardi noted that the minutes should reflect that Tim Lewis was the attorney for Case No. PB 00-14 Kathwood Road (WBRC Corp.).

   On a motion made by Ms. Kavourias and seconded by Mr. Morgan, the Planning Board voted unanimously to approve the January 3, 2007 work session minutes as amended.

3. **CORRESPONDENCE**
   a. *Discussion with Nikki Coddington, Energy Conservation Coordinator for the Town of Greenburgh.*
   Ms. Nikki Coddington, Energy Conservation Coordinator for the Town of Greenburgh, gave a presentation to the Planning Board concerning green buildings and green construction.

   Ms. Coddington noted that she has given the Town Board some directions on a green building policy as things in the world are moving very quickly to address climate change. Ms. Coddington noted that the Town of Greenburgh has joined the US Mayors' climate protection agreement and the Greenburgh was a leader in green construction for residential construction with the passing of the energy star requirement for new construction. Ms. Coddington noted that the Town has not passed a policy on the commercial construction. Ms. Coddington noted that currently she reviews an application and tries to have the applicant incorporate some form of energy efficiency or green construction.

   Ms. Coddington stated that many other municipalities are looking at using LEED standards for both public and private construction. She stated that the many of the municipalities are fast tracking the applications or offering incentives as part of the development. She noted that municipalities are looking at performance based measurement tool such as EPA's "Energy Star" program. This program looks at the energy that goes into the construction of the building. There is a third system called Green Globes that looks at green buildings.

   Ms. Coddington inquired as to what the Planning Board was looking for as part their own tool box in reviewing buildings. Chairperson McLaughlin noted that Planning Board is looking for to move forward in these areas and has been discussing installing green roofs on a building on Route 9A. Chairperson McLaughlin noted that the WMPF will be having seminar on green buildings on March 21.

   Mr. McNamara noted that he had sent out a presentation on LEED to the Board. Ms. Insardi noted that the Planning Board can make findings for green buildings and green roofs under SEQRA. Mr. McNamara noted that he is currently designing two green roofs. Mr. McNamara noted that he would like to know more about what is happening in Chicago and Boston. Chairperson McLaughlin noted that a dentist in Irvington has installed a lot of energy efficient and green technologies in the building and is expecting a pay back with in ten years.

Ms. Coddington noted that the Town already has the "Energy Star" already for residential buildings. Mr. McNamara stated that he thought that this was the biggest joke going because all the process is filling out a form and paying money. Mr. McNamara felt this was just another way for the Town to reach into a homeowner's wallet. Ms. Coddington noted that if the LEED standards are constantly updated as compared to the other standards. Mr. McNamara noted that he felt that this in not applicable to the Town. Mr. McNamara inquired whether the Town's New Library was following LEED. Ms. Coddington noted that the she believes they are following some of the LEED standards but was not sure if the building was going to be LEED certified. Ms. Coddington noted that one of the issues is the cost of the certification. She noted that some municipalities are requiring that a building could be LEED certifiable but not go through paying the costs of certification.

Mr. Walter inquired whether the LEED program takes into the balance the lifecycle of building and you could do a lifecycle back to the square one of the project, where do you draw the line in the analysis? Ms. Coddington stated that using the Hydrogen refueling station as an example, where do they get the energy to make the hydrogen and that the applicant should be getting the energy from clean sources. Ms. Coddington noted that the difference when looking at "energy star" would be the amount of energy the building uses during construction and once it is operating, where as LEED would looks at development as whole building and site design approach. Ms. Coddington noted that one of the drawbacks to LEED is the fact that the building could be LEED certified but not very energy efficient and the Town needs to incorporate a combination of standards.

Chairperson McLaughlin noted that the Planning Board is committed to moving forward with this and this needs to be worked into the Comprehensive Plan. Mr. McNamara felt that the Town should move forward with incentives. Chairperson McLaughlin asked if Ms. Coddington could research some other municipalities and bring that back to the Board for further discussion.

b. <u>Case No PB 06-20</u> **17 Longview Drive (Kurtul) – Minor Wetlands/watercourse submission**
   On a motion made by <u>Ms. Kavourias</u> and seconded by <u>Mr. Morgan</u>, the Planning Board voted unanimously to schedule the application for a work session to February 21, 2007.

c. <u>Case No. PB 06-37</u> **58 Paret Lane (Sarnataro) – Minor Wetlands/watercourse submission**
   On a motion made by <u>Ms. Kavourias</u> and seconded by <u>Mr. Morgan</u>, the Planning Board voted unanimously to schedule the application for a work session to February 21, 2007.

d. <u>Case No. PB 06-10</u> **1 Artillery Lane – Revised Steep Slopes Permit submission**
   On a motion made by <u>Ms. Kavourias</u> and seconded by <u>Mr. Morgan</u>, the Planning Board voted unanimously to schedule the application for a work session to March 7, 2007.

e. <u>Case No</u> PB 06-24 **46 Bretton Road –Edersheim - Steep Slopes Permit submission**
   On a motion made by <u>Ms. Kavourias</u> and seconded by <u>Mr. Morgan</u>, the Planning Board voted unanimously to schedule the application for a work session to March 7, 2007.

f. <u>Case No. PB 07-02</u> **Avalon Bay Properties - Steep Slopes Permit submission**
   On a motion made by <u>Ms. Kavourias</u> and seconded by <u>Mr. Morgan</u>, the Planning Board voted unanimously to schedule the application for a work session to March 7, 2007.

g. <u>Case No. PB 04-28</u> **Seely Place - Subdivision**
   Mr. Madden noted that the Planning Board, in its Final Subdivision Approval letter dated May 5, 2005, accepted a cash bond from the applicant, Mr. James Kennedy, in the amount of $129,947.00 in order to ensure that trees on the site would be removed and preserved. Mr. Madden noted that applicant has seeking release of the bond on the damaged trees.

   Mr. Richard Blancato, attorney for the applicant, stated that the applicant has complied with all aspects of the approval and that the applicant was seek release of the full amount of the bond since the bond is set to expire in one week.

   On a motion made by <u>Mr. Morgan</u> and seconded by <u>Ms. Kavourias</u>, the Planning Board voted unanimously to release the total $129,947.00 that was used for the tree protection bond for <u>Case No. PB 04-28</u> Seely Place.

4. **COMMITTEE REPORTS**
   a. **None**

5. **REFERRALS FROM THE TOWN BOARD**
   a. _Case No. PB 06-02 - Chase Bank (Heritage SPE, LLC), 353 North Central Park Avenue, White Plains, New York - Site Plan_
   A referral from the Town Board for a recommendation on a proposed project for site plan approval that involves the demolition of the existing +/-1,500 sq. ft. Mobil gas station and the construction of a 4,056 one-story Chase Bank building with two drive-thru lanes, parking stalls and drive aisles, landscaping, improved drainage and storm water collection, a landscaped buffer between the adjacent lot, and improved site lighting. The proposed action is located at 353 North Central Park Avenue, in the 259,984 sq. ft. (5.97-acres) Dalewood I Shopping Center, owned by Heritage SPE, LLC.. The property is located in the Central Avenue (CA) Impact District and the bank use is permitted as a principal use (Type II). The property is designated as Volume 8, Section 27, Sheet 27, Block 8271, Lots 14 &15 on the tax map of the Town of Greenburgh.

   Mr. Clifford Davis, attorney for the applicant noted that the applicant addressed the issues raised by the Planning Board. Mr. Davis stated that that applicant submitted a pedestrian count and movement study for the shopping center and Mr. Maris has reviewed this study. Mr. Davis noted that the application has provided a by pass lane on the plan as requested.

   Chairperson McLaughlin inquired as to how the pass thru lane would work. Mr. Irwin Anderson, traffic consultant for the applicant noted that the 10 foot wide passing lane would encroach into the landscape island and would allow the cars to go around any stalled or broken down cars.

   Chairperson McLaughlin asked why the applicant could not move the building closer to the Central Avenue so they did not have to cut down the size of the landscaping strip. Mr. Anderson noted that the applicant would be encroaching into the front yard setback and would then need to seek a variance on the application.

   Mr. McNamara stated that the project is located in the unified shopping district and that the applicant is not addressing how the proposed building works in promoting this adjective with the rest of the site and particular pedestrian access to the building. Mr. McNamara asked the applicant the applicant to submit a drawing that shows the building being rotated ninety degrees and oriented towards the rest of the site as opposed to Central Avenue and to submit a drawing that reflects a double façade, where the building is both oriented towards Central Avenue and the shopping center. Mr. Anderson noted that the application has includes several new sidewalks along Central Avenue and along the interior of the parking lot that allow access to the building. Chairperson McLaughlin asked how the pedestrians were to cross over from the main building to the proposed new building. Mr. Madden suggested that the applicant could include a crosswalk composed of pavers or stamped concrete in a different color that would highlight that where the crosswalk is located in front of the Verizon Store to the proposed bank.

   Chairperson McLaughlin asked Ms. Insardi if the removal of the gas station would affect any type of easements or restrictions on the site that were part of the approval. Mr. Madden noted that he would try to find the approval letter but was afraid this approval might be part of the records that were lost.

   Chairperson McLaughlin inquired if the speed bumps would be located before the crosswalks and wanted to the Police to review this. Chairperson McLaughlin noted that if speed bumps are not an option that the applicant could look at rumble strips in front the sidewalks.

   Chairperson McLaughlin noted that the Planning Board would like to have the applicant submit a revised plan and have the Police and Fire department opine on the proposed changes, in particular, regarding keeping the existing curb cut onto Central Avenue.

   On a motion made by Ms. Kavourias and seconded by Mr. Morgan, the Planning Board voted unanimously to schedule the application for a public discussion on February 21, 2007.



   b. *Case No. TB 07-01 – Local Law - Temporary Moratorium on Certain Applications and Approvals within the Central Avenue Mixed Use Impact District in the Town of Greenburgh*
   *A referral from the Town Board for a recommendation on a proposed Local Law for the "Temporary Moratorium on Certain Applications and Approvals within the Central Avenue Mixed Use Impact District in the Town of Greenburgh," in which the Town Board will consider a Local Law imposing a 180 day moratorium on the filing, acceptance and/or approval of applications for site plan and subdivision pertaining to the CA-Mixed Use Zoning District.*

Mr. Madden presented to maps that were produced by the Department for the discussion. Mr. Madden noted that the first map was of the entire Central Avenue Mixed Use Impact Zone. Mr. Madden went over the properties in the zone highlighting which properties were commercial, multifamily, single family, church, cemetery and vacant. Mr. Madden noted that the second map highlighted the vacant properties located along Central Avenue that could be developed. Mr. Madden noted that the Planning Board asked Staff to look at what the multiplier would be for multifamily development along Central Avenue. Mr. Madden noted that Rutgers University has just released a New York State multiplier for multifamily construction and that staff did a separate analysis of the number of school kids in multifamily developments along Central Avenue to see if the Rutgers multipliers corresponded to this area. Staff could only find information on Stone Ridge Manor located in the Edgemont school district.

Mr. Stellato noted that the when Stone Ridge Manor was being developed, the School district supplied the number on other multifamily developments that showed these type of projects generated higher number of students than the state multiplier average.

Mr. Madden handed to the Planning Board, tables on how the two multipliers were produced and how this corresponded to vacant property along Central Avenue and the number of school children each property would produce. Mr. Madden noted that the numbers were based on the overall property and did not take into account any deductions of the buildable area for steep slopes, wetlands or open space requirements. Mr. Madden noted that Staff is still researching the other multifamily buildings and has asked for assistance with the number from the school districts. Mr. Stellato noted that staff did look at some recent EIS that have been submitted and noted that the EIS were using a higher multiplier number for calculating the number of school children.

Mr. Madden noted that the school data along goes back to 1996 and the building data goes back to 1998 as this was all that was available electronically and if the Board would like further research then this analysis would have to be preformed by hand. Mr. Madden noted that staff is still analyzing the types of development that have been located along Central Avenue.

Chairperson McLaughlin spoke to the Commissioner of Westchester County DOT and he stated that the County was starting a Bus Rapid Study on the Central Avenue corridor and that the Town should be involved with this. Mr. Madden noted that the Town has been invited to participate in the study. Chairperson McLaughlin noted that the Central Avenue study should be all inclusive. Mr. Stellato noted that the consultant was in process of taking the data that staff was researching and look at making recommendations for the district.  Chairperson McLaughlin noted that the 1976 study was never really implemented. Mr. Madden noted that the staff was in the process of acquiring as much data as possible to paint an accurate picture of what is happening and this would work into the comprehensive plans study as well.

Mr. Madden handed to the Planning Board, tables that showed the increase in the Edgemont school district over the last few years as compared to the national average and the student enrollment of surrounding districts. Mr. Madden noted that again staff was waiting for data to do further analysis.

Chairperson McLaughlin asked staff to include the transcript from the Town Board public hearing that will held on February 14.

6.  **OLD BUSINESS**
   a.  *Case No. PB 00-14 Kathwood Road (WBRC Corp.) – Kathwood Road, Elmsford, New York – Preliminary Subdivision*
   *Work session to review the proposed preliminary subdivision application that proposes to merge of Lots 1-8 and Lots 17-28 which are separated by Wellford Road (a paper street) in order to create a six-lot subdivision, located*

*on Kathwood Road. The property is located in located R-7.5 One Family Residential District. The subject property is approximately 1.144 acres. The property is designated as Volume 7, Section 24, Sheet 43C and 43-D, Block 10 and 15, and includes Lots 1 through 8, and Lots 17 through 28 on the tax map of the Town of Greenburgh.*

On a motion made by <u>Ms. Kavourias</u> and seconded by <u>Mr. Morgan</u>, the Planning Board voted unanimously to reschedule the application for a work session to February 21, 2007.

7. <u>**NEW BUSINESS**</u>
   a. None

8. <u>**ITEM FOR PUBLIC HEARING AND PUBLIC DISCUSSION (ITEMS WILL START AT 8:45 P.M.)**</u>

   At 8:55 P.M., the Planning Board went into Public Hearing. All items for public hearing were transcribed and the transcript is attached to the minutes.

   a. <u>Case No. PB 05-32 Rama</u> - *70 Old Army Road, Scarsdale, New York – Wetland/watercourse violation*
      Continuation of a public hearing to determine the restoration of the affected wetland buffer to its condition prior to violation. The affected wetland buffer is located on the east side of Old Army Road, on the corner of Old Army Road and Ardsley Road, in the R-15 One Family Residence District, and is designated as Volume 8, Section 35, Sheet 38, Block 1735, Lot 8, on the tax map of the Town of Greenburgh.

   b. <u>Case No. PB 05-05</u> Dimarino - 34 West Prospect Avenue, White Plains, NY - *Site Plan, Preliminary Subdivision, Town Planning Board Steep Slopes permit*
      Continuation of a public hearing on a preliminary subdivision, site plan and Town Planning Board steep slopes permit application. The applicant is proposing a three (3) lot subdivision on 0.59 acres of land. The property is split between IB (Intermediate Business) District and R-7.5 Residential Zoning District. Two of the lots would be located in the R-7.5 Residential Zoning District and ingress and egress onto West Prospect Avenue. The other lot would be located in the IB (Intermediate Business) District and ingress and egress onto Fulton Street. The applicants proposes keep the existing house, located in the R-7.5 and build a new 2,688 sq. ft. single family residence on the proposed adjacent lot. The applicant is proposing to build a 960 sq. ft. building on the proposed lot located in the IB District. The applicant proposes to disturb up to 3,058 square feet (SF) of area classified as 15-25% slope (STEEP SLOPE), up to 674 square feet (SF) of area classified as 25-35% slope (VERY STEEP SLOPE) and up to 1,706 square feet (SF) of area classified as 35%+ slope (EXCESSIVELY STEEP SLOPE) on the property. The total of the disturbed area on the project for the project is 5,438 square feet (SF). The subject site is located at 34 West Prospect Avenue in the IB (Intermediate Business) District and R-7.5 Residential Zoning District, and is designated as Volume 8, Sheet 13 Block 162, Lots 19A3, 19B, 22, 23 on the tax map of the Town of Greenburgh.

   c. <u>Case No. PB 06-05</u> 57 Paret Lane (Gazivoda) - 57 Paret Lane, Hartsdale, New York - *Wetlands/Watercourse and Town Planning Board Steep Slopes Permit*
      Public hearing to review the proposes to renovate and build an addition to an existing single family house located on an approximately 67,725 square foot (SF) lot. The propose work would disturb approximately 2,200 square feet of the approximately 3,810 square feet watercourse buffer area. The proposed disturbance is located approximately twenty six (26) feet away from an intermittent watercourse. This application, as proposed, cannot be done without slope disturbance. The applicant proposes to disturb 1,911 square feet (SF) of area classified as steep slope (15-25% slope) and 1,316 square feet (SF) of area classified as "very steep slope" (25-35% slope) and 678 square feet (SF) of area classified as "Excessively Steep Slope." The total of the disturbed area for the project is 4,380 square feet (SF) on a 40,443 square feet (SF) property. The subject site is located on the north side of Paret Lane, approximately 675 feet from Hawthorne Road, in the R-40 Single Family Residence District, and is designated as Volume 8, Section 30, Sheet 28, Block 1764, Lot 12 on the tax map of the Town of Greenburgh.

   d. <u>Case No. PB 06-15</u> Bryant Ave. Lots 21 & 22 (Poguio) – Elmsford, New York - *Town Planning Board Steep Slopes Permit*
      Public hearing to review the Poguio application for a Town Planning Board Steep Slope permit construction of a single-family residence on a 5,000 square foot vacant lot. The applicant proposes to disturb 1,715 square feet of area classified as 15-25% slope (STEEP SLOPE), 691 square feet of area classified as 25-35% slope (VERY

STEEP SLOPE) and 619 square feet of area classified as slope 35% or greater (EXCESSIVELY STEEP SLOPE). The subject property is located on the westerly side of Bryant Avenue approximately 125 feet from Payne Street in the R-5 One Family Residence District. The property is designated as Volume 7, Section 20, Sheet 14, Block 1353, and Lots 21 & 22 on the tax map of the Town of Greenburgh.

e.   Case No. PB 06-28 Endicott Avenue Lots 30 & 31 (Casolaro) - – Elmsford, New York - *Town Planning Board Steep Slopes Permit*
     Public hearing to review the Casolaro application for a Town Planning Board Steep Slope permit to construct a new single family home and driveway. The applicant proposes to disturb up to 2,143 square feet (SF) of area classified as 15-20% slope (STEEP SLOPE), up to 744 square feet (SF) of area classified as 20-35% slope (VERY STEEP SLOPE). The proposed total of the disturbed slope area is on the property is up to 5,000 square feet (SF). The proposed action cannot be done without slope disturbance. The property is located in the R-5 One Family Residential Zoning District, approximately 50 feet from the corner of Payne Street and Endicott Avenue. The property is designated as Volume 7, Section 20, Sheet 14, Block 1353, Lots 30 & 31 on the tax maps of the Town of Greenburgh.

## 9.   ESTABLISH DATE FOR NEXT MEETING

The next regular meeting of the Greenburgh Planning Board will be Wednesday, February 21, 2007 and will begin at 8:00 P.M.

## 10.  ADJOURNMENT

The February 7, 2007 work session of the Greenburgh Planning Board was adjourned at 11:07 P.M.

Respectfully submitted,


_____
Thomas Madden, AICP
Deputy Commissioner
Department of Community Development and Conservation

# Number of Potential School-Age Children Among Developable Site Along Central Avenue

| Address | Acres | Max. # of Bedrooms Permitted Under Current Zoning (35 Units/Acre) | # of Units Based on Equal Mix of 2- and 3- Bedroom Units | # of School-Age Children Based on Standard Multiplier (0.215) | # of School-Age Children Using Stone Ridge Multiplier (0.6) |
|---|---|---|---|---|---|
| 1) 90 Central Park Avenue South | 0.91 | 31.85 | 12.74 | 3 | 8 |
| 2) Central Park Avenue South | 2.41 | 84.35 | 33.74 | 7 | 20 |
| 3) Central Park Avenue South | 2.26 | 79.1 | 31.64 | 7 | 19 |
| **Total** | | | | **17** | **47** |
| 1) 62 Dromore Road | 2.34 | 81.9 | 32.76 | 7 | 20 |
| 2) 520 Central Park Avenue South | 1.567 | 54.845 | 21.938 | 5 | 13 |
| 3) 540 Central Park Avenue South | 0.46 | 16.1 | 6.44 | 1 | 4 |
| 4) Central Park Avenue South | 0.25 | 8.75 | 3.5 | 1 | 2 |
| **Total** | | | | **14** | **39** |

**Comparison of School Districts in the Town of Greenburgh**

Based on readily available data for all school districts within the Town of Greenburgh, for the years 1998-2005, there was an increase in the Edgemont Union Free School District of 251 students, or a 15.3% increase. Each year during this period saw an increase in the number of students, which was not the case for all school districts in the Town. The Greenburgh Central School District saw a decrease in the number of students of 11.2% (or 226 students) over this same period, and the Dobbs Ferry Union Free School District saw a 0.8% decrease (or 11 students). The school district which experienced the most similar increase (in terms of percentage increase) to the Edgemont School District is the Greenburgh-Graham Union Free School District, which experienced a 16.5% increase in enrollment between 1998 and 2005. However, enrollment saw increases as well as decreases from one year to the next, unlike the Edgemont Union Free School District, which saw increase each year.

**National vs. Edgemont Union Free School District Trends**

| School Year | Edgemont Union Free SD | Enrollment in All Educational Institutions in U.S. |
|---|---|---|
| 1991-1992 | 1,355 | 61,681 |
| 1992-1993 | 1,356 | 62,633 |
| 1993-1994 | 1,397 | 63,118 |
| 1994-1995 | 1,389 | 63,888 |
| 1995-1996 | 1,452 | 64,764 |
| 1996-1997 | 1,485 | 65,743 |
| 1997-1998 | 1,584 | 66,470 |
| 1998-1999 | 1,643 | 66,982 |
| 1999-2000 | 1,672 | 67,667 |
| 2000-2001 | 1,678 | 68,671 |
| 2001-2002 | 1,730 | 69,920 |
| 2002-2003 | 1,798 | 71,215 |
| 2003-2004 | 1,834 | 71,760 |
| 2004-2005 | 1,894 | 71,865 |
| 2005-2006 | 1,914 | 72,075 |
| 2006-2007 | 1,923 | 72,657 |
| % increase: | 41.92% | 17.79% |
| Source: New York State Department of Education; Michelle McNally; Digest of Education Statistics, 2005. | | |

As made evident in the table above, the Edgemont Union Free School District has seen a much greater increase in enrollment than that which was seen throughout the nation as a whole. The Edgemont School District experienced an almost 42% increase in its student enrollment over the last 15 years, while in the nation overall, there has been an 18% increase in enrollment.



**Standard Multipliers (based on Stone Ridge Manor development)**

| Unit Type | # Units | Standard Multiplier* | # School-Age Children |
|---|---|---|---|
| 3-bedroom | 12 | 0.39 | 4.68 |
| 2-bedroom | 28 | 0.14 | 3.92 |
| Total | 40 | **0.215** | **8.6** |

| | | | |
|---|---|---|---|
| to get overall | 12/40= | 0.3 | |
| standard multiplier | 28/40= | 0.7 | |
| (using weighted | 0.39*0.3= | 0.117 | |
| average): | 0.14*0.7= | 0.098 | |
| | 0.117+0.098= | **0.215** | |

*Standard multiplier came from Rutgers University, Center for Urban Policy Research, *Residential Demographic Multipliers: Estimates of the Occupants of New Housing*, June 2006.

**Multipliers based on Stone Ridge Manor development, with 24 actual schoolchildren generated\*\***

| Unit Type | # Units | Multiplier | # Children |
|---|---|---|---|
| 3-bedroom | 12 | 0.6 | 7.2 |
| 2-bedroom | 28 | 0.6 | 16.8 |
| Total | 40 | **0.6** | **24** |

| | | |
|---|---|---|
| 24*(12/40)= | 7.2 | |
| 24*(28/40)= | 16.8 | |
| 7.2/12= | 0.6 | |
| 16.8/28= | 0.6 | |

***The number of school-age children generated from Stone Ridge Manor development came from Michelle McNally, resident within Edgemont SD.

**Residential Demographic Multipliers**
**New York - All School Children: School-Age Children**

| Structure Type/Bedrooms | Total SAC |
|---|---|
| Single-Family Detached, 2 BR | 0.25 |
| Single-Family Detached, 3 BR | 0.58 |
| Single-Family Detached, 4 BR | 1.05 |
| Single-Family Detached, 5 BR | 1.47 |
| Single-Family Attached, 2 BR | 0.14 |
| Single-Family Attached, 3 BR | 0.39 |
| Single-Family Attached, 4 BR | 1.12 |
| 5+ Units-Own, 1 BR | 0.14 |
| 5+ Units-Own, 2 BR | 0.14 |
| 5+ Units-Own, 3 BR | 0.59 |
| 5+ Units-Rent, 1 BR | 0.08 |
| 5+ Units-Rent, 2 BR | 0.23 |
| 5+ Units-Rent, 3 BR | 1.00 |
| 2-4 Units, 1 BR | 0.36 |
| 2-4 Units, 2 BR | 0.45 |
| 2-4 Units, 3 BR | 0.83 |

source: Rutgers University, Center for Urban Policy Research,
Residential Demographic Multipliers: Estimates of the Occupants of New Housing, June 2006.



## Town of Greenburgh School District Enrollment, 1998-2006

Legend:
- Edgemont Union Free SD
- Greenburgh Central SD
- Ardsley Union Free SD
- Dobbs Ferry Union Free SD
- Elmsford Union Free SD
- Greenburgh Eleven Union Free SD
- Greenburgh-Graham Union Free SD
- Greenburgh-North Castle Union Free SD
- Hastings-on-Hudson Union Free SD
- Irvington Union Free SD
- Pocantico Hills Central SD
- Union Free SD of the Tarrytowns
- Valhalla Union Free SD



# Population Density, 2000

*Population*

33

Data represents population by
Census Block Group. Map prepared
by the Westchester County Department
of Planning.

*WESTCHESTER COUNTY DEPARTMENT OF PLANNING DATABOOK*

# EXHIBIT 22

Edgemont Junior Senior High School - Scarsdale, New York/NY - Public School Profile



# PUBLIC SCHOOL
### R E V I E W
*public elementary, middle, and high schools*

‣ Home
‣ About Public Schools
‣ Find Schools
‣ Research Communities

[ Search ]

### Home > New York > Westchester > Edgemont Junior Senior

**School District**
Discover the best school districts before you buy a home or move.
NeighborhoodScout.com

**High School Summer School**
Take Summer School Classes Online. State Accredited & Transferable!
www.AlliedHighSchool.com

Ads by Google

## Edgemont Junior Senior High School

200 White Oak Ln, Scarsdale, NY 10583 - 1723 - ⊕ Map          tel: (914)725-1500

▢ Visit School Website          ☉ View current housing listings in 10583

▢ Review this school!

🔍 Find your graduating class at Classmates.com

School Website

### School Overview:

School Reviews:

| Definition of Terms | Edgemont Junior Senior High School |
| --- | --- |
| School Level | High school |
| Grades Offered | Grades 7 - 12 |
| County | Westchester County, NY |

▢ Review This School!

### *Students & Faculty*

| | |
| --- | --- |
| Total Students | 864 students |
| % Male / % Female | 53%  /  47% |
| Total Classroom Teachers | n/a |
| | Grade 7 - 134 students |
| | Grade 8 - 162 students |
| | Grade 9 - 134 students |
| Students by Grade | Grade 10 - 158 students |
| | Grade 11 - 136 students |
| | Grade 12 - 140 students |

| | This School | ( NY ) School Average |
| --- | --- | --- |
| Teacher : Student Ratio | n/a | *1:14* |

| *Students by Ethnicity* | This School | ( NY ) School Average |
| --- | --- | --- |

Edgemont Junior Senior High School - Scarsdale, New York/NY - Public School Profile

| | | | |
|---|---|---|---|
| % Asian | 18% | 7% | |
| % Hispanic | 1% | 21% |  |
| % Black | 1% | 21% | |
| % White | 81% | 50% | |

| Additional Student Information | This School | ( NY ) School Average |
|---|---|---|
| % Eligible for Free Lunch | n/a | 1% |
| % Eligible for Reduced Lunch | n/a | n/a |
| % Migrant Students Enrolled | n/a | n/a |

## School Performance:

| | ( NY ) Statewide Testing Performance |
|---|---|
| School Statewide Performance | View Education Department Test Scores |

## School District:

School District Name    Edgemont Union Free School District

| | This School's Agency | ( NY ) District Average |
|---|---|---|
| Number of Schools Managed | 3 | 9 |
| Number of Students Managed | 1,834 students | 6,022 students |
| District Total Revenue | $22,217,000 | $67,644,000 |
| District Expenditure | $20,872,000 | $69,648,000 |
| District Revenue / Student | $12,114 | $9,510 |
| District Expenditure / Student | $11,381 | $10,550 |
| District Graduation Rates | n/a | 77% |

## School Notes:

- Add information about this school (e.g., awards, news stories, notable alumni, fun facts)

## School Zip Code:

| About This Zip Code ( 10583 ) | School Zip ( 10583 ) | ( NY ) State Average |
|---|---|---|
| Population (Approximate) | 39,091 people | 18,256,961 people |
| % (age 25+) w/College Degree | 74% | 32% |
| Population Average Age | 41 years old | 35 years old |
| Average Household Size | 2.8 persons | 2.6 persons |
| Median Household Income | $122,234 | $42,801 |

http://www.publicschoolreview.com/school_ov/school_id/55105

Edgemont Junior Senior High School - Scarsdale, New York/NY - Public School Profile

Avg. # of Rooms in Household      7.3 rooms          4.7 rooms



Median Value of Housing Unit
Zipcode (10583)



What's a Zindex?
Subject to Zillow Terms of Use

Median Age of Housing Structure      56 years old          55 years old

% Owning / % Renting          85% / 15%            44% / 56%

## School Map:

Get: driving directions ☀ Weather: 10-day forecast or monthly climate averages.

Tip: Zoom in/out using the slider below. View aerial photos using the Satellite or Hybrid buttons.

Note: Data has been gathered from several government and commercial data sources. School data reflects years 2002-04 statistics (most recent years available). Area and demographic data reflects year 2000 statistics. Public School Review does not ensure the timeliness or accuracy of the information on this site.

More Options:

- View website: 🖥 Visit school website
- Find housing: ⊕ View current housing listings in 10583
- Reconnect: 🔍 Find your graduating class at Classmates.com

- Review:  Submit a review for this school
- Tools: Search schools by zip, Compare schools side-by-side
- More schools: Private schools, Boarding schools & military schools
- Return to: Westchester County public schools, New York public schools, Home

**Featured Partners:**

Find Your Graduating Class

I Graduated in [1994 / 1993 / 1992 / 1991]

classmates.com

home | about public school | find schools | research communities

about us | display school data | school mailing lists | site partners | feedback | public school jobs

**Find More Schools: Private Schools, Boarding Schools & Military Schools, Community Colleges**

Copyright 2003- 2007 Public School Review LLC. All rights reserved.
Use of this site constitutes acceptance of our User Agreement and Privacy Policy

# EXHIBIT 23

S&R Development Estates, LLC
600 Mamaroneck Avenue
Harrison, NY 10528


February 14, 2007


The Honorable Members of the Planning Board
of the Town of Greenburgh
177 Hillside Avenue
Greenburgh, NY  10607


Re:     Resolution of the Town Board Proposing a
Moratorium on Construction in
the Central Avenue Mixed-Use      Impact
District ("CA District").


Dear Honorable Members of the Planning Board of Greenburgh:

We have written to you twice previously, on January 17, 2007 and January 31, 2007.  We write again to respond to presentations made to you at your working session of February 7, 2007.

The presentation was made in the context of your review of a moratorium resolution prohibiting development in the CA-I Zone adopted by the Town Board on January 12, 2007.

Previously, on January 8, 2007, the Planning Commissioner publicly stated that he supported the moratorium and it is evident that the materials submitted to you have been chosen and manipulated to further support a moratorium.  The presentations of February 7, 2007 were intended to show that the CA-I Zone contained 7 sites which reasonably could be developed as multi-family residential housing; that such development would generate a significant number of new students in the Edgemont School District; and that with the addition of those students the School District would become so overburdened as to create an emergency situation necessitating a moratorium on residential construction in the CA-I Zone.

Very quickly, you pointed out some of the inappropriate assertions. For example, you questioned the Commissioner's inclusion as a developable site the Historic Greenville Cemetery, development there being so unlikely as to make its inclusion improper and clearly intended to mislead.

Let me look at each of the documents submitted (at least those copies of which you kindly furnished to me):

1. Chart entitled "Overall Student Enrollment Percentage Increase"

This chart purports to compare the percentage increase in enrollment in Edgemont as against the "National" overall increase. National enrollment statistics are inappropriate in assessing enrollment in a single community. The chart fails to disclose the scope of the national enrollment cited. It may include colleges, universities, graduate and professional schools, *etc.* It may include areas with declining population, the "rust belt", New Orleans, *etc.* It is unlikely that this chart shows a comparison of apples to apples.

Why the choice of a base year 1991-1992? The Edgemont Board of Education published statistics on November 28, 2006 which should have been disclosed to you. I attach a copy. It shows that in the 27 years from 1979, total K-12 enrollment increased from 1,604 to 1,921 *i.e.*, a total of 317 students; a percentage increase total of only 20% in 27 years; an average annual increase of 0.74%. The base date of the chart submitted to you distorts the facts.

We believe that between the years 1982, when the Scarsdale Woods Project was built and 2003 when the Stone Ridge Project was built there was no significant multifamily development in the CA – I Zone. But, look at the chart! It shows dramatic percentage increases in student enrollment during those very same years. Obviously, that increase in enrollment did not come from the CA-I Zone, but instead came from new single family homes and from numerous additions/enlargements of existing homes outside the CA-I Zoning district.

This chart does not support the need for a moratorium on residential construction in the CA - I Zone.

2. Chart entitled "Comparison of School Districts in the Town of Greenburgh"

There is presented in tabular form a comparison between enrollment in the Edgemont district and all Educational Institutions in the U.S. Again, we ask what institutions are included in this national category. We repeat that a national statistic is not relevant and finally we call to your attention the gross misstatement of the U.S. education population which exceeds fifty-four million students is here stated as less than one hundred thousand.

2

3. Chart entitled "Town of Greenburgh School District Enrollment"

This chart is likewise guilty of the base year gimmick and shows no basis for finding the CA-I Zoning District as responsible for increases in school enrollment.

4.  Chart entitled "Number of Potential School-Age Children Among Developable Sites Along Central Avenue"

This chart is intentionally opaque because it does not clearly identify the location of two of the largest sites listed. More importantly, the analysis employed to determine potential development is completely flawed and results in misleading the Planning Board: a) It lists sites that contain fewer than two acres, the minimum required for residential development in the CA-I Zone; b) does not calculate the reduction in potential development which results from the existence of Steep Slopes encountered on the sites; c) does not take into account the reduction in potential development at sites which cannot realistically accommodate setback requirements for front, rear and sideyards; d) does not realistically take into account sites which will most likely be developed for commercial uses, are already developed for commercial uses or are already used for non-residential uses such as the historic Greenville Cemetery.

The Chart sets forth a misleading assumption of the likely mix of the number of bedrooms in potential residential developments, assuming an unrealistic equal mix of two and three bedroom units. More specifically, our development – 62 Dromore Road, will be 100% two bedroom apartments. This fact was well known to the Commissioners, but totally ignored in their misstatement. Two bedroom units produce many fewer students. For 62 Dromore Road the statistical evidence indicates that we should expect our development to generate only 7 school children at any one time. In our own private calculations we assumed the project would produce 15 students. But even our own number – more than double the statistical expectation - will not produce a significant number of school children or burden the school system with its 1,921 students.

The inclusion of Stone Ridge Manor, a townhome development occupied by renters-not owners, as a norm is totally unjustified and should be totally disregarded.

Let me step back and review the basic issues presented.

Is there an emergency requiring a moratorium?

The Planning Commissioner has found only two sites, other than ours, in the CA-I District with nominally more than the requisite two acres (without consideration of their possible impairment by the factors described above). Only our site, 62 Dromore Road, is currently planned for development and our site will produce only 7 school

children (even if you double that number to 15 it will not create a burden).

The analysis showing large percentage increases in Edgemont school population are not related to residential development in the CA-I Zone, and going forward there will be little residential development in the CA-I Zone where potential development sites have all been built upon, except for our site and possibly two of the others the Commissioner has found.

An increase in school population in itself does not create an emergency. The School District in the past has very successfully accommodated the growth the Commissioner describes. The Edgemont School District is well known as a superior district in Westchester and is ranked by Newsweek as the 56th best school system in the entire nation. Class sizes average only 20-21 students and the Edgemont Board of Education describes in detail its ability to provide each student flexibility with course choices, changes in courses, advanced placement opportunities, foreign language opportunities, *etc.* . This is a healthy, most successful school district, certainly not one facing an emergency requiring a moratorium in the CA-I District to prevent the attendance of 7-15 students.

All of the smoke and confusion created by the material submitted to you is intended to block our project. As you can see and as we predicted the arguments about needing a moratorium on commercial development have faded away and the remaining argument that the School System requires protection from burdensome residential development is not supported by any reasonable review of the facts.

The Town Board is abjectly surrendering to political pressure and hysteria from certain members of the Edgemont community. Their resolution reflects that unseemly pressure and should be rejected.

Very truly yours,

S&R Development Estates, LLC

By: _____

Richard Troy
Managing Member

cc:    Town Supervisor, Hon. Paul Feiner
       The Honorable Members of the Town Board of Greenburgh

4

2 Edgemont

Presented 11/28/06

**Enrollment History-Taken from October BEDS data**

| | K | 1 | 2 | 3 | 4 | 5 | 6 | Spec. | K-6 Total | 7 | 8 | 9 | 10 | 11 | 12 | Spec. | 7-12 Total | K-12 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1979 | 70 | 94 | 89 | 100 | 119 | 127 | 106 | | 705 | 155 | 147 | 156 | 151 | 166 | 124 | | 899 | 1604 |
| 1980 | 62 | 84 | 94 | 100 | 103 | 118 | 134 | | 695 | 109 | 156 | 148 | 154 | 146 | 164 | | 877 | 1572 |
| 1981 | 64 | 71 | 89 | 98 | 104 | 101 | 118 | | 645 | 131 | 114 | 155 | 148 | 154 | 143 | | 845 | 1490 |
| 1982 | 61 | 80 | 75 | 99 | 105 | 109 | 106 | | 635 | 126 | 131 | 123 | 152 | 152 | 144 | | 828 | 1463 |
| 1983 | 74 | 74 | 75 | 88 | 110 | 105 | 107 | | 633 | 111 | 132 | 136 | 120 | 153 | 146 | | 798 | 1431 |
| 1984 | 71 | 88 | 82 | 78 | 102 | 106 | 107 | | 634 | 101 | 118 | 130 | 120 | 112 | 153 | | 734 | 1368 |
| 1985 | 76 | 83 | 102 | 93 | 83 | 108 | 112 | | 657 | 113 | 111 | 120 | 133 | 131 | 114 | 1 | 723 | 1380 |
| 1986 | 98 | 96 | 82 | 111 | 95 | 83 | 114 | | 679 | 109 | 116 | 109 | 121 | 131 | 153 | | 739 | 1418 |
| 1987 | 86 | 108 | 96 | 87 | 111 | 98 | 94 | | 680 | 119 | 104 | 118 | 107 | 118 | 126 | | 692 | 1372 |
| 1988 | 95 | 85 | 125 | 93 | 89 | 112 | 89 | | 688 | 93 | 123 | 105 | 116 | 105 | 121 | | 663 | 1351 |
| 1989 | 99 | 108 | 87 | 120 | 92 | 84 | 110 | | 700 | 88 | 102 | 110 | 109 | 113 | 111 | | 633 | 1333 |
| 1990 | 99 | 99 | 104 | 105 | 116 | 87 | 93 | 8 | 711 | 118 | 93 | 103 | 105 | 104 | 109 | | 632 | 1343 |
| 1991 | 112 | 113 | 98 | 106 | 100 | 120 | 91 | 7 | 747 | 95 | 112 | 96 | 95 | 104 | 106 | | 608 | 1355 |
| 1992 | 94 | 119 | 116 | 97 | 106 | 97 | 123 | 9 | 761 | 93 | 101 | 112 | 86 | 93 | 108 | 2 | 595 | 1356 |
| 1993 | 125 | 117 | 123 | 121 | 92 | 106 | 89 | 4 | 777 | 128 | 94 | 99 | 122 | 82 | 95 | | 620 | 1397 |
| 1994 | 105 | 123 | 110 | 120 | 107 | 87 | 107 | | 759 | 89 | 133 | 100 | 101 | 120 | 87 | | 630 | 1389 |
| 1995 | 125 | 122 | 131 | 111 | 122 | 106 | 90 | | 807 | 107 | 94 | 130 | 99 | 98 | 117 | | 645 | 1452 |
| 1996 | 106 | 135 | 119 | 132 | 119 | 121 | 115 | | 847 | 90 | 113 | 99 | 143 | 96 | 97 | | 638 | 1485 |
| 1997 | 150 | 118 | 139 | 124 | 134 | 128 | 125 | | 918 | 126 | 92 | 111 | 101 | 142 | 94 | | 666 | 1584 |
| 1998 | 112 | 159 | 122 | 141 | 131 | 131 | 130 | | 926 | 126 | 127 | 106 | 112 | 106 | 140 | | 717 | 1643 |
| 1999 | 110 | 122 | 171 | 127 | 145 | 138 | 138 | | 951 | 137 | 129 | 123 | 114 | 115 | 103 | | 721 | 1672 |
| 2000 | 117 | 117 | 121 | 167 | 124 | 142 | 139 | | 927 | 136 | 134 | 134 | 125 | 109 | 113 | | 751 | 1678 |
| 2001 | 127 | 126 | 121 | 121 | 166 | 125 | 149 | 6 | 941 | 134 | 139 | 143 | 139 | 128 | 106 | | 789 | 1730 |
| 2002 | 121 | 136 | 135 | 129 | 131 | 166 | 129 | | 947 | 155 | 136 | 154 | 139 | 142 | 124 | | 850 | 1797 |
| 2003 | 121 | 131 | 144 | 130 | 134 | 136 | 174 | | 970 | 134 | 162 | 134 | 158 | 136 | 140 | | 864 | 1834 |
| 2004 | 120 | 141 | 141 | 149 | 141 | 143 | 140 | | 975 | 184 | 137 | 166 | 136 | 159 | 137 | | 919 | 1894 |
| 2005 | 124 | 136 | 138 | 152 | 149 | 140 | 139 | | 978 | 151 | 184 | 143 | 170 | 133 | 155 | | 936 | 1914 |
| 2006 | 137 | 133 | 140 | 142 | 156 | 154 | 140 | | 1002 | 138 | 155 | 189 | 140 | 166 | 131 | | 919 | 1921 |

# EXHIBIT 24

 **MAIL**

Print - Close Window

**Subject:** Dromore Road update

**Date:** Mon, 26 Feb 2007 21:33:22 -0500

**From:** "Steve Bass" <sbass@greenburghny.com>

**To:** gblist@cit-e.net

Over the last several months there has been much discussion about a property next to the Greenburgh Nature Center and Edgemont High School 's playing fields. The owners of that property had expressed their intention to build a 37-unit condominium complex. Today the owners were informed that their parcel is zoned for single-family housing only.

The property, which is located off Central Avenue on Dromore Road , was thought to be in the Central Avenue mixed-use zone, where the only residential development permitted is multifamily housing. The Dromore Road site, which consists of approximately two and a half acres, is actually in an R-20 district, which is zoned for single family residences on minimum half-acre lots.

The Town Council understands that the Greenburgh Nature Center 's board and Edgemont residents may prefer to see the Dromore Road property not developed at all and to have it preserved instead as open space. The Town Council will continue to explore with community leaders that possibility.

# EXHIBIT 25

Scarsdale Inquirer 3/2/07

# Mistake removes threat of apartments on Dromore

### By HEATHER MURRAY

A clerical error in amending the official Greenburgh town zoning map back in 1996 almost resulted in allowing the potential development of a 37-unit multifamily complex on 62 Dromore Road neighboring the Edgemont High School playing fields and the Greenburgh Nature Center.

Luckily for Greenburgh and Edgemonters alike, Town Councilman Francis Sheehan caught the mistake last week while tracing the map's evolution over the years. He told the Inquirer he had wondered why the Central Avenue mixed-use district extended to a Dromore Road property set off from Central Avenue. In fact, it does not. Once Sheehan saw the mistake, he had town employees research further into the CA zone's history to make sure he was correct.

The error crept in when lines for a new conservation overlay zone were drawn in. The Dromore Road property, which clearly sat in the R-20 single-family residential zone, appeared from 1996 onward to be in the Central Avenue mixed-use zone.

So, when developers who bought the property back in May dropped by town hall to say they were interested in putting up a new single-family house there, building Inspector John Lucido, relying on the erroneous map, told them they were not allowed to (Lucido was on vacation this week and could not be reached for comment). According to

*Continued on page 11*

# Threat of apartments on Dromore Road in error

Continued from page 1

the official zoning map, the property was designated as mixed-use rather than residential. What they could do was build a multi-family residence. S & R Development Estates decided to do just that, coming back in January with tentative plans to build 37 units.

The town sent a letter Monday to the developer's attorney, informing her that the "property located on 62 Dromore was, and still is, located in the R-20 one-family residence district and not included in the town board's resolution of rezoning to the new Central Avenue mixed-use impact district."

Although according to the zoning ordinance on the books the developers can no longer build 37 units or realize the $7.6-million rise in the property's value they were expecting, they can fit two, or possibly three, houses there, Sheehan said.

Edgemont resident Bob Bernstein said while he feels "the town is on solid legal ground in disclaiming reliance on an apparently erroneous zoning map ... the matter is not entirely free from doubt." The town code states that the official zoning map is "the final authority as to the current zoning classification of any land within the boundaries of the unincorporated Town of Greenburgh." Developers could argue the erroneous map was still the official one, and thus, the final authority.

Bernstein said more oversight needs to be done in the future. "The ultimate bible is the town's zoning map. The map requires certification by the supervisor that it is correct. And he wasn't doing that."

Sheehan said he was looking at ways to prevent this from happening in the future. "I am a strong proponent of administrative standards. We have outstanding town staff. We simply need administrative protocols for them to follow. In the instant case, we need more eyes looking at changes to the official zoning map." He suggested that in addition to the supervisor either the entire town board sign the map, or at minimum, the liaison to the zoning board of appeals and planning board.

"Each revision to the map should be separately documented, with original signatures and copies of prior revisions saved for archival purposes. This has not been past practice, but it is worth implementing to safeguard against incorrectly drawn lines going unnoticed in the future," Sheehan said.

Town Supervisor Paul Feiner said he was glad "there was no harm in this mistake. We have a professional staff that takes care of the maps. All of our land use reviews get such extensive analysis that errors should be caught. We try to do a perfect job, but everybody's human."

Feiner said whether or not the mistake had been caught in time, the developers no longer planned to build 37 units. A month ago they sent a second proposal to town hall lowering the number to nine or 10 units.

The GNC and Edgemonters have both expressed interest in preserving this property as open space.

Bernstein said, "We have to be sure we have a willing buyer and a willing seller. We aren't sure we have either at this point. Am I interested as a leader in more open space for Edgemont? Absolutely."

GNC board president Mike Sims said, "We're very comforted by the news. I need to meet with my board, the town board and community members to see if we can go forward and preserve that property." Sims said if there is community and board support, he sees multiple ways to raise the cash to buy the property including private donation and reliance on community and town support.

Sims said the GNC will reach out to Edgemonters. "We need to find out how passionate they are about preserving the property. It's pretty easy for a community member to say it's not acceptable to have dense multifamily housing here. It's quite another thing when it comes down to two or three houses at most."

Councilman and liaison to the GNC Steve Bass said, "I would like to think there are many options here and will keep the dialogue open."

# EXHIBIT 26

# KRAMER LEVIN NAFTALIS & FRANKEL LLP

TONI L. FINGER
ASSOCIATE
PHONE 212-715-9239
FAX 212-715-8235
TFINGER@KRAMERLEVIN.COM

March __, 2007

<u>**BY FEDERAL EXPRESS**</u>

Ms. Alfreda Williams
Records Access Officer
Town of Greenburgh
177 Hillside Avenue
Greenburgh, New York 10607

     Re:    <u>Application for Public Access to Records per Freedom of Information Law</u>

Dear Ms. Williams:

     We are counsel to S&R Development Estates LLC, owner of the property (hereinafter referred to as the "Property") located at 1 Dormore Road, Scarsdale, New York 10583, situated within the Town of Greenburgh and designated by the Town of Greenburgh as Section 31, Sheet 37B, Block 1692, Lots 14A, 70A, 70B and 70C.

     We hereby submit a request pursuant to the Freedom of Information Law for copies of all documents and records (including, but not limited to, all maps, resolutions, amendments, Local Laws, reports, studies, memoranda, notes, exhibits, transcripts, meeting minutes and audiotapes) of, prepared by or on behalf of, or received by, the Town of Greenburgh, its Town Board, its Planning Board or any other Town board, department or officer) pertaining to any of the following:

     (1)    the creation of the Central Avenue Mixed-Use Impact District (the "CAMUID"), or any proposed or actual amendments or modifications of the CAMUID;

     (2)    the boundaries of the CAMUID or any proposed or actual amendments or modifications of those boundaries;

     (3)    any versions of the Zoning Map or the Tax Map of the Town of Greenburgh effectuated in effect as of January 1, 1908, or effectuated at any time since that date;

     (4)    any subdivision of land or lots of which the Property is or ever was a part; or

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

Effy Zinkin, Esq.
September 5, 2006
Page 2


    (5)  any proposed moratorium on all or some construction within the
CAMUID.

    Please contact me at the above telephone number if you have any questions
regarding this request.


          Very truly yours,


          Toni L. Finger


cc:  S&R Development Estates LLC
    DelBello Donnellan Weingarten Tartaglia Wise & Widerkehr, LLP

TOWN OF GREENBURGH
ZONING BOARD OF APPEALS
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~X

In re: Appeal of S&R Development Estates, LLC        Case No.: 07-15
Of Determination of Mark Stellato, Commissioner,
Department of Community Development and              **SECOND**
Conservation for the Town of Greenburgh regarding   **SUPPLEMENTAL**
zoning classification of Property located at 62      **AFFIDAVIT**
Dromore Road, Volume 8, Section 31, Sheet 37B,
Block 1692, Parcels 14A, 70A, 70B and 70C.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~X

STATE OF NEW YORK            )
                            )ss.
COUNTY OF WESTCHESTER        )

[stamp: RECEIVED SEP 1 0 2007 TOWN OF GREENBURGH ZONING BOARD]

RICHARD TROY, being duly sworn, deposes and says that:

    1.       I am a managing member of S&R Development Estates, LLC

("S&R") and submit this second supplemental affidavit in connection with the appeal

filed by S&R with the Zoning Board of Appeals.

    2.       Specifically, I take exception to the unsworn memorandum[1]

submitted to the ZBA by Town Building Inspector John Lucido. The memorandum is

is not relevant to whether the Property was properly in the CA-I or R-20 zone as of

the date of Commissioner Stellato's decision. Further, the Lucido memorandum is

factually inaccurate on at least two counts.

    3.       Mr. Lucido claims that an architect retained by S&R, John Sullivan,

told him during a telephone conversation on July 18, 2006 that S&R only intended to

build a one-family home on the subject property. That is patently false.

    4.       Mr. Sullivan was perfectly aware of our intention to develop the

Property for multi family housing. Annexed hereto as Exhibit 29 is a copy of a

---

[1] Your deponent takes exception to the refusal of the Board to compel individuals with direct
knowledge concerning the position taken by Commissioner Stellato, including but not limited to the

retainer agreement between S&R and Sullivan Architecture, PC.  Mr. Sullivan signed

the retainer agreement on July 17, 2006, one day before the purported telephone

conversation between Mr. Lucido and Mr. Sullivan.  The retainer agreement

specifically notes on page 2 that "it is the intention of [S&R] to develop a residential

condominium complex at 62 Dromore Road in the Town of Greenburgh."  In

addition, he had prepared rough sketches for such development prior to July 18, 2006.

He did not say that his client wanted to construct a new one family home.  His call

was made to confirm the Property's multi family zoning.

5.       Further, we had met with Mr. Sullivan at his office for the first time

on June 14, 2006.  At that meeting we discussed the property.  He was familiar with

the property and its topography because he had designed an addition to the monastery

abutting the property to the east.  We compared and contrasted the potential plans to

develop town homes versus a multi family apartment building.  Mr. Sullivan favored

an apartment building and was adamant that we should have first floor enclosed

parking.  John wanted to consult with the engineers and attorneys to determine

whether and to what extent the steep slopes shown on our June 23, 2006 "Steep

Slopes Survey" might reduce the maximum number of bedrooms which would be

permitted under the CA-I Zoning.  We were impressed with John, in part, because he

had designed the Stone Ridge Manor Town Homes at 347 Central Park Avenue.

6.       I also remind the ZBA that, approximately two years prior to the

purported conversation between John Lucido and John Sullivan, I attended a meeting

in 2004 with my brother, Stephen Troy, architect Peter Gaito and Deputy

Commissioner Madden at which time Deputy Commissioner Madden confirmed to us

---

commissioner, to appear before the ZBA to provide testimony under oath regarding same.

that the subject Property was zoned CA-I. See July 9, 2007 Affidavit of Richard Troy

at ¶ 8. Further, common sense dictates the fallacy of Lucido's memorandum. Why

would S&R pay $1.4 million to demolish a single family house, only to turn around

and construct a new single family house? The concept is preposterous that one would

pay so much for land, unless one thought that multi-family development was possible

on the Property.

7.        Mr. Lucido is also incorrect in stating that a demolition permit was

issued on October 6, 2006. Rather, the permit was issued on December 1, 2006;

demolition occurred from December 6 through December 12, 2006. See July 9, 2007

Affidavit of Richard Troy at ¶¶ 14 and 15.

8.        If the Lucido Memorandum is to be considered at all, special note

should be taken of its central point: Mr. Lucido admits that he confirmed to our

architect, John Sullivan that the Property is in the CA Mixed-Use Impact District and

could be developed for multi-family housing!

9.        The Lucido Memorandum is a transparent attempt to divert the

Board's focus from the 2006 Zoning Map, which statutorily controls and clearly

places the Dromore Property within the CA-I Zone.

_____
Richard Troy

Sworn to before me this
10th day of September, 2007

_____
Notary Public

CLARE R. FOX
Notary Public, State of New York
No. 01FO4946852
Qualified in Westchester County
Commission Expires 3/6/11          3

# EXHIBIT 29

# SULLIVAN ARCHITECTURE, PC

ARCHITECTURE

SITE PLANNING

URBAN DESIGN

July 18, 2006

Lockwood Management, LLC
Richard and Steven Troy
620 fifth Ave., 3rd Floor
New York, New York   10020

Re:    62 Dromore Road
       Greenburgh, New York

Dear Richard and Steven:

Enclosed is our proposed agreement to provide architectural design services for the above referenced project. We very much look forward to working with you developing this design!

Upon your review and acceptance of this Agreement, please return one signed copy to me along with the retainer. The second copy is for your records.

I look forward to hearing from you.

Sincerely,

John P. Sullivan, FAIA

31 Mamaroneck Avenue
White Plains, New York 10601
(914) 761-6006 Fax: (914) 761-4919
E-mail: jpsfaia@sullivanarch.com
www.sullivanarch.com

## *SCOPE OF WORK*

**Client:**

Lockwood Management LLC
Richard & Steven Troy
620 Fifth Ave., 3rd Floor
New York, New York 10020

**Architect:**

Sullivan Architecture, PC
31 Mamaroneck Avenue
White Plains, New York  10601

It is our understanding that it is the intention of the Client to develop a residential condominium complex at 62 Dromore Road in the Town of Greenburgh, New York.

The program for the condominium complex, as based upon discussions with the Client, shall be as follows:

- The number of residential units shall be in accordance with the permitted zoning criteria of the Town for this site;

- The exact size of the units included bedroom count, shall be explored during design services;

- It is anticipated that on-grade parking shall be provided with the dwelling units constructed above in a multi-story structure;

- Neither a specific construction budget, nor a specific market has been presented by the Client at this time.

Lockwood Management LLC
Proposal for Architectural Services
62 Dromore Road
July 17, 2006
Page 2 of 11

*SCOPE OF SERVICES*

## SERVICES

The following is an outline of architectural and site planning services that Sullivan Architecture proposes to address the Client's program. We will advise the client should the services of other consultants be required. Such services may include; mechanical engineering (HVAC, electrical, plumbing and sprinkler); landscape architecture and environmental consultants. (We understand the Client has retained a civil engineer).

## PHASE I - PROGRAMMING & PLANNING SERVICES:

1.  This phase begins with the Architect conducting program review meetings with the Client, to discuss their goals and project program. These discussions are not only to outline specific program needs and spatial requirements, but to also discuss the general and overall architecture, finishes, and desired market and zoning criteria.

2.  An overall project budget identifying the construction budget shall be provided by the Client at this time, to give the Architect the overall and specific project cost requirements.

3.  The Architect shall visit the proposed location and conduct a walk-through/site visit to become familiar with the space, site and immediate environmental context.

4.  The Client shall have an updated survey map prepared by a Surveyor (to include topography, wetlands, utilities, etc.) as the Architect has determined it is a requirement for design services.

5.  Based upon a site plan provided to us electronically (or by hard copy) from the Client, the Architect will prepare an Existing Conditions Site Plan. We will visit the site to verify existing structures and obvious features (water, rocks, etc.) and to identify any environmental concerns that may impact the project.

6.  The Architect shall prepare a zoning analysis based upon the Town of Greenburgh zoning ordinance to outline the zoning requirements (i.e. setbacks, bulk, etc.) and discuss the proposed improvements/project with the regulations Client, Land Use Attorney and Civil Engineer.

7.  A site analysis will be prepared that will address locations of utilities, septic, well, steep slopes, wetlands, etc., to identify a buildable envelope and possible zoning variances from the zoning analysis that may be required.

Lockwood Management LLC
Proposal for Architectural Services
62 Dromore Road
July 17, 2006
Page 3 of 11

**_SCOPE OF SERVICES_**

## PHASE II - SCHEMATIC DESIGN:

Based upon a review of the project program identified in Phase I services, the Architect shall prepare a schematic design to illustrate design intent of the project:

1. Initially, we will prepare a schematic design presented in sketch format and will include a site plan and floor plans of the design for review and comment by the Client. Sketches of exterior designs may also be presented. An alternative plan may be presented to provide a design option for the Client.

2. We shall conduct a design review session meeting with the Client and project team to review the initial design and discuss any comments, requests and/or combine plans to meet the project program.

3. Following the Client's approval of an initial design, we will prepare a final set of schematic design documents, to include floor plans, exterior or sketch elevations and site plan.

4. We will prepare a building code analysis to identify design compliance with the applicable building code, and/or to identify if any design revisions are necessary for compliance.

5. We will further define the previously prepared zoning analysis based on the refined design, and will consult with the Planner and Building Department to confirm zoning compliance and ascertain what approvals are required.

Lockwood Management LLC
Proposal for Architectural Services
62 Dromore Road
July 17, 2006
Page 4 of 11

*SCOPE OF SERVICES*

## PHASE III - DESIGN DEVELOPMENT:

Based upon the Client approved Schematic Design and information provided to the Architect during Phase II services, we shall prepare a set of Design Development Documents. These drawings will serve as a basis for Phase V documents and will be prepared utilizing CAD technology.

1.    The drawings will include a site plan, floor plans, elevations and building sections.

2.    The designs of the exterior elevations will be rendered and colored for presentation to the Client and for municipal approvals.

3.    The Architect will advise the Client of other required project consultants to be retained by the Client. The Architect will coordinate the design with the Client's other consultants.

4.    The Architect shall coordinate the designs with any required structural, mechanical and civil engineering consultants. They will prepare similar documents for each engineering discipline outlining the necessary construction requirements for the structural, HVAC, plumbing and electrical systems, and site engineering.

## PHASE IV - APPROVALS:

The Architect will assist the Client and project team in securing Town planning and zoning approvals for this project. The Architects services do not include Civil Engineering or Landscape Architecture. However, we coordinate these consultant services with our design and work together in obtaining Approvals.

1.  We will be available to assist in the preparation of applications and with environmental documents and will attend project team meetings, as well as requested municipal meetings.

2.  We shall be available to present our designs and presentation drawings during this process.

Lockwood Management LLC
Proposal for Architectural Services
62 Dromore Road
July 17, 2006
Page 5 of 11

*SCOPE OF SERVICES*

## PHASE V - CONSTRUCTION DOCUMENTS:

Based upon the design development drawings and authorization to proceed by the Client, the Architect shall prepare a set of Construction Documents to include drawings and specifications to illustrate the intent of the project.

1. The drawings shall include floor plans, framing plans, exterior elevations, sections, details and a general construction specification.

2. The drawings do not include structural engineering.

3. We also include an electrical layout drawing indicating the location of lights, switches and outlets of the dwelling units only.

4. The Architects services include the design and specifications for kitchen cabinets however other built-in millwork is considered an additional service.

7. The drawings and specifications will be used to solicit bids, obtain a building permit by the Contractor or Client and construct the improvements.


## PHASE VI - BIDDING:

If requested, we will administer the bidding and contract negotiation process with prospective invited contractors during the bid phase.

1. Upon receipt of bids from a selected list of contractors, we will analyze the bids and advise the client of each submission.

2. We will prepare a standard *AIA Form of Agreement between Client and Contractor* for the awarded contractor.

3. A consideration should be given to retain a Construction Manager to work with the Architect in estimating the project during the Design Phases to assist in adhering to the budget. Additionally, they will administer the bidding and construction of the project. We welcome discussing this process further.

Lockwood Management LLC
Proposal for Architectural Services
62 Dromore Road
July 17, 2006
Page 6 of 11

**SCOPE OF SERVICES**

## PHASE VII - CONSTRUCTION/CONTRACT ADMINISTRATION:

The Architect will provide administration services of the Contract during construction. Our services will include both field and intra-office administration.

1. Shop drawing reviews, material submissions, review of substitutions/changes and field visits (typically once a week) to verify construction is proceeding timely and in accordance with the design.

2. We will also review all contractor requests for payments and advise the client of the approved amounts.

Lockwood Management LLC
Proposal for Architectural Services
62 Dromore Road
July 17, 2006
Page 7 of 11

**FEE STRUCTURE**

**Compensation:**

The fees for providing Architectural services as stated above shall be in accordance with the following phases of service:

- Phase I – Programming & Planning Services     $7,000
- Phase II - Schematic Design                                    $30,000

The fees for subsequent services shall be determined upon further clarification of the project scope and completion of a schematic design.

- Phase III - Design Development
- Phase IV - Approvals
- Phase V - Construction Doc.
- Phase VI - Bidding
- Phase VII - Contract Admin.

\* Approval meetings will be billed on an hourly basis with a minimum of $300 per meeting for attendance at a night meeting.

**Retainer:**                    $ 5,000

An initial retainer of $8,000 will be required upon acceptance of this proposal and authorization to proceed, and shall be credited to the final Phase of the project.

**Reimbursable Expenses:**

In addition to our stated fee for services, The Client shall reimburse the architect for the following expenses associated with this project at 1.10 cost, to include but not be limited to:

- Consultant services paid by the Architect
- Photography
- Photocopying and faxes
- Long distance telephone calls
- Travel @ $0.45 per mile
- Printing
- Postage, handling, express mail, messengers

Lockwood Management LLC
Proposal for Architectural Services
62 Dromore Road
July 17, 2006
Page 8 of 11

*MISCELLANEOUS CONDITIONS*

A. CLIENT PROVIDED INFORMATION

The Client shall provide in writing, full information regarding the program requirements of the project. These requirements shall set forth the Client's spatial and architectural objectives, schedule, construction budget, desired unit mix and projected market. Copies of base site plans indicating property lines, topography and utilities in print and electronically (AutoCad R-2006) shall be provided to the architect.

B. ADDITIONAL SERVICES

1. Additional Services shall be any and all services not specifically listed above under *Scope of Work* or *Scope of Services*. Such additional services may include, but not be limited to:

   - Municipal approvals including preparation of applications, information for environmental impact statements, board meetings, etc.;
   - Renderings and models;
   - Environmental services including SEQRA;
   - Civil engineering;
   - Interior design;
   - Landscape Architectural services.

2. All revisions to drawings and/or documents previously approved and/or accepted by the client which are necessitated by Client changes to program, design, budget or negotiations with approval authorities, contractors or other consultants shall be considered additional services and shall be billed according to the following Schedule of Hourly Rates.

C. SCHEDULE OF HOURLY RATES:

| | |
|---|---|
| Principal | $185.00 per hour |
| Associate | $140.00 per hour |
| Project Manager | $120.00 per hour |
| Senior Draftsperson/CAD Operator | $100.00 per hour |
| Junior Draftsperson/CAD Operator | $ 85.00 per hour |
| Clerical | $ 45.00 per hour |

D. CHANGE ORDERS

The Architect shall notify the Client verbally and in writing if a change is required in the Scope of Services. The written notification shall require the Client to approve such changes to this agreement in writing and shall indicate the change in compensation due the Architect as mutually discussed and agreed upon.

Lockwood Management LLC
Proposal for Architectural Services
62 Dromore Road
July 17, 2006
Page 9 of 11

## MISCELLANEOUS CONDITIONS

### E. STATEMENT OF SERVICES

Services, additional services and reimbursable expenses shall be billed monthly. Payment for services shall be due within (21) days of the invoice date. If payment due for basic or additional services and/or reimbursable expenses are not received within 21 days after billing, the Architect reserves the right to notify the Client in writing that services may be ceased until payment is rendered in full.

### F. SCHEDULE

The Architect is prepared to begin within immediately following receipt of the signed agreement and retainer.

In order to signify the completion of each phase, the Client shall sign and date two sets of prints, one for the Architect's records and one for the Client's records. This signature will also indicate the Client's acceptance of the design to date and the Client's approval to proceed to the next phase.

### G. OWNERSHIP AND USE OF ARCHITECT'S DRAWINGS AND DOCUMENTS

Original design drawings and documents are instruments of services and shall remain the property of the Architect. Copies of all drawings and documents relating to the project will be provided to the Client. Drawings and documents prepared by the Architect are for this specific project. The Architect does not sanction the reuse of the design (in whole or part) and plans for any purpose without compensation to the Architect.

### H. ARCHITECT PROFESSIONAL CREDITS

The architect shall have the right to include representations of the design of the project, including photographs of the exterior and interior, among the architect's promotional and professional materials. The architect's materials shall not include the Client's confidential or proprietary information without written permission from the Client.

### I. TERMINATION OF AGREEMENT

This agreement may be terminated by either the Client or Architect at any time upon seven (7) days written notice to the other party. ~~Upon termination of this agreement by Client, Architect shall be paid the portion of the fee payable upon completion of the phase of service in progress.~~ Upon termination of this agreement by the Architect, the Architect shall be paid the compensation due hereunder for services authorized by the Client and performed to the termination date.

Lockwood Management LLC
Proposal for Architectural Services
62 Dromore Road
July 17, 2006
Page 10 of 11

*MISCELLANEOUS CONDITIONS*

J.  ADDITIONAL CONTRACT CONDITIONS
The proposal/agreement is valid until August 1, 2006.  Should the services and project extend beyond December 31, 2007, compensation may be subject to review and adjustment. .  The Architect's *Schedule of Hourly Rates* is subject to adjustment on January 1st of each calendar year.

Lockwood Management LLC
Proposal for Architectural Services
62 Dromore Road
July 17, 2006
Page 11 of 11

ACCEPTANCE OF THE PROPOS

The Client and architect have agreed to act according to the statements made her
for the project known as 62 Dromore Road.

Sullivan Architecture, PC

Date: 7·17·06

John P. Sullivan, FAIA
President

StR Development Estates
Lockwood Management LLC

Date: 8/28/06

Richard & Steven Troy

Dissenting decision of Rohan F. Harrison, Board Member.

I dissent in the Board's decision that the 2007 map is the latest official zoning map of the Town.

The instant application is an appeal of a written decision dated February 26, 2007 from Mark T. Stellato, Commissioner, Department of Community Development and Conservation. After conducting "an initial zoning history" of 1 Dromore Road (a/k/a 62 Dromore Road), Scarsdale, New York ("The Property"), Commissioner Stellato concluded that the Property is in the R-20 Zone and not within the Central Avenue Mixed Use Impact District (CA District). The applicant and owner of the Property is S&R Development Estates, LLC ("S&R"). S&R disagrees with Commissioner Stellato's conclusion based on the 1980 Official Zoning Map of the Town as amended in 1997, 2000, 2003 and 2006. Thus, the issue before this Board is whether the Property is in the R-20 Zone or CA District under the latest official zoning map of the Town.

I  HISTORY OF CA DISTRICT

After completing the 1976 Central Avenue Comprehensive Development Plan for the Central Avenue Corridor, the Town amended the August 6, 1957 Zoning Ordinance by resolution dated May 24, 1978. This resolution created the CA District. Two years later on June 25, 1980, by resolution, the Town repealed the 1957 Zoning Ordinance and all amendments thereto, including the May 24, 1978 resolution creating the CA District. The 1980 resolution created a new zoning ordinance by replacing Chapters 65 and 66 of the Town Code. The CA District continued under the 1980 Zoning Ordinance.

II  OFFICIAL ZONING MAPS

Following the enactment of the

10/18/07 - 07-15          67

1980 Zoning Ordinance, an official zoning
map dated June 25, 1980 was adopted by the
Town.  This 1980 map has been revised,
altered, changed, corrected or amended in:

          (a)    1984;
          (b)    1986;
          (c)    1987;
          (d)    1990;
          (e)    1991 (twice);
          (f)    1994;
          (g)    1996
          (h)    1997 (twice);
          (i)    2000
          (j)    2003
          (k)    2006; and
          (l)    2007

          (Neither S&R nor the Town
considers this an "amendment" to the 1980
map, but for completely different reasons.)

          III    S&R'S DUE DILIGENCE

          Whether S&R or any resident
seeking a variance, applicants are not
required to give sworn statement of facts
or sworn testimony before our Board.
Notwithstanding this fact, S&R through one
of its managing members, Richard Troy,
submitted an affidavit ("Troy Affidavit"),
as amended, to this Board.  If the facts in
the Troy Affidavit are true, have they
proven that the "discovery" of the Property
as being in the R-20 Zone is suspect?

          Richard Troy and the other
managing member of S&R, Stephen Troy, began
researching the Property in September 2004.
They reviewed the official maps of the
Town, including the two separate 1997 maps
and the 2000, 2003 and 2006 maps.  Upon
their review of these maps, they determined
that the Property is in the CA District,
even though a one-family dwelling was
thereon.

          To confirm their determination
that the Property is in the CA District,
the Troys consulted with a licensed

architect who is very familiar with our
zoning ordinance.  They also consulted with
two attorneys from the law firm of
DelBello, Donellan, Weingarten, et. al.
These two attorneys have appeared before
our Board on numerous occasions and are
familiar with our zoning ordinance.  In
addition, the Troys attended a meeting with
their architect and Commissioner Stellato's
Deputy Commissioner, Thomas Madden.
Thereafter, in September 2005, they hired
an appraiser to value the Property based on
the opinion of a second architect.  All of
these expert individuals confirmed the
Troys' conclusions that the Property is in
the CA District.  Accordingly, on May 24,
2006, S&R purchased the Property for
$1,415,640.00 from Philip Thomas, who had
purchased it on July 2, 1999 from Lan &
Barbara O'Kun for $875,000.00.

        Continuing in their due
diligence after S&R purchased the Property,
the Troys engaged an engineering consulting
company that had overseen at least four
projects within the Town.  This company
advised S&R that the Property can be
developed up to 37 two bedroom apartments.
After that S&R engaged a third
architectural company.  This company had
facilitated an addition to the monastery
adjacent to the Property.  This architect
advised S&R that the Property can sustain a
maximum of 75 one bedroom apartments.  Both
companies confirmed that the Property is in
the CA District.  Subsequently, S&R applied
for and received a demolition permit to
demolish the one-family dwelling on the
Property, evidencing its intent to build
multi-family apartments thereon.

        IV    S&R'S CLAIMS OF
CONCERTED ACTION AND CONSPIRACY BY OUR
ELECTED OFFICIALS, GREENBURGH NATURE CENTER
("GNC") AND EDGEMONT COMMUNITY COUNCIL.

        As the record appears before
this Board, the foregoing facts have not
been controverted.  Except for the
affidavit of the Executive Director of the

GNC, William Lawyer, the facts in the Troy
Affidavit have not been refuted.
Admittedly, the Chairman of this Board
restricted and/or precluded testimony on
S&R's conspiracy claim, in an attempt to
keep the Board focused on the main issue of
whether the Property is in the CA District
or the R-20 Zone under the Town's official
zoning map.  Despite this restriction
and/or preclusion, the Chairman has always
stated that this Board will accept written
submission in this matter.  The offer of
written submission by the Chairman is

consistent in many "high profile" cases
before our Board wherein the Board will not
have sufficient time to explore all nuances
of an issue.

            Although William Lawyer never
testified before this Board, he submitted a
30-paragraph affidavit ("William
Affidavit") for our consideration.
Understandably, none of our elected
officials has submitted a statement denying
the facts in the Troy Affidavit, because
S&R has filed a notice of claim against the
Town.  However, it is shocking that not one
civic association within the Town will
address the disturbing conspiracy claims in
the Troy Affidavit.  The fact that the Troy
Affidavit contains extremely damaging
statements against the Edgemont Community
Council ("ECC") should be a sufficient
reason for the ECC to submit a written
response to this Board.  Indeed, now is not
the time for the ECC to be invoking any
kind of silence on the damaging facts
underlying S&R's conspiracy claims.

            Nevertheless, here is a brief
summary of the facts in paragraphs 18-66 of
the Troy Affidavit surrounding S&R's claim
of conspiracy and concerted action by the
Town, unregistered New York State special
interest groups or lobbyists and other
not-for-profit organizations.  (Lobbyists
are required to register with the New York
Temporary State Commission On Lobbying.
The Town can implement a process that will
disclose to the public individuals who are

lobbying our elected officials.  Indeed,
public disclosure of lobbying in the Town
will avoid some of the abuses mentioned in
the Troy Affidavit.)  From the commencement
of demolition of the one-family dwelling on
the Property, there has been opposition to
its development.  This opposition ranges
from zero development to the development of
37 homes on the Property, which is
approximately 2.34 acres.  In an effort to
find a compromise between zero development
and the development of 37 homes, many
meetings were held with S&R and its
representatives, including its attorneys,
architect and engineer, and various Town
elected officials, non-elected Town
officials, representatives from the GNC,
the President of the ECC, Michelle McNally,
the President of the Greenridge Civic
Association, Robert Bernstein, Esq., and
others.  While all these participants were
never present at any one meeting with S&R
and its representative(s), each attended at
least one meeting with S&R solely or with
its representative(s) present.  Throughout
all these meetings and subsequent telephone
conversations thereon, none of these
participants mentioned to S&R or its
representative(s) that the Property is not
within the CA District.  In fact, all of
them operated as if the Property is within
the CA District based upon their course of
conduct:

        (1) immediate preparation and
meeting on the ad hoc moratorium
restricting construction or development of
multiple-family dwellings in the CA
District within the Edgemont School
District ("ESD");

        (2) threat to use the eminent
domain law of the State of New York (since
the decision in the United States Supreme
Court case of Kelo v. City of New London,
38 states have reformed their eminent
domain law to preclude abuse, and New York
is not one of them);

        (3) offer to purchase or give

the Property, in whole or in part, for or
to the GNC;

(4) offer to purchase or give
the Property, in whole or in part, for or
to Edgemont through a scheme that would
ultimately permit development of the
Property as a future town hall for Edgemont
if and/or when Edgemont secedes from the
Town of Greenburgh (Edgemont's age-old
threat of secession was acknowledged in a
campaign flyer during the recent democratic
primary for Town Supervisor);

(5) per the "Gift Agreement"
under Exhibit 19 of the Troy Affidavit,
gifting or selling the Property to Robert
Bernstein, Esq., in his individual capacity
for "$1,400,000.00, plus actual documented
out-of-pocket expenses incurred in
developing the Property through the date of
this [Gift] Agreement"; and

(6) selling the Property to
the ECC.

The hastily proposed
moratorium, the threat of eminent domain
and the many schemes to purchase the
Property by some of the aforementioned
participants from the many meetings with
S&R were based on the premise that the
Property is within the CA District.  At the
end of all these meetings and telephone
conversations thereon prior to February 26,
2007, S&R under one scenario would have
been allowed to erect ten homes on the
Property, provided that certain preceding
conditions failed to materialize, for
example, the procurement of the purchase
price.

V FEBRUARY 2007

Having had many meeting on its
development of the Property, S&R submitted
its application on February 2, 2007 to the
Town for site plan approval.  The next day,
February 3rd, S&R attended a meeting
organized by a councilman with the entire

Town Council present except the Town
Supervisor.  At this meeting, among other
things, the parties agreed to grant an
option to the ECC to purchase the Property.
On February 7th, S&R attended a Planning
Board meeting on the proposed moratorium
restricting multi-family dwellings within
the CA District, which is "the only zoning
district within the Edgemont School
District [that] permits multi-family
dwellings."  (See Troy Affidavit, Exhibit
18, letter from the Westchester County
Planning Board Deputy Commissioner exposing
the real and suspect intent of the proposed
moratorium.)  The February 14th Town Board
meeting included the proposed moratorium on
its agenda but the meeting was cancelled.
The following week Richard Troy rejected on
of our councilmen's offer to have the
property gifted immediately, based upon his
guarantee that a referendum to create the
Edgemont Parks Board would be placed on the
September democratic primary ballot and
would be approved by the eligible
electorate permitted to vote thereon.
Having had his last offer rejected by
Richard Troy, this councilman sent an
e-mail on February 26th referenced as the
"Dromore Road update" over the Town e-mail
system stating for the first time that the
Property is zoned R-20.  Had Richard Troy
accepted this councilman's last minute
offer before the e-mail blast, would he and
those who were privy to the "discovery" of
the Property being in the R-20 Zone have
kept this information from the public?
Nonetheless, on this same day, Commissioner
Stellato sent to S&R's attorney his written
decision which concluded that the Property
is in the R-20 Zone and not within the CA
District.  On the following day, February
27th, the zoning map was altered, revised,
changed, "corrected" or amended to now
include the Property in the R-20 Zone.

     S&R does not consider the
February 27th alteration an amendment
pursuant to our Town Code.  The Town does
not consider it an amendment either.  The
Town maintains that this alteration was a

"correction" and, therefore, is not subject
to the requirement for an amendment to the
zoning ordinance.  This argument assumes
that the official zoning map was incorrect
in the first instance.  Indeed, there can
be no correction without an initial error,
as set forth below.

VI  ANALYSIS

A.  Correct Forum:

Before discussing the central
issue of whether the Property is in the CA
District or R-20 Zone based on the official
zoning map of the Town, as amended, the
collateral issue of whether S&R is in the
appropriate forum must be addressed.  The
Zoning Board of Appeals is vested with the
authority to interpret the Town's zoning
ordinance.  Upon interpreting the zoning
ordinance, this Board can grant or deny any
request for a variance.  This Board's
authority also includes clarifying terms
used in our zoning ordinance even when no
variance request is being made, which was
the situation in the recent "high profile"
case of #06-35, Jack Saw, LLC.  In case
#06-35 there was no request for a variance.
However, this Board was asked to overrule
or uphold the building inspector's
conclusion that the applicant's so-called
"conference center" was really a disguised
funeral home.  Under our zoning ordinance,
conference centers are permitted in the
OB-1 District but not funeral homes.
Ultimately, this Board had to interpret
what constitutes a "conference center" and
"funeral home or establishment" under our
zoning ordinance.

This case is similar to case
#06-35, except the Board is now being asked
to interpret or clarify the official zoning
map of the Town.  (S&R has not requested an
interpretation of our zoning ordinance.
However, the majority in its decision has
made the interpretation of Section 285-64
an issue with its "correction doctrine."
See Section (VI)(E) and footnote No. 6,

infra.)  The issue before this Board is whether the Property is within the CA District or R-20 Zone based upon the official zoning map of the Town, as amended.  The issue is not whether this Board has the authority to redraw zoning district boundary lines.  That authority rests with the Town Council, which is the legislative body of the Town.  From the record before this Board, the attorney for S&R has not made any request to alter, "correct", change, add to, subtract from, revise or amend what he and S&R deem the latest official zoning map of the Town, as amended.  Put otherwise, S&R is not asking this Board to invalidate what it considers the latest zoning map of the Town.  Based on the issue of whether the Property is in the CA District or R-20 Zone under the Town's official zoning map, as amended, the application is appropriately before this Board.  Furthermore, in light of the damaging facts on conspiracy and consorted action claims in the Troy Affidavit implicating all members of the Town Council, some more than others, the applicant chose the correct forum.  S&R already knows the decision of the Town Council, based on the Troy Affidavit.

          B.  Burden of Proof on the 2007 Map:

          From the record, the following facts are undisputed:

          (1)  The 1980 Official Zoning Map of the Town shows the Property in the R-20 Zone.

          (2)  The 1980 Official Zoning Map was amended in 1984, 1986, 1987, 1990 and several times through 1996.  Despite these amendments to the 1980 Official Zoning Map, the Property was still in the R-20 Zone.

          (3)  From 1997 to February 26, 2007 there were many amendments to the 1980 Official Zoning Map.

10/18/07 - 07-15          75

(4)  From 1997 to February 26, 2007 the Property was in the CA District, whether by amendment from the Town Council or otherwise.

(5)  The February 27, 2007 zoning map was filed after S&R's application for site plan approval was submitted on February 2, 2007.

(6)  The February 27, 2007 map was not in existence when Commissioner Stellato issued his February 26, 2007 decision.

(7)  The February 27, 2007 map shows the Property in the CA District.

Under Section 285-7(A) of the Town Code, the official zoning map, as amended, is the final authority on the current zoning classification of any property within the Town.  The official zoning map can only be amended by the Town Council pursuant to Section 285-64 of the Town Code.  Therefore, any amendment or change to the zoning map not in accordance with Section 285-64 is null and void, and such amended map is not the official zoning map of the Town.

From the record, this Board knows beyond any doubt that the 2007 map was not created by the Town Council pursuant to Section 285-64.  This fact is known with absolute certainty because the map was created or generated without public notice or hearing.  Furthermore, the 2007 map was created the same day or the day after Commissioner Stellato urged the Town Engineer to remove the Property from the CA District, as shown on the 2006 map, and to place it in the R-20 Zone.

While this Board is absolutely certain that the 2007 map is not the official zoning map of the Town, it cannot state with any certainty that the 2006, 2003, 2000 and all prior maps going back to 1980 are not the official zoning maps of

the Town.  Unlike the 2007 map, there has
been no admission by anyone that (s)he
ordered the creation of these maps contrary
to Section 285-64.  Thus, this Board is
compelled to accept them as the "official"
zoning maps of the Town until proven
otherwise.

          To prove that the 2006 map and
all prior maps are "unofficial" requires
both a legal and factual foundation, which
is what S&R established with the 2007 map.
The factual foundation is the Town Engineer
or someone else changed the 2006 map to
create the 2007 map at Commissioner
Stellato's request.  The legal foundation
is that such change was not done pursuant
to Section 285-64.  S&R had the burden of
proving that the latest map (2007) is not
official, and it sustained that burden.
The Town now has the burden of proving that
its own maps from 2006 to 1997 are
unofficial or official with an error
surround the Property.

          Note that neither S&R nor the
Town ever has to prove that any Town
document is accurate, because there is an
inherent presumption of reliability and
accuracy in the production and maintenance
of all public documents.  However, the
party alleging unreliability of a public
document bears the initial burden of
proving its claim.  Unlike the 2007 map,
the Town is claiming that is 1997, 2000,
2003 and 2006 maps are inaccurate.
Therefore, the burden of proof on the
unreliability of these maps is on the Town.

          C.  Town of Greenburgh's
Burden of Proof:

          While the Town's burden of
proof is not proof beyond any doubt or
absolute certainty, the Town must provide a
rational basis in its proof of any issue,
claim or position.  In the instant case,
the Town contends that the official zoning
maps from 1997 through 2006 erroneously
designated the Property in the CA District.

Therefore, the Town must establish a
rational basis for this claim or position,
based on a preponderance of the evidence
presented in the record.

In the quest to sustain its
burden of proof, the Town has submitted
Commissioner Stellato's February 26th
letter to S&R's attorney, both a July 19,
2007 and August 8, 2007 memorandum from
Commissioner Stellato to this Board, and an
August 9, 2007 memorandum from a town
attorney staff member to the deputy town
attorney assigned to this Board.  The sum
and substance of these documents is that
the Town thoroughly researched the Property
and discovered that it was mistakenly
placed in the CA District.  The July 19th
and August 8th memoranda specifically
indicate (assume) that this mistake
occurred in 1997 when the GNC lot and
monastery lot adjoining the Property were
rezoned into the Conservation Overlay
District (CD).  Both memoranda further
indicate (assume) that the Town Engineer
made the mistake of moving the boundary
lines of the Property into the CA District
in 1997 while updating the official zoning
map to include the CD.  Thus, a collateral
question for this Board is whether these
documents justify a reasonable inference
that an error occurred in the zoning or
rezoning of the Property in 1997.

Indeed, inferences from
evidence are permitted daily in courtrooms
throughout this country, provided such
inferences are reasonable.  While there are
many reasonable inferences a court may
admit in any given case, one that is very
familiar to trial attorneys is the missing
witness charge.  The side, whether
plaintiff or defendant, that has the
"burden" to produce a witness and "fails"
to do so risks a missing witness charge.
The court, in this charge, must instruct
the jury to infer that had the witness been
produced, she would have testified against
the side that failed to produce her.  This
is a reasonable inference permitted in

court.  It gives a reasonable explanation
as to why a witness is missing.  Similarly,
this Board must examine from the Town's
submission whether the inference or
assumption that an error occurred is
reasonable under the circumstances in this
case.

The Town's August 9th
memorandum states that no local law,
ordinance or resolution has been discovered
that shows the Property in the CA District.
Based on this memorandum and Commissioner
Stellato's letters, the Town asserts that
it has met its burden of proving that the
property was never rezoned out of the R-20
Zone into the CA District, and this Board
should assume that an error occurred in
1997.  However, S&R argued that because no
law was found by the Town, that does not
necessarily mean none exists.  S&R further
argued that no one in the Town will ever
know for certain whether such law exists,
because the Town's recordkeeping is
woefully below the standard set by state
law.  S&R points to the Town's inadequate
compliance with its Freedom of Information
Act or Law ("FOIL") request to support this
argument.  S&R has shown that the Town
submitted documents (e.g., maps and
ordinance) to this Board that is never
received under its FOIL request.  This can
mean that the Town recently discovered
these documents, which may prove that its
recordkeeping is inadequate, or the Town is
intentionally withholding evidence from
S&R.  The Town has not provided any
explanation on its failure to adequately
comply with S&R's FOIL request.  Indeed,
the Town's lack of an explanation here has
a direct relationship on whether it has
sustained its burden of proof.

D.  Evidence From The Town and
February 26, 2007:

This Board has always relied
on the evidence proffered before it by the
Town.  The Board has never had any reason
in previous cases to doubt whether it is

receiving all or some of the evidence from
the Town.  However, this case has raised
some concerns in the mind of this member,
starting with the damaging facts in the
Troy Affidavit, as amended.  If Richard
Troy had agreed to the February 26, 2007
last minute offer from one of our
councilmen, would Commissioner Stellato
have issued his letter dated February 26th?
Would Commissioner Stellato have ordered,
contrary to the Town Code, the alteration
to the zoning map?  Would the February 27th
map have been created if this councilman's
offer on February 26th was accepted by
Richard Troy?  From the record, we know
that neither Commissioner Stellato nor this
councilman "discovered" the alleged error
in the zoning of the Property.  Therefore,
why was there a delay in disclosing this
information to the public?  The public was
informed of this "discovery" in a town-wide
e-mail blast after Richard Troy rejected
our councilman's offer of February 26th.
At a minimum, the timing of these events
raises serious concerns.

          Therefore, the events
surrounding the "discovery" of the alleged
zoning "error," of February 26th and
February 27th must be further explored,
especially in light of the Town's poor
recordkeeping and inadequate FOIL
compliance received by S&R.  Truly, a court
of law is in a better position than this
Board member to determine whether an
alleged error occurred or whether some kind
of scheme is involved to deprive S&R of its
use and enjoyment of the Property.  Without
sworn testimony from the participants in
this matter, this Board member does not
have sufficient information to make a
well-informed decision in this case.

          E.  The Majority's Decision -
the correction of an error:

          A majority of this Board has
concluded that an error occurred in 1997.
The majority has "found that the 2007
revision to the Zoning Map was a mere

correction of an error that appeared on
previous maps." The majority is labeling
the alteration of the 2006 map to create
the February 27, 2007 map as a "correction"
and not an amendment. However, there can
be no "correction"of the 2006 map unless
the Town knows that an error occurred. The
Town has asked this Board to assume or
infer that an error has occurred. Unlike
direct proof through facts, an assumption
or inference is rebuttable. It is an
indisputable fact that Commissioner
Stellato had the Property removed from the
CA District under the 2006 map to the R-20
Zone under the 2007 map. This Board does
not need to assume that Commissioner
Stellato ordered this alteration because he
has already admitted to this fact.
Conversely, to rationalize its decision,
the majority must assume that an error
occurred in 1997. The majority has no
admission or direct proof that such error
occurred, however. Ultimately, a court
after receiving sworn testimonies or
statements of fact will decide whether the
majority's assumption or inference of an
error is reasonable, given the damaging
facts in the Troy Affidavit and the Town's
poor recordkeeping and FOIL disclosure.
Put otherwise, a court will determine
whether S&R has sufficiently rebutted the
Town's inference of an error on its
official zoning map displayed to the public
for reliance thereon.

        Further, the majority's
characterization of the 2007 alteration to
the 2006 Official Zoning Map as a
"correction" does not diminish the fact
that an amendment of the map occurred in
violation of Section 285-64 of the Town
Code. To "correct" the 2006 map is to
alter, change or revise it. All of these
terms involve adding to or subtracting from
the 2006 map. Under Section 285-64, any
addition to or subtraction from the Town's
official zoning map is an amendment. When
the Town Council amends the official zoning
map of the Town, it does one of two things:
(1) add to or (2) subtract from the map.

Therefore, the majority's "correction doctrine" is a disguised amendment.

Additionally, the majority correctly concluded that this Board does not have the authority to invalidate a zoning map, because the power to creat and amend such map is a "legislative function." Despite its conclusion, the majority invalidated the Town's 2006 Official zoning Map in favor of the 2007 unofficial zoning map. Thus, the majority has ignored its own conclusion.

F. Intentional Alteration Versus A Scrivener's Error:

Can this Board ignore a zoning map that it knows beyond any doubt was altered on the very parcel that is before the Board? One member in the majority may have answered this question. That member concluded that if one of our councilmen admitted to altering the zoning map on the issue before this Board, our Board "wouldn't be able to do anything." (See page 14 of the transcript from the meeting of August 16, 2007.) I totally disagree with this conclusion. This Board would be abdicating its duty if it ignored such deliberate or intentional alteration of our zoning map. This intentional act is completely different from the assumed scrivener error that has been raised in the record. Whether a zoning map containing an alleged error can be considered the Town's official zoning map is a legal question best left for a court to determine after obtaining sworn testimonies or statements of fact. However, this Board can make a factual determination as to whether a parcel has been transferred from a commercial zone to a residential zone. This decision is less problematic when there is an admission of the change, which is the situation before this Board.

G. GNC and The Lack of Public Notice:

The William Affidavit states that the GNC has not received any public notice at any time relating to the zoning or rezoning of the Property to the CA District.  To date, this fact has not been refuted by S&R.  Despite the Town's inadequate recordkeeping, this fact supports the Town's inference that an error occurred in the rezoning of the Property in 1997 during the creation of the CD. Statements of fact like these from other neighbors in the area, for example, the owner of the adjoining apartment complex, will mitigate the Town's awful recordkeeping.

H.  S&R's Due Diligence Revisited:

With respect to S&R's claim of due diligence in researching the Property from 2006 to 1997, why did S&R and all its experts end their research at 1997?  The official zoning map of the Town is the 1980 map, as amended through 2006.  On the face of the 2006, 2003, 2000 and 1997 maps are all the amendments made to the 1980 Official Zoning Map.  Despite this readily apparent information, S&R and all its experts stopped at the two 1997 maps.  This is incomplete research.  A thorough research of the Property includes tracing its boundary lines going back to the 1980 Official Zoning Map, since the official zoning map of the Town is the 1980 map, as amended to present.

When S&R purchased title insurance on the Property from Lex Terrae, Ltd ("LTL") it relied on LTL doing a thorough or 40/50 year search on the chain of title, which is industry practice on a purchase transaction.  If LTL had merely done a last owner search and a defect to title was later discovered by S&R, LTL would be negligent in researching the public record on the Property.  Likewise, S&R should have done a more thorough search of the Town's map and public record.  All the maps researched by S&R list other maps.

10/18/07 - 07-15              83

Since S&R was aware that the Town's
official zoning map is the final authority
on the current zoning classification of any
property within the Town, why didn't S&R
end its research at the 2006 map?  Why did
S&R research any other maps?  In
undertaking this additional research, why
did S&R only research maps (2003, 2000 and
1997) that show the Property in the CA
District and not the earlier maps (1996,
1994, 1991, 1987, 1986, 1984 and 1980)
which show the Property in the R-20 Zone?
A court will have to decide whether S&R
should have researched those other maps
under these circumstances, which include
the alleged "surprise" expressed by its
representative upon being informed by the
Building Inspector, John Lucido, that the
Property is in the CA District based on his
review of the zoning map.  (See memorandum
to this Board from John Lucido dated August
30, 2007.  In its "Second Supplemental
Affidavit" dated September 10, 2007, S&R
refuted portions of this memorandum.
However, both John Lucido and S&R agree
that the Property is in the CA District
prior to February 27, 2007.)

        I.  FOIL Request

        Knowing that the Town's
explanation or presumption that an error
occurred in 1997 may be strengthened once
the Town, among other things, adequately
responds to S&R's FOIL request, this member
is perplexed as to the Town's conduct.
Obviously, "full" disclosure removes the
implication that the Town is hiding
information on the alleged error of 1997.
Therefore, the Town is merely forestalling,
to the detriment of its main argument, what
it must ultimately provide in court under
the Civil Practice Law and Rules ("CPLR").
A court, unlike this member, can compel
discovery and testimony on the alleged
error of 1997, while deciding whether a map
containing a purported error can be an
official zoning map of the Town under these
circumstances.  Indeed, the court may
question the reasonableness of the Town's

10/18/07 - 07-15                84

alleged error if "full" disclosure is not
provided to S&R pursuant to the CPLR.

VII    CONCLUSION

        For the foregoing reasons, I
disagree with the majority that the 2007
map is the latest official zoning map of
the Town.  The record clearly shows that
this map was intentionally altered in
violation of Section 285-64.  The record
further shows that there is no proof that
the 2006 map was intentionally altered.
Accordingly, the 2006 map is the latest
official zoning map of the Town.

        Whether the Property legally
belongs in the CA District under this map
is a question this Board member needs
additional information on to reasonably
answer, assuming that the Board has the
authority to render a decision on this
specific issue.  Admittedly, the Town has
offered an explanation (a rebuttable
presumption) of why the Property is in the
CA District starting from 1997 to February
26, 2007.  However, this explanation is
weakened by the implications that can be
adduced from the Town's poor recordkeeping
and inadequate FOIL response to S&R.  This
explanation is further weakened by some of
the events documented in the Troy
Affidavit.  These matters need to be
addressed by the Town in order to further
strengthen its argument that an error
occurred in zoning or rezoning the Property
in 1997.  Put succinctly, addressing these
matters will reduce the ambiguity in this
case.  Ambiguity in our zoning ordinance,
as the Board knows, must be construed in
favor of the property owner and against the
municipality.  (Since Section 285-64
governs amendment to the zoning map, what
section of the Town Code governs what the
majority calls a "correction" to the zoning
map?  Under the circumstances of this case,
a "correction" must be done pursuant to
Section 285-64, because to "correct" or
amend the zoning map involves altering it
by adding to or subtracting from it, as

10/18/07 - 07-15                 85

discussed in the body of this text.  If
Section 285-64 does not apply to
"corrections" that amend (alter, change or
revise) the zoning map, then Section 285-64
is ambiguous.)

          THE CHAIRMAN:   With that our
business this evening is concluded and we
are adjourned.

          (Time noted: 11:01 p.m.)


               ooOoo




          Certified to be a true and
accurate transcript of the above-captioned
stenographic minutes.

          _____
          Lori Ann Schirripa
          Official Court Reporter