UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X
S&R DEVELOPMENT ESTATES, LLC and JOHN          07 Civ. 11112 (WCC)
DOE NOS. 1 THROUGH 75,                   :
                                                    **ECF CASE**
                          Plaintiffs,    :

            - against -                  :           **OPINION**
                                                     <u>**AND ORDER**</u>
STEVEN BASS, EDDIE MAE BARNES, PAUL       :
FEINER, DIANA JUETTNER and FRANCIS
SHEEHAN, Constituting the Town Board of :
the Town of Greenburgh, Westchester
County, New York; STEVEN BELASCO,         :
MALCOLM BAUMGARTNER, EVE BUNTING-SMITH,
NICHOLAS DECICCO, LAWRENCE DOYLE, ROHAN :
HARRISON and DANIEL ROSENBLUM,
Constituting the Zoning Board of Appeals:
of the Town of Greenburgh, Westchester
County, New York; MARK STELLATO,          :
Commissioner of the Department of
Community Development and Conservation   :
of the Town of Greenburgh; and JOHN and
JANE DOE,                                 :

                          Defendants.    :
- - - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                          BLEAKLEY PLATT & SCHMIDT, LLP
                          **Attorneys for Plaintiffs**
                          One North Lexington Avenue
                          White Plains, New York 10601

WILLIAM P. HARRINGTON, ESQ.

        Of Counsel

                          LANDMAN CORSI BALLAINE & FORD P.C.
                          **Attorneys for Defendants**
                          120 Broadway, 27th Floor
                          New York, New York  10271-0079

JAMES M. WOOLSEY, III, ESQ.
JERRY A. CUOMO, ESQ.

        Of Counsel

**Conner, Sr. D.J.:**

Plaintiffs, S&R Development Estates, LLC ("S&R") and John Doe Nos. 1 though 75 ("Doe plaintiffs"), bring this action under 42 U.S.C. § 1983 against defendants, Steven Bass ("Bass"), Eddie Mae Barnes ("Barnes"), Paul Feiner ("Feiner"), Diana Juettner ("Juettner") and Francis Sheehan ("Sheehan") (collectively the "Town Board defendants"); Steven Belasco, Malcolm Baumgartner, Eve Bunting-Smith, Nicholas DeCicco, Lawrence Doyle, Rohan Harrison and Daniel Rosenblum (collectively the "Zoning Board of Appeals ("ZBA") defendants"); Mark Stellato ("Stellato"), the Town of Greenburgh (the "Town") and John and Jane Doe, to obtain relief for defendants' actions that allegedly deprived plaintiffs of their property rights. Plaintiffs allege claims under the Due Process, Takings and Equal Protection Clauses of the United States Constitution; a claim for declaratory judgment pursuant to 28 U.S.C. § 2201; a claim pursuant to N.Y. C.P.L.R. Article 78 and a claim under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601. Defendants moved to dismiss the claims pursuant to FED. R. CIV. P. 12(b)(1) and 12(b)(6). For the following reasons, defendants' motion is granted.

## BACKGROUND

Plaintiffs allege the following in the Amended Complaint.

### I.    The Parties

S&R is a limited liability company in the Town of Harrison, New York. (Am. Complt. ¶ 7.) The Doe plaintiffs are unidentified persons intended to represent the future residents of the multiple dwellings proposed to be constructed by S&R on the property at issue. (*Id*. ¶ 8.) Defendant Feiner is the Supervisor of the Town and a member of the Town Board. (*Id*. ¶ 10.) Defendants Bass,

1

Barnes, Juettner and Sheehan are members of the Town Board. (*Id.* ¶ 11.) Defendant ZBA is the agency of the Town vested with the power to interpret and apply the Town's zoning ordinance. (*Id.* ¶ 12.) Defendant Stellato is the Commissioner of the Town's Department of Community Development and Conservation. (*Id.* ¶ 13.) The "Doe" defendants are unidentified persons or entities that engaged in unlawful conduct to deprive plaintiffs of their rights to the Property. (*Id.* ¶ 14.)

## II.　　The Property

S&R acquired property (the "Property") on May 24, 2006 in Edgemont, an unincorporated area within the Town. (*Id.* ¶¶ 15, 17.) The Property was improved with one 3,200-square-foot single-family home and a swimming pool but is now vacant and undeveloped. (*Id.* ¶ 17.) It is situated at 1 Dromore Road a short distance east of Central Avenue, a heavily trafficked primarily commercial thoroughfare. (*Id.* ¶¶ 15, 16.) The Property is adjoined on the west by the Scarsdale Woods Condominiums, a 179-unit multi-family residential complex, and across Dromore Road to the north is the Nature Center property. (*Id.* ¶ 16.) At the time of acquisition, the Official Town of Greenburgh Zoning Map (the "Zoning Map") showed that the Property was in the Central Avenue Mixed Use Impact District (the "CA Zone"), which would allow development of a multi-family complex containing at least 82 bedrooms. (*Id.* ¶ 18.) According to the Greenburgh Town Code, the Zoning Map is "the final authority as to the current zoning classification of any land" in the Town. (*Id.* (citing Greenburgh Town Code § 285-7(A)).)

**III.     S&R's Pre-Acquisition Due Diligence**

Before purchasing the Property, S&R's representatives examined copies of the Zoning Map from 1997, 2000, 2003 and 2006, all of which showed the Property situated in the CA Zone; no earlier versions of the Zoning Map were available. (*Id*. ¶¶ 19-21.) S&R's representatives met with Peter Gaito ("Gaito"), a licensed architect experienced with the Town's zoning ordinance, who confirmed that the Property was in the CA Zone and permitted use would include a multi-family development. (*Id*. ¶ 22.) S&R's representatives and Gaito met with Thomas Madden ("Madden"), the Town's Deputy Commissioner of Community Development and Conservation, at the Town Hall. (*Id*. ¶ 23.) Madden confirmed that the Property was zoned CA, reviewed the substantive zoning restrictions, stated that there should be no obstacles to development of a multi-family complex and expressed no concerns regarding the development's potential impact on the environment, open space, the Nature Center or water and sewer capacity. (*Id*. ¶¶ 24-25.)

S&R hired an appraiser, Howard Gelbtuch ("Gelbtuch"), who engaged Gary Spilatro ("Spilatro"), a licensed architect with zoning experience throughout Westchester County, to provide confirmation that the Property was in the CA Zone. (*Id*. ¶¶ 27-28.) Spilatro consulted the Official Zoning Map and was told by an employee in the Department of Community Development and Conservation that the map controls a parcel's zoning designation. (*Id*. ¶ 28.) Gelbtuch, based upon his own study and Spilatro's confirmation, valued the Property at $10,200,000 as of September 22, 2005. (*Id*. ¶ 29.) On May 24, 2006 S&R, closed on the Property, believing it was located in the CA Zone. (*Id*. ¶ 30.)

## IV.     Demolition and Development Plans

After acquiring the Property, S&R assembled a development team.  Sullivan Architecture ("Sullivan"), the lead architect, conducted an independent review of the zoning designation and spoke with John Lucido ("Lucido"), the Town's Building Inspector, who confirmed that the Property was in the CA Zone. (*Id*. ¶¶ 31, 32.)  On October 18, 2006, Sullivan advised S&R that a maximum of 75 one-bedroom apartments could be built on the Property.  (*Id*. ¶ 33.)  S&R proceeded with the demolition of the single-family home and swimming pool that were on the Property.  To obtain the necessary demolition permit from the Town, S&R: hired Munson Company as surveyors to provide a new survey and topographical map; hired Galdun Frankel Environmental as environmental consultants to confirm that the Property contained no wetlands or water courses; retained Even Air, Inc. to perform necessary asbestos remediation and Testor Environmental Technologies, Inc. to perform air monitoring; had Consolidated Edison remove the electrical facilities; worked with the Town's Water and Sewer Department to perform a water-main disconnect; disconnected the phone and cable services; and had Robison Oil pump out the remaining oil in the above-ground oil tanks. (*Id*. ¶ 34.)  The Town issued the Demolition Permit on December 1, 2006, demolition was conducted from December 6 through 12, 2006 and the Town issued a certificate of completion of demolition work on December 15.  (*Id*. ¶¶ 36-37.)

Immediately after the demolition commenced, William Lawyer ("Lawyer"), the Executive Director of the Nature Center, told one of S&R's attorneys that the Nature Center would oppose any development of the Property containing more than one or two homes.  (*Id*. ¶ 38.)  Lawyer contacted Supervisor Feiner, who announced his opposition to development on the Property in a December 10, 2006 web log entry that stated his intention to "[i]nitiate effort to protect Greenburgh Nature Center

4

from possible development [at] 1 Dromore Road." (*Id*. ¶ 39 (alterations in original).)

## V.    The Pre-Submission Meeting with the Town's Department of Planning and Conservation

On December 19, 2006, S&R's representatives, Sullivan, S&R's engineer and one of S&R's attorneys met with Commissioner Stellato and Deputy Commissioner Madden. (*Id*. ¶ 40.) S&R presented Stellato and Madden with an "as of right" development plan that would require no variances because it satisfied the requirements for development in the CA Zone. (*Id*. ¶ 41.) The plan was for a four-story building with 37 two-bedroom apartments that included generous "green corridors." (*Id*. ¶ 42.) The plan also called for indoor parking, which would increase construction costs and decrease the rentable square footage in the building, but would minimize any potential impact on neighboring properties. (*Id*. ¶ 43.) Neither Stellato nor Madden raised any objections or questions as to the Property's location in the CA Zone or as to the plan's compliance with the zoning ordinance; Stellato's only issue was that the plan needed 5,000 square feet of open space within the building envelope and Madden's concern was that "Type I" disturbances should be avoided. (*Id*. ¶ 44.) At the conclusion of the meeting, Stellato privately warned S&R's representatives that they should be aware of recent public comments by other Town officials in opposition to development of the Property. (*Id*. ¶ 46.)

After the meeting, S&R's representatives and development team met Supervisor Feiner in the hallway and Feiner suggested that S&R speak to the Nature Center about the development plan; S&R asked Feiner to arrange such a meeting and attend. (*Id*. ¶ 47.) That day S&R's representatives also met Lucido by chance, who advised them that the Town would delay S&R's progress toward

approval of the development plan but eventually S&R would obtain the necessary approvals. (*Id.* ¶ 48.)

## VI.    The Proposed Moratorium

The Greenburgh Conservation Advisory Council voted on December 18, 2006 to assist the Nature Center in acquiring the Property in order to prevent development. (*Id.* ¶ 49.) After the New Year, the Town proposed a moratorium on development that was crafted to apply to the Property and virtually no other parcels, was not accompanied by land use studies necessary to justify a legitimate moratorium and was intended to coerce S&R to convey the Property to the Town or the Nature Center. (*Id.* ¶ 50.)

On January 1, 2007, on the Town's web site, Supervisor Feiner reiterated his prior opposition to development of the Property, stating that his 2007 goals included presenting the Town Board with options to protect the Nature Center from development that can have a negative impact and reaching out for partners to establish a possible acquisition of the Property. (*Id.* ¶ 51.) On January 4, Feiner stated on his web log that he would ask that a resolution for a public hearing on a development moratorium be placed on the agenda for the Town Board's January 12 meeting. (*Id.* ¶ 52.) *The Scarsdale Inquirer*, on January 5, reported that Board member Bass told Stellato in December to put the moratorium on the Board's January agenda and urged the Nature Center to support the moratorium. (*Id.* ¶ 53.) On January 7, *The Journal News* published an article with a statement by Feiner that if S&R wanted too much money for the Property the Town could try to acquire it by eminent domain. (*Id.* ¶ 54.)

On January 8, Stellato submitted to the Town Board a recommendation for a moratorium that

was based on a draft prepared by Michelle McNally ("McNally"), President of the Edgemont Community Council ("ECC"), an influential neighborhood association. (*Id*. ¶ 55.) At the Town Board meeting on January 10, the following comments were made: Robert Bernstein ("Bernstein"), President of the Greenridge Civic Association, a member organization of the ECC, stated that the ECC would do whatever it took to impose the moratorium; a Nature Center representative stated that the Center's board had voted unanimously to support the moratorium; McNally urged the Town to place the moratorium on the agenda as soon as possible; and Bill Greenawalt, Chairman of the Parks Commission, expressed his support for the moratorium. (*Id*. ¶ 57.) On January 12, a special Town Board meeting was held to consider enactment of a local law imposing a 180-day moratorium on the filing, acceptance and approval of all applications for site plan and subdivision approval in the CA Zone. (*Id*. ¶ 58.) There was no discussion of the moratorium's usefulness or purpose and there were no studies by the Town's Planning Commission. (*Id*.)

On January 17, S&R wrote to the Town Board to provide detailed objections to the moratorium. (*Id*. ¶ 60.) S&R's representatives and S&R's land-use counsel met with Feiner, Bass and several representatives of the Nature Center on January 18, 2007. (*Id*. ¶ 61.) S&R's representative stated that S&R could not financially afford a long moratorium but a representative of the Nature Center stated that the Center supported the moratorium. (*Id*.) S&R then proposed the following compromise to reduce the scope of the development in the hope of avoiding the moratorium: there would be no moratorium; S&R would donate a portion of the Property to the Nature Center in the form of a conservation easement; S&R would grant the Nature Center an option to purchase the Property at S&R's cost; and if the Nature Center or the Town did not raise the funds to purchase the Property they would support S&R's development of ten residential units on the

Property.  (*Id*.)  A Nature Center board member rejected the proposal, insisting the moratorium be enacted and that S&R gift the conservation easement to the Nature Center immediately and trust the Center to raise the necessary funds to purchase the Property.  (*Id*.)

On January 24, S&R wrote to the Town Board to request a meeting with the Board members and ask for a delay in enacting the moratorium.  (*Id*. ¶ 62.)  That day the Town Board had a public hearing on the moratorium at which: Stellato spoke in favor of the moratorium, indicating that residential development in the CA Zone should be 50% less dense; Bernstein stated that there were enough multi-family dwellings in the Town, that he did not want an increase in school district enrollment and that he was concerned about infrastructure, traffic and taxpayer burdens; McNally spoke about the spike in school enrollment and proposed a moratorium only as to residential development in the CA Zone.  (*Id*. ¶ 63.)

On January 27, S&R hosted a meeting attended by Bass, Sheehan, Bernstein, McNally and Nature Center President Sims.  (*Id*. ¶ 64.)  At the insistence of Bass, plaintiff's attorney was not informed of the meeting and, at the insistence of Sheehan, Feiner was not told about the meeting. (*Id*.)  At the meeting the participants reached the following agreement in principle: the ECC would create a new park district that would accept a conservation easement over part of the Property; if this new district was unable to raise the purchase money for the Property at a price equal to S&R's out-of-pocket costs, the Town and the ECC would support S&R's development of ten residential homes on the Property and the Property would be excluded from the moratorium.  (*Id*. ¶ 65.)

S&R wrote to the Town Planning Board on January 31, 2007 protesting the hasty process to enact the moratorium and the lack of any proper basis or analysis.  (*Id*. ¶ 66.)  On January 31, 2007 the Westchester County Planning Board also wrote a letter questioning the intent of the moratorium,

stating that "[t]he fact that the proposed moratorium singles out multi-family dwellings within the Edgemont School District as the only example of why this proposed moratorium is necessary, raises questions about the moratorium's intent." (*Id*. ¶ 67 (alteration in original).)

On February 2, S&R's application for Site Plan Approval for the Property, which called for 37 two-bedroom units on the Property, was formally submitted to the Town's Department of Community Planning and Conservation. (*Id*. ¶ 69.) The next day S&R's representatives hosted another meeting with Bass, Sheehan, Barnes, Juettner, Bernstein and McNally. (*Id*. ¶ 70.) At the meeting the parties reiterated the agreement reached at the January 27 meeting. (*Id*.) Bernstein stated that he would cause the ECC to purchase the property through a bond offering by an Edgemont Park District that he would create, and that the bond issue could be put to vote in September 2007. (*Id*. ¶ 71.)

At the February 7, 2007 Town Planning Board meeting, the moratorium was discussed and handouts were provided discussing the school district, student enrollment, population density, Central Avenue land use and vacant properties. (*Id*. ¶ 72.) On February 14, S&R's representatives, one of S&R's attorneys and two engineers met with Madden regarding the formal submission of S&R's development plan. (*Id*. ¶ 73.) No questions were raised regarding the Property's CA zoning classification. (*Id*.) On this day, S&R wrote to the Town Board again arguing that the moratorium should not be enacted and asking that the Board avoid "surrendering to political pressure and hysteria from certain members of the Edgemont community." (*Id*. ¶ 74.) One week later S&R's representative received a call from Bass in which Bass stated that he wanted to arrange a referendum to be placed on the September ballot to approve a bond offering for the new Edgemont Park District to purchase the Property and expressed confidence that the offering would be approved. (*Id*. ¶ 75.)

He asked S&R's representative to "trust" him and make a gift of part of the Property immediately, which S&R's representative declined to do.  (*Id.*)

## VII.   The Property's Zoning Designation

On February 26, 2007, Bass sent an email to subscribers of the Town's email program stating that the Property was actually zoned R-20, which is classified as a "One Family Residence District" in the Town Code.  (*Id.* ¶ 76.)  On the same day, Stellato issued a determination stating that the Property was situated in an R-20 zone.  (*Id.*)  Stellato directed Michael Lepre ("Lepre"), the Town Engineer, to alter the Zoning Map to, among other things, change the zoning designation of the Property from CA to R-20.  (*Id.* ¶ 77.)  There was no notice, public hearing or action of the Town Board before the alteration of the Zoning Map.  (*Id.* ¶ 78.)  No further steps were taken by the Board to enact the proposed moratorium.  (*Id.* ¶ 80.)

A March 2, 2007 article in *The Scarsdale Inquirer* reported that Sheehan discovered the zoning "mistake last week while tracing the map's evolution over the years."  (*Id.* ¶ 82.)  Bernstein was also quoted as stating that he felt the "town [was] on solid legal ground" but S&R could argue that the erroneous map was still the official one, and thus, the final authority.  (*Id.*)  Shortly after this Bass telephoned S&R's representative and asked if S&R would sell the Property for $2 or $3 million.  (*Id.* ¶ 83.)

## VIII.  The ZBA Proceedings

By letter to the Town dated March 9, 2007, S&R's attorneys requested documents pursuant to the New York Freedom of Information Law ("FOIL"), seeking all versions of the Town's Official

Zoning Map and all legislation relating to the CA Zone. (*Id.* ¶ 84.) The request was approved by the Town's public information officer on March 25. (*Id.*) In April 2007, S&R timely initiated an appeal to the ZBA from Stellato's determination that the Property was zoned R-20. (*Id.* ¶ 85.) On July 9, 2007, the deadline for submission of additional evidence in support of the appeal, S&R submitted an affidavit of its representative that recounted the meetings and hearings at which Town officials confirmed that the Property was in the CA Zone and the meetings with the Town, the Nature Center and the ECC regarding a possible compromise solution. (*Id.* ¶ 86.) The Town, however, did not make any responsive documents available to S&R until July 11, two days after the deadline. (*Id.* ¶ 87.) The Town's response to S&R's FOIL request included the Zoning Maps from 1932, 1952, 1957, 2000, 2006 and February 2007. (*Id.* ¶ 88.)

On October 19, 2007, the ZBA voted to sustain Stellato's determination that the Property was zoned R-20, with five members voting in favor and one member dissenting. (*Id.* ¶ 89.) On November 9, the written decision was filed in the office of the Town Clerk. (*Id.* ¶ 90.) The decision held that the Zoning Map, which had been changed in February, indicated that the property was zoned R-20 and S&R had failed to present documentation that established the Property was ever zoned CA. (*Id.*) The dissenting opinion concluded that the Town had failed to fulfill its duty to preserve the maps and had lost documentation, and it was wrong to place the burden on S&R to produce documentation showing the Property had been zoned CA. (*Id.*)

S&R presented a notice of claim to the Town and on September 10, 2007 appeared for an examination under oath to testify to the relevant facts of the claim. (*Id.* ¶ 91.) More than 30 days lapsed between the presentation of the claim and the commencement of this action. (*Id.* ¶ 92.) Plaintiffs filed this action on December 7, 2007, alleging takings, due process, equal protection,

declaratory judgment, Article 78 and FHA claims. Plaintiffs specifically allege that: S&R had a constitutionally protected property right to develop the Property in accordance with the CA Zone regulations or to receive just compensation for the Property and defendants deprived it of those rights; the Town failed to provide S&R with reasonable notice of the zoning regulations applicable to owners and prospective purchasers of real property; defendants discriminated against S&R in the application of the Town's zoning ordinance and the moratorium that was under consideration; S&R is entitled to a declaration that the Property is zoned CA; the ZBA decision was affected by an error of law, was arbitrary, capricious, irrational, unsupported by substantial evidence and an abuse of discretion; and defendants violated the FHA.

## DISCUSSION

### I. <u>Legal Standard</u>

A motion brought under FED. R. CIV. P. 12(b)(6) posits that the plaintiff has failed "to state a claim upon which relief can be granted." On a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all of the well-pleaded facts and consider those facts in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005); *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 583 (S.D.N.Y. 1993) (Conner, J.). In assessing the legal sufficiency of a claim, the court may consider only the facts alleged in the complaint, and any document attached as an exhibit to the complaint or incorporated in it by reference. *See* FED. R. CIV. P. 10(c); *Dangler v. N.Y. City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir. 1999); *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 69 (2d Cir. 1996).

On a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the issue is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks and citation omitted). The fact pleading standard is "a flexible 'plausibility standard' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007); *see Ello v. Singh*, 531 F. Supp. 2d 552, 562 (S.D.N.Y. 2007). Allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which plaintiff complains are insufficient as a matter of law. *See Martin v. N.Y. State Dep't of Mental Hygiene*, 588 F.2d 371, 372 (2d Cir. 1978).

The standard for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is "substantively identical" to the 12(b)(6) standard, except that the plaintiff has the burden of establishing jurisdiction in a 12(b)(1) motion. *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003); *see also Baruch v. Schmiegelow*, 175 Fed. App'x 422, 422 (2d Cir. 2006).

## II.     Plaintiffs' Constitutional Claims Are Not Ripe

Ripeness is rooted in Article III's case or controversy requirement and the prudential limitations on the exercise of judicial authority. *See Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005) (citing *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733 n.7 (1997)). "The ripeness doctrine's 'basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Id.* (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430

U.S. 99 (1977)). In *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985) the Supreme Court developed a two-prong ripeness test specific to land use disputes.

Before commencing suit, a land developer must obtain a final decision – a definitive position as to how it can use the property from the entity charged with implementing the zoning regulations. *See id.* at 186; *Murphy*, 402 F.3d at 348. This prong conditions federal review on a property owner submitting at least one meaningful application for a variance. *See Williamson County*, 473 U.S. at 190; *Murphy*, 402 F.3d at 348. The second *Williamson County* prong requires that a property owner seek compensation for an alleged taking before proceeding to federal court. *See Murphy*, 402 F.3d at 348 (citing *Williamson County*, 473 U.S. at 194). Although the Supreme Court developed the *Williamson County* ripeness test in the context of a regulatory takings challenge, the Second Circuit and other Circuits apply prong-one ripeness to equal protection and due process claims asserted in the context of land use challenges. *See Murphy*, 402 F.3d at 350-51; *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). Courts in this Circuit have also applied the ripeness doctrine to FHA claims. *See Woodfield Equities, L.L.C. v. Incorporated Vill. of Patchogue*, 357 F. Supp. 2d 622, 631-32 (E.D.N.Y. 2005) (applying ripeness doctrine to plaintiff's FHA, Americans with Disabilities Act and Rehabilitation Act claims); *Sunrise Dev., Inc. v. Town of Huntington*, 62 F. Supp. 2d 762, 770-71 (E.D.N.Y. 1999) (applying ripeness doctrine to plaintiff's FHA and Americans with Disabilities Act claims and determining plaintiff had received final denial of a special use permit).[1]

---

[1] Plaintiffs argue that courts are reluctant to withhold judicial review in the face of discriminatory municipal actions based upon a generally well-developed factual record, the actual harm experienced by the plaintiff in delaying judicial resolution and the relative lack of harm to a municipal defendant in defending its conduct. (Pls. Mem. Opp. Mot. Dismiss at 8.) However, because we find plaintiffs' claims are not ripe we choose not to exercise judicial

## A.    **Final Decision Requirement**

A final decision exists when a development plan has been submitted, considered and rejected by the governmental entity with the power to implement zoning regulations.  *See Goldfine v. Kelly*, 80 F. Supp. 2d 153, 159 (S.D.N.Y. 2000) (Conner, J.)  "A final decision is required because until one is reached, 'it is impossible to tell whether the land retains any reasonable beneficial use. . . .'" *Id*. (citing *Williamson County*, 473 U.S. at 186).  The Second Circuit identified four considerations that undergird prong-one ripeness: (1) it "aids in the development of a full record"; (2) "only if a property owner has exhausted the variance process will a court know precisely how a regulation will be applied to a particular parcel"; (3) "a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes, [t]hus . . . enforc[ing] the long-standing principle that disputes should be decided on non-constitutional grounds whenever possible; and (4) it "evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution."  *Murphy*, 402 F.3d at 348.

S&R did not seek a variance to develop a multi-family housing project on the Property once the ZBA determined that the Property was in an R-20 zone.  Plaintiffs argue that a variance is not necessary for finality, and S&R did obtain a final decision from the ZBA when it appealed the Town's decision to alter the Zoning Map.  (Pls. Mem. Opp. Mot. Dismiss at 7-8.)  Plaintiffs argue that the Town "killed" S&R's site plan application by re-zoning the Property and S&R appealed the change to the ZBA, which was the only legal remedy available.  (*Id*. at 9.)  Plaintiffs cite cases which they claim sustained constitutional land use claims under analogous circumstances.  (*Id*. at 7-8 (citing

---

review over them, particularly because we do not think the record is well developed at this time as we do not have a decision from the ZBA on S&R's proposed plans and S&R has not been delayed long in the application process for their project.

*County Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159 (3d Cir. 2006); *Lauderbaugh v. Hopewell Twp.*, 319 F.3d 568 (3d Cir. 2003); *Reahard v. Lee County*, 30 F.3d 1412 (11th Cir. 1994); *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354 (6th Cir. 1992); *Sharpvisions, Inc. v. Borough of Plum*, 475 F. Supp. 2d 514 (W.D. Pa. 2007)).)

The cases plaintiffs cite are either inapposite[2] or not analogous to the present case. In *Lauderbaugh*, the plaintiff's claim was ripe because she appealed a formal revocation of her building permit to the Township Zoning Hearing Board. 319 F.3d at 574-75. In *Reahard*, the plaintiffs sought what was in effect a variance, by requesting that the Town Board's administrative designee issue an "administrative interpretation" regarding their development. 30 F.3d at 1415-16. The plaintiffs then appealed that decision to the County Board of Commissioners, which affirmed the administrative determination, and the court determined that was a final decision. *Id.* at 1416. In *Bannum*, the plaintiff filed affidavits with the Board of Zoning Adjustments seeking to establish a non-conforming use variance. 958 F.2d at 1363. The plaintiff was informed that its proposed use was considered nonconforming by the city, and that a nonconforming use variance would not be issued. *Id.* In these cases the plaintiffs submitted a specific development plan that was rejected by the government entity with authority.

Even if, as plaintiffs argue, the Town "killed" S&R's development plan by re-zoning the

---

[2] In *County Concrete*, the plaintiff alleged that the Town made false public accusations against it during the application process and made false accusations about its operations in order to prejudice the plaintiff's ability to obtain plan approval. 442 F.3d at 166-67. The court determined that, under those circumstances, the plaintiff's claim was ripe. *Id*. at 167. Plaintiffs do not allege defendants engaged in any such conduct in this action. In *Sharpvisions*, plaintiff was challenging the imposition of conditional use approval as discriminatory in and of itself. 475 F. Supp. 2d at 522. Here plaintiffs are not challenging the process of approval, but rather the specific determination and actions of defendants.

Property, S&R did not submit its plan to the ZBA for a determination as to whether it could obtain a variance. The government entity vested with implementing zoning regulations, the ZBA, has not issued a final determination as to the use of the Property. *See* GREENBURGH TOWN LAW § 285-48 (authorizing the ZBA to grant variances and special permits). Although plaintiffs are correct that the ZBA issued an opinion as to the zoning classification of the Property, it has not issued a final decision as to S&R's development plan. Therefore, we do not know "whether the land retains any reasonable beneficial use. . . ." *Goldfine*, 80 F. Supp. 2d at 159 (internal quotation marks and citation omitted); *see Murphy*, 402 F.3d at 352 ("Bypassing the Zoning Board of Appeals and its hearing processes, which were statutorily designed for exploration and development of these sorts of issues, leaves the [plaintiffs'] alleged injuries ill-defined"); *Southview Assoc., Ltd. v. Bongartz*, 980 F.2d 84, 98 (2d Cir. 1992) (finding the plaintiff had not obtained a final decision, where its first application for a permit was denied but it was not precluded from submitting another proposal to the Board, because it was unclear whether the Board would deny approval for all uses that would enable the plaintiffs to derive economic benefit from the property); *Marathon Outdoor, LLC v. Vesconti*, 107 F. Supp. 2d 355, 362 (S.D.N.Y. 2000) (final-decision requirement not met because the plaintiff failed to seek a variance or waiver from the Board charged with enforcing the Zoning Resolution); *Kittay v. Giuliani*, 112 F. Supp. 2d 342, 349 (S.D.N.Y. 2000) (plaintiff failed to seek approval or variance from any governmental agencies regarding the applicability of certain regulations to its property, and without such a decision the plaintiff was inviting the court "to address important and potentially complex constitutional and regulatory issues in a vacuum"); *Cedarwood Land Planning v. Town of Schodack*, 954 F. Supp. 513, 526 (N.D.N.Y. 1997) (the plaintiff's takings claim was unripe because the Planning Board's determination that the plaintiff did not have vested rights under the density bonus provision

did not conclusively determine whether plaintiff would be "denied all reasonable beneficial use of its property") (internal quotation marks and citation omitted).

### 1.    **The Futility Exception**

The finality requirement is not mechanically applied, and a property owner may be excused from obtaining a final decision if pursuing an appeal or seeking a variance would be futile, for example if the "zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." *Murphy*, 402 F.3d at 349.

Plaintiffs argue that it would be a futile exercise to seek a variance to develop multi-family housing in a single-family zone. (Pls. Mem. Opp. Mot. Dismiss at 11.)  First, plaintiffs point out that the factual record "could not be more well-developed."  (*Id.*)  Next plaintiffs argue that the Town officials, the ZBA that the Town officials appointed, the Nature Center and the "local anti-housing Edgemont school group" have undermined and will continue to undermine S&R's development plans. (*Id.*)  Plaintiffs argue that forcing S&R to return to the ZBA will not further define the Town's position with respect to the Property because the Town has made it clear that it opposes any form of multi-family development and they want S&R to donate the property to the Nature Center.  (*Id*. at 11-12.)  Finally, plaintiffs argue that it would be futile to pursue a variance because the ZBA has already applied different evidentiary standards to the Town and S&R, has declined to enforce S&R's subpoena for Stellato and attempted to place the blame on S&R for the Town's poor record-keeping practices.  (*Id*. at 12.)

We do not agree that it would be futile for S&R to seek a variance or permit from the ZBA. Although S&R has faced opposition to its development plan from Town officials and influential

Town groups, it has not shown that the prospect of refusal from the ZBA would be certain. *See Goldfine*, 80 F. Supp. 2d at 159. Futility does not exist merely because of hostility to the developer's plans. *Id*. at 160-61; *see Tri-State Video Corp. v. Town of Stephentown*, 1998 WL 72331, at *4 (N.D.N.Y. Feb. 13, 1998) (noting that courts construe the futility exception narrowly, and the plaintiffs' claim that the Town and its officials were openly hostile to the plaintiffs' use of their property did not change the fact that the ZBA had not issued any ruling on the plaintiffs' proposed use and therefore the futility exception did not apply); *see also Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149, 161 (W.D.N.Y. 2006).

Plaintiffs have not shown that the ZBA "dug in its heels and made it clear that all such applications will be denied." *Murphy*, 402 F.3d at 349. The Town's alleged hostility and bias can not be imputed to the ZBA simply because the Town appoints the ZBA members. And the ZBA's decision makes no mention of whether it would consider a variance or special permit as to S&R's plans for the Property. (*See* Walker Decl., Ex. K.) We can not conclude that because the ZBA ruled against S&R on the zoning classification of the Property, it would necessarily deny it a reasonable beneficial use of the Property. The futility exception was created to "protect property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved." *Kittay*, 112 F. Supp. 2d at 349-50 (internal quotation marks and citation omitted). Therefore, the exception requires that at least one meaningful application be made in order to consider a claim ripe for adjudication. *Id*. S&R has not made any application to the ZBA and the ZBA has not made it clear that an application would be decided against S&R. Therefore, plaintiffs' claims are not ripe.

Although we are not unsympathetic to plaintiffs' complaints that the Town treated S&R with

hostility and unfairly changed the zoning classification of the Property after S&R's purchase and plans for the site, plaintiffs' claims are not ripe for our review. *See Dougherty*, 282 F.3d at 89.

### B.     State Compensation Requirement

Seeking a "'reasonable, certain and adequate provision for obtaining compensation,'" is required with respect to due process, equal protection and takings claims. *Goldfine*, 80 F. Supp. 2d at 161 (quoting *Williamson County*, 473 U.S. at 194; citing *Rivervale Realty Co. v. The Town of Orangetown*, 816 F. Supp. 937, 943 (S.D.N.Y.1993)). Even if plaintiffs withdrew the takings claim, as they suggest (see Pls. Mem. Opp. Mot. Dismiss at 14, n.9), the second prong of *Williamson County* applies to plaintiffs' due process and equal protection claims. Despite New York's provisions for obtaining compensation, plaintiffs have not alleged that they pursued an action in state court for compensation before filing this action. For this additional reason, plaintiffs' claim is dismissed as not ripe. *See Country View Estates @ Ridge, LLC v. Town of Brookhaven*, 452 F. Supp. 2d 142, 157 (E.D.N.Y. 2006) (noting that, despite the "reasonable, certain and adequate" provision for obtaining compensation from the State, plaintiff had not alleged any efforts to seek compensation in the courts of New York and finding that the takings, due process, equal protection and substantive due process claims were not ripe); *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 453 (S.D.N.Y. 1998) (Conner, J.) (noting that New York has established a procedure for pursuing just compensation and dismissing plaintiffs' takings claim because they had not yet pursued their claim in state court).

### III.     Plaintiffs' Declaratory Judgment and Article 78 Claims

An Article 78 proceeding must be brought in New York State court. See *Abato v. N.Y. City*

*Off-Track Betting Corp.*, 2007 U.S. Dist. LEXIS 41846, at \*29 (S.D.N.Y. June 7, 2007) (citing N.Y. C.P.L.R. § 7804(b).) Therefore, this Court does not have subject matter jurisdiction to hear such a claim. *See id.*; *Blatch ex rel. Clay v. Hernandez*, 360 F. Supp. 2d 595, 637 (S.D.N.Y. 2005). Plaintiffs argue that the allegations of the Article 78 claim are "inextricably intertwined" with the constitutional and FHA claims. (Pls. Mem. Opp. Mot. Dismiss at 40.) However, to the extent plaintiffs are requesting that the Court exercise supplemental jurisdiction, we decline to do so because we dismiss plaintiffs' federal claims. Likewise, plaintiffs' request for declaratory relief, specifically for a declaration that the property is zoned according to the 2006 Zoning Map, also arises under state law and we decline to exercise jurisdiction. *See Concerned Citizens v. N.Y. State Dep't of Envtl. Conservation*, 1997 U.S. App. LEXIS 36155, \*16 (2d Cir. Sept. 2, 1997) (internal citations omitted) ("[T]he Declaratory Judgment Act, 28 U.S.C. § 2201 (1994), does not enlarge the jurisdiction of the federal courts . . . and [] a declaratory judgment action must therefore have an independent basis for subject matter jurisdiction.").

## CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss is granted. Plaintiffs' claims are dismissed without prejudice.

SO ORDERED.

Dated: White Plains, New York
September 26, 2008

*William C. Conner*
Sr. United States District Judge

21